1
2
3

Talonya Adams
2 North Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: (602) 343-1838
talonya@gmail.com

4

*Plaintiff*

5

6

# IN THE UNITED STATES DISTRICT COURT

7

# FOR THE DISTRICT OF ARIZONA

8

Talonya Adams

Case No: CV-17-00822-PHX-DLR

9

Plaintiff,

10

vs.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CONTROVERTING STATEMENT OF FACTS**

11

12

Arizona Senate

13

Defendant.

14

15

16

(Assigned to Honorable Douglas L. Rayes)

17

18

19
20
21
22
23
24
25
26

Plaintiff Talonya Adams ("Ms. Adams") hereby respectfully submits: (a) her response to specific numbered paragraphs of the Arizona State Senate's *Defendant Statement of Facts in Support of Defendant's Motion for Summary Judgment* (ECF No. 103)[1], and (b) her objections to proffered declaration of Wendy Baldo (ECF No. __) and Jeff Winkler (ECF No. ___) in support of Senate's SOF (FIND A NAME). These responses are submitted solely for the purposes of Defendant's motion for summary judgment. Nothing

27

28

---

[1] Unless otherwise indicated, citations to "ECF No. ___" refer to documents filed electronically in *Talonya Adams v. State Senate,* Case No. CV-17-00822.

herein shall be deemed an admission of the truth, materiality, relevancy or admissibility of any Arizona Senate statement or declaration at trial or for any other purpose.

## TABLE OF CONTENTS

I.   PLAINTIFF'S   LOCAL   RULE   56.1(B)(1)   RESPONSE,   CONTROVERTING STATEMENT   OF   FACTS,   AND   OBJECTIONS   TO   DEFENDANT'S   SEPARATE STATEMENT   OF   FACTS   OFFERED   IN   SUPPORT   OF   THEIR   MOTION   FOR SUMMARY JUDGMENT……………………………………………………….3

1. **PLAINTIFF'S LOCAL RULE 56.1(B)(1) RESPONSE, CONTROVERTING STATEMENT OF FACTS, AND OBJECTIONS TO DEFENDANT'S SEPARATE STATEMENT OF FACTS OFFERED IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

1. *Defendant's SOF* ¶ 1: Plaintiff Talonya Adams was hired by the Arizona Senate Minority Democratic Caucus as a Policy Advisor in December 2012, with no prior experience as a policy advisor to a legislative body, at an annual salary of $60,000.

   **Partially admit.** Plaintiff, Talonya Adams was employed by the State of Arizona and worked at the Arizona State Senate, as a policy advisor in December 2012.

   **Disputed.**   The Arizona Senate Minority Democratic Caucus has no hiring authority in the Arizona State Senate and did not hire Ms. Adams. *Declaration of Talonya Adams ("Adams Declaration), attached as Exhibit 1, at* ¶ __ The Arizona State Senate Rules expressly state the appointment, terms and conditions of employment, compensation, discipline, and discharge of employees of the Senate shall be determined by the President. *Arizona Senate Rules, attached as Exhibit21, at* ¶ 2.  During her tenure at the Arizona Senate, Ms. Adams did not receive an annual salary of $60,000 at the Arizona State Senate. *Adams Declaration, attached as Exhibit 1, at* ¶ __ + W2's**.**  In 2000, while working in the Legal and Corporation Affairs Group at Microsoft, Ms. Adams gained lobbying and legislative tracking, drafting and advocacy experience. During law school in 2005, Ms. Adams worked alongside the government relations team where she further developed lobbying and public policy related experience at the Arizona State House and Senate, while working as a summer associate at Greenberg Traurig. *Id.* at ¶ __**.** Whether Ms. Adams was appointed or hired is a disputed material issue of fact. *Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction ECF 13* **1: 19-**; *Baldo Declaration (Doc. 13-1* ¶¶ 7, 9  attached as Exhibit 3.

2. *Defendant's SOF* ¶ 2: The previous month (November 2012) the Arizona State Senate Minority Democratic Caucus had also hired another Policy Advisor with no prior experience as a policy advisor to a legislative body, John Fetherston (Caucasian Male), at an annual salary of $47,000 ($13,000 *less than Plaintiff*).

**Partial Admit.**  Mr. Fetherston, a Caucasian Male, was recent graduate of Arizona State University with no prior experience professional work experience, legislative or otherwise (excluding an internship).

**Disputed.** The Arizona State Senate Minority Democratic Caucus has no hiring authority. *See Senate Rule 1, attached as Exhibit 2.* Ms. Adams did not receive an annual salary of $60,000 while working at the Arizona State Senate.  *Adams Declaration, attached as Exhibit X, at ¶ __.*

3. *Defendant's SOF* ¶ 3: Although the Plaintiff had a law degree, a law degree was neither a requirement nor necessary for the non-attorney policy advisor position for which she was hired and held for the entirety of her Senate employment (nor was she licensed by the Arizona State Bar at the time she was hired).

**Partially Admit.** Ms. Adams had a J.D. from Sandra Day O'Connor (2006) and was a licensed attorney in December 2012, at the time of hire and throughout her employment at the Arizona State Senate.

**Partially Dispute.** Ms. Adams was not in a non-attorney policy advisor position. *See Baldo Declaration, attached as Exhibit 3 ¶2*; *Defendant's Motion to Dismiss Doc. 13, 7:3-7.* The Arizona State Senate pays for bar dues for licensed attorneys. *See Reilly Response attached as Exhibit ___.* The Arizona State Senate paid Ms. Adams bar dues. *See Adams Declaration ¶ ___.*  The Senate had no job description for the Policy Advisor role Ms. Adams held. *See Defendant's Interrogatory Answers Nos. X and, attached as Exhibit X.* The Senate supply office prints business cards for its policy advisors, the Senate's business card for Ms. Adams

included attorney credentials: Talonya Adams, ESQ; Policy Advisor. *See Exhibit X.*

4. *Defendant's SOF* ¶ 4: In late August/early September 2014, Plaintiff advised her Senate staff leadership at the time (Democratic Caucus Chief of Staff Peter Silverman, Minority Leader Senator Anna Tovar, and Majority/Senate Chief of Staff Wendy Baldo) that she wanted to simultaneously pursue a Masters of Business Administration (MBA) degree through Thunderbird School of Global Management Executive MBA Program.

**Disputed.** In mid-August 2015, Ms. Adams met solely with Ms. Baldo to discuss the possibility of applying to the Executive MBA program at Thunderbird School of Global Management ("Thunderbird"). Ms. Baldo granted the approval and Ms. Adams then applied to Thunderbird and commenced panel interviews. Upon being accepted to Thunderbird, Ms. Baldo advised Ms. Adams to meet with Mr. Silverman, Senator Tovar and Senator Pancrazi and she complied. *Adams Declaration at* ¶ X.

5. *Defendant's SOF* ¶ 5: The First Term of this MBA program was scheduled to begin on September 13, 2014.

**Admit, subject to clarification**. Although an immaterial fact and irrelevant to this legal matter, the Thunderbird International Executive Masters in Business Administration (EMBA) twenty fourth cohort (E24) commenced on September 13, 2014. The cohort was comprised of 37 career professionals, who worked full-time and resided internationally or domestically in the United States that traveled to Glendale, Arizona roughly twice per month for the EMBA program. Ms. Adams traveled the shortest distance.

6. *Defendant's SOF* ¶ 6: Plaintiff's Senate staff leadership was supportive of the MBA opportunity, but had concerns about how Plaintiff could manager her

Thunderbird coursework—which included international travel weeks during legislative session—concurrently with her full-time Senate responsibilities.

**Partially Admit.** Ms. Baldo seemed to be supportive and granted employer approval for Ms. Adams to attend Thunderbird and expressed no concerns about how Plaintiff could manage her Thunderbird coursework or Senate responsibilities.

**Partially Disputed.** Ms. Baldo's statement on behalf of the "Senate staff leadership" lacks foundation, offer no direct knowledge of the alleged fact and is inadmissible hearsay.

7. *Defendant's SOF* ¶ 7: Legislative session is the most important period of the year for all Senators and staff.

**Disputed.** This alleged material fact lacks foundation. Ms. Baldo is not a Senator, nor does she staff committees. Ms. Baldo's conclusionary allegations without specific supporting facts is inadmissible.

8. *Defendant's SOF* ¶ 8: The workload of Senate policy advisors during legislative session is extremely heavy, requiring long working hours to meet the operational, workload, and staffing needs of the Members of their caucus and the committees they are assigned to staff.
**Admit.**

9. *Defendant's SOF* ¶ 9: Particularly during legislative session, the work of the Senate must come first.

**Disputed.** At the Arizona State Senate "family comes first." The Arizona State

Senate policy allows individuals to work for external employers during the legislative session. *See disclose additional employers; Adams Declaration (Add Lisette Flores, Silverman mediation for Superior Court); AZSEN474-AZSEN475 attached as Exhibit ___.*

10. *Defendant's SOF* ¶ 10: The legislative session begins the second Monday in January and typically runs until April, May or June.

   **Admit.**

11. *Defendant's SOF* ¶ 11: Plaintiff and Senate Chief of Staff Wendy Baldo signed a written Agreement confirming, among other requirements, that Plaintiff agreed that she "may not participate in field seminars or residence programs that would require absence from the Senate during legislative session.

   **Partially Admit.**  Plaintiff does not dispute that Defendant's Exhibit 6 is a true and correct copy of the employer approval agreement that Thunderbird International School of Global Management required as a precursor to admission. Nor does Plaintiff disputed that Ms. Baldo and Ms. Adams were the only signatories to the employer approval agreement.

   However, Plaintiff respectfully refers the Court to Plaintiff's Exhibit X for a complete and accurate statement of its contents. Specifically, ¶5 states: "subject to amendment language…

   The previously omitted language in ¶5 was written after Thunderbird rejected the initial proposed agreement as employer approval would require Ms. Adams to attend both residency weeks: September 2014 (interim) and May 2016 (graduation). Ms. Baldo agreed.  In exchange, Thunderbird agreed to allow Ms. Adams to travel with the future Fall 2015 executive cohort (E25). *See attached*

*AZSENXXX (Snag email); draft formation and final signed agreement.*

12. *Defendant's SOF* ¶ 12: The Agreement also granted Plaintiff the extraordinary option of being absent from the Senate on Fridays *during* legislative session, provided that she used her vacation time when she did so (vacation or other leave absence is not typically granted during legislative session).

   **Disputed.** The agreement was of no monetary value or tuition reimbursement. It offered no "extraordinary" option, as other policy advisors were allowed to engage in activities on Fridays during the legislative session was not unique to Ms. Adams. The Senate's characterization of the agreement differs from its actual content, while the Agreement speaks for itself.

13. *Defendant's SOF* ¶ 13: Plaintiff was granted this authorization provided that her work at the Senate would be her first priority, particularly during legislative session.

   **Disputed.** Disputed to the extent Defendant's characterization of the Agreement differs from its actual content, which speaks for itself. The agreement and email regarding graduation/residency week outlined the terms of the approval between Plaintiff and Arizona State Senate. *See Baldo email, attached hereto as Exhibit __.*

14. *Defendant's SOF* ¶ 14: Just two months later, and just after the November 2014 election which resulted in new Democratic Caucus staff leadership, Plaintiff approached her new Democratic staff leadership (Democratic Caucus Chief of Staff Jeff Winkler, Democratic Caucus Minority Leader Katie Hobbs, as well as Majority/Senate Chief of Staff Wendy Baldo) requesting to do—participate in international travel that would require extended absence from the Senate during the upcoming 2015 Legislative Session.

   **Disputed.** In late October/early December Ms. Adams met with Ms. Baldo to

discuss the Thunderbird School of Global Management/Arizona State University merger. If approved by the Higher Learning Commission, the fate and terms under which Ms. Adams contracted with Thunderbird were subject to revision. At that meeting, Ms. Baldo told Ms. Adams Mr. Silverman was leaving the Senate, to wait until his departure, then obtain approval from new caucus leadership and she would grant the approval. Ms. Baldo did not ever revoke the employer approval. *Adams Declaration*

15. *Defendant's SOF* ¶ 15: This request was denied.

**Disputed.** Senate alleged Ms. Adams continuously requested approval. The dates of specificity of "the request" that is denied is vague.

16. *Defendant's SOF* ¶ 16: Plaintiff accused her direct supervisor, Mr. Winker, of engaging in a "privacy breach" because he discussed her request with other individuals before denying it.

**Disputed.** Mr. Winkler notified Ms. Adams that he had shared her personnel request with non-Senate employees and sought their advice. Plaintiff .

17. *Defendant's SOF* ¶ 17: In 2014, conflicts had developed between Plaintiff and her initial direct supervisor, Peter Silverman.

**Disputed.** This is Senate's first time alleging such conflicts. There is not evidence in the record that supports a "conflicts" between Plaintiff and Mr. Silverman in 2014. Furthermore, the Senate's characterization of the testimony differs from its actual content, which speaks for itself.

18. *Defendant's SOF* ¶ 18: These conflicts continued with Mr. Silverman's successor, Jeff Winkler.

**Disputed.** This is Senate's first time alleging such conflict, none of which are supported by the record. Ms. Adams did not have a "continued" conflict or

"conflicts" with Mr. Winkler, related to any alleged conflict with Mr. Silverman. *See Adams Declaration.*

19. *Defendant's SOF* ¶ 19: The 2015 Legislative Session began on Monday, January 12, 2015.

    **Admit.**

20. *Defendant's SOF* ¶ 20: The Second/Spring Term for Plaintiff's MBA program began during the same week, on Friday, January 16, 2015.

    **Admit with clarification.** On January 16, 2015, a revised EMBA schedule commenced in accordance with the Arizona State University/Thunderbird merger.

21. *Defendant's SOF* ¶ 21: The first week of February 2015, Plaintiff began complaining to Mr. Winker and Minority Leader Hobbs that her timesheets should reflect all the time she spent working for the Senate, instead of just eight hours per day.

    **Disputed.** In December 2014, Mr Winkler assigned Ms. Adams to staff three committees, instead of two (including Government), all Election bills (formerly staffed by the Election subject matter expert), an intern to manage (rather than share), General Counsel bill folders that needed to be filed before the commencement of session and arrival of the new GC and random ad hoc projects. In January 2015, she inquired about the mounting unbalanced workload.

22. *Defendant's SOF* ¶ 22: She claimed that she was "working without compensation."

    **Undisputed, subject to clarification.** Ms. Adams was working at all time for less than her alleged $60,000 annual "salary" or salary equivalent. *Adams Declaration,*

*attached as Exhibit ___.*

23. *Defendant's SOF* ¶ 23: Plaintiff also sought to discuss decreasing her Legislative Session workload.

**Disputed.** As the only African American professional at the Arizona State Senate, Plaintiff sought to inquire as to why Mr. Winker was shifting her Caucasian male counterparts responsibilities to her and lessening their work load, while creating a work imbalance.

24. *Defendant's SOF* ¶ 24: Later that same week, Plaintiff complained to Ms. Baldo that she believed she was being "set up to fail"—not because of her race or sex, but because people were unhappy with her participate in the Thunderbird MBA program.

Disputed. Ms. Adams complained to Ms. Baldo about an imbalanced and increasing workload, gender issues related to Mr. Winkler's treatment of women in the basement. *Adams Declaration.*

25. *Defendant's SOF* ¶ 25: The following week, on Thursday, February 12, 2015, the media published the salaries of all Senate staffers.

**Partially Admit.** On February 12, 2015, the Capitol Times published the salaries of Senate policy advisors. AZSEN0393-AZSEN0395.

26. *Defendant's SOF* ¶ 26: Plaintiff had previously been instructed that the proper protocol to raise Democratic Caucus staff/personnel issues was to raise them with her staff leadership: first Democratic Caucus Chief of Staff Jeff Winkler; then Minority Leader Hobbs and then Majority/Senate Chief of Staff Wendy Baldo. However, on Friday, February 13, 2015, Plaintiff emailed the entire Democratic leadership in the Senate (six Senators), demanding "a meeting with all of you on or

before Monday, February 16, 2015, to discuss my current status on the Democratic Caucus staff.

**Disputed.** The Arizona State Senate did not have any formal written policy explicitly describing the protocol to raise personnel issues.  In December 2014, Senator Bradley was introduced as the "staff liaison" and his role would be to discuss staff related matters with staffers.

27. *Defendant's SOF* ¶ 27: Minority Leader Hobbs responded to Plaintiff that her email was inappropriate; and that she, Mr. Winker, and Ms. Baldo all had met with Plaintiff regarding her concerns and that if Plaintiff had remaining concerns she would initially address them with her supervisor, Mr. Winkler.

**Disputed.** Ms. Hobb's email stated a meeting was not appropriate, not the email itself. The majority of the Senators on the email, excluding Hobbs and Quezada, had spoken with an encouraged Ms. Adams to send an email to meet with the entire leadership. *See Adams Declaration, AZSEN0384 attached as Exhibit __.*

28. *Defendant's SOF* ¶ 28: Plaintiff apologized but nevertheless responded to the entire group of Senators again by informing Mr. Winkler that she wanted to discuss a salary increase.

**Undisputed with clarification.** Ms. Adams, the only African American policy advisor in both chambers of the Arizona State Legislature, raised concerns about the fact that her workload has substantially increased (greater than 1/3 of all Senate bills were in her committee) and she had not received a raise in the three sessions that she had been at the Senate.

29. *Defendant's SOF* ¶ 29: At 9:36 p.m. that same evening, Plaintiff also abruptly

advised her Senate staff leadership that she was planning to leave town to travel to Seattle relating to a family health matter, and would like to have a discussion with Mr. Winkler on Monday morning.

**Partially admit.** In a single response to Ms. Hobbs, Democratic leadership and Winkler, Ms. Adams confirmed that she would in fact be traveling to Seattle to be with her son due to a health related emergency issue and she inquired about FMLA protocols. *AZSEN0319;*

**Partially Disputed.** The notice was not abrupt. Notice had been given to Mr. Winkler, Ms. Hobbs and Ms. Baldo earlier in the week, on more than one occasion.

30. *Defendant's SOF* ¶ 30: Mr. Winkler responded by email at 9:52 p.m. that he would be in a by 7:30 if not earlier on Monday morning and would clear his schedule to meet with her.

**Admit.** To the extent that this is a correct quotation of Mr. Winkler's schedule. However, Ms. Baldo's declaration of Mr. Winkler's response is inadmissible hearsay.

31. *Defendant's SOF* ¶ 31: From Mr. Winkler's perspective as Plaintiff's supervisor, the primary purpose of the Monday morning meeting was to discuss a handoff of Plaintiff's responsibilities for the period of time that she would be absent during legislative session.

**Dispute.** On February 13, 2015, Ms. Adams was terminated, after asking for a raise. On Monday morning before office hours, Mr. Winkler was prepared to notify Ms. Adams that she was fired. Furthermore, no other policy advisor were required to meet a supervisor in-person during a medial emergency of a child. *Adams Declaration* ¶ __.

32. *Defendant's SOF* ¶ 32: In follow-up to Mr. Winker's 9:52 pm email, Plaintiff did not ever indicate to Mr. Winkler that she would not be in the office to meet with him the morning of Monday, February 16, 2015, or to speak with him by phone that morning.

**Admit, with clarification.** Ms. Adams travelled to Seattle and then called Mr. Winkler at the scheduled time of 7:30 am on Monday, February 16, 2015.

33. *Defendant's SOF* ¶ 33: Plaintiff did not come to work on Monday, February 16, 2015.

**Admit, with clarification.** Ms. Adams was on approved medical leave and did not come into the office on Monday, February 16, 2015. However, she did work remotely, beginning with a scheduled call to Mr. Winkler at 7:30 am on Monday, February 16, 2015.

34. *Defendant's SOF* ¶ 34: Instead, she left a voicemail on the Caucus mail line advising that she was out of town and would not be available for work-related calls.

**Disputed.** Plaintiff called Mr. Winkler at the office at 7:27 am Arizona time, per his 9:52 pm email on Friday night. Mr. Winkler did not answer. Then Ms. Adams left a voice message notifying Ms. Ramirez that she would be out of the office due to a medical emergency with her child, Jeff was aware and requested that Mr. Winkler call her and if he did not get her, please leave a message and she would return the call when she became available. The practice for "calling in sick" was to notify Ms. Ramirez who updated the IN/OUT board and Chief of Staff.

35. *Defendant's SOF* ¶ 35: Mr. Winkler discovered that the substantive briefing work

14

that Plaintiff already should have completed in order to hand it off for that day and the rest of that week had not been done.

**Disputed.** This claim is unsubstantiated by the record.  Plaintiff had completed any and all substantive briefing work, based upon then existing agendas prior to her departure to care for her son.  Mr. Winkler expected Ms. Adams was work on revised agendas and bills that were posted while she was out of the office on medical leave—a request not required of any other policy advisor. *See AZSEN0368, AZSEN0314-AZSEN315; AZSEN317-318,*

36. *Defendant's SOF* ¶ 36: Mr. Winkler also learned that this failure by Plaintiff to timely complete her substantive briefing work had happened during prior weeks of the 2015 Legislative Session as well.

**Disputed.** During the 2015 Legislative Session, Plaintiff worked extensive hours and timely completed her "substantive" briefing work, as well as ad hoc projects Mr. Winkler began to spontaneously adding to her workload; three committees, all election and election related bills heard in the House of Representatives Elections Committees, GC bill-folders, Senator Bradley's omnibus bill and any other weekly ad hoc projects Mr. Winkler could think of. This is a new alleged material fact that is not supported by the record.

37. *Defendant's SOF* ¶ 37: The morning of Monday, February 16, 2015, Mr. Winkler left Plaintiff an urgent message to contact him.

**Disputed.** The morning of February 16, 2015, Mr. Winkler did not call Plaintiff, nor did he send an urgent message to contact him that morning, nor did Mr. Winkler return Ms. Adams call from 7:27 am the morning of February 16, 2015.—the time he said he would clear his schedule for.

38. *Defendant's SOF* ¶ 38: Mr. Winkler did not receive a call back from Plaintiff until the afternoon of Monday, February 16, 2015.

**Partially Disputed.**  Mr. Winkler did not call Plaintiff on the morning of February 16, 2015.

**Partially Admit.** Plaintiff did call Mr. Winkler in the morning and several times in the afternoon on Monday, February 16, 2015.

39. *Defendant's SOF* ¶ 39: Although Mr. Winkler was understanding regarding Plaintiff's family health matter, he advised her that the manner in which she had mishandled the completion/transition of her responsibilities, particularly during legislative session, was not acceptable.

**Disputed.** Ms. Adams had not mishandled the completion of her responsibilities during the legislative session, nor did Mr. Winkler allege such. Nor did Ms. Adams did not mishandle the "transition" of her responsibilities, *during an emergency,* particularly during legislative session, nor did Mr. Winkler allege or advise such during the call. ***Adams Declaration***

40. *Defendant's SOF* ¶ 40: Plaintiff advised him at that time that she would work with and assist her intern regarding the uncompleted substantive briefing work.

**Disputed.** Ms. Adams had left no uncompleted substantive briefing work. *Adams Declaration*

41. *Defendant's SOF* ¶ 41: She did not, and thus Mr. Winkler, Plaintiff's intern, and additional research staff personnel were required to complete Plaintiff's uncompleted substantive briefing work.

**Disputed.** Ms. Adams had left no uncompleted substantive briefing work. Although practices were to cover policy advisors workload in the event of an emergency or other leave, Ms. Adams had been informed that her intern was given

no assistance.

42. *Defendant's SOF* ¶ 42: During the week of February 16, 2015, Plaintiff's Senate staff leadership met and discussed her conduct and having lost trust and confidence in her.

**Disputed.** The vague statement regarding "conduct", "lost of trust" and "confidence in her" are brand new claims asserted by the Senate. These statements are unsupported by the facts.

43. *Defendant's SOF* ¶ 43: In follow-up to these discussions, the joint decision to terminate Plaintiff's employment ultimately was made at the end of the week on Friday, February 20, 2015, by her Senate staff leadership of Majority Chief of Staff Wendy Baldo, Minority Chief of Staff Jeff Winkler, and Minority Leader Katie Hobbs.

Disputed. Ms. Adams' medical benefits were terminated on February 13, 2015 and she was *notified* of her employment being terminated on February 20, 2015. The decision to terminate Ms. Adams on February 13, 2015 was made on or before February 13, 2015. (Adams Dclr)  The decision to terminate Ms. Adams while she was away on medical leave with her ill son, was made on or before February 20, 2015. Pursuant to Senate Rule 1, only the President of the Senate, Andy Biggs, has the power to terminate a Senate employee.

44. *Defendant's SOF* ¶ 44: Prior to her February 20, 2015 termination, Plaintiff did not ever express any belief to any of these three decision makers that she was being discriminated against with respect to her pay, workload or otherwise on the basis of her race or sex, nor were any of them aware of any such complaints by Plaintiff.

**Disputed.** Ms. Adams had spoken to Ms. Baldo on two occasions re: race discrimination, gender discrimination, workload and disparate treatment in the "basement" and at the Senate. Ms. Adams had had several conversations with Ms. Hobbs regarding gender discrimination at the Arizona Senate.

45. *Defendant's SOF* ¶ 45: Plaintiff alleges that she "was discriminatorily paid less than non-African American male employees performing the same services and job duties."

**Admit.**

46. *Defendant's SOF* ¶ 46: Plaintiff was at all times paid better than, or comparable to, other similarly situated Democratic Caucus policy advisors despite the fact that she was at all times the least experienced of all such policy advisors.

**Disputed.** Ms. Adams was not paid better than or comparable to other similarly situated J.D. holding and/or licensed attorney policy advisors. Ms. Adams was not the least experienced of all policy advisors, although the second to last hired at the time of her first termination (2/13/2015).

47. *Defendant's SOF* ¶ 47: In December 2012, when Plaintiff was hired at an annual salary of $60,000, there was only one other Democratic Caucus policy advisor with Plaintiff's same job responsibilities and title (solely a "policy advisor") and with Plaintiff's same level of prior legislative staff experience (none): John Fetherston (a Caucasian male), hired the month before Plaintiff (November 2012) at an annual salary of $47,000 -- $13,000 *less* than Plaintiff.

**Disputed.** Plaintiff did not receive an annualized salary of $60,000 during her tenure at the Senate. Ms. Adams' job responsibilities are a disputed material fact, as the Senate claims in it does not have a job description for Ms. Adams. *See Initial Disclosure*

*Statement at ___.*  Plaintiff had prior public policy and legislative lobbying/advocacy experience, a law degree and was a licensed attorney, in a public policy role, for which no job description exists. Mr. Fetherston was a non-attorney, without a law degree working in a non-attorney policy advisor role.

48. *Defendant's SOF* ¶ 48: In December 2012, there was only one additional Democratic Caucus policy advisor with Plaintiff's same job responsibilities and title (solely a "policy advisor"), Jeff Winkler (a Caucasian male). Mr. Winkler had 23 more months of legislative staff experience than Plaintiff, including two previous Legislative Sessions.

**Disputed.** Plaintiff had prior public policy and legislative lobbying/advocacy experience, a law degree and was a licensed attorney, in a public policy role, for which no job description exists.

49. *Defendant's SOF* ¶ 49: Mr. Winkler was hired in January 2011 at an annual salary of $47,000 ($13,000 less than Plaintiff).

**Disputed.**  Immaterial fact, as Ms. Adams was not hired by the State of Arizona to work at the Arizona State Senate until December of 2012. Mr. Winkler is not a comparator as he is a non-attorney, non-law degree holder working in a non-attorney policy advisor role.

50. *Defendant's SOF* ¶ 50: In December 2012, the same month Plaintiff was hired, Mr. Winkler received a salary increase to $60,000 (the same as Plaintiff).

**Admit subject to clarification**. In December 2012, Mr. Winkler, a non-attorney policy advisor, received a $13,000 salary increase after 23 months of "legislative staff experience", which included two Legislative Sessions.

51. *Defendant's SOF* ¶ 51: There were two other Democratic Caucus policy advisors

on staff in December 2012 when Plaintiff was hired, but they performed roles and responsibilities in addition to their policy advisor roles. Patricia Osmon started with the Legislature in 1997 and had a dual title and responsibilities as both a Senior Policy Advisor as well as Staff Attorney, and received an annual salary of $81,915. Aaron Latham was hired in January 2011 and also had a dual title and responsibilities as both Director of Communications as well as a policy advisor. Nonetheless, Mr. Latham received an annual salary of $60,000—the same as Plaintiff. Lastly, in January 2015, Lisette Flores, started as both General Counsel to the Democratic Caucus as well as policy advisor at an annual salary of $80,000.

52. *Defendant's SOF* ¶ 52: In June 2013, following passage of the State of Arizona Personnel Reform in September 2012, all eligible state of Arizona employees (not just Senate employees) who had been employed prior to September 2012 received a 5% salary increase. *Not true.* Mr. Winkler, Mr. Latham, and Ms. Osmon were eligible for and received this 5% salary increase, but neither Plaintiff nor John Fetherston were eligible because neither of them were State of Arizona employees prior to September 2012.

**Disputed.** Basis of eligibility for 5% salary increase was not solely date of hire—it required "covered" employees to surrender 'civil service protections' in exchange for a 5% one-time salary increase. Senate alleges all political/legislative employees are "uncovered" employees—and ADOA alleges such ARS 41-XXXX staffers are not subject to "covered" or "uncovered" status. Therefore, unclear how or why or whether raise was given as a camouflage way to.

53. *Defendant's SOF* ¶ 53: Other than this increase in June 2013, which raised Mr. Winkler's salary from $60,000 to $63,000, no other salary changes occurred for Mr. Winkler or Mr. Fetherston until the end of 2014.

**Partially Admit.** Plaintiff admits Mr. Winker and Mr. Fetherson received salary

increases in two consecutive years, while she received no salary increase in any year that she worked at the Arizona State Senate. However, Mr. Fetherston and Mr. Winkler, while treated better than Ms. Adams in regards to salary increases, vacation accrual time, committee assignments, workload distribution and compensation time, neither are her true comparators. Ms. Adams true comparators are other law degree holding and/or licensed attorneys that staffed the same committees or subset of committees staffed by Ms. Adams and received nearly a 30-40% premium in pay. Ms. Adams comparator is Mr. Bogart (Caucasian male) hired three business days after Ms. Adams was fired) and received a $40,000 annual salary to do Ms. Adams job, against Ms. Adams alleged $60,000 annual salary.

54. *Defendant's SOF* ¶ 54: In November 2014, Mr. Winker was selected to be Democratic Caucus Chief of Staff (a position for which Plaintiff did not apply), while also continuing to maintain some policy advisor responsibilities, and thus his salary was increased to $95,000.

**Disputed.** Patsy Osmon, 1X-year Staff Attorney and Policy Advisor was selected to be the Democratic Chief of Staff and General Counsel—Ms. Hobbs gave the role to Jeff Winkler.  It is undisputed that Ms. Adams did not apply for the Chief of Staff role.

55. *Defendant's SOF* ¶55: In December 2014, Mr. Fetherston received a salary increase from $47,000 to $52,000, still $8,000 *less* than Plaintiff's annual salary of $60,000.

**Admit, subject to clarification.** Mr. Fetherston, a non-attorney policy advisor, received a $5,000 pay increase after 24 months of "legislative staff experience", which included two Legislative Sessions.

56. *Defendant's SOF* ¶ 56: On July 23, 2015, five months after being terminated,

Plaintiff filed an EEOC Charge of Discrimination claiming unequal pay/discrimination (based on race) and retaliation.

**Disputed.** Plaintiff's EEOC Charge of Discrimination dated June 25, 2015, made claims regarding unequal pay, sex and racial discrimination and retaliation.

Plaintiff checked the boxes for race, sex, retaliation. Due to a clerical error, the sex charge box was subsequently added.

57. *Defendant's SOF* ¶ 57: Plaintiff's Charge was dismissed by the EEOC on September 26, 2016.

**Disputed**. The EEOC issued Plaintiff a Notice of Right to Sue without conducting a full investigation. The EEOC issued no determination on the merits of case. The EEOC contacted none of Ms. Adams witnesses. Plaintiff respectfully refers the Court to Plaintiff's Exhibit X, for an accurate copy of Ms. Adams administrative remedy filing.

### CONTROVERTING STATEMENT OF FACTS

2.  Ms. Adams was required to resign her role as an elected precinct committeeman as a condition precedent to employment at the Arizona Senate.

3.  Mr. Winkler (Caucasian male) was an elected precinct committeeman at time of hire in 2011 to present.

4.  During her tenure, Ms. Adams was the only African American policy advisor and/or lawyer working in either chamber of the Arizona State Legislature.

5.  In 2013, Ms. Adams received less compensation time that all other similarly situated policy advisors.

6.  In 2013, Ms. Adams did not receive a salary increase, although her similarly situated counterparts did.

7.  In 2014, Ms. Adams did not receive a salary increase, although her similarly situated and non-similarly situated counterparts did.

8.  In October 2014, Thunderbird School of Global Management and Arizona State University were granted approval to merge.

9.  The ASU/Thunderbird merger required the current E24 cohort to complete all course work within the 20-month term, on or before May 2016 and disallowed recruitment any future Thunderbird cohort.

10. Upon notification, Ms. Adams sought to amend the employer approval agreement, as agreed upon by the parties in ¶ 5.

11. Ms. Baldo requested that Ms. Adams seek approval from new leadership, Ms. Hobbs.

12. Ms. Adams met with Ms. Hobbs at Ms. Baldo's directive.  Ms. Hobbs transferred the request to Mr. Winkler.

13. Mr. Winkler shared the request with former Senate employees and several other third parties, without a business need to know and then denied the request.

14. In December 2014, Ms. Adams was encouraged to apply for a General Counsel role. Ms. Adams was the most qualified and the only candidate with legislative experience, yet a non-African American female, with no legislative experience, was hired to fill the role and allowed to maintain her employment during the legislative session.

15. In 2015, Ms. Adams did not receive a salary increase, although her similarly situated and non-similarly situated counterparts did.

16.

17. On Friday, February 13, 2105, Ms. Adams spoke with several Senators regarding pay disparity, workload disparity and expressed concerns regarding discriminatory treatment that seemed to be happening to the only African American attorney and/or policy advisor working in either chamber of the Arizona State Legislature.

She was encouraged to schedule a meeting and she did.

18. On Friday, February 13, 2015, Ms. Adams was notified that she was the only policy advisor that had never received a raise.

19. On that same date, Ms. Adams requested a salary increase.

20. In response, the Arizona State Senate terminated Ms. Adams employment and benefits on Friday, February 13, 2015.

21. Monday, February 16, 2015 was federal holiday and all working Senate employees received compensation time, except Ms. Adams.

22. Ms. Adams was granted permission to be on medical leave with her son.

23. Mr. Winkler required Ms. Adams worked the entire week of February 16, 2015 while out on leave, yet she received no holiday pay for Monday, February 16, 2015 or regular pay for hours worked the week of February 16, 2015.

24. On February 20, 2015, Ms. Adams, while on approved medical leave, was terminated over the telephone because "her services were no longer needed."

25. On February 25, 2015, Mr. Bogart (Caucasian male) was hired replace Ms. Adams at a salary nearly $40,000 more than Ms. Adams.

26. On Ms. Adams was notified that her employment had been terminated on February 20, 2015.

27. In March 2015, Ms. Adams filed an unemployment insurance claim and was approved, because the Senate did not contest.

28. In late Spring, the Senator Ableser attempted to negotiate a settlement with Ms. Adams, if she "didn't sue" the Senate for discrimination.

29. During Ms. Adams tenure at the Arizona State Senate, the Senate had no employer policy handbooks or supervisor manuals.

30. During Ms. Adams tenure at the Arizona State Senate, the Senate had no written policy concerning diversity.

31. During Ms. Adams tenure at the Arizona State Senate, the Senate had no written

policy concerning equality employment practice.

32. Ms. Adams had no disciplinary record.

33. Ms. Adams had not received written complaints or other documents criticizing plaintiff's workplace conduct.

34. Prior to filing an EEOC complaint, Ms. Adams had no knowledge of Mr. Winkler's allegations that she had failed to complete "substantive briefing materials' at any time during her tenure at the Arizona State Legislature.

35. Prior to March 2018, three years after her termination, Ms. Adams had not received written complaints or other documents criticizing plaintiff's work performance.

36. Ms. Adams frequently received praise regarding her job performance.

37. Ms. Adams did not ever receive a performance evaluation.

38. The Arizona State Senate had not taken disciplinary action against Ms. Adams.

39. Arizona Senate does not reward its female attorneys equally when compared to their male counterparts performing equal or substantially equal work.

40. Instead, Arizona Senate systematically pays female attorneys less than male attorneys and policy advisors.

41. Not only are Arizona Senate male policy advisors paid more (in base salary and in bonuses), they are routinely given higher profile work assignments, and are recognized for their accomplishments, while female attorneys are not.

42. Arizona State Senate advances the careers of its male attorneys more quickly than its female attorneys.

RESPECTFULLY SUBMITTED this 30th day of May, 2018.

By: /s/ Talonya Adams
Talonya Adams, *Plaintiff*

Cross Claim.

Here, Ms. Adams unquestionably established the *McDonnell Douglas* factors for a prima facie case: (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action (fired on 2/13/15 and again on 2/20/15), and (4) other employees with qualifications similar to her own were treated more favorably. *See Sischo-Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1109 n. 7 (9th Cir.1991); *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817 (1973).

- •

Once Ms. Adams established her prima facie case, the burden then shifted to the Senate to articulate nondiscriminatory reasons for the allegedly discriminatory conduct. *See id.* Arizona Senate, in its motion for summary judgment, produced evidence that it terminated Ms. Adams because…

The Supreme Court's has held that the plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

**What additional showing is necessary.**   We have said that the plaintiff "need produce very little evidence of discriminatory motive to raise a genuine issue of material fact." *Lindahl,* 930 F.2d at 1438; *see also, Strother v. Southern Cal. Permanente Med. Group,* 79 F.3d 859, 870 (9th Cir.1996) (quoting *Lindahl*); *Warren v. City of Carlsbad,* 58 F.3d 439, 443 (9th Cir.1995) (quoting *Lindahl*); *Sischo-Nownejad,* 934 F.2d at 1111 (when a plaintiff introduces "direct or circumstantial" evidence "a factual question will almost always exist with respect to any claim of a

1

nondiscriminatory

2

[150 F.3d 1221]

3    reason"); *Lowe v. City of Monrovia,* <u>775 F.2d 998</u>, 1009 (9th Cir.1985) ("[a]ny indication

4    of discriminatory motive ... may suffice to raise a question that can only be resolved by a

5    factfinder").

6

7

8

9    All of the evidence supporting the employer's proffered reasons came from statements,

10   depositions, and declarations prepared after the employment decision was made and

11   while this litigation was in progress. This alone is not disqualifying. "Simply because an

12   explanation comes after the beginning of litigation does not make it inherently

13   incredible." *Lindahl,* 930 F.2d at 1438. The evidence in this record of the

14   contemporaneous reasons for Ms. Adams termination, however, is inconsistent in

15   material ways with the statements upon which the employer relies.

16

17   In their declarations prepared for litigation, Guthier and Ruschman explain that they

18   selected Rossi for the Wesson position because he had demonstrated creativity in

19   marketing and they believed he would work well with both sales and marketing

20   personnel. They explain further that they did not select Godwin because Guthier had

21   concerns about Godwin's ability to get along with Ruschman and the sales force. As to

22   the Rosarita position, Guthier and Ruschman assert that they selected Smith not only

23   because of his marketing experience, but also because of his easygoing personality.

24

25   Although the employer's declarations and depositions indicate that "creativity" was the

26   most important criterion for selecting the male Wesson marketing manager, the criterion

27   of "creativity" does not appear in the contemporaneous memorandum prepared at the

28   time of the selection. Although "shifting explanations are acceptable when viewed in the

context of other surrounding events ... such weighing of the evidence is for a jury, not a judge." *Payne v. Norwest Corp.,* 113 F.3d 1079, 1080 (9th Cir.1997).

Godwin's indirect evidence of discriminatory motive, as well as her direct evidence was sufficient to raise genuine issues of fact as to whether Hunt Wesson's nondiscriminatory explanations were the true reasons or whether they masked discriminatory motives. *See St. Mary's,* 509 U.S. at 502, 113 S.Ct. 2742; *Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993). We therefore conclude that summary judgment should not have been granted.

Sex Claim.

The court does not consider dispositive that Davis checked only the box for discrimination based on sex, and did not check the box for retaliation. *See Pacheco v. Mineta*, 448 F.3d 783, 792 (5 Cir. 2006) ("To be clear, we do not require that a Title-VII plaintiff check a certain box or recite a specific incantation to exhaust his or her administrative remedies before the proper agency."). The substance of an EEOC charge, not its form, is the key characteristic for analysis.

*Claims are reasonable, meritorious and founded in good faith.*
    I.   Discrimination

a. Race (Prima Facie)
   i. Member of a protected class
      1. *Plaintiff, a female African American began her employment with the Arizona State Senate in December 2012 as a Policy Advisor.*
         a.
   ii. Qualified for her job
      1. *Plaintiff was a strong performer who did not receive any negative criticism (regarding her work performance) during her employment.*

   iii. Suffered an adverse employment action; and
      1. Denied salary increase
         a. 2013 Ms. Adams had 1 session, no salary increase.
         b. 2014 Ms. Adams had 2 sessions, no salary increase.
         c. 2015 Ms. Adams was entering 3 session, no salary increase.
      2. Denied General Counsel role
      3. Only candidate with legislative experience
      4. Given other's work.
      5. Termination
   iv. Was treated less favorably than other similarly situated employees outside of her protected class  (McDonnell Douglas)
      1. Claim #9—job responsibilities, heavier workload
      2. Claim#10—Elections Cmte.
      3. Claim 11—only Policy Advisor did not receive a pay raise.
      4. Claim 12—requested raise.
      5. Claim 13—claims had been address, were a lie.
      6. Claim 14—
b. Employer's articulations of legitimate nondiscriminatory reason for the challenged action
   i. Job abandonment
   ii. Insubordination
c. Pretext
   i. A discriminatory reason more likely motivated the employer; or
   ii. indirectly by showing that the employer's proffered explanation is unworthy of credence.
      1. Must be both "specific and substantial to over the legitimate reasons put forth by" the employer.
d. Pretext means more than a mistake on part of the employer; pretext means a lie, specifically a phony reason for some action.

29

i. such weaknesses, implausibilities, inconsistencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence. (Dept of Fair Emp't

e. Sex

II. Retaliation
   a. Adverse Action
      i. Failure to hire Ms. Adams as General Counsel
      ii. Termination for seeking a raise
   b. Termination for complaining about disparate treatment
   c. Termination for seeking family related emergency leave—as had been granted to other policy advisors for non-immediate family.

      i. Disability—
      ii. Protected Activity
         1. *The substance of the charge must demonstrate protected activity.*
      iii. Causation
      iv. Pretext
   d. Post employment retaliation
      i. Speaking with third parties
      ii. Media
      iii.

FMLA
   I. Timing of employees complaint
   II. Employees motivation for raising the complaint

Promotions granted

   Each time policy advisor given raise—state P was denied a promotion.

Ableser—D's own actions, (Hobbs meeting with AA community, Ableser's call to negotiate a deal) such as requesting a confidential non-monetary settlement, in exchange for Ms. Adams not filing a lawsuit, suggests that D's themselves thought that Ms. Adams might have a racial discrimination claim.

Bradley. employee raised genuine issue of material fact regarding whether she was engaged in a protected activity where she had a reasonable, good-faith belief that the hospital's pay scheme was discriminatory based on gender and voiced these concerns to the hospital's secretary of the compensation committee

FMLA

*Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982) (employee, fired because he opposed discrimination against a fellow employee, was protected by 42 U.S.C. § 2000e-3 even if employee was mistaken and there was no discrimination; "The mistake, of course, must be a sincere one; and presumably it must be

reasonable . . . for it seems unlikely that the framers of Title VII would have wanted to encourage the filing of utterly baseless charges by preventing employers from disciplining the employees who made them. But it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry.").

"Whether [the plaintiff's] belief that [his co-worker] was being [sexually] harassed was reasonable, in good faith and sincere . . . is a credibility question that cannot be resolved by

BOGART

Your employer can't pay you as a contractor while treating you like an employee. If your employer controls when, where, and how you work, the government says you're an employee—and your company needs to pay your payroll taxes and offer you the same benefits it offers to regular employees.

Ms. Adams had not abandoned her job.

Ms. Adams work performance did not meet expectations.

Failure to protest. Failure to raise issue with EEOC. Failure to provide any details as to *who* what committee, what date, what briefing did Ms. Adams complete that did not meet expectations."

At-will—for any reason or no reason.

Services were no longer needed—Bogart

Privacy breach—Use Sandy Reilly email "leave requests are protected by privacy, not subject to public disclosure.

nappropriate gathering and disclosure of confidential medical information.

mployers have a fiduciary duty to know about (and control as necessary) the use of information regarding their plans and plan participants.

Ms. Adams has a reasonable expectation for privacy regarding her leave request. Publication to Mr. Silverman (a former Senate Chief of Staff) and Mr. Mandell (a former Senate Chief of Staff), which Ms. Adams had not ever worked with or been supervised by.

Ms. Adams informed Mr. Winkler she would respected the denial, but found the disclosure/sharing of the request with third parties that had not business need to know to be inappropriate and a breach.

- treatment so unusual, egregious, unjust, or severe as to suggest discrimination,
- an employer's history of showing bias toward younger employees,
- statistically significant differences in the numbers of females and males hired or fired,
- adverse treatment of workers in the protected classification, but not workers outside of it, and vice versa
- charges or complaints of similar discriminatory treatment by other members of the protected class,
- violation of company policy with regard to protected workers, without justification, and
- false reasons for adverse treatment given by the employer as a cover up of the real reason.

SOF—Required to resign as a precinct committeemen as a condition precedent to taking role at Senate.  LLT email—

Ms. Adams did not believe it was the forum to make that claim.

*Precinct Committeemen Resignation*

In 2011, Mr. Winkler was hired as a policy advisor. At the time of his hiring, Mr. Winker was an elected precinct committeemen.  Mr. Winker was not required to resign as a precinct committeemen as a condition precedent to

Ms. Adams was required to resign a precinct committeeman prior to accepting the position.

Counteroffer: Ms. Adams counter offeredand

*2012 Retreat*

On December 15, 2012, Ms. Adams attended the 2012 Democratic Caucus Retreat.

On December 17, 2012, Mr. Silverman set Ms. Adams start date with the Arizona State Senate as December 20,2015.

1

2   Ms. Adams was not paid for her attendance at the retreat.

3   Ms. Adams was paid for 16 hours on her initial paycheck. Subsequent paychecks

4   required Ms. Adams to be paid on a per hour basis.

5

6   Defendant may dispute a stated fact on the ground that it is not supported by

7   admissible evidence, Fed. R. Civ. P. 56(c)(2), or on the ground that evidence in the

8   record raises a genuine dispute as to the stated fact's truth or accuracy. Defendant

9   may not dispute a fact based on how it anticipates that fact may be used in Plaintiff's

10  legal arguments. Should Defendant find a stated fact ambiguous, it may explain the

11  ambiguity, state its understanding of the stated fact, and admit or deny that fact based

12  on its understanding and citations to relevant record evidence.

13

14  *Spoke with Wendy Baldo regarding the gender discriminatory hiring practices to hire*

15  *Jeff Winkler (a non-bachelor degree holder) over Patsy Osmon (a 1X-year Senate*

16  *veteran, female, licensed attorney—Staff Attorney, "acting" Chief of Staff and Policy*

17  *Advisor denied—although chosen.  (Baldo Declaration)*

18  *This unlawful discriminatory activity was protected activity.*

19  *GC—Ms. Adams asked to interview, interviewed, most qualified, not hired or even*

20  *notified she was not hired—this was protected activity.*

21

22  *Caucasian males—allowed to interview without necessary credentials to be General*

23  *Counsel. Winkler given role. Osmon—selected for role. (Hobbs Declaration)*

24

25

26

27

28

1
2
3                           **<u>CERTIFICATE OF SERVICE</u>**
4
5          I hereby certify that on April 30th, 2018, I electronically transmitted the foregoing
6   *Plaintiff's Objections to Defendant's Motion for Summary Judgment* to the Clerk's Office
7   using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to
8   the following CM/ECF registrants:
9
10  Mr. John Fry
    Mr. N. Todd McKay
11  Assistant Attorneys General
    2005 N. Central Avenue
12  Phoenix, Arizona 85007
13  /s/ Talonya Adams
14  Talonya Adams, *Plaintiff*
15
16
17
18
19
20
21
22
23
24
25
26
27
28