# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Talonya Adams, | ) | |
| | ) | No. **CV-17-00822-PHX-DLR** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 30, 2019 |
| **Arizona Senate,** | ) | 9:31 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

### ORAL ARGUMENT

**TELEPHONIC APPEARANCES:**
For the Plaintiff:
    **Talonya Adams,** Esq.
    In propria persona
    2 North Central Avenue, Suite 1800
    Phoenix, AZ 85004

For the Defendant:
    Office of the Attorney General
    By:  **N. Todd McKay,** Esq.
    2005 North Central Avenue
    Phoenix, AZ 85004

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

<u>**P R O C E E D I N G S**</u>

1

2          (Proceedings commenced at 9:31 a.m.)

3          THE COURTROOM DEPUTY:  Civil Case No. 17-822, Adams

4    versus Arizona Senate, on for motion hearing.

5          Counsel, please announce for the record.

6          MS. ADAMS:  Talonya Adams here on behalf of the

7    plaintiff; and plaintiff.

8          MR. MCKAY:  Todd McKay on behalf of the Arizona

9    Senate.

10          THE COURT:  Okay.  Mr. McKay, it's your motion.

11          MR. MCKAY:  Do you want me to approach?

12          THE COURT:  Yes, please.

13          MR. MCKAY:  Good morning.

14          THE COURT:  Good morning.

15          MR. MCKAY:  This is a case brought within the confines

16    of Title VII, as the Court is aware, and I just want to make a

17    couple initial points of law.

18          In line and consistent with the first step in

19    *McDonnell Douglas*, the Supreme Court stated in *Celotex versus*

20    *Catrett*:  The plain language of Rule 56(c) mandates the entry

21    of summary judgment after adequate time for discovery and upon

22    motion against the party who fails to make a showing sufficient

23    to establish the existence of an element essential to that

24    party's case and on which that party will bear the burden of

25    proof at trial.

1              In such a situation, there can be no genuine issue as

2    to any material fact since a complete failure of proof

3    concerning an essential element of the nonmoving party's case

4    necessarily renders all other facts immaterial.

5              The moving party is entitled to a judgment as a matter

6    of law because the nonmoving party has failed to make a

7    sufficient showing on an essential element of her case with

8    respect to which she has the burden of proof.

9              And then similarly, under the first step of the

10   *McDonnell Douglas* analysis, the first and threshold step is

11   that the plaintiff bears the initial evidentiary burden of

12   demonstrating the prima facie case of unlawful race or gender

13   discrimination or retaliation here.

14             If plaintiff meets this initial evidentiary burden,

15   she can establish an initial inference of unlawful

16   discrimination or retaliation; but on the other hand, if the

17   plaintiff does not meet this initial evidentiary burden, her

18   claims fail and the remainder of the *McDonnell Douglas* analysis

19   is rendered moot and summary judgment is mandated.

20             Plaintiff in this case has not met the initial burden

21   of demonstrating a prima facie case of unlawful race or gender

22   discrimination or retaliation.

23             THE COURT:  Let me just ask you a question.

24             MR. MCKAY:  Certainly.

25             THE COURT:  Your reply memorandum --

1          MR. MCKAY:  Yes.

2          THE COURT:  -- you spend the majority of your argument

3     arguing that Ms. Adams' statement of facts should be stricken,

4     but you don't mention any prejudice.

5          Have you been prejudiced at all by the arguments that

6     you set forth in your --

7          MR. MCKAY:  I would argue we absolutely have been

8     prejudiced.

9          THE COURT:  Okay.  That's what I want to hear.  You

10    didn't argue that.  You didn't give me any information.

11         What's your prejudice?

12         MR. MCKAY:  Well, the prejudice is the rules have

13    certain requirements as far as --

14         THE COURT:  Okay.  Let's talk about prejudice.  I

15    understand the rules, and I understand the deadlines.

16         MR. MCKAY:  Yeah.  Well, that --

17         THE COURT:  Tell me, how have you been prejudiced?

18    How has your case been prejudiced, harmed in a way that would

19    affect the outcome of this case by her delay?

20         MR. MCKAY:  I don't know that we're prejudiced based

21    on the delay.  I think it's more the failure to comply with

22    Rule 56.1(e) and provide record citations in the responsive

23    memorandum.  I think it's failure to abide by the page

24    limitations.  We have extensive explanation and argument in

25    statements of fact, which should be in the response memorandum,

1    within page limitations.

2         There was an initial statement of fact -- I guess the

3    only prejudice would be the fact that there -- sorry.

4         There was an initial statement of fact filed on the

5    May 30th initial extended deadline, and then --

6         THE COURT:  Well, let me tell you, I agree with you.

7    She violated a lot of the standard rules we have in this court

8    regarding statement of facts and the length.

9         MR. MCKAY:  Agreed.

10        THE COURT:  It just is something that I assumed as a

11   lawyer she would know better.  But my question to you is, where

12   is your prejudice?

13        MR. MCKAY:  Our prejudice, if her statement of facts

14   is deemed to be what she filed on May 30th, that was within the

15   Court's extension --

16        THE COURT:  Yeah.

17        MR. MCKAY:  -- and then her response memorandum is

18   deemed to be what she filed on June 25th, we're not prejudiced

19   to that extent.

20        But to the extent that then she attaches yet another

21   statement of facts as an exhibit almost 30 pages long, and then

22   that was sort of the drop-dead date of any responsive filings,

23   and then the next day we got 153 pages of additional exhibits,

24   and then the following Monday, on the 29th, we got, you know,

25   yet more exhibits.

```
 1            So at that point, combined with the fact that the

 2    assertions in the response are devoid of any citation to the

 3    record, you know, it --

 4            THE COURT:  Well, let me tell you, I'm not going to

 5    consider any assertions not supported by the record.  That's

 6    just basic rules of motions for summary judgment.  So you've

 7    got that one.

 8            But tell me the prejudice other than that.  Is there

 9    any prejudice other than that?

10            MR. MCKAY:  Well, it is.  It's difficult for us to

11    know, you know, exactly, for example, what she is claiming is

12    an adverse employment action.  You know, so --

13            THE COURT:  You don't understand what her claim for

14    adverse employment action is?

15            MR. MCKAY:  Well, her response has --

16            THE COURT:  What do you understand it to be?

17            MR. MCKAY:  Well, I understand it to be, with respect

18    to the discrimination claim, that she was paid less than other

19    similarly situated individuals; and with respect to the

20    retaliation claim, that she was terminated.

21            THE COURT:  Okay.

22            MR. MCKAY:  So -- but there seems to be a lot of

23    additional things she sort of argues without support, so it's

24    difficult --

25            THE COURT:  Well, let's talk about similarly situated
```

1    people.  That's a question I have.

2              MR. MCKAY:  Yeah.

3              THE COURT:  You argue that plaintiff was paid better

4    or comparably to similarly situated employees in the minority

5    caucus.  But there's a Garth Kamp and Rodney Ross who were

6    policy advisors, who are in the minority caucus or the

7    majority?

8              MR. MCKAY:  Majority.

9              THE COURT:  And they were paid significantly greater,

10   weren't they?

11             MR. MCKAY:  Correct.

12             THE COURT:  An underlying assumption of your argument

13   appears to be that Garth Kamp and Rodney Ross are not

14   comparably situated because they're in the majority caucus.

15             MR. MCKAY:  Yes.  And I know Your Honor has relied

16   on --

17             THE COURT:  That's what I'm trying to understand.

18             MR. MCKAY:  Yes.

19             THE COURT:  What evidence is there in the record that

20   a majority caucus policy advisor position materially differs

21   from a minority caucus policy advisor position?

22             MR. MCKAY:  Well, that is plaintiff's burden under the

23   fourth element of her prima facie case.  Under the *Moran/Selig*

24   case, which I know --

25             THE COURT:  Well, she established that they have the

1    exact same position she has.  So how does that make it her

2    burden?

3          MR. MCKAY:  Well, *Moran/Selig* requires that the

4    individual seeking relief demonstrate that the individuals

5    alleged to be similarly situated are similarly situated in all

6    material respects.

7          So they were in a different caucus.  They had a

8    different supervisor.

9          THE COURT:  They're in the same legislature.  They

10   have the same job title, the same job description.  How are

11   they materially different?

12         MR. MCKAY:  Because the majority caucus pays

13   differently than the minority caucus.  She never applied for a

14   job in the majority caucus.

15         THE COURT:  Where in the record does it say that?

16   Because the record I see says these people have the same job

17   she has, and there's nothing in the record to suggest that

18   they're any different than what she is.

19         MR. MCKAY:  The record I see says that she sat on some

20   committees with these individuals, and I don't think that

21   supports the showing required under *Moran/Selig* to show that

22   she is similarly situated.  It doesn't show how much experience

23   they had versus what she had.

24         If she obviously was in the majority caucus, she

25   reported to the same supervisor, she had the same amount of

1    experience, and then she was paid significantly less, then that

2    is something to argue about.

3           THE COURT:  Well, for a prima facie case, she's

4    established there are people in the same legislature, same job

5    description, same job title.  What more does she need to show?

6           MR. MCKAY:  Well, I would argue that's not all

7    material respects.  Because they're not in the same caucus.

8    They don't answer to the same supervisor.  They don't serve the

9    same senators.  Their jobs are -- she -- and again, it's her

10   burden to show that it is similar in all material respects at

11   the prima facie level --

12          THE COURT:  Well, let me ask you this --

13          MR. MCKAY:  -- not the Senate's burden to show it's

14   not.

15          THE COURT:  Just so I understand --

16          MR. MCKAY:  Yeah.

17          THE COURT:  -- how is it different?  I don't see

18   anything in the record that says that they're different than

19   she is.

20          MR. MCKAY:  Well, there's nothing in the record to

21   show that it's the same in all material respects.

22          THE COURT:  I'm just asking you, as a matter of fact,

23   tell me, how is it different for Garth Kamp and Rodney Ross,

24   who have the same policy advisor position she has?  How are

25   they not similarly situated?

1          MR. MCKAY:  Well, you know, it could be the situation

2    of an associate, you know, in a large firm versus an associate

3    in a small firm doing the same kind of work, having the same

4    title, sitting on the same committees, but it's a different --

5    they're not the same in all material respects with respect to

6    their compensation.  And that's --

7          THE COURT:  Yeah, I know they're not the same in the

8    compensation.  That's the problem.

9          So I'm trying to understand, how is the position of

10   policy advisor different for Garth Kamp and Rodney Ross than it

11   is for Talonya Adams?

12         MR. MCKAY:  Well, again, it's not the Senate's burden

13   to show that.  It's her burden to show how they're the same in

14   all similar respects.

15         THE COURT:  Okay.  Well, she's shown it to me, then,

16   because she shows that they have the same job title, same job

17   description, they do the same thing she does.  I don't see a

18   difference here.

19         MR. MCKAY:  All right.  Well, you know, we would argue

20   that there's more material respects than just saying I have the

21   same title and I sit on some committees, and everybody over

22   here on this side of the aisle -- her intake questionnaire --

23         THE COURT:  Is their job description different than

24   hers?

25         MR. MCKAY:  The Senate doesn't have a job description.

1    I don't -- you know, I don't --

2         THE COURT:  Is the expectation of their job different

3    for them than it is for her?

4         MR. MCKAY:  She was hired to -- solely to work for the

5    Democratic caucus and the Democratic senators, and that's, you

6    know, what -- those are her supervisors.

7         You know, her job was as part of the -- and I guess I

8    would say her Exhibit A is her intake questionnaire to the

9    EEOC, and it lists John Fetherston and Patsy Osmon as her only

10   similarly situated individuals.

11        John Fetherston was the individual that was hired in

12   the Democratic caucus the month before her, and Patsy Osmon was

13   another female Democratic policy advisor who was also a staff

14   attorney.  And she didn't list anyone else; she didn't list

15   Garth Kamp or Rodney Ross or anyone else.

16        THE COURT:  Are you saying at this point I can't

17   consider Garth Kamp or Rodney Ross for that reason?

18        MR. MCKAY:  I'm just saying it's an ever-moving target

19   with her and --

20        THE COURT:  Well, that's how discovery works in

21   lawsuits.  Sometimes you find out information in discovery that

22   you didn't know when you filed the lawsuit.  I don't know what

23   happened here.

24        But I'm just saying what I've seen and is obvious that

25   it's your assumption in your argument is that Garth Kamp and

1    Rodney Ross aren't similarly situated, but I don't see anything

2    in the record that suggests they aren't.  Everything I see in

3    the record suggests that they are.  That's the problem I'm

4    having with the argument on that.

5            MR. MCKAY:  Fair enough.  I see what you're saying,

6    and again, you know, I think you've made your point, I've made

7    mine, that, you know, just sort of superficially saying because

8    we have the same job title and we sat on some of the same

9    committees, in our view, doesn't meet *Moran/Selig* in terms

10   of --

11           THE COURT:  Okay.  Well, I'm just working on what's in

12   the record.  You may call it superficial, but it seems to me

13   that a job title in the same legislature should mean something.

14   It seems more than superficial to me if you have the same job

15   title and you're doing the same thing.

16           So let's move on then.

17           MR. MCKAY:  Fair enough.

18           THE COURT:  You contend that employee complaints

19   concerning Family Medical Leave are not protected by Title VII.

20           MR. MCKAY:  Correct.

21           THE COURT:  What about a situation where those

22   complaints are accompanied by concerns of unlawful racial

23   discrimination; that is, an employee's concerned that she's

24   being denied FMLA leave because she's black or because she's a

25   woman?  Does that change --

1          MR. MCKAY:  She did not articulate that, but in that

2     hypothetical, it would potentially be something that would be

3     covered under Title VII.

4          THE COURT:  Okay.  And in your reply, you argue

5     that -- essentially that her affidavit, which is Exhibit 5 to

6     her statement of facts, is a sham.  But you don't point to me

7     any specifics where -- that you're referring to, to any

8     paragraph where you say:  This statement is in the affidavit,

9     and here we have this portion of her deposition where she

10    answered differently.

11         That's typically what I see in sham arguments.  You

12    didn't do that here.

13         MR. MCKAY:  Well, our argument there is in her

14    interrogatory response, she listed five discrete things with

15    respect to her alleged protected activity that she engaged in.

16    So -- and that was over the course of her original

17    interrogatory responses and her supplemental interrogatory

18    responses on what is the basis for your retaliation claim.

19         THE COURT:  Okay.  Well, let me ask you this, then.

20    You didn't put it in your motion, but let me ask you now.

21         MR. MCKAY:  Yeah.

22         THE COURT:  What in her affidavit, her Exhibit 5, is

23    inconsistent and contrary to what she said previously in her

24    interrogatory?

25         MR. MCKAY:  There is argument in her response,

1    presumably based on that Declaration 5, where she says she

2    complained about disparate treatment based on being an

3    African-American or being a woman.

4         A lot of what she argues in the response also is

5    passive voice, where she just says, "As an African-American

6    policy advisor who was a woman," and then something happened to

7    her, rather than, "I articulated that something was because of

8    race or sex to anyone at any time."  And none of these five

9    things in her interrogatory responses say "because of race or

10   sex."

11        THE COURT:  So it's because she didn't put in there

12   "because of race or sex"?

13        MR. MCKAY:  Correct.

14        THE COURT:  But in her intake questionnaire and in her

15   charge of discrimination that she filed with the EEOC, she did

16   allege that; right?

17        MR. MCKAY:  She alleged -- yes.  But that was six

18   months after she'd been fired.

19        THE COURT:  Okay.  So we're to ignore what she alleged

20   in her intake questionnaire and her charge of discrimination?

21        MR. MCKAY:  Yes.  Because the relevance is did she say

22   anything to anyone at the Senate prior to being terminated such

23   that she could be viewed as having engaged in protected

24   activity and then have been unlawfully retaliated against for

25   doing so.

1            THE COURT:  Well, are you arguing that she's injecting

2    new theories into the case for the first time at summary

3    judgment or that her affidavit is contradicting something that

4    she previously said under oath?

5            MR. MCKAY:  Yes.  In terms of this case, she has not

6    asserted that in her interrogatory responses nor in deposition,

7    that she ever said "because of race or sex" with respect to any

8    of these listed activities.

9            THE COURT:  So my question was either/or.  So it

10   sounds like you're saying -- your argument is that she's

11   injecting new theories, not that she's contradicting something

12   she previously said?

13           MR. MCKAY:  Well, she's -- as the case that we cited

14   on the sham affidavit rule, a party cannot substitute an

15   affidavit alleging helpful facts for earlier testimony harmful

16   to its case in order to avoid summary judgment.

17           So if she failed to say "because of race or sex" in

18   any of her admissions in her interrogatories or in any of her

19   deposition testimony on this topic and then saw our motion --

20           THE COURT:  Well, let me just --

21           MR. MCKAY:  -- and then plugged it in --

22           THE COURT:  Excuse me for interrupting, but isn't that

23   what this case is all about?  A claim of discrimination because

24   of race or sex and set forth initially in her charge of

25   discrimination and in her intake questionnaire?

1          MR. MCKAY:  But did she engage in protected activity

2   and articulate that to anyone at the Senate prior to being

3   terminated is the issue with respect to the retaliation claim,

4   and there's nothing in the record that she did that at any

5   point prior to the close of discovery in this case.

6          THE COURT:  Well, in your -- in the affidavit you

7   submit from the witnesses who say they weren't put on notice by

8   her, those are all dated the date you filed your motion for

9   summary judgment.  Is there anywhere in her deposition where

10  she was asked those questions?  Because she's made those

11  allegations in her charge of discrimination and the intake

12  questionnaire.

13         MR. MCKAY:  She says she engaged in protected

14  activity.

15         THE COURT:  Yeah.

16         MR. MCKAY:  So --

17         THE COURT:  But I guess I'm missing -- it seems like

18  you're switching gears now.  You're talking about whether or

19  not she notified someone of the charge, and the basis for your

20  argument in the motion for summary judgment are the affidavits

21  of the witnesses who said, "We were never told."

22             So you're trying to argue that because these witnesses

23  say she never told anybody and because she didn't say in her

24  interrogatory it was the basis of race or sex, that that's

25  evidence that it's inconsistent with her now to say, "I told

1    somebody."

2            MR. MCKAY:  No.  We're arguing that she asserted that

3    she wanted to be paid more --

4            THE COURT:  Yeah.

5            MR. MCKAY:  -- and she asserted that she thought there

6    was a pay disparity and so she was entitled to be paid more.

7    That's as far as she went.

8            So she didn't say "because of race or sex."  Again,

9    she's using the passive voice --

10           THE COURT:  Well, let me ask you this:  Do you agree

11   that she did say that in her intake questionnaire, that she was

12   making this claim based on sex and race?

13           MR. MCKAY:  Well, she misperceives --

14           THE COURT:  Let me ask -- yes or no?

15           MR. MCKAY:  No.

16           THE COURT:  You don't think her intake questionnaire

17   indicated that she was making a charge based on sex or race?

18           MR. MCKAY:  I think it's based on a fundamental

19   misunderstanding on what is engaging in a protected activity

20   under Title VII versus something that is not a protected

21   activity under Title VII.

22           THE COURT:  All right.  So that goes back to my

23   original question then.  I think the question I asked before --

24           MR. MCKAY:  Yeah.

25           THE COURT:  -- and you agreed, that an employee's

1   complaints concerning Family Medical Leave is protected under

2   Title VII if those complaints are accompanied by concerns of

3   unlawful racial discrimination.

4           I think you agreed with that; true?

5           MR. MCKAY:  I said I would agree -- if someone made a

6   complaint that somehow they were not -- they were receiving

7   disparate treatment because of race or sex, then that can be

8   covered under Title VII.

9           But she didn't articulate to anyone prior to being

10  terminated that she was being discriminated against based on

11  race or sex, and her interrogatory responses confirm that.

12          THE COURT:  Well, was she asked that specific

13  question?

14          MR. MCKAY:  Yes.

15          THE COURT:  "Did you tell anybody?"

16          MR. MCKAY:  It said, "What is your basis for

17  retaliation?"  She listed five activities as her protected

18  activities.  She said:  Submission of actual hours worked on

19  time sheet submittals; apply for general counsel role;

20  inquiring how to obtain a raise; for the first time during her

21  employment, requesting a raise; and to inquiring about Family

22  Medical Leave.

23          That's it.  She doesn't say that anything was linked

24  to anything because of race or sex.

25          THE COURT:  I see what you're saying.  Your argument

1    is that you wanted her to say that the retaliation claim is

2    based on the fact that I made these complaints specifically to

3    certain people.  And these are the -- she listed the complaints

4    but she doesn't say who she complained to.

5            MR. MCKAY:  No.  She needs to make a complaint to

6    someone that's because of race or sex to fall under Title VII.

7            THE COURT:  That's what I'm saying.

8            MR. MCKAY:  Yeah.

9            THE COURT:  She listed the complaints she feels were

10   based on her sex or race issue, but she doesn't tell you who

11   specifically she made those complaints to prior to the

12   termination.

13           MR. MCKAY:  Or when, yeah.  Agreed.

14           But there was no -- she makes no record prior to the

15   close of discovery that there was any complaints of race or sex

16   made.  It all came after the fact.

17           THE COURT:  In her deposition, did you ask her that

18   question specifically:  Did you complain to anybody about these

19   conditions you feel are based on race or sex?

20           MR. MCKAY:  We have provided --

21           THE COURT:  Yes or no?

22           MR. MCKAY:  -- transcripts --

23           THE COURT:  Did you ask that question?

24           MR. MCKAY:  Well, I didn't take the depositions,

25   but --

1    THE COURT:  Okay.  Whoever took the deposition, did

2    they ask that question?  Because that seems to me the question

3    that should follow if you feel like there is a concern that she

4    never made those complaints to somebody.  Was that question

5    asked?  That seems like a fundamental question you'd ask in

6    this case.

7    MR. MCKAY:  Yes.  Yes.  And there is transcript

8    testimony provided on the record where -- because she had

9    indicated that at some point she made some sort of disparate

10   treatment claim to Wendy Baldo, who is the chief of staff.  And

11   in the deposition transcript record we've provided, she lays

12   out in deposition everything that she said to Wendy Baldo, and

13   it essentially tracks her interrogatory responses.

14   And then the question was:  Is there anything more?

15   And she said:  I don't think so.

16   And that's all in the record.

17   THE COURT:  Okay.  I think I see a disconnect in the

18   communication here where she's answering questions as to what

19   she thought the discrimination was and you're asking -- you

20   think you're asking her:  Who did you tell about this alleged

21   discrimination before the termination that resulted in your

22   termination, which you feel is the retaliation?

23   MR. MCKAY:  Well, the questions were since she has

24   indicated in her response memorandum that she at some point

25   supposedly said something regarding disparate treatment to

1  Wendy Baldo, we have deposition transcript testimony of, well,

2  what complaints did you make to Wendy Baldo?

3          And none of them were articulated to have anything to

4  do with any discrimination on the basis of race or sex.  It's

5  just, "I want to be paid more.  I think people are out to get

6  me and setting me up to fail because I'm in this Thunderbird

7  program."

8          There was no sort of language to even provide an

9  inference to anyone that she was of the opinion that anything

10  that she was frustrated with had to do with anyone

11  discriminating against her because of her race or her sex.  It

12  was just things that she was frustrated with in the workplace.

13          THE COURT:  And doesn't she claim in her affidavit

14  that she made the same claim to more than Wendy Baldo, though?

15          MR. MCKAY:  She does.  And again, that's inconsistent

16  with anything that --

17          THE COURT:  Where --

18          MR. MCKAY:  -- she said in her interrogatory

19  responses.

20          THE COURT:  Was she asked -- well, I think there

21  was -- it looks to me like a misconnect between what you were

22  asking and what she was answering in that interrogatory.  You

23  didn't ask specifically:  Who did you tell?

24          That seems to me like a very basic question.  Who did

25  you tell you were making -- you were concerned about that you

1    were being discriminated because of race and sex?

2         MR. MCKAY:  It said:  Provide full and complete

3    information on the basis for your retaliation claim.

4         So -- and then she was allowed to supplement that.

5    And neither the original or the supplemental provided anything

6    that was a protected activity under Title VII.

7         And then the only thing that she has --

8         THE COURT:  But you're saying we can't consider what

9    she told the EEOC?  You weren't aware of that, or why should we

10   not consider that?

11        MR. MCKAY:  Well, I mean, for purposes of the

12   litigation, I believe she's bound to the confines of her

13   responses in this litigation.  And again, when she referenced

14   protected activity at the EEOC level, she again had this same

15   fundamental misunderstanding of what a protected activity was.

16        THE COURT:  All right.  Anything else you want to tell

17   me?

18        MR. MCKAY:  Well, with, I guess, respect to the third

19   element of retaliation, to the extent that she's not saying who

20   she said what to and when, under the *Nassar* case, to establish

21   a causal link of but-for causation, there's not a foundation

22   for that either.

23        THE COURT:  But she does say that in her affidavit

24   now.  Doesn't she?

25        MR. MCKAY:  Well, again, you know, her affidavit sort

1    of is subject to some of the same deficiencies as Your Honor

2    said you would not consider, you know, additional improper

3    argument, that --

4            THE COURT:  I said I won't consider any facts that

5    aren't supported by -- in her statement of facts that aren't

6    supported by references to --

7            MR. MCKAY:  Right.

8            THE COURT:  -- relevant supporting facts.

9            MR. MCKAY:  Well, she has extensive explanation and

10   argument in her statement of facts which is more properly to be

11   put in the response memorandum --

12           THE COURT:  I agree.

13           MR. MCKAY:  Yeah.

14           THE COURT:  But I'm talking about her affidavit now.

15           MR. MCKAY:  I'm just saying that the affidavit items

16   are part of that same defective explanation and argument in the

17   statement of facts.

18           THE COURT:  Well, her affidavit has problems because

19   it does make arguments.  But the portions of it that she says

20   happened, those are facts, aren't they?  I mean, you may not

21   agree with them, but if she says, "This is what I remember

22   happening," isn't that a fact that the Court can consider?

23           MR. MCKAY:  Well, the Court certainly can consider it.

24           You know, I would say, again, that we're prejudiced

25   because she didn't even file that affidavit until the 26th of

1    June, so again, it was yet another missed deadline.

2         THE COURT:  But you had a chance to reply to that,

3    though; right?

4         MR. MCKAY:  We did, yeah.

5         THE COURT:  Yeah.

6         MR. MCKAY:  But, you know, it was -- again, it was --

7    we filed a reply to her initial May 30th response, which was

8    unclear whether it was response or a statement of facts.  So we

9    sort of laid out --

10        THE COURT:  I'm not arguing with you on that.

11        MR. MCKAY:  I get it, yeah.

12        THE COURT:  Yeah.

13        MR. MCKAY:  I'm just saying that we sort of laid out,

14   you know, what the rules were, what the Court's orders were,

15   and then she still didn't come close.

16        THE COURT:  Yeah, you know, I can't argue that.  I

17   mean, I hear you.

18        MR. MCKAY:  All right.

19        THE COURT:  But with regard to her affidavit, though,

20   she does make statements of fact that indicate that she did

21   tell certain people things about her concerns about how she

22   felt she was being discriminated against.

23        MR. MCKAY:  Again, that -- you know, that's our

24   argument -- and I know the term "sham affidavit" is harsh.  I

25   mean, we're not trying to say "sham."  We're just trying to say

1  that, you know, a later affidavit --

2         THE COURT:  Well, it would make it a lot easier for me

3  if you had asked her specifically:  Did you tell anybody about

4  this before you were terminated?

5         If that specific question had been asked, it would

6  make it a lot easier for me to look at this and try to line

7  them up.  I don't see that anywhere.

8         And when I say "sham affidavit," basically you want to

9  line up what was asked and what was answered.  And if it wasn't

10  specifically and clearly established in the deposition, I don't

11  know how you can argue that you can't come back and give

12  explanations in an affidavit --

13         MR. MCKAY:  Well --

14         THE COURT:  -- in those circumstances.

15         MR. MCKAY:  -- again, you know, I guess I would

16  just -- just to sort of put a bow on our point is that in the

17  interrogatory response, we said "full and complete information

18  on the basis for your retaliation."  And then in the deposition

19  we asked, you know, "What were the complaints that were made,"

20  and there was never an assertion of saying because of race or

21  sex.

22         THE COURT:  Well, it just seems to me you went --

23  whoever took the deposition went in there knowing what her EEOC

24  complaints were.  It just seems to me that if you would have

25  nailed that down so that we don't have this discussion anymore,

1    because it wasn't nailed down in the deposition, in my opinion.

2            MR. MCKAY:  All right.  Well, I'll move on.

3            I guess, you know, with respect to -- to the extent,

4    for the sake of argument, she fulfills her prima facie case

5    elements and then, you know, we move to -- through the

6    remainder of the *McDonnell Douglas*, the --

7            THE COURT:  And just so you know, I've read

8    everything.  So whatever you've put in --

9            MR. MCKAY:  I'm wrapping up.  I won't --

10           THE COURT:  -- your papers, I've read it already.

11           MR. MCKAY:  Yeah.  I'm just going to make some final

12   points.

13           THE COURT:  Okay.

14           MR. MCKAY:  Yeah.

15           The *Anderson/Liberty Lobby* case says -- I know you're

16   well familiar with it, but:  At the summary judgment stage, the

17   trial judge's function is to determine whether there is a

18   genuine issue for trial.  There is no issue for trial unless

19   there is sufficient evidence favoring the nonmoving party for a

20   jury to return a verdict for that party.

21           A conclusory self-serving affidavit lacking detailed

22   facts and any supporting evidence is insufficient to create a

23   genuine issue of material fact.

24           And then lastly, as set forth at the end of our motion

25   for summary judgment, citing the *Coleman* case:  Pretext

1    requires more than simply denying the credibility of the

2    defendant's proffered reason for the challenged employment

3    action in relying solely on the plaintiff's subjective belief

4    that the challenged employment actually was unnecessary or

5    unwarranted.

6            If we move to the last step of *McDonnell Douglas,*

7    then:  The ultimate evidentiary burden shifts back to the

8    plaintiff, who must introduce specific and substantial evidence

9    sufficient to raise a genuine issue of material fact regarding

10   whether the Senate's articulated reason for the adverse

11   employment action was its true reason or merely a pretext for

12   unlawful discrimination or retaliation in violation of

13   Title VII.

14           And our argument is, even if we move past the prima

15   facie stage, there's not specific and substantial evidence of

16   pretext for unlawful discrimination or retaliation in violation

17   of Title VII.

18           THE COURT:  Okay.  Thank you.

19           MR. MCKAY:  Thank you.

20           THE COURT:  Ms. Adams?

21           Do you want to approach the podium, please.

22           MS. ADAMS:  Yes, Your Honor.

23           THE COURT:  Ms. Adams, you're an attorney; right?

24           MS. ADAMS:  Yes, Your Honor.

25           THE COURT:  And you're familiar with the local rules?

1          MS. ADAMS:  Yes, Your Honor.

2          THE COURT:  You familiar with the Federal Rules of

3   Civil Procedure?

4          MS. ADAMS:  I am familiar, Your Honor.

5          THE COURT:  Okay.  Your filings in response to this

6   motion for summary judgment didn't follow any of those.  You

7   know that?

8          MS. ADAMS:  Yes, Your Honor.

9          THE COURT:  You know, one of the reasons we're having

10  such difficulty with your motion and one of the reasons there

11  have been so many objections is because you didn't follow the

12  rules as required.  Is there some reason you didn't follow

13  these rules?

14         MS. ADAMS:  Your Honor, I think as it relates to the

15  response to the motion for summary judgment, I'm going to speak

16  of Ms. Adams in the third person, because it just makes it a

17  little bit easier.  But as it relates to the filing, I will

18  speak in the first person.

19         Was I wasn't quite certain how to articulate my

20  controverted statement of facts.  And from plaintiff's

21  perspective, it's been equally challenging pursuing justice in

22  this case based on the fact that the Senate has been equally

23  vague.

24         THE COURT:  Well, regardless, the rules set forth page

25  limitations, deadlines, the manner and method in which these

1   things should be filed.  I don't know how the Senate's position

2   on the merits could affect your ability in any way to comply

3   with the rules, and I'm not understanding your argument.

4          Why were you unable to comply with the rules in --

5   with regard to your response to the motion for summary judgment

6   and your statement of facts?

7          MS. ADAMS:  As it relates to the response to motion

8   for summary judgment, Your Honor, I'm simply overwhelmed.  I've

9   never filed one.  I've never been an EEOC plaintiff.  I am

10  familiar with the Rules of Civil Procedure from an academic

11  standpoint.  I'm a nonlitigator.  I'm not a trial lawyer.

12         I had provided -- I had worked with legal counsel on a

13  contract basis to try to put together a response to the motion

14  for summary judgment.  I couldn't do that in a timely manner.

15  I reached out to the Court to request the extension.  The

16  extension was granted.  And I --

17         THE COURT:  But then you filed it well beyond the

18  extension.  Do you remember that?

19         MS. ADAMS:  As I listened to opposing counsel, Your

20  Honor, I'm trying to understand the -- oh, I filed the exhibits

21  after the deadline, correct.

22         THE COURT:  Okay.  Is there some reason for that?

23         MS. ADAMS:  I simply just didn't have the exhibits

24  printed, organized, or prepared.  Lack of organization.  No

25  excuse, Your Honor.

1          THE COURT:  And why couldn't you stay within the page

2     limits, at least?

3          MS. ADAMS:  As it relates to the exhibits, Your Honor?

4          THE COURT:  As it relates to your statement of facts

5     and the motion -- and your reply.

6          MS. ADAMS:  I think as it relates to the statement

7     of -- the controverted statement of facts, my reading of the

8     rule and presumption was a statement not challenged would be

9     deemed admitted.  And I thought I was making a sufficient

10    record as it relates to the exhibits that supported my

11    challenge to the --

12         THE COURT:  You understand that if you're going to

13    exceed the page limits as set forth in the rules, you need to

14    get a motion filed to do that?  Did you not know that?

15         MS. ADAMS:  I understand that today, Your Honor.

16         THE COURT:  You didn't understand it at the time?

17         MS. ADAMS:  I didn't think to even reach out to the

18    Court.

19         THE COURT:  Okay.

20         All right.  Let's talk about the people who you

21    indicate are in the majority, Garth Kamp and Rodney Ross.  You

22    heard the argument that it's your burden to establish that they

23    are in comparable positions as you are.

24         I don't understand the way things work down there, but

25    it looks to me like a policy advisor is a policy advisor.  Do

1    you know of any reason why Garth Kamp and Rodney Ross wouldn't

2    be similarly situated to you?

3            MS. ADAMS:  No, I do not, Your Honor.  In fact, when

4    the Senate -- Sandy Reilly, the Senate comptroller, filed a

5    response with the EEOC, she listed both of those individuals as

6    well as all others that had a hybrid policy advisor role as

7    comparators.

8            In addition, Your Honor, as it relates to similarly

9    situated individuals, Senate cites a case -- and I may get the

10   pronunciation wrong, but I think it's *Shaninga v. St. Luke's*

11   *Medical Center*.  This case clarifies under the -- at the

12   summary judgment stage, a prima facie case to Title VII is

13   minimal.  Doesn't even rise to the level of preponderance of

14   the evidence.

15           It specifically goes to the point that Mr. McKay is

16   making regarding adverse employment action.  Similarly situated

17   employees under the Ninth Circuit -- courts have analyzed

18   employers' reasons for why employees are not similarly situated

19   at the pretext stage of the *McDonnell Douglas* matter, not at

20   the prima facie stage.

21           So the presumption that Ms. Adams is required not only

22   to assert but prove Rod Ross or Garth Kamp would be similarly

23   situated at the prima facie stage is dispelled by the Senate's

24   own case citing the exact -- in the *Shaninga v. St. Luke's*

25   *Medical Center*.

1          In addition, I think it's been clear from the

2    beginning two things.  From plaintiff's perspective, plaintiff

3    is a member of two protected classes.  Senate asserts plaintiff

4    is member of a protected class, not certain which one they are

5    willing to accept.  But at all times relevant, Ms. Adams is an

6    African-American female --

7          THE COURT:  Slow down, please.

8          MS. ADAMS:  Thank you, Your Honor.

9          Ms. Adams is an African-American female protected

10   under both classes under the Civil Rights Act of Title VII.

11         THE COURT:  Well, let me ask you a question.  The

12   argument in the reply is that your affidavit is introducing new

13   evidence that hadn't been introduced before, and it's

14   inconsistent with your answers to interrogatories when they

15   asked you, "Tell us all the facts that support your claim for

16   retaliation."

17         MS. ADAMS:  Yes.

18         THE COURT:  Why in your -- why in that interrogatory

19   didn't you mention that you told people in the Senate about

20   your concerns about how you were being discriminated against?

21   You list the areas where you claim the discrimination occurred,

22   but you didn't talk about telling anybody.

23         MS. ADAMS:  Thank you, Your Honor.

24         As it relates to the interrogatories and the

25   supplemental responses, two things.  Presuming the Court

1    strikes Ms. Adams' affidavit, right, with or without declaring

2    it a sham affidavit, the Court strikes it, Senate is saying

3    that there is no evidence in the record, nothing in the record

4    that supports Ms. Adams' claim of race or sex discrimination.

5              THE COURT:  No.  They're saying that -- if I

6    understand the argument, is the retaliation, you have to

7    establish that the people who were retaliating against you knew

8    that you had made these claims.

9              MS. ADAMS:  Correct.

10              THE COURT:  And they're saying nowhere does it show

11    that you told anybody that you were concerned about how you

12    were being treated because of race or sex.

13              MS. ADAMS:  As it relates to race and sex

14    discrimination, Your Honor, Ms. Adams did speak to then

15    minority leader Senator Katie Hobbs regarding sex

16    discrimination in the Senate.  Senator Katie Hobbs has made

17    statements herself to the media that the Senate is a sexist

18    environment.

19              Ms. Adams did speak to Wendy Baldo as it relates to

20    disparate treatment and testified to that in deposition

21    testimony when disposed [sic] for hours by the Senate in

22    March of 2017.  Those pages are blank as it relates to what was

23    submitted to the Court, but those statements were made.

24              In addition, Ms. Adams spoke to Senator David Bradley,

25    who had been appointed the staff liaison, and members of the

1   Senate -- or staffers were advised to go to Senator Bradley

2   with concerns.  Ms. Adams, although not required under the law,

3   specifically stated she believed she was discriminated against.

4   Mr. Bradley testified to that in his deposition.

5          THE COURT:  Okay.  So back to my question:  The

6   defendant claims or understands that your claim on the

7   retaliation is that you were terminated because you complained

8   about wage disparities.  Is that the extent of your claim, or

9   are there other ways that you believe you were retaliated

10  against for engaging in protected activity?

11         MS. ADAMS:  That is not the extent of my claim.  I

12  think defendant -- I won't suspect what I think about the

13  defendant.

14         As I read the motion, my take is the argument is that,

15  look, Ms. Adams didn't check the "sex" box, and so therefore,

16  it relates -- as it relates to the retaliation claim --

17         THE COURT:  Stop, stop.  Let me focus you now.

18         MS. ADAMS:  Okay.

19         THE COURT:  I'm not asking you to talk about -- I'm

20  setting up the question based on what they believe.

21         I just heard the argument that they believe your claim

22  on the retaliation is that you were terminated because you

23  complained about wage disparities.

24         And my question is:  What do you think?  Is that the

25  extent of your claim, or are there other ways that you believe

1    you were retaliated against for engaging in protected activity?

2    I want to know what you think, what your claim is.

3              MS. ADAMS:  No, Your Honor, it's not the extent of my

4    claim.

5              THE COURT:  All right.  What is it?

6              MS. ADAMS:  As it relates to retaliation, plaintiff's

7    position is Ms. Adams was retaliated against for engaging in

8    protected activity.  And that protected activity was pursuing

9    Family Medical Leave Act to go be with her biological son, who

10   had been hospitalized.  That -- as other policy advisors had

11   done.

12             That protected activity is complaining about disparity

13   as it relates to the salary that Ms. Adams was paid as a policy

14   advisor, requisite to other policy advisors.

15             That protected activity is making complaints as it

16   relates to the vacation accrual rate as to which Ms. Adams was

17   receiving based on similarly situated and non-similarly

18   situated.  Every other person is accruing vacation accrual rate

19   per pay period at a rate higher than Ms. Adams, and it is

20   increasing while Ms. Adams' rate of salary remains flat the

21   existence of her duration at the Senate.

22             The vacation accrual rate began at 3.7 hours.  It

23   increased for every other similarly situated person or policy

24   advisor or hybrid policy advisor.  Never increased for

25   Ms. Adams.

1     The compensation time, everyone else is getting 80

2  hours of compensation time, with the exception of John

3  Fetherston in one year.  Not Ms. Adams.  Right?

4     These are economic disparities that are viable under

5  Title VII of the Civil Rights Act of 1964.

6     THE COURT:  Okay.  It sounds like you're making --

7  what you're telling me is the basis for your discrimination

8  claim.  That's what you're claiming discrimination for; right?

9     MS. ADAMS:  Arguably, sure.  Yes.  I think as it

10  relates to the salary, Ms. Adams and other women at the Arizona

11  Senate were systematically paid less.

12     THE COURT:  So I'm just trying to understand, breaking

13  it down, you have two claims; you have the discrimination and

14  retaliation.

15     My first question was to you about what is the basis

16  for your retaliation claim, and you listed a lot of things, but

17  it sounds like that also dovetails into your discrimination

18  claim.

19     MS. ADAMS:  I think it does, because but for the fact

20  that Ms. Adams was African-American and female -- I think the

21  claims here are both race discrimination and sex -- or, I'm

22  sorry, sex and retaliation.

23     Ms. Adams does not concede that her sex claim is

24  stricken.  She engaged in --

25     THE COURT:  No, I'm not asking about that.  I just

1    want to know what's the basis for your claim.

2            MS. ADAMS:  As it relates to sex and the termination,

3    Your Honor, Ms. Adams made complaints about disparate treatment

4    as it relates to women at the Arizona State Senate.  She made

5    those complaints.

6            THE COURT:  So let me ask you:  Where in the record is

7    there evidence of other racial or sex-based discrimination

8    other than pay discrepancies?

9            MS. ADAMS:  For the record, Your Honor, Ms. Adams was

10   the only African-American policy advisor professional within

11   the entire Arizona State Legislature that was African-American.

12   Today there's no one.

13           So as it relates to race discrimination, outside of

14   disparate impact and the fact that the Senate alleges but for

15   the only African-American minority leader the state has ever

16   had selecting Ms. Adams, she would have never been hired at the

17   Arizona State Senate, there is no further evidence in the

18   records as it relates to race discrimination.

19           As it relates to sex discrimination, Ms. Adams would

20   argue the history of systematic -- oh, excluding salary, you're

21   asking?

22           THE COURT:  Okay.  Let me -- no, no.

23           What I'm asking is this:  When I had the defendant's

24   argument here a minute ago, I was told their understanding was

25   that the claim that you're making for discriminations --

1   discrimination seems to be based on the fact that you were paid

2   less because of your race and sex.

3           And I asked you:  Is that the extent of your claim, or

4   are there other ways that you believe you were discriminated

5   against because of race or sex?

6           MS. ADAMS:  Yes.

7           THE COURT:  And you gave me a whole litany of things.

8           My question is:  With regard to those other bases,

9   where in the record is there evidence of other racial or

10  sex-based discrimination other than pay discrimination, pay

11  discrepancies?

12          And what I'd like to know is, where in the record is

13  it?  Where do I look?

14          MS. ADAMS:  As it relates to Ms. Adams?

15          THE COURT:  In your case.

16          MS. ADAMS:  Yes.

17          THE COURT:  Yeah.  You're saying you were

18  discriminated against, and it was more than just your pay.

19  Where are the other discrepancies found in the record?

20          MS. ADAMS:  Your Honor, may I ask a clarifying

21  question?

22          When you say "your pay," are you talking about salary

23  or are you also talking about fringe benefits?  When I'm

24  talking about compensation time and vacation accrual time, are

25  you including that in your --

1        THE COURT:  Well, is that what you're doing?  When you

2   say "pay," you're talking about the full compensation package?

3        MS. ADAMS:  It's -- I think in part.

4        THE COURT:  Okay.

5        MS. ADAMS:  And I hesitate only because there are

6   different years of -- there's variance depending on the year in

7   which we're speaking.

8        THE COURT:  So is it your argument that, for race

9   discrimination, that because you were the only African-American

10  policy advisor, any adverse action must have been attributed to

11  your race?

12       MS. ADAMS:  No.

13       THE COURT:  Okay.  Because that's what I thought you

14  were saying.

15       MS. ADAMS:  No.  No.  But I think it's relevant, and

16  courts have considered the fact that there is one -- only one

17  African-American policy advisor.

18       I was understanding Your Honor to ask a question

19  regarding other individuals or a history of racial

20  discrimination in the Senate.

21       As it relates to my case, there's the salary

22  discrepancy.  There's the salary increases.  Right?  So the pay

23  raises is really the trigger, the impetus for Ms. Adams

24  asking -- the Arizona Capitol Times article disclosing the --

25  you know, disclosing the salaries and the pay increases is the

1    impetus for Ms. Adams seeking a raise.

2              THE COURT:  Okay.  I understand that.

3              All right.  Is there anything else you want to tell

4    me?

5              MS. ADAMS:  Yes.  Your Honor, I don't feel as if I

6    fully answered your question.

7              THE COURT:  I don't think you did.

8              My original question is:  Where in the record with

9    regard to your discrimination claim is there evidence of other

10   racial or sex-based discrimination other than the pay

11   discrepancies?  And included in that would be the full pay

12   package; leave and sick time, et cetera.

13             Other than what you've already told me -- other than

14   what's related to your sex -- excuse me, to your pay package,

15   where is there record of sex or race discrimination related to

16   something other than pay discrepancies?

17             MS. ADAMS:  I think the workload complaints Ms. Adams

18   had made, and it is in the record, both in the EEOC and every

19   single complaint Ms. Adams -- and I believe it's the basis,

20   although the Senate offers zero facts for the insubordination,

21   Ms. Adams had a workload that was far more extensive than other

22   policy advisors.

23             THE COURT:  And you think that's because of your sex

24   or race?

25             MS. ADAMS:  Yes, I do.

1          THE COURT:  Okay.  What else?

2          MS. ADAMS:  The termination of Ms. Adams on

3   February 13th, 2015.  No -- there's no history of a policy

4   advisor being terminated in the middle of session over the

5   phone while out of the office on approved medical emergency

6   leave.

7          THE COURT:  Okay.

8          All right.  Is there anything else you want to tell

9   me?

10          MS. ADAMS:  Yes, Your Honor.

11          As it relates to the termination on February 13th,

12   Ms. Adams was not notified.  Right?  She -- Senate alleges

13   Ms. Adams didn't show up to work on the following Monday,

14   February 16th.  She wasn't required to.  She was on approved

15   medical emergency leave.  No one on emergency leave has been

16   required to work while remotely.

17          Ms. Adams didn't know that she was fired until a week

18   later, when she was notified over the phone on February 20th,

19   2015.  Senate alleges Ms. Adams was fired on February 20th now,

20   but they don't assert that in their record.

21          It's a case that is littered with disputed facts, Your

22   Honor.  And the facts are material.

23          Ms. Adams' job was offered to a Caucasian male while

24   the week of February 16th.  He declined.  And then it was

25   subsequently offered and the Senate contracted with Mark

1   Bogart, a Caucasian male, three business days after notifying

2   Ms. Adams.  Her things were boxed by pages.

3         And the termination of Ms. Adams, the hiring of

4   Caucasian male policy advisors, paying them a 40 percent

5   premium, an annualized salary of 339 -- or $39,000 more per

6   year than Ms. Adams, the refusal to even respond to her request

7   for a raise, these things, Ms. Adams believes, are all

8   discriminatory and believes that they are based on her sex and

9   her race.

10         THE COURT:  Okay.  Now, if I deny the motion for

11   summary judgment and we have a trial in this case, you'll be

12   representing yourself in trial; right?

13         MS. ADAMS:  Your Honor, if it goes to trial, I need

14   help.  I really need help on this case.  I'm not able to -- I

15   certainly have thought through that.  I'm not able to

16   cross-examine myself.  I really don't have --

17         THE COURT:  We have people who represent themselves in

18   court all the time, and we work things out with regard to the

19   examination.

20         My only point is if this goes to trial and you are in

21   court representing yourself, you need to familiarize yourself

22   with the Rules of Evidence, Rules of Civil Procedure, and --

23   because whether you're -- you're an attorney but you're

24   representing yourself, and you're basically a self-represented

25   litigant.  Even self-represented litigants who aren't attorneys

1    are expected to follow the rules in the courtroom.

2          And so I'm just suggesting if this case goes to trial,

3    you familiarize yourself with all the rules applicable because

4    they will apply to you.  You understand?

5          MS. ADAMS:  Yes, I understand, Your Honor.

6          THE COURT:  Okay.  Anything else you want to tell me?

7          MS. ADAMS:  No, Your Honor.

8          THE COURT:  Okay.  Thank you.

9          Mr. McKay?  I've got a quick question for you on the

10   discrimination claim.

11         MR. MCKAY:  Yes.

12         THE COURT:  Assuming that plaintiff has made out a

13   prima facie case that she was paid less because of her race or

14   sex --

15         MR. MCKAY:  Yes.

16         THE COURT:  -- what is the Senate's legitimate

17   nondiscriminatory reason for paying her less?

18         MR. MCKAY:  Well, if for the sake of argument we're

19   looking over at the --

20         THE COURT:  Is there --

21         MR. MCKAY:  -- majority caucus --

22         THE COURT:  Yeah.

23         MR. MCKAY:  -- the decisions were made based on the

24   individuals, her coworkers within the Democratic caucus, and so

25   she was paid higher or comparably to those individuals.  So in

1    terms of pay --

2            THE COURT:  So we're back to the same argument that

3    individuals in the majority caucus aren't comparably situated

4    to where Ms. Adams was; is that true?

5            MR. MCKAY:  Correct.  With respect to the starting

6    salary --

7            THE COURT:  So let me assume -- assume for purposes of

8    argument that I find that they are similarly situated.  Is

9    there a legitimate nondiscriminatory reason for paying her

10   less?

11           MR. MCKAY:  Well, it's that they just look at the

12   salaries of the minority caucus, and it's not a -- it's not --

13   they don't look at race.

14           THE COURT:  You're making the same argument.

15           MR. MCKAY:  They don't look at gender.

16           THE COURT:  I'm assuming that we don't limit it to the

17   minority caucus.

18           MR. MCKAY:  Right.

19           THE COURT:  I'm saying there's nothing in the record

20   that I see that says we should do that.

21           MR. MCKAY:  I'm just saying that's the reason why the

22   salary was set based on those parameters.  And that's not

23   because of her race or gender or because of -- well, because of

24   race or gender.  It's a nondiscriminatory, nonretaliatory

25   reason.

1          THE COURT:  Is there anything in the record that says

2     that?  I don't see anything in the record that says that people

3     in the minority caucus get paid less than people in the

4     majority caucus.

5          MR. MCKAY:  Well, I don't know that it explicitly says

6     that.  I think it just says that she was hired by the minority

7     caucus, she was supervised by the minority caucus, her, you

8     know, staffing peers were the minority caucus.  So that was --

9     the record that we've put forth is that was her world within

10    the Senate, was the minority caucus.

11         THE COURT:  Okay.

12         All right.  Anything else you want to tell me?

13         MR. MCKAY:  Just briefly, again, with respect to the

14    record, plaintiff hasn't timely or properly put any evidence in

15    the record.  She makes few, if any, proper citations to the

16    record.

17         She was granted an extension of over 70 days, I think,

18    to file the response memorandum on the basis that she was

19    retaining separate legal counsel to assist her.  And then she

20    was extended three months to take depositions.  She doesn't

21    attach a single page of deposition transcripts.

22         And so that's all prejudicial to us, you know,

23    attempting to even respond to or reply to whatever constitutes

24    the universe of her response to summary judgment and statement

25    of facts and record, what that might be.

1          And then I guess just lastly, with respect to the

2    issue of were there any other issues that would be adverse

3    employment actions potentially under the discrimination claims

4    beyond pay, I think we're then back to the *Moran/Selig* case

5    with respect to there's no foundation laid to exactly what comp

6    time was, how it worked, how other individuals might have been

7    situated to receive whatever comp time or whatever vacation

8    accrual rate or anything along those lines.

9          It's just sort of vague, that, you know, certain

10   people got this, you know, and then that's all there is.  She

11   attaches a couple pages of I'm not sure what listing different

12   people getting different things.  May have been from the EEOC

13   file.  It may have been from her public records request.  I

14   don't know.

15         But again, I would argue that with respect to those

16   items, she's not made a sufficient showing under the

17   *Moran/Selig* case that she was similarly situated to all of

18   these individuals in all material respects with respect to

19   these other items.

20         THE COURT:  Okay.  Well, thank you.

21         MR. MCKAY:  Thank you, Your Honor.

22         THE COURT:  I'll take it under advisement.

23         We'll stand in recess.  Thank you.

24         MS. ADAMS:  Thank you, Your Honor.

25         (Proceedings concluded at 10:32 a.m.)

1                      C E R T I F I C A T E

2

3           I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12           DATED at Phoenix, Arizona, this 25th day of February,

13   2019.

14

15

16                          s/Jennifer A. Pancratz_____ _____ ____

17                          Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25