**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

```
Talonya Adams,                 )
                               )   No.  CV-17-00822-PHX-DLR
         Plaintiff,            )
                               )
         vs.                   )   Phoenix, Arizona
                               )   June 21, 2019
Arizona Senate,                )   1:31 p.m.
                               )
         Defendant.            )
_____)
```

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**FINAL PRETRIAL CONFERENCE**</u>

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2

 For the Plaintiff:

3

        Talonya Adams, Esq.
4       In propria persona
        2 N. Central Avenue, Suite 1800
5       Phoenix, AZ 85004

6  For the Defendant:

7       Michael D. Moberly, Esq.
        Ryley Carlock & Applewhite PA
8       1 N. Central Avenue, Suite 1200
        Phoenix, AZ 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2          (Proceedings commenced at 1:31 p.m.)

3          THE COURTROOM DEPUTY:  Civil Case No. 17-822, Adams

4     versus Arizona Senate, on for final pretrial conference.

5          Would the parties please announce for the record.

6          MS. ADAMS:  Talonya Adams, plaintiff.

7          MR. MOBERLY:  Afternoon, Your Honor.  Mike Moberly,

8     Ryley, Carlock & Applewhite, on behalf of the defendant.

9          THE COURT:  Good afternoon.

10          All right.  This is our final trial management

11     conference.  We're going to have a lot of things to cover this

12     afternoon, so let's get started.

13          First, we're going to have a four-day trial, which

14     breaks down to about 20 hours of trial time.  I'll need four

15     hours of that, approximately, for voir dire and jury

16     instructions, so that leaves 16 hours for counsel.  Each side

17     will have eight hours.

18          I will have a clock here that keeps track of the time.

19     And any time you're talking, it's your time, direct or

20     cross-examination, opening or closing.  And if it's a long

21     argument on an objection, then that'll be your time as well.

22          All right.  If we get close to the end and it looks

23     like there's plenty of time, I'm not going to -- if someone

24     goes over, I'm not going to hold it against them if we have

25     enough time for that to happen.  But if it's close and we're

1    running out of time, I'm going to hold you to your time.  Okay?

2         All right.  Now, preliminary instructions.  I added

3    some -- to one of the instructions about the claims.  Have both

4    sides had a chance to look at that?

5         MS. ADAMS:  Yes, Your Honor.

6         THE COURT:  Is there any objection to the addition?  I

7    just want the jury to understand in the preliminaries what

8    they're looking for.  And so to do that, I thought they should

9    have the elements of the claim as to what has to be proved and

10   who has the burden.

11        MR. MOBERLY:  Your Honor, if I might, I don't have an

12   objection.  But with respect to the preliminary instructions

13   that we were handed this morning, on page 3 --

14        THE COURT:  Yeah.  That's what I'm talking about.

15        MR. MOBERLY:  Yeah, right, okay.  On page 3, we have

16   the defendant's position at the bottom.  And it seems to me

17   that it fits more appropriately near the top, after the

18   paragraph in which it talks about the plaintiff's assertion.

19        THE COURT:  Okay.

20        MR. MOBERLY:  Seems like it's just kind of hanging out

21   there where it's located.

22        THE COURT:  Yeah, I don't have a problem.  I'll move

23   that up.

24        So it will be plaintiff asserts that defendant

25   discriminated against her in terms of her compensation based on

```
1   her race and sex and that it terminated her employment in

2   retaliation for complaining about that discrimination; the

3   defendant denies that it discriminated or retaliated against

4   plaintiff, and so on.

5          MR. MOBERLY:  Correct.

6          THE COURT:  Okay.

7          All right.  Are there any other suggestions,

8   complaints, or objections to the preliminary instructions?

9          MR. MOBERLY:  No, Your Honor.

10         MS. ADAMS:  Your Honor, I have a question regarding

11  the definition of "compensation" here.  Is it the Court's

12  intention that compensation includes Ms. Adams' salary and all

13  fringe benefits?

14         THE COURT:  Why don't you tell me what you're

15  referring to so I can look at it.

16         MS. ADAMS:  Claims and Defenses, page 3.

17         THE COURT:  Okay.  What -- where --

18         MS. ADAMS:  I suppose line 10.

19         THE COURT:  Line 10?

20         MS. ADAMS:  The plaintiff received less compensation

21  than her similarly situated coworkers.

22         THE COURT:  I'm not intending right now to go into a

23  lot of detail into what this all -- I just want the jury to

24  know what they're looking for.  If we have an instruction at

25  the end of the case that defines compensation, I'll consider
```

1    that.  But right now, I just want to give the jury a heads-up

2    of here's what this case is about, and when you're looking at

3    the evidence, here's what you need to keep an eye out for.

4            MS. ADAMS:  Okay.  Thank you, Your Honor.

5            THE COURT:  Okay?  And if you want to make a statement

6    to the jury in opening statement as to what you believe

7    compensation entails, you might be able to do that.

8            But I don't want to get too bogged down in the weeds

9    with these preliminaries.  These are just to help the jury

10   understand what this case is about and what their job is.

11           MS. ADAMS:  Understood.

12           THE COURT:  Okay?

13           MS. ADAMS:  Yes, Your Honor.

14           THE COURT:  All right.  So let's move on from

15   preliminary instructions.

16           There's an instruction in here, though, that talks

17   about questions from the jury.  In federal court that's

18   typically not done, but I do it because I'm very familiar with

19   it from having been in state court and I don't object to it.

20   But I don't do it unless both sides agree that that's what they

21   want to do.

22           The only downside of it is that it takes a little more

23   time away from your presentation of your cases, especially if

24   you have a juror who asks a lot of questions.  Usually that's

25   not a problem, but sometimes I've seen cases where you get a

1    juror who just wants to be a lawyer and asks a lot of

2    questions, and what happens is we have them write it out, bring

3    it up here, we have a sidebar, you guys can tell me if you

4    object, then I'll rule on the objection, then I'll read the

5    question to the juror -- to the witness, and then I'll allow

6    follow-up based on that.  So that takes a little extra time.

7           It's up to you guys, though.  I'll let you decide now,

8    but I need to know so we can plan on whether we're going to

9    have juror questions or not.

10          MR. MOBERLY:  Your Honor, given the time constraints

11   we're probably going to be under in this case, I would prefer

12   we not have juror questions.

13          THE COURT:  Okay.  That's the end of the discussion.

14          Okay.  So we won't -- I'll take out instructions about

15   juror questions, and I'll make that change that we talked about

16   on Claims and Defenses, and I think these instructions will be

17   ready to go.

18          Jury questions are interesting.  And sometimes they

19   give you insight to what the juror -- one juror is thinking,

20   but sometimes people put too much weight on what one juror may

21   be thinking, because other jurors may not be thinking the same

22   way.

23          All right.  Your final list of witnesses, is that on

24   page 8 of your voir dire?  Is that the final list?

25          MR. MOBERLY:  Our list in the pretrial order and in

1    the voir dire is final.  I can't speak --

2            THE COURT:  Well, you got two different -- if I just

3    go off the list that you have in your page 8 of voir dire, am I

4    covering everybody?

5            MR. MOBERLY:  For me -- for our side, yes, unless

6    Ms. Adams has someone to add.

7            THE COURT:  Ms. Adams, have you seen that?  Are you

8    following where I am?  Your proposed joint jury voir dire,

9    page 8, there's a list of witnesses that is consolidated.  And

10   I could just pull that out and use that in my voir dire if

11   those are your final witnesses.

12           MS. ADAMS:  Your Honor, there is -- given two things,

13   one, the eight hours to present my case, which I was just

14   notified of now, as well as --

15           THE COURT:  Well, hang on a second.  When we set this

16   trial, I told you how many hours you all were going to have.  I

17   just re-emphasized that today.  I never set a trial without

18   talking about the number of days and how much time we get in

19   each day.

20           We get five hours of trial per day.  I need four hours

21   for questions of voir dire and instructions, and that leaves 16

22   hours.  And it's 50/50 unless someone needs more time and the

23   other side agrees.  So --

24           MS. ADAMS:  Understood.

25           THE COURT:  -- you're not being surprised by these

1    eight hours.

2         So go ahead.

3         MS. ADAMS:  As it relates to the witness list, Your

4    Honor, I filed a motion for issuance of subpoenas.  I haven't

5    had a ruling on that motion.  I'm not -- pursuant to General

6    Order 18, as a pro se litigant, I'm disallowed to issue

7    subpoenas unilaterally.

8         THE COURT:  So the witnesses -- I don't have that

9    motion in front of me.  Tell me which witnesses you need to

10   subpoena.

11        MS. ADAMS:  My understanding is I will need to

12   subpoena all of the witnesses that are -- that are listed.

13   There are witnesses that likely are not to be subpoenaed or

14   called, depending on the rulings today.

15        THE COURT:  Well, here -- I'm looking at a list of 13

16   witnesses.  Are you asking for subpoenas for all 13?

17        MS. ADAMS:  I suppose, yes, Your Honor.

18        THE COURT:  Are any of these witnesses, witnesses that

19   the defendant's going to call?

20        MR. MOBERLY:  Yes.  The first -- the first five are,

21   and the four are still -- the first four are still with the

22   State.  Mr. Silverman no longer is.

23        THE COURT:  So is there going to be a need for her to

24   subpoena the first five witnesses?

25        MR. MOBERLY:  You know, we told her we'd accept

1    service, but we can produce them without the need for a

2    subpoena.

3               THE COURT:  Okay.  So I'm going to order that you

4    produce them.

5               And so that the first five witnesses on this witness

6    tab at page 8 of the voir dire will be produced by the

7    defendant.  So you don't need to subpoena those first five.

8               MS. ADAMS:  Thank you, Your Honor.

9               MR. MOBERLY:  Your Honor, could I interrupt for just a

10   second?

11              THE COURT:  Sure.

12              MR. MOBERLY:  Only because we don't have control over

13   Mr. Silverman anymore.  He's in private practice.  I suspect he

14   would appear, but I have not spoken to him about that.

15              THE COURT:  Okay.  Well, just when you speak to him,

16   if he says, "I'm not going to appear," just get on the phone

17   and I'll issue a subpoena for him.

18              MR. MOBERLY:  Fair enough, yeah.

19              THE COURT:  And I might even call him.

20              MR. MOBERLY:  Yeah.

21              THE COURT:  Okay?  But you're going to need subpoenas

22   for -- is there an objection to any of these subpoenas?

23              MR. MOBERLY:  No.  No.

24              THE COURT:  With the witnesses?  Okay.

25              So I'm going to grant plaintiff's motion for subpoenas

1    to be issued to the witnesses listed in her motion except for

2    the first five in the witness tab, which are Baldo, Reilly,

3    Hobbs, Winkler, and Silverman.  Okay?

4              MS. ADAMS:  Thank you, Your Honor.

5              THE COURT:  All right.  So back to my question.

6    During voir dire, I have to ask the jury if you know any of

7    these witnesses.  So I want to make sure I have all the

8    witnesses that are going to be called.

9              Does this witness tab at page 8 of the joint voir dire

10   contain all the witnesses that both sides intend to call?

11             MS. ADAMS:  Your Honor, I don't have the witness tab

12   in front of me.  I'd like an opportunity to review it before I

13   respond.

14             MR. MOBERLY:  Your Honor, I can share it with her.

15             THE COURT:  Okay.  Thank you.

16             MS. ADAMS:  The answer is no, and I can give you the

17   additional names in just a moment.

18             There are two additional witnesses, Your Honor.  One

19   is Barbara McGuire.  The second is Martin Quezada,

20   Q-U-E-Z-A-D-A.

21             THE COURT:  Hang on a second.  I got Barbara McGuire.

22   Who's the second one?

23             MS. ADAMS:  Martin Quezada.

24             THE COURT:  How do you spell that?

25             MS. ADAMS:  Q-U-E-Z-A-D-A.

1          THE COURT:  Okay.

2          MS. ADAMS:  There was a custodial witness of Heather

3   Randolph, and that's contingent upon today's rulings.

4          THE COURT:  Okay.  All right.  So I'll -- when I do

5   the voir dire questioning, I'm going to give these names to the

6   jury to see if anybody knows them.

7          All right.  Now, exhibits.  You guys have listed a lot

8   of exhibits and a lot of objections.  Are there any exhibits

9   that we can stipulate into evidence right now?

10          MR. MOBERLY:  Your Honor, I'll address that.  The

11   exhibits were the part of the pretrial order that we were

12   struggling with right till the eleventh hour.  I think we both

13   agreed that we need to clean up that.  And we have been working

14   on it --

15          THE COURT:  Okay.

16          MR. MOBERLY:  -- in our office, and I think I'm

17   prepared to provide a clean set of ours to the plaintiff on

18   Monday or Tuesday.

19          THE COURT:  Okay.

20          MR. MOBERLY:  And then I think we'll be able to figure

21   out -- there are some that we've stipulated in, but the

22   numbering makes it a little less clear than it needs to be.

23          THE COURT:  And I'm going to tell you, I'm not a fan

24   of forcing someone to bring in a custodian of records just to

25   lay a foundation when it's clear that the foundation would be

```
1    there.  It's just a matter of causing extra work and delaying

2    the trial.  So hopefully you guys can stipulate on custodian

3    issues if it's clear that there will be a foundation that can

4    be laid, just -- and won't waste our time in trial with a

5    custodian coming in.

6              MR. MOBERLY:  Yeah.

7              THE COURT:  Okay.  So would you please send us a

8    notice of the exhibits that we can stipulate into evidence so

9    that at 8:30 on the day of trial when we come in before the

10   jury comes in, I'll put all those exhibits into evidence so you

11   won't have to talk about laying foundation.  When you have the

12   witness, you can just hand them the witness -- the Exhibit

13   No. 5 in evidence and talk about that, and we can save a little

14   time in trial that way.

15             Okay.  You guys have some deposition designations.  I

16   didn't -- are there objections?  Will there be any objections

17   to these designations?

18             MR. MOBERLY:  No.

19             THE COURT:  Okay.  So whatever you've agreed on is

20   what's going to come in, and I won't need to review any

21   objections.  Okay?

22             Voir dire, I do a pretty thorough voir dire, but I do

23   allow some follow-up.  Would 10 minutes per side be adequate?

24             MR. MOBERLY:  I'm sorry?

25             THE COURT:  When I'm done with my voir dire, I'll give
```

1    you a chance to ask some follow-up.  Would 10 minutes be enough

2    for each of you, or do you want some more?

3            MR. MOBERLY:  10 minutes will be sufficient for the

4    defense, Your Honor.

5            MS. ADAMS:  Is the 10 minutes your time or is the 10

6    minutes my time?

7            THE COURT:  Voir dire is all my time.  Okay?  So I'm

8    not going to hold that against you.  Voir dire and jury

9    instructions don't count against you.  The time I spend

10   instructing the jury and the time I -- that we spend

11   questioning the jury is not time that's counted against you.

12   It's only when we're in the courtroom in front of the jury

13   presenting evidence, arguing objections, and making opening and

14   closing statements.  Okay?

15           All right.  So is 10 minutes per side fine with you,

16   Ms. Adams?

17           MS. ADAMS:  Your Honor, I would prefer a little more

18   time.

19           THE COURT:  Okay.  How much?

20           MS. ADAMS:  Can you do 15 minutes?

21           THE COURT:  Okay.  I'll do 15 minutes per side.

22           MS. ADAMS:  Thank you.

23           THE COURT:  Okay.  Mr. Moberly, when I introduce the

24   counsel to the jury, you will be alone in this case, it looks

25   like?

1          MR. MOBERLY:  I believe so, Your Honor, yes.  If not,

2     I'll let you know beforehand.

3          THE COURT:  Okay.  Now, plaintiff's proposed voir

4     dire, there's an objection at page 7 of the voir dire

5     questions.  And my question is, what is the objection?

6          MR. MOBERLY:  It's -- give me a minute to flip to it

7     because I don't specifically recall.

8          MS. ADAMS:  I think argumentative.

9          MR. MOBERLY:  Well, it just seems to me that that

10    question the way it is phrased suggests the potential decision

11    in the case.  "Do you think that men and women with the same

12    title and role in the workplace should be treated equally in

13    salary and economic benefits?"

14         I think there is a wrestling match to be had here over

15    what similarly situated is, and I think this suggests the

16    outcome of that disagreement.

17         THE COURT:  You know, I see these kind of questions in

18    personal injury and tort claims basically asking, "Do you agree

19    with our system that someone should be compensated for their

20    injuries?"  It's kind of the same kind of thing.  I don't see a

21    problem with that, so I'm going to overrule your objection.

22    She can -- I'll ask that question.

23         MR. MOBERLY:  Okay.

24         THE COURT:  Okay.  All right.  Now we got some -- we

25    have some motions in limine.

1            Okay.  Let's go to the motions in limine.  Plaintiff's

2     Motion in Limine No. 1, to take judicial notice of certain

3     public records and documents.

4            I'm not sure what the relevance is in what you're

5     asking me to do here.

6            MS. ADAMS:  Yes.  And I recognize that in defense's

7     response, Your Honor.  There are the Senate rules that are

8     adopted each session pursuant to the Arizona State

9     Constitution --

10           THE COURT:  Let me ask you this:  Are you offering --

11    you want to offer that into evidence, or are you going to

12    cross-examine somebody with it?  How do you intend to use it?

13           MS. ADAMS:  I think the aim is to, yes, introduce the

14    Senate rules.  So the Senate president dictates under Senate

15    Rule No. 1 any and all decisions that relate to employees of

16    the Arizona State Senate.

17           Wendy Baldo is the chief of staff of the Arizona State

18    Senate.  She testified during her deposition that she has been

19    delegated the authority to make these decisions on behalf of

20    the president.

21           THE COURT:  Well, if she's going to testify to that, I

22    don't know why you also need it to come in under judicial

23    notice.  I mean, it sounds like this is going to be something

24    that's not going to be contested, and if you're going to use it

25    as evidence, you don't need a judicial notice finding for that.

1    Use it, and the witness can identify that as the rule and if

2    that's the rule they work under.

3           MS. ADAMS:  It is proposed -- Senate Rule No. 1 is

4    proposed as an exhibit, but I think it's not stipulated to.

5           In addition to that, Mark Bogart was the Caucasian

6    male that replaced Ms. Adams' employment.  He is listed in the

7    Senate Journal, the official record of the Senate's business,

8    as a policy advisor.  Senate asserts he was a consultant.

9           And I'm seeking admission both of the exhibit and

10   judicial notice.  I understand it's redundant, but we don't

11   have a ruling on the exhibits as of yet, and it's not

12   stipulated.

13          THE COURT:  Let's see the way this goes.  I'll defer

14   ruling on this until I know more about how this is going to be

15   used, but it sounds like if it's something you're going to use

16   with a witness anyway and it's something you're relying on and

17   it's a rule propounded by the Senate, I don't see how there

18   could be an objection to it, if it's relevant.

19          MS. ADAMS:  Thank you.

20          THE COURT:  So we'll see how this plays out, but I

21   still would like to see what happens at trial with this.

22          MS. ADAMS:  Okay.

23          THE COURT:  Okay.  So Plaintiff's Motion in Limine

24   No. 1, I'm going to defer ruling on admissibility until it's

25   offered at trial.

1          Okay.  Number 2, Plaintiff's Motion in Limine No. 2,

2    to exclude evidence of EEOC application and paperwork.

3          I'm not sure what it is you're -- are you asking to

4    exclude evidence or the proof of what the EEOC determined or

5    did?  Is that what you're asking for?

6          MS. ADAMS:  I think so, yes, Your Honor.

7    Specifically, the charge of discrimination, which is Bates

8    stamped AZSEN 0080 and 0081.

9          THE COURT:  I think you've answered my question.

10         So what you're asking to exclude is the finding and

11   the ruling of the EEOC?

12         MS. ADAMS:  The finding, the charge of discrimination,

13   the notice of dismissal, the intake notes with hearsay.

14         THE COURT:  Okay.  I see this as a 403 issue.  It

15   looks like there may be some relevance to it, but it looks like

16   the risk of unfair prejudice substantially outweighs that.

17   That's how I'm looking at it at this point.  Is there something

18   I'm missing?

19         MR. MOBERLY:  You're not, Your Honor.  The Ninth

20   Circuit's law on this is a little bit hazy, but if that's your

21   assessment, I understand that.  But it would be limited to the

22   determination itself?

23         THE COURT:  Determination.

24         MR. MOBERLY:  Correct.

25         THE COURT:  Let me make that clear.  I'm going to

1    grant your motion under Rule 403 as to evidence or proof of

2    what the EEOC determined or did.  I think there -- the risk of

3    unfair prejudice substantially outweighs any probative value.

4         But I'm going to deny it as to purposes of impeachment

5    as to any statements or assertions that Ms. Adams made in the

6    EEOC proceedings that are inconsistent with her testimony or

7    positions taken in this litigation.

8         In other words, what the EEOC did isn't coming in.

9    But what you did might if it's inconsistent with what you're

10   claiming here.  Follow that?

11        MS. ADAMS:  Yes, I do recognize that, Your Honor.  I

12   would also ask that it be -- plaintiff have the benefit of

13   impeachment as it relates to the Senate's corporate

14   representatives that responded to the EEOC claim.

15        THE COURT:  I'm not sure what you're asking me to do.

16        MS. ADAMS:  I'm asking you to allow me --

17        THE COURT:  If you've got something that impeaches

18   them, use it.

19        MS. ADAMS:  Okay, great.  Great.

20        THE COURT:  All right.  Plaintiff's Motion in Limine

21   No. 3, to exclude any reference to the Senate's employment

22   decisions and reasoning of employer action without personal and

23   direct knowledge, nor prior to offer of proof.

24        You know, in a vacuum it's hard for me to really rule

25   on this.  I'm not going to deny it, but I'm not going to grant

1    it either.  I'm going to defer ruling on that objection until

2    it comes up at trial.

3         So you need to make your objection when it comes up.

4    Okay?  When the evidence is presented or offered, then I can

5    rule on it.  Because at this point I don't know what specific

6    witnesses or statements you're asking me to exclude, and I

7    can't rule on this in a vacuum.  Okay?

8         MS. ADAMS:  Yes, Your Honor.

9         THE COURT:  All right.  So Motion in Limine No. 3 is

10   deferred until the objection is raised at trial.  And I'll rule

11   on the evidence as it's offered, if there's an objection made

12   to it.

13        Okay.  Invoking the rule of exclusion of witnesses,

14   that's granted.  All witnesses will remain outside the

15   courtroom until they're called to testify.

16        And then when they're -- but when they've been

17   released and they're finished testifying, they can come in and

18   watch if they wish.  And if there's an investigator, then that

19   person may be allowed to stay and assist counsel at counsel

20   table.

21        Plaintiff's Motion in Limine No. 5, to exclude

22   evidence of collateral source benefits.

23        So you're talking about unemployment benefits?  Is

24   that what you're referring to?

25        MS. ADAMS:  That's exclusively it.

1           THE COURT:  Do you have any objection to that?

2           MR. MOBERLY:  No.  That was the part we agreed with.

3    It just seemed to be broader.

4           THE COURT:  All right.  So I'm going to grant the

5    motion in limine as it pertains to unemployment compensation

6    benefits.  But I think where the disagreement -- I'm not sure

7    there is a disagreement, but I'm not going to exclude it as to

8    interim earnings that are not a collateral source.  Okay?

9           MS. ADAMS:  Yes.

10          THE COURT:  All right.  Defendant's motion in limine

11   regarding unemployment compensation proceedings.  Now, what the

12   concern is is that defendant didn't contest plaintiff's claim

13   for unemployment benefits, and the defendant argues that in the

14   unemployment compensation arena, there's a different standard

15   that's employed than employed in this case.

16          It seems that under 403, there is some relevance but

17   it would be substantially outweighed by the risk of unfair

18   prejudice.

19          So I'm going to grant the motion except for I'm

20   denying it as to statements or positions taken in those

21   proceedings by the defendant that are inconsistent with

22   positions or statements taken in this case, which plaintiff may

23   use in rebuttal and/or for impeachment.

24          MR. MOBERLY:  Your Honor, could I ask a question about

25   that?

1        THE COURT:  Yeah.

2        MR. MOBERLY:  Because I believe all the -- I don't

3    believe there was -- I could stand to be corrected, and if I

4    do, I understand your ruling.  But I believe the only issue

5    here is the fact that we did not contest --

6        THE COURT:  If there's no other evidence, I don't

7    know.  I don't know what went on there either, but I'm just

8    saying, like we did in the earlier one, the EEOC proceedings,

9    allowed impeachment to come in if there's something

10   inconsistent with what's taken here.  And that's all I'm doing.

11       MR. MOBERLY:  And I think I understand that.  What I'm

12   not clear on, and I apologize, is would the fact that we did

13   not contest it be deemed -- itself be deemed an inconsistent

14   statement?

15       THE COURT:  Not in her case in chief.  But you can

16   open the door on this one.

17       MR. MOBERLY:  Okay.  Fair enough.

18       THE COURT:  Okay.  So in rebuttal, there may be

19   something that she can present to show that, hey, they're

20   saying this, but here's the position they took at the

21   unemployment compensation proceedings.

22       MR. MOBERLY:  I --

23       THE COURT:  So I'm not going to let her bring it in in

24   her case in chief, but Ms. Adams, if you feel that there's

25   something that happened in their defense case that raises

1  issues that are inconsistent with the position they took in the

2  unemployment compensation proceedings, bring it to my attention

3  and we'll talk about it.  And he could open the door, but don't

4  you decide he's opened the door until you've talked to me about

5  it and I'll make that decision.  Okay?

6       MS. ADAMS:  Yes, Your Honor.

7       THE COURT:  All right.  Defendant's motion in limine

8  regarding alleged settlement discussions.

9       Is there an issue about delay in filing your EEOC

10  claim in this case?

11       MR. MOBERLY:  No, Your Honor.

12       THE COURT:  Okay.  All right.  Well, I'm going to

13  grant the motion under Rule 408.  Defendant's motion in limine

14  regarding alleged settlement discussions is granted.  The only

15  thing that I saw in the arguments was that there was some

16  concern about a delay in filing the EEOC claim.

17       If that's an issue in this case, then plaintiff can

18  testify that the delay was caused by settlement discussions.

19  So she can talk about the settlement discussions only in that

20  context, but she can't talk about the substance of them.  Okay?

21       All right.  Defendant's motion in limine to preclude

22  plaintiff from introducing or relying on damage evidence.

23       All right.  We've got, just, I guess, yesterday,

24  pursuant to my order, plaintiff's damages spelled out, and it

25  looks like in a lot of detail.  I'm not sure this detail is

```
1    spelled out before, but now it is.  Does the defense have an

2    objection?

3            MR. MOBERLY:  Yes, I do, Your Honor, if I could be

4    heard on this.

5            THE COURT:  Yes.

6            MR. MOBERLY:  I think this is exactly the problem that

7    I was pointing out.

8            THE COURT:  Well, let me just -- let's just walk

9    through her -- the disclosure as to what she claims her damages

10   are, and you can tell me.  Because I've got to also make a

11   determination not only to whether it was disclosed or not in

12   appropriate time frame, but whether it -- there's been any

13   prejudice or harm.

14           So --

15           MR. MOBERLY:  I think I might be able to spare us

16   going through the whole thing.

17           THE COURT:  All right.  All right.

18           MR. MOBERLY:  I mean, I'm willing to do that, but

19   my --

20           THE COURT:  Yeah, that's fine.  If there's something

21   you agree that you're not contesting, let's just -- let's not

22   spend time on that.

23           MR. MOBERLY:  So when we filed our motion, we

24   described very specifically what questions weren't answered,

25   what we had asked for, what had not been provided.  Most of it
```

1    had to do with the mitigation issue.  We wanted income tax

2    returns.  We wanted employment applications.  We wanted all of

3    this stuff.

4            That all was addressed by you in November of 2017,

5    when the plaintiff was instructed to produce that.  We quoted

6    that portion of your order or your -- of the transcript from

7    that hearing, and you followed it up with an order.

8            What has never been produced since then is a single

9    document or item of evidence of any kind reflecting mitigation

10   issues, which we need in order to address this half million

11   dollar -- I mean, what was produced last night isn't even

12   really evidence, in my mind.  It is, in fact, a demonstrative

13   exhibit for closing argument.

14           So --

15           THE COURT:  I think what it is is what should have

16   been produced under Rule 26 to describe the damages.

17           MR. MOBERLY:  I would agree with that, Your Honor.

18           THE COURT:  So that's what this looked like to me.

19           MR. MOBERLY:  Yeah.

20           THE COURT:  So --

21           MR. MOBERLY:  So that's when it all started.  Let

22   me -- if you give me just a minute so I can walk through it.

23           THE COURT:  Okay.

24           MR. MOBERLY:  You clearly understood, when you saw the

25   motion, what we were talking about, because your order on

1    Monday specifically quoted those things that we were looking

2    for:  income tax returns, applications, et cetera.  It couldn't

3    have been more clear.

4         The plaintiff's response didn't indicate those had

5    ever been provided, and they haven't been.  It said, as you

6    will recall --

7         THE COURT:  Hang on.  Plaintiff's response to your

8    motion in limine?

9         MR. MOBERLY:  My motion.  I'm sorry.  I'm going too

10   fast.

11        THE COURT:  All right.  Go ahead.

12        MR. MOBERLY:  It said, if you will recall, that we

13   would not agree to a protective order and that we could have it

14   if we would agree to that.

15        Apart from the absurdity, if you will, of taking that

16   position four weeks before trial, when she wants to introduce

17   this evidence, the fact is that it's not accurate.  I have an

18   exchange of email with the State's counsel and Ms. Adams in

19   February of 2018, three months after you instructed her to

20   produce it, where she said she was going to file the motion for

21   protective order that you advised her that she needed to do,

22   and the State's attorney said, "We'll not object to that."  And

23   she said it twice in that email.  I'm happy to share it with

24   everybody.

25        So we get to the point, then, where we file our

1    motion.  You order her -- this is this most recent motion on

2    Monday.  You order her to produce that mitigation stuff, and we

3    still don't have one lick of evidence on that.  We don't have

4    an income tax return.  We don't have a W-2 form, a 1099 form.

5    We don't have an employment application, a rejection letter.

6          So if things stand as they are now with this evidence

7    that she produced untimely last night, even, she's going to get

8    to go to court and make an argument for half a million dollars

9    where we're in a position of not being able to challenge it on

10   mitigation grounds or even to be able to decide whether it

11   would be prudent or imprudent to challenge it.

12         We don't even have an interrogatory answer or a

13   deposition statement that says, "I don't have this kind of

14   material."  We just have a stubborn plaintiff that refuses to

15   produce what the rules require her to produce, what you have

16   twice ordered her to produce -- arguably three times ordered

17   her to produce -- and we're now two and a half weeks from

18   trial.  This is exactly why I think this can't go like it's

19   structured.

20         THE COURT:  So I guess -- so my question is, then,

21   what portion of the damages that she set out in her filing from

22   yesterday are you objecting to?

23         MR. MOBERLY:  How do I know?  I mean, if I have

24   mitigation issues, then I -- she's got flat losses.  If I've

25   got mitigation evidence, I can figure out what offset I can

```
 1    argue.  If I've got employment applications or rejections, I

 2    can challenge that.  I could have even retained an expert to

 3    testify to that.

 4             I'm at a loss as to answer your question.  That's the

 5    problem.

 6             THE COURT:  Well, it looks like she's showing

 7    $1,500 -- I think that's per month -- as a mitigation amount.

 8             MR. MOBERLY:  Sure.

 9             THE COURT:  Is that --

10             MR. MOBERLY:  Do I have to accept that?

11             THE COURT:  Is that her unemployment?  I don't know.

12    Do you know what that is?

13             MR. MOBERLY:  I don't know where that came from.

14             THE COURT:  All right.  Ms. Adams, do you want to

15    respond?

16             MS. ADAMS:  Yes, I would like to respond, Your Honor.

17             Two things.  One, I was deposed in March of 2018.  The

18    issue of damages did come up.  I did speak to the issue of

19    damages.  I did speak to the issue of job search.

20             In the proposed order that we -- the joint proposed

21    pretrial order --

22             THE COURT:  Let me just cut right to the chase.  Have

23    you produced your income tax returns?

24             MS. ADAMS:  I have not.

25             THE COURT:  Why not?
```

1          MS. ADAMS:  Some of them are not filed, and that has

2     been communicated both to Mr. Moberly and -- I'm sorry, strike

3     that -- it's been communicated to Ms. Andrea Lovell as well as

4     Mr. McKay at the Senate.

5          THE COURT:  So what income tax returns were you

6     seeking?  What years?

7          MR. MOBERLY:  Any of the interim income tax returns

8     from the time that her employment ended through today's date.

9          THE COURT:  Have you filed an income tax return any of

10    these years?

11         MS. ADAMS:  2015 and 2016.  I'm happy to provide an

12    IRS manuscript of my reported earnings.

13         THE COURT:  Why don't you give him your income tax

14    returns?

15         MS. ADAMS:  Because I think they'll dump them in the

16    public domain, Your Honor.  It's the same reason -- I have

17    medical injury.  I'm not claiming -- I'm not disclosing that or

18    it's not an issue in this case because I -- I feel --

19         THE COURT:  Did you see my ruling that when you make

20    claims like this, you waive confidentiality and privilege?  You

21    can file a motion for protective order, and I've just heard

22    that they would agree to it.  You wouldn't even have to file a

23    motion; you'd file a stipulation.

24         MS. ADAMS:  They wouldn't agree to a stipulation.

25         THE COURT:  Well, whether they would or not, I've

1   already ruled that you've waived the confidentiality or

2   privilege of your income tax returns by making these claims for

3   lost wages.  They're entitled to know what your income is and

4   what your mitigation -- the mitigation they think they're

5   entitled to claim in this case.

6        And they're not required to rely on what you put down

7   in some document that you submit a day before our final joint

8   pretrial conference.  They're entitled to see the underlying

9   evidence.

10       MS. ADAMS:  I understand that, Your Honor.  I think

11  mitigation in part, based on Ninth Circuit case law, is in part

12  earned income and in part attempts.  And I think, as it relates

13  to my deposition, I complied.

14       THE COURT:  Well, I've already ordered that you comply

15  by submitting documentation.  You've told me there's at least

16  one or two income tax returns you have refused to submit

17  despite my order that you do that.  Are there applications for

18  jobs that you have prepared and submitted to any employer?

19       MS. ADAMS:  Yes, Your Honor.  Yes, Your Honor.

20       THE COURT:  Have you submitted those as part of the

21  evidence requested in this case?

22       MS. ADAMS:  I think the job search is Bates stamped,

23  and there's -- they're not willing to stipulate to the

24  admission of it.

25       THE COURT:  Okay.  So you have provided the defendant

1    with every effort you've made to seek employment since you have

2    lost your employment with the defendant?  Is that true?

3            MS. ADAMS:  I don't know that it's every effort that

4    I've made, Your Honor, but I have provided them with job search

5    information.  I've provided them with unemployment compliance,

6    job search.  I've provided them with notice that I started my

7    own business.

8            The defendant -- part of the issue in this case is

9    employer approval and participation in education.  That's a

10   mitigating factor.  I've done that.  I've run for office.  The

11   Arizona State Senate is aware of that.  These are all

12   mitigating factors.  They can --

13           THE COURT:  So what you're telling me are the things

14   you've done to try to earn income since you've lost your job?

15           MS. ADAMS:  Yes.

16           THE COURT:  And you disclosed all of this?

17           MS. ADAMS:  Yes.  I had this conversation with

18   Mr. John Fry when I was deposed for seven hours in March of

19   2018.

20           THE COURT:  Is there any income you have had other

21   than the -- is that $1,500, is that unemployment compensation?

22           MS. ADAMS:  No, it's not unemployment compensation.

23   It's money that I draw from my business.

24           THE COURT:  Okay.  Have you disclosed your business

25   profit and loss statements or the earnings or anything that

1   they can look at to determine if the business is -- what

2   mitigation should be applied to the business?

3             MS. ADAMS:  No, I haven't, other than -- I mean,

4   verbal deposition disclosure.

5             THE COURT:  Tell me, how do you get the $1,500?  How

6   does that work?

7             MS. ADAMS:  How do I get it?  I took out of

8   retirement.  Right?  I took out retirement money to start this

9   business.  I live off credit cards.  I drive a 12-year-old car.

10            THE COURT:  So the $1,500 is not income, it's credit?

11  It's borrowed money?

12            MS. ADAMS:  It's -- well, no, it's -- in a --

13  depending on how you -- depending on how you assess it, it's my

14  retirement money.  It's cashed with a 10 percent penalty

15  retirement.

16            THE COURT:  So the $1,500 is coming out of an IRA or a

17  401(k)?

18            MS. ADAMS:  No, I took it -- I take in withdrawals

19  over the course of time at different intervals for purposes of

20  running my business and for purposes of surviving.

21            THE COURT:  Let me ask you this:  Has your business

22  made a profit?

23            MS. ADAMS:  Sorry to breathe so deeply.

24            I don't know that it is necessarily cash flowing, but

25  it's -- you know, we're breaking even.

1          THE COURT:  Well, all the problem here is is that that

2     information is discoverable by the defendant so they can assess

3     whether or not there is -- what you're -- what you've told me

4     basically is that that $1,500 isn't even mitigation if it's

5     coming out of your 401(k).

6          But they're entitled to see what it is you're doing

7     and figure out what the mitigation you're entitled to --

8     they're entitled to cut against any claim, if there is some.

9     And you haven't given it to them.  I mean, it sounds like, to

10    me, that what you're describing to me is you're not making

11    enough money to even make 1,500 bucks every two weeks,

12    whatever, a month, whatever it is you're claiming, and that's

13    borrowed money from your 401(k), which shouldn't even count as

14    mitigation.  That's what it sounds like.

15         But how do they know?  They haven't seen your numbers.

16    They haven't seen your books.  They haven't seen what it is

17    that you're relying on for that $1,500, and they're not

18    required to just take your word on it.  They're entitled to see

19    the underlying documentation.  Have you given that to them?

20         MS. ADAMS:  I think I've given them some of the

21    documentation, Your Honor.

22         THE COURT:  Do you file -- does your business file

23    any --

24         MS. ADAMS:  No.

25         THE COURT:  -- kind of quarterly statement?  Do you

1   have any records you're keeping of the money in and money out

2   for your business?

3            MS. ADAMS:  I do have that.  I do have record of that.

4   I don't -- when I filed 2016, it was the business's first year.

5   I was in school.  I didn't graduate until May of 2016 from

6   Thunderbird, but started the business in 2015, and really

7   started seeing folks and kind of moving the business forward

8   after 2016.

9            THE COURT:  Do you have a bookkeeper, anybody keeping

10  books?

11           MS. ADAMS:  I do not, no.

12           THE COURT:  How do you keep your books?  Do you

13  have --

14           MS. ADAMS:  I just have an Excel spreadsheet.

15           THE COURT:  So you have an Excel spreadsheet that

16  shows what money's coming in, what money's going out?

17           MS. ADAMS:  I do.

18           THE COURT:  From day one of the business?

19           MS. ADAMS:  I don't know that it's from day one.  I

20  created the business in 2015.  I formed it in 2015.  I think

21  it's probably around 2016, post-Thunderbird, summer of 2016

22  forward.

23           THE COURT:  So what's the nature of the business?

24           MS. ADAMS:  It's a law firm.

25           THE COURT:  Okay.  So you have a law firm where --

```
 1   what kind of services do you provide?
 2           MS. ADAMS:  Mostly I'm working with start-ups.  I'm
 3   doing some -- I'm doing -- mostly working with start-ups, doing
 4   some end user license agreements, operating agreements,
 5   formations, dissolutions.  Lately I'm doing some breach of
 6   contract work.
 7           THE COURT:  And you're an employee of your company?
 8           MS. ADAMS:  I'm not sure that I understand that
 9   question.  I --
10           THE COURT:  How is your business formed?  Is it a
11   professional corporation or --
12           MS. ADAMS:  It's an LLC.
13           THE COURT:  Okay.  And where does the $1,500 come
14   from?  That's compensation as an employee or is it profit as a
15   business owner?
16           MS. ADAMS:  I take it as compensation.
17           THE COURT:  And do you get it -- do you file a W-2
18   with the IRS?
19           MS. ADAMS:  Oh, I see what you're saying.  No.  No.  I
20   probably take it -- I'm extracting the $1,500 out of the
21   business a month.  And that's -- and I offset that with credit
22   cards and other mitigating things.  I moved out of my house.  I
23   rent it out.  It's -- you do what you have to do to survive.
24   You lose your job, right?
25           THE COURT:  Well, and no one's criticizing that.  But
```

1    I am criticizing your lack of disclosure.

2            MS. ADAMS:  And the lack of disclosure is exactly the

3    same liability on the other side.  I mean, they --

4            THE COURT:  I'm sorry, what does that mean?

5            MS. ADAMS:  They want to say, oh, a stubborn

6    plaintiff.  The Senate has failed to disclose many documents,

7    all of which are exclusively in its custody and control, even

8    pursuant to this Court's order.

9            THE COURT:  Well, I'm not talking about them right

10   now.  I'm talking about --

11           MS. ADAMS:  I understand that.

12           THE COURT:  -- your case.  An important part of your

13   case is your damages.

14           MS. ADAMS:  It is.

15           THE COURT:  An important part of their defense is

16   understanding what your damages are.  They need to understand

17   them, and so they need to understand what you claim you lost

18   and what you have earned in the interim as mitigation.

19           MS. ADAMS:  Yes.

20           THE COURT:  And they're not required to take your

21   word.  They're entitled to see your books.  And you haven't

22   turned the books over to them; is that right?

23           MS. ADAMS:  I think it's roughly correct, Your Honor.

24   Right?  They -- and I think it's convenient that Mr. Moberly is

25   here and he's not been on this case for, you know, anything

1    that predates February --

2         THE COURT:  I don't think that really matters.  If you

3    disclosed it somewhere, you can show me where it's been

4    disclosed, whether Mr. Moberly was on the case or not.

5         I'm just trying to get down -- why haven't you just

6    turned that over?  It seems to me that you know what you've got

7    to do.  You know what your claim is.  You know they're entitled

8    to investigate mitigation.  And you're putting yourself in a

9    situation where you may not be able to put on some of your

10   evidence because you haven't disclosed enough.

11        MS. ADAMS:  I think, Your Honor, two things.  One, as

12   it relates to the 2015 tax return, I can disclose that.  I

13   would like to disclose it under a protective order of this

14   court.

15        Two, as it relates to the 2016 tax return, it was

16   filed substantially late, after 2016, after the close of

17   discovery.  So -- and I'm happy to send that over.  But as it

18   relates to --

19        THE COURT:  Look, I'm not going to just create some

20   sort of protective order for you.  Either you get a stipulation

21   or you file a motion.

22        But besides that, I've already ruled that whatever

23   confidentiality or privilege you have with regard to your tax

24   returns has been waived by the fact that you've made this claim

25   in this case.  They're entitled to see those.

1          MS. ADAMS:  Okay.

2          THE COURT:  It is not some favor you're doing for me

3     or for them to give it to them.  It's required.  I've required

4     it, and I've mentioned it more than once before.

5          So I'm just puzzled why we're having this conversation

6     for the second or third time.  It just doesn't make sense to

7     me.  The risk you're taking is this evidence may not come in.

8     You might put on a great case and prove that there was

9     discrimination or retaliation, but you may not be able to prove

10    any damages.  Because you've got to share with them what you've

11    done so they can do their investigation.

12         MS. ADAMS:  And I would say, Your Honor, there is a

13    difference between damages and mitigation.  Right?  There's a

14    difference between damages and mitigation.  They are asking you

15    to make a dispositive ruling as it relates to damages on this

16    case.  They've asked for summary judgment.  They lost.

17         As it relates to damages -- and they don't specify,

18    right?  As it relates to the back pay -- as it relates to the

19    back pay, the Senate is very clear as to what Ms. Adams'

20    earnings were, as to what the calculations would be, as to what

21    damages might be.

22         THE COURT:  Hang on a second.  I don't think I'm

23    hearing him say he's objecting to your calculations as to what

24    you can claim you would have earned.  But what I hear him

25    saying is, how can we have a fair assessment of your damages if

1    we don't know what your mitigation is?

2         MS. ADAMS:  And so can we clarify that?  Because I

3    think they are -- I think they are objecting to what I would

4    have earned and entry of that evidence.

5         MR. MOBERLY:  The point is simply that we can't make

6    an assessment of the appropriate damage award without both

7    components.

8         THE COURT:  You're not objecting to what she's

9    claiming she would have earned; you're just objecting that, we

10   can't assess -- determine what the damages are unless we have

11   both sides of that equation?

12        MR. MOBERLY:  Not only the offset earnings but also

13   the efforts to find other employment, none of which we've been

14   given other than, she is correct, we did get some unemployment

15   submission documentation from her early on.

16        THE COURT:  Okay.

17        MS. ADAMS:  Starting a business is mitigation.  Going

18   to school and pursuing a degree is mitigation.  And I would

19   argue that running for office is mitigation.

20        THE COURT:  That all may be true, but you've got to

21   tell them -- give them the documents that show all these things

22   so they can assess what it was you did and what your efforts

23   were and what your income was from those efforts.

24        MS. ADAMS:  I understand, Your Honor.

25        THE COURT:  They're not required to take your word on

1   this.  They're entitled to see the underlying documents.  And I

2   would expect in this case that the underlying documents would

3   be your spreadsheet from your business, the money that you

4   brought in or lost in your efforts to run for office, your

5   income tax returns, and your efforts at seeking other

6   employment.  I mean, those are things that are the basic stuff

7   that the defense is entitled to see and know when they're

8   preparing for this trial.

9           All right.  So what's the defense's position with

10   regard to the past lost wages?

11           MR. MOBERLY:  Maybe I ought to ask you to repeat that,

12   because I'm not sure what --

13           THE COURT:  I'm looking at her disclosure from

14   yesterday, and she shows past lost wages.

15           MR. MOBERLY:  Well, our position, I guess, is that

16   this came in at 7:30 last night, and I haven't actually looked

17   at those figures.  They may or may not be accurate.

18           THE COURT:  Well, I'm just trying to understand, are

19   there -- are you claiming every category of damages is going to

20   be tainted by the fact that she hasn't produced evidence of

21   mitigation or of the things she did to mitigate her damages?

22           MR. MOBERLY:  No.  I would say that what would be

23   impacted would be back -- back pay or back wages.

24           THE COURT:  Past lost wages?

25           MR. MOBERLY:  Past lost wages.  Front pay, certainly

1   by the mitigation issue in terms of the efforts to make

2   other -- or find other employment.  And we also don't have --

3          THE COURT:  Is there a particular time frame that you

4   claim the past lost wages would cut off?  Because she

5   testified, and I assume in her testimony she gave evidence

6   about what had happened up to that point with her.

7          MR. MOBERLY:  So do I have a position on when her back

8   pay would cease to run?

9          THE COURT:  Yeah.

10          MR. MOBERLY:  I think it runs through trial.

11          THE COURT:  No, no, no.  You're claiming you can't

12   really assess the amount she should be entitled to for past

13   lost wages because she didn't give you mitigation information.

14          MR. MOBERLY:  Right.

15          THE COURT:  How far back would that go?  Would that go

16   from the very moment she is terminated, or is there a certain

17   point that you feel that, yeah, we had some information but we

18   have nothing after this, and we shouldn't be forced to allow a

19   damage claim beyond this point for the full amount of the

20   wages?

21          MR. MOBERLY:  Yeah.  Well, again, it's difficult

22   without seeing what she would produce to answer that precisely.

23   I mean, in theory, the entire back pay period is subject to

24   mitigation requirements, and any earnings other than the

25   unemployment would be an offset.

1          I don't know other than what we've heard here today

2     what her employment history is, how much she made at any point

3     in that time.  So I guess the answer, not to compound it, is

4     yes, I'm saying that whole period -- based on the information I

5     have now, that whole period is subject to offset.

6          THE COURT:  Okay.  So there are post-termination

7     damages she's claiming from February 16, 2015, to the date of

8     the judgment of $336,000.  You're claiming none of that should

9     be admissible as evidence to the jury because she hasn't

10    disclosed evidence of the mitigation that you have been

11    seeking?

12         MR. MOBERLY:  That is our position.

13         THE COURT:  But you're not objecting to the $53,000 of

14    pre-termination damages she claims between December 12th and

15    February 13th, 2015?

16         MR. MOBERLY:  I'm not sure what that's a reference to

17    at this point, Your Honor.

18         THE COURT:  I'm assuming it's damages for her lesser

19    income.

20         Is that right?

21         MS. ADAMS:  Yes, Your Honor.

22         THE COURT:  The lesser income she should have received

23    under her theory in comparison to a similarly situated

24    employee.

25         MR. MOBERLY:  So are we -- the question is would we

1    say that was -- that we're -- our objection is to the failure

2    to give us mitigation --

3             THE COURT:  I don't see how mitigation would play on

4    that.

5             MR. MOBERLY:  Yeah, I don't think that would apply to

6    that, that's correct, Your Honor.

7             THE COURT:  All right.  What about past lost benefits?

8             MR. MOBERLY:  Well, I think other than the two things

9    that were left alive in your -- in your summary judgment

10   ruling, the annual accrual leave rate and the compensatory

11   leave time, there are no past benefits at issue in this case.

12            THE COURT:  She says comp time, $22,000, and vacation

13   accrual, $33,000.

14            MR. MOBERLY:  Again, that wasn't really focused and

15   I'm objecting to last night's document, but abstractly, you're

16   correct that the mitigation issue would not -- if those are

17   accurate figures and she can prove the liability, you are

18   correct that it would not offset that.

19            THE COURT:  Okay.  So, and then finally, she's showing

20   ASRS retirement, 6 percent match, and then special damages --

21   that's of 23,000, and special damages of $14,700 for student

22   loan forgiveness.

23            MR. MOBERLY:  Yeah.  See, I mean, I think those are

24   forward-looking losses that may or may not be subject to an

25   offset, again, without knowing -- you know, if she's -- for

1    example, if she was making twice as much as she made at the

2    State, that would all be academic.

3              THE COURT:  But the primary objection is the past lost

4    wages from --

5              MR. MOBERLY:  And future -- and future lost wages.

6              THE COURT:  And future -- from the date of termination

7    to the judgment?  Okay.

8              All right.  Ms. Adams, I don't know what else I can

9    do.  You haven't given them the information that I've asked you

10   to give them three times already, the information about your

11   efforts at mitigation and the documentation that supports that.

12   And they're entitled to it.  I mean, that's -- you got to have

13   both sides of the equation for the jury to have accurate

14   information to assess damages.  If you only give one side, only

15   your side, then that's not fair to the defendant.

16             You've said $1,500.  I don't know if that's every

17   other week or every month, but I'm not sure that's even -- you

18   probably overstated what you've made in mitigation based on

19   what you've just told me, but we don't know.  You haven't given

20   the documentation showing that.  I don't know what else to do.

21             You understand; right?

22             MS. ADAMS:  Not exactly, Your Honor.  I think -- I

23   think one of the damage remedies that's claimed in the

24   plaintiff's second amendment -- second amended complaint is

25   reinstatement.  Right?  And so reinstatement has been on the

1    table since this litigation was filed.

2          THE COURT:  Okay.

3          MS. ADAMS:  It is up to this Court to determine

4    whether or not reinstatement is appropriate.  In the event that

5    reinstatement is not appropriate, case law is very clear that

6    front pay can be made in lieu of reinstatement.

7          And so to -- for defendants to walk into this court

8    today and say, her damages on back pay should be entirely

9    stricken because -- and from the date -- we're talking about

10   the date of February 16th.  My theory of the case is I was

11   terminated on February 13th.  They allege, but don't even

12   answer, the date of termination.  And yet they're asking this

13   Court to say she didn't attempt to mitigate?  I worked the

14   entire week of February 16th at the Arizona State Senate.

15   That's known to them.  That's mitigation.

16         THE COURT:  Okay.  So beyond that, is there

17   information they have about -- any documentation they have that

18   shows what your mitigation efforts were?  I mean, you testified

19   in your deposition that you -- what did you say?  Did you say

20   you didn't have a job but you were looking?  Is that where you

21   were at that point?

22         MS. ADAMS:  No.  I said -- it was 2018.  I said I

23   started -- I created a law firm.

24         THE COURT:  And when did you do that?

25         MS. ADAMS:  In two thousand -- I believe 2015 was when

```
1    I filed and started the lease, and I actively began working

2    after Thunderbird, during -- somewhat during and after

3    Thunderbird, in roughly summer of 2016.

4           THE COURT:  So you had a year where you were busy

5    putting together the law firm?

6           MS. ADAMS:  I collected unemployment and I, pursuant

7    to the unemployment requirements, I conducted a job search for

8    about -- I think for about probably eight nonconsecutive

9    months.  They have that documentation.  That's in 2015.

10          THE COURT:  All right.  Well, it sounds like there's

11   enough there to show that mitigation for that eight-month

12   period when she was seeking -- she was receiving unemployment

13   and showed that she was doing the job search required by

14   statute.  But we have no information about what she did with

15   that law firm.

16          So I think that the mitigation information that's

17   necessary is available for the first eight months after your

18   termination, if that's the number of months you had where you

19   were receiving unemployment and you were providing information

20   to the defense that shows that you were meeting the

21   requirements of the unemployment payment requirements.

22          But beyond that, I don't know how we can find that you

23   have given sufficient information about your mitigation.

24          MS. ADAMS:  I was in -- I was in a 20-month

25   international MBA program, Your Honor.  That is mitigation.
```

```
1    This -- this argument that you have to, like, double your

2    income, that you have to go and make as much as you did before,

3    you don't.  You have to attempt.  And case law is very clear,

4    attending and pursuing a degree, especially one that costs

5    $91,500 that they agreed to and then fire you five months into

6    the program, is mitigation.

7              THE COURT:  All right.  So your mitigation is that you

8    were pursuing a degree instead of looking for --

9              MS. ADAMS:  That's part -- certainly part.  And did

10   obtain a degree, despite all of the crises that you encounter

11   when you sue the Arizona State Senate.

12             THE COURT:  But you were doing that while you were

13   also running a law firm?

14             MS. ADAMS:  I was -- I was pursuing work and doing the

15   executive program at Thunderbird.

16             THE COURT:  It sounds like that's all really good

17   information that the jury would like to hear, but you haven't

18   disclosed it.

19             MS. ADAMS:  They knew it.  They knew it, Your Honor.

20             THE COURT:  But they --

21             MS. ADAMS:  They agreed to the --

22             THE COURT:  Stop, stop.

23             MS. ADAMS:  -- employer approval.  They say that's the

24   insubordination, going and asking when the Thunderbird school

25   is going to close.
```

1      THE COURT:  No, no, no.  No, I'm not -- I'm talking

2  about your law firm.  Your law firm is an active going

3  business.

4      MS. ADAMS:  Yes.

5      THE COURT:  You have money in and money out.

6      MS. ADAMS:  Yes.

7      THE COURT:  They're entitled to see those numbers so

8  they can assess the amount that should be argued by them as

9  mitigation.  You know --

10      MS. ADAMS:  So how -- so how are they harmed?

11      THE COURT:  So no one's faulting you for getting your

12  degree, and that's fine, but you were doing more than that.

13  You were starting a law firm.

14      MS. ADAMS:  Yes.

15      THE COURT:  So go ahead.  How were they harmed?

16      MS. ADAMS:  His argument is, we don't have any way to,

17  you know, prove that she didn't mitigate.  Right?  So

18  mitigation information, it just isn't the hard numbers, right?

19  If he wants to say, look, Your Honor, we think the offset is

20  greater or should be greater, it's one thing.  Get -- get the

21  numbers.

22      THE COURT:  How can he say that without you giving him

23  the basic information where he can get the numbers?  You have

24  all the numbers.  He doesn't.  And he's not required to rely on

25  what you say.  That's the problem.

1          You have a disclosure requirement, especially when

2    they ask you specifically for those documents, that

3    information, and I tell you to give it to them.  That's the

4    problem.

5          No one's faulting you for what you've done.  I think

6    that's great that you started a law firm and finished

7    Thunderbird.  But I am faulting you for not doing what you're

8    supposed to do in this lawsuit when it comes to disclosing the

9    information that's necessary to address the damages,

10   specifically the mitigation.  That's the problem here.

11         MS. ADAMS:  I think there's the economic aspect of the

12   mitigation and there's the noneconomic aspect of the

13   mitigation.  I don't think the failure to disclose a tax return

14   puts them in a position where they're not able to defend on --

15   as it relates to mitigation.

16         THE COURT:  You're not listening to me.

17         MS. ADAMS:  I --

18         THE COURT:  I'm not talking about just tax returns.

19   I'm talking about your business, the business where you're

20   drawing $1,500 every so often.

21         MS. ADAMS:  And I'm just -- and it's filed on a

22   Schedule C, Your Honor.  It's filed on a Schedule C.

23         THE COURT:  Well, whatever.  You're giving in your

24   calculations of your damages a figure of $1,500.  Is that a

25   month or every week or how --

1          MS. ADAMS:  It's about every month I take out 1,500.

2          THE COURT:  $1,500 a month?

3          MS. ADAMS:  Yes.

4          THE COURT:  So you recognize there's some mitigation

5    going on.  You've come up with that number.  You decide how

6    much to pay yourself.  They have no idea whether you're losing

7    money or making money or if you're entitled to more or less

8    mitigation.

9          From what you've told me, that sounds like that's not

10   even mitigation.  That just sounds like you're borrowing money

11   from yourself.  But we don't know.  We haven't seen the

12   underlying documents.  That's really the problem here.

13         MS. ADAMS:  I understand that, Your Honor.

14         THE COURT:  So I'm going to at this point grant the

15   defendant's motion regarding preclusion of introducing damage

16   evidence on the past lost wages only for everything after you

17   stopped drawing unemployment benefits.

18         Because during that period, we know that you've

19   complied with your job search and we know how much you were

20   making from unemployment.  After that, we don't know what

21   happened because you didn't give the documentation.  You didn't

22   tell us.  You didn't file your personal income tax returns.

23   You didn't file your business income tax returns.  You didn't

24   give them your spreadsheet regarding your business.

25         All those things should have been disclosed so they

1    could evaluate and make their defense as to mitigation.  And I

2    suspect, based on what you've told me, it would probably all be

3    in your favor.  I still can't understand why you didn't

4    disclose that to them.

5              But that's where we are now.  I'm going to deny --

6              MS. ADAMS:  And --

7              THE COURT:  -- deny the motion as to the other damages

8    claimed.

9              MS. ADAMS:  Can I clarify, Your Honor?  I think as it

10   relates to -- can you state as it relates to the category of

11   damages again?

12             THE COURT:  These are the post-termination damages.

13   You've listed them as from February 16th, 2015, to judgment.

14   I'm going to say you can claim post-termination damages from

15   February 16, 2015, until you stopped drawing unemployment.

16   Because at that point -- up to that point, we knew what your

17   mitigation efforts were and we knew how much you were making

18   from the unemployment compensation.

19             After that, you haven't produced records or documents

20   showing what your income was either through your business --

21   either your business or you personally.  You haven't produced

22   any documentation, despite the requests that have been made

23   repeatedly by the defendant and ordered by me on more than one

24   occasion.

25             Okay.  All right.  Finally, defendant's motion in

1    limine regarding untimely disclosed documents.

2            I don't know what you're talking about.

3            MR. MOBERLY:  Yeah, Your Honor.  That sort of bleeds

4    into the damages issue and the nondisclosure.  There were other

5    types of documents.  There are, even now, pending some public

6    records requests outside the context of this litigation, and

7    our position was that discovery closed.  Our position is

8    discovery closed much earlier than these requests cover.

9            But I will tell you, I think this can be deferred to

10   trial, because I think we covered it in the pretrial order as

11   well.

12           THE COURT:  Okay.  Well, keep in mind under

13   Rule 37(c), it's just not a blanket ruling, you win because

14   she's late.  I have to look and see if the failure to disclose

15   was substantially justified or harmless.

16           MR. MOBERLY:  Fair enough.

17           THE COURT:  And I'm going to take a look at that.  If

18   you raise a late filing, I'm going to review it with you.  And

19   if you don't have any prejudice and if it's harmless, it's

20   coming in.  Unless there's some other objection.

21           MS. ADAMS:  And, Your Honor, I think there are, as it

22   relates to exhibits listed in the pretrial order -- proposed

23   pretrial order, there are primarily two issues.

24           One is a subpoena that was issued to the Arizona

25   Department of Administration seeking documents that the Senate

1    did not produce but was required to produce under the rules of

2    discovery.

3              The second --

4              THE COURT:  Let me just -- I've tried to make it clear

5    to you guys that when there's a discovery dispute, call here.

6    We'll get on the phone and resolve it.  You don't need to issue

7    subpoenas when it's something that should have been produced.

8    You let me know about it, and I'll order that it's produced.

9              But go ahead.  Next --

10             MS. ADAMS:  It was a subpoena issued in the fall of

11   2017.  The Arizona Department of Administration came back, and

12   the bulk of the subpoena request is salary pay information for

13   Ms. Adams.  Arizona Senate hasn't -- couldn't produce a last

14   pay stub for Ms. Adams.  They cannot produce a date of

15   termination.  They cannot produce a job description.

16             And that's what makes Your Honor's earlier ruling on

17   damages so punitive.  So punitive.  They have released hardly

18   anything.  They're in contest -- in custody of the entire

19   amount.

20             One of the -- in addition to that subpoena of fall of

21   2017, which was -- the response was emailed to me.  Todd McKay

22   was on the "To" line of the email, received the information at

23   the same time I did.  There is no prejudice.  There's no

24   surprise.  There is no harm.

25             The second is a public records request of March 15,

1    2019.  This is salary information as it relates to policy

2    advisors in the Arizona State Senate.

3         THE COURT:  Well, let me just tell you that I didn't

4    get the sense that the defense was going to strongly object to

5    those things, and I made it clear that unless they can show me

6    how they're prejudiced by the delay, it's probably -- it's

7    going to come in unless there's some other basis for it to be

8    excluded.

9         So I'm not going to rule on it at this point.  He said

10   he'll object if he has an objection to it, but he'll have to

11   show me how he's prejudiced by the delay.

12        MS. ADAMS:  Okay.

13        THE COURT:  And as far as my other ruling being

14   punitive, it's not -- it's not a punitive ruling.  It's a

15   ruling based on the fact that the defense can't prepare for its

16   defense without the documents that have been requested a number

17   of times.

18        MS. ADAMS:  Your Honor, they could have filed a motion

19   to compel.  They deposed me for seven hours.  I provided some

20   documentation.  And mitigation is not strictly tax returns.

21        THE COURT:  Well, anyway, we're at this point in the

22   case.  There's a requirement to disclose that information.

23   There have been interrogatories.  We had a discussion about it

24   earlier, months ago, when I told you that, you know, when

25   you're a plaintiff, you have a duty to disclose a lot of

1    things.

2          And no one got back to me and said, "I'm not going to

3    disclose this because they're not going to sign a protective

4    order."  I would have denied that requirement anyway.  If you

5    filed a motion, I probably would have granted a protective

6    order, but I'm not going to say you don't have to produce it

7    because they haven't stipulated to a protective order.

8          They don't have to stipulate to a protective order.

9    You've waived any privilege or any kind of confidentiality when

10   you brought this claim seeking these damages.  I don't know how

11   many times I got to tell you that.

12         MS. ADAMS:  I understand, Your Honor.

13         THE COURT:  All right.  I think we've covered just

14   about everything.  Here's how we do voir dire.

15         (The Court and the courtroom deputy confer.)

16         THE COURT:  We'll have the jurors all brought in.  I

17   ask all the jurors the questions.  I don't -- used to be the

18   judge would put 12 jurors in the box and then they'd ask those

19   jurors, and if someone got struck, they'd bring somebody else

20   and replace them.

21         I ask all -- I think we're having like 35 jurors

22   coming.  I'll ask all of them the questions, but the first

23   eight are the ones who will probably be our jury.  Okay?  As

24   they go -- so you're probably best spending most of your time

25   with the first jurors.

1          Now, if Juror No. 1 gets struck, then we're talking

2     about Juror 2 through 9, possibly.

3          Anyway, during the voir dire, if one of the jurors has

4     a situation like, "I got to take my mom in for chemotherapy" or

5     something, I'm going to let them go right then.

6          But there will be some other jurors who give answers

7     I'm not clear about.  What I'll do is before I ask the jurors,

8     there's a question that -- near the end of the questioning

9     saying on the back of their numbers, there's questions about

10    what area do you live in, how far did you go in education, how

11    many kids do you have, what do you do for a living.

12         Before I ask those questions, I'll call you up, say,

13    "Here's the jurors I intend to strike at this point because I

14    think their answers require me to strike them for cause."  But

15    I'll give you a chance to tell me.  If you object, I'll let

16    them stay, and you can follow up with them.  Okay?

17         So when I call you up, please bring your notes about

18    the jurors, because I'm going to be saying, "I see Juror No. 3,

19    he said he couldn't be fair.  I think we should let him go.

20    Any objection?"

21         All right?  That way I'm not asking all the jurors

22    these questions about their whole history when we know they're

23    going to be gone anyway.  It's just a matter of saving time.

24    Okay?

25         (The Court and the courtroom deputy confer.)

1          THE COURT:  I'm going to request 35 jurors.  We'll

2     have eight jurors that we'll seat.  To get a verdict here, we

3     only need six jurors, so if we lose one or two jurors, it's not

4     going to be a problem.  And I say "lose" them; someone gets

5     sick during the trial or something like that.

6          When I'm done asking the questions, I'll send the jury

7     out for lunch.  Then I'll ask, "Ms. Adams, do you have any

8     strikes for cause?"

9          That means if there's someone in this jury who said

10    something that you think was disqualifying and as a matter of

11    fairness they should be struck, you let me know.  And then I'll

12    do the same thing for the defense.

13         And then when we're done with strikes for cause, I'll

14    leave.  You guys each get three peremptory strikes.  Okay?  You

15    can strike three jurors for any reason or no reason, as long as

16    it's not for some forbidden reason like race.  Okay?  Or

17    religion.

18         So that's how we're going to do it.  Does either side

19    have any questions?

20         MS. ADAMS:  No, Your Honor.

21         MR. MOBERLY:  No, Your Honor.  I'm sorry.

22         THE COURT:  Okay.  All right.  Normally the way they

23    do it in federal court is they do the strikes at the same time,

24    as opposed to one person strikes and turns it over to the other

25    one.  You guys okay with that, or do you want to do the -- pass

1    it back and forth?

2           MR. MOBERLY:  I'm indifferent.  Whatever Ms. Adams

3    would like.

4           THE COURT:  Okay.  What I'm saying, in state court,

5    Ms. Adams, what happens is the lawyers see the jurors' list.

6    One lawyer makes a strike, then hands it to the other lawyer,

7    and the lawyer makes the next strike and hands it back, until

8    you have six strikes.

9           The way they do it in federal court is it's

10   simultaneous.  You both are making your strikes simultaneously.

11   You don't know who's struck, and you might end up striking

12   somebody he struck.  So that's how it works.

13          So we'll do the simultaneous, then, just like we

14   normally do in federal court.  Okay.

15          All right.  Is there anything else to bring up at this

16   time?

17          MS. ADAMS:  Is there any ruling as it relates to the

18   verdict forms?

19          THE COURT:  Is there an objection to the verdict

20   forms?  I didn't spend a lot of time on those.  Is there an

21   issue?

22          MR. MOBERLY:  Yeah, Your Honor, there is.  We

23   submitted two separate forms, as I think your order allowed.

24          THE COURT:  Let me take a quick look at that.  That's

25   usually not an issue.

1      Oh.  I'm not a fan of asking jurors multiple questions

2 as to each claim.

3      MR. MOBERLY:  Your Honor, if I could just explain our

4 verdict form, it might save you some time.

5      THE COURT:  All right.

6      MR. MOBERLY:  And this problem bled a little bit into

7 our wrestling with the pretrial order.

8      We attempted to make our verdict form fit as closely

9 as possible your summary judgment ruling.  And our position is

10 the verdict forms submitted by the plaintiff don't -- aren't

11 circumscribed by the material that you ruled on, some of which

12 was in the defendant's favor.

13      THE COURT:  Give me an example.  Where in the

14 plaintiff's verdict form are you specifically referring to?

15      MR. MOBERLY:  Well, I'm kind of -- once again trying

16 to find -- there are references in hers, for example, simply to

17 whether there was wrongful treatment.

18      THE COURT:  Where are you --

19      MR. MOBERLY:  That's in Question No. 2.

20      Question No. 1 was whether race was a motivating

21 factor in any adverse action of plaintiff's employment.  Your

22 summary judgment ruling has made it very clear that the only

23 issue with respect to whether race or sex discrimination played

24 a part was pay, annual leave accrual rate, and compensatory

25 leave time.

1          You -- for example, with respect to the termination

2     question, it is strictly a retaliation case.  And that problem

3     permeates all of these questions.  It appears to be an attempt

4     to reinject into the case the issues that you took out of it

5     when you ruled in summary judgment.

6          MS. ADAMS:  And if I can respond, Your Honor, the

7     ruling for summary judgment was as it relates to my -- my

8     understanding of the ruling of summary judgment was as it

9     relates to any kind of economic benefit or disparity.

10         I -- I am not clear, and I did talk to Mr. Moberly

11    about asking the Court for clarification as to whether or not

12    the retaliation claim is strictly narrowly focused on a request

13    for a salary increase.  Having seen the Court's Claims and

14    Damages section, it appears that that is the case.

15         THE COURT:  So, Ms. Adams, do you have an objection to

16    the defendant's form of verdict?

17         MS. ADAMS:  I do.  I think --

18         THE COURT:  What is -- what's the objection?

19         MS. ADAMS:  I'd like to pull it up.

20         Mr. Moberly, was there -- there was an update that was

21    just sent recently, yesterday?

22         MR. MOBERLY:  A little different, but yeah.

23         THE COURT:  I have one that was filed on June 19th.

24    It was filed two days ago.

25         MS. ADAMS:  Okay.

1          MR. MOBERLY:  Yeah, that's the one.

2          MS. ADAMS:  Do you know the name of --

3          THE COURT:  Document 161.

4          MS. ADAMS:  Yes, Your Honor.  Specifically, throughout

5    this document, Document 161, this defendant's amended proposed

6    form of verdict, it asks the question -- for example, Question

7    No. 1:  Has plaintiff proven, by a preponderance of the

8    evidence, that the Senate intentionally and unlawfully

9    discriminated against her based on race with respect to her

10   pay?

11          One, it goes back to the earlier question regarding

12   compensation.  Pay is -- can be -- just be implied as salary.

13   Two, intentional discrimination, I don't know what case or

14   statute they're relying on to have the discrimination have this

15   intentional scienter.  And, three, I asked Mr. Moberly when we

16   met, what is lawful discrimination?

17          THE COURT:  Okay.

18          MR. MOBERLY:  Your Honor -- Your Honor, I'll defer to

19   you if you think "intentionally and unlawfully" is redundant in

20   here.  That's --

21          THE COURT:  Well, does the instruction require

22   intentional or unlawful behavior?

23          MR. MOBERLY:  Well, the case law certainly does.

24   We're talking about a disparate treatment case.

25          THE COURT:  Well, I'm talking about our instruction.

1          MR. MOBERLY:  I don't remember exactly how the

2     instruction was worded.

3          THE COURT:  What she has to prove.

4          MS. ADAMS:  No, it does not.

5          THE COURT:  Okay.  So your objection are the words

6     "intentionally and unlawfully"?

7          MS. ADAMS:  "Intentionally and unlawfully

8     discriminated against."

9          The other issue is as it relates to just the standard,

10    right?  My proposed verdict form includes whether or not race

11    or sex was a motivating factor.  And that language comes out of

12    the -- I need to find it.

13         It's the Palace case, and let's see if I can find it

14    quickly.  And that's an issue of law, right?  I think Mr. -- I

15    think the Arizona State Senate is under the presumption that --

16         THE COURT:  I put that in the preliminary instruction,

17    Claims and Defenses, that the plaintiff has the burden of

18    proving that plaintiff's race and/or sex was a motivating

19    factor --

20         MS. ADAMS:  Right.

21         THE COURT:  -- in the defendant's decisions concerning

22    how she was compensated.  I agree that that is the proper

23    standard, motivating factor, not the sole factor.

24         So are you saying that these jury instruction -- or

25    this jury verdict form suggests that?

1          MS. ADAMS:  I'm saying that it does not.  It doesn't

2    have any "motivating" language, and I think it can easily be

3    read and mistaken by a jury to be read that the discrimination

4    was --

5          THE COURT:  Hang on a second.  Point to me where it is

6    you're referring so I can understand what it is we're talking

7    about.

8          MS. ADAMS:  We can start with Question No. 1, but I

9    think they're all similar.  Question No. 1:  Has plaintiff

10   proven, by a preponderance of the evidence, that the Senate

11   intentionally and unlawfully discriminated against her --

12         THE COURT:  We're taking out "intentionally and

13   unlawfully."

14         MS. ADAMS:  Okay.  So say if we strike that, and then

15   it reads:  Has plaintiff proven, by a preponderance of the

16   evidence, that the Senate discriminated against her based on

17   her race with respect to her pay?

18         I don't think that's the standard.  Right?  I think --

19         THE COURT:  This is a verdict form.  Keep in mind,

20   we're giving the jury instructions that tells them what the

21   standard is.  We're not going to restate the entire jury

22   instruction when we put it in this verdict form.  The jury is

23   to take the jury instructions, make some decisions, and then

24   just give us their results.  This is just to document what

25   their results are.

1          MS. ADAMS:  Okay.  I want to note the objection and I

2     want to again point to --

3          THE COURT:  Tell me specifically what it is you think

4     the instruction should say -- or the verdict form should say.

5          MS. ADAMS:  If you give me a moment, Your Honor, I'd

6     like to pull up mine.

7          THE COURT:  Okay.  I'm looking at your instruction and

8     your number 1.  You say:  Do you find that the Arizona Senate

9     violated the Civil Rights Act in that plaintiff's race was a

10    motivating factor in any adverse action?

11         That's what you want, is that language?

12         MS. ADAMS:  I would like motivating factor language,

13    yes.

14         THE COURT:  That's already in the instruction.

15         MS. ADAMS:  Okay.

16         THE COURT:  I mean, if you look back, when I -- in the

17    preliminary, it says:  The plaintiff must prove both, by a

18    preponderance of the evidence ... number 2, plaintiff's race

19    and/or sex was a motivating factor in the defendant's decision

20    concerning how she was compensated.

21         I don't feel I have to reinstruct the jury in all

22    these verdicts too.  I give them the instruction.  In your

23    closing argument, I'm assuming you're going to make that

24    argument as well:  that I've proven beyond -- by a

25    preponderance of the evidence that a motivating factor in the

1    decision was my race or sex.  And I'm assuming you're going to

2    tell them that it doesn't have to be the sole factor, although

3    it probably was, but only needs to be a motivating factor.

4            I'm summarizing what I think you're going to say to

5    the jury.

6            MS. ADAMS:  I understand.

7            THE COURT:  So I think that with your closing

8    argument, which -- and, but even without your closing argument,

9    the instruction is clear that it has to be a motivating factor.

10   Okay?

11           So I'm going to take out the intentional and unlawful

12   discrimination -- "intentionally and unlawfully" out of these

13   instructions, and I think defendant's verdict forms are what

14   we'll go with.

15           But is there any other objection you have --

16           MS. ADAMS:  I think there's objection to Question

17   No. 8:  What is the present cash value -- A, I think that's an

18   interesting term and not defined for a jury of our peers -- of

19   plaintiff's compensatory damages?  Damages are limited to

20   compensatory only.  I'd like to know why.  And I oppose that

21   Question No. 8, for the record.

22           THE COURT:  Okay.

23           MR. MOBERLY:  Perhaps the present cash value issue is

24   more complex than we need to throw at the jury in this form.  I

25   took this from a form that I found otherwise.

1          The reason that I don't have anything other than -- or

2     that it's limited to compensatory damages is simply because the

3     lost pay and benefits and attorneys' fees issues are for the

4     court in a Title VII case.

5          Now, we could -- you could obviously elect to request

6     an advisory verdict.  Then this number would have to be -- this

7     question would have to be tweaked a bit.

8          THE COURT:  Okay.  So, Ms. Adams, present cash value

9     usually is a situation where there's future economic loss,

10    where they bring an economist in to bring it back to present

11    value --

12         MS. ADAMS:  I understand that, Your Honor.  Does the

13    jury understand that?

14         THE COURT:  Let me finish, please.

15         That's not used here.  It's not relevant, so I'm

16    taking out the present cash value.  That's not an issue in this

17    case.

18         So, you're right, that comes out.  And I'm going to

19    ask that this Question No. 8 be reworked based on my rulings

20    and the motions in limine, to include all the damages that

21    she's seeking that are still available to her in this case.

22    Okay?

23         MR. MOBERLY:  I'll do that.

24         THE COURT:  And then you let me -- pass it by

25    Ms. Adams, and if there's still some sort of conflict, I'll

1   resolve it.

2           MR. MOBERLY:  Okay.

3           THE COURT:  Okay.  Ms. Adams, are there any other

4   objections to the verdict forms?

5           MS. ADAMS:  I -- I just would like an opportunity to

6   go through it one more time, Your Honor.

7           THE COURT:  Okay.  Well, you'll have -- we'll talk

8   about them again before we give the final instructions and give

9   the jury the verdict forms.

10          But at this point, where we are is I'm taking out the

11  "intentionally and unlawfully" out of all of them where it

12  appears.  And Mr. Moberly is going to redo Question No. 8 and

13  run it by you, and you guys hopefully can agree on something

14  there.  If not, we'll resolve it at the time we have to deal

15  with this at the close of the evidence.

16          All right.  Is there anything else to bring up at this

17  time?

18          MR. MOBERLY:  Not from the defendant, Your Honor.  Not

19  from the defendant.  Excuse me.

20          THE COURT:  Ms. Adams?

21          MS. ADAMS:  I have a question as to whether or not a

22  jury list will be available prior to trial.

23          THE COURT:  No, it's not.

24          MS. ADAMS:  Okay.

25          THE COURT:  Anything else?

1          MS. ADAMS:  No, Your Honor.

2          THE COURT:  Okay.  We'll stand in recess.

3          MR. MOBERLY:  Thank you, Your Honor.

4          (Proceedings concluded at 3:01 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 25th day of June,

13   2019.

14

15

16                        s/Jennifer A. Pancratz_____ _____ ____

17                        Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25