**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Talonya Adams, | ) | |
| | ) | No.  CV-17-00822-PHX-DLR |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 12, 2019 |
| Arizona Senate, | ) | 10:21 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL DAY 4 - CLOSING ARGUMENTS**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

    For the Plaintiff:
3
        Talonya Adams, Esq.
4       In propria persona
        2 N. Central Avenue, Suite 1800
5       Phoenix, AZ 85004

6   For the Defendant:

7       Michael D. Moberly, Esq.
        Ryley Carlock & Applewhite PA
8       1 N. Central Avenue, Suite 1200
        Phoenix, AZ 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **I N D E X**

2    **SUMMARY OF COURT PROCEEDINGS**                          **PAGE:**

3    Closing Arguments

                 Plaintiff                              4
4                Defendant                             12
                 Plaintiff Rebuttal                    23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

# P R O C E E D I N G S

1        (Prior proceedings held on the record not transcribed

herein.)

            (Jury present.)

            THE COURT:  Please be seated.

            Ms. Adams, you may proceed.

            MS. ADAMS:  Thank you, Your Honor.

            May it please the Court, Judge Rayes, Mr. Moberly,

ladies and gentlemen of the jury.  Thank you very much for your

time, for your week, for your investment, for your attention to

serve on this jury and to be part of our democracy.

            I brought this case four and a half -- or three years

ago.  I was fired four and a half years ago, and I have

suffered substantial anguish and loss of enjoyment of life as

it relates to the government's conduct in terminating my

employment.

            You've heard this testimony in this case, and it's a

fairly simple case.  Each of us, as we go into our early

adulthood and prepare the foundations of our lives, we marry,

we have children, we play out our lives, and life often has

contradictions.  Some are surprising.  Some are not.

            You heard the testimony here in this courtroom this

week, first with Senator Cajero Bedford on Wednesday morning.

She drove from Tucson to speak on my behalf and tell you she

was dumbfounded when she had found out Ms. Adams had been

1    fired.

2            You heard the testimony from Senator Bradley that

3    talked about Ms. Adams' work at the Arizona State Senate.  He

4    said that she had applied for the general counsel role, that

5    the scale of ranking that the committee used was a 1 to 5, and

6    he gave her a 5 based on her skill, her understanding of the

7    law, her professionalism.  And yet Ms. Adams didn't get the

8    role.

9            You heard the testimony of current assistant minority

10   leader, Lupe Contreras, Guadalupe Contreras.  He said

11   Ms. Adams' firing was abrupt, that her work ethic was solid,

12   and that one day she was at the Senate and the very next day

13   she was gone.

14           You heard current mayoral candidate Steve Farley, who

15   was the assistant minority leader in February 2015, when

16   Ms. Adams was terminated.  He said he was surprised.  He was in

17   leadership.  He was second in leadership.  He had no knowledge

18   of why Ms. Adams was fired and no information at all prior to

19   the firing.  He said she had done excellent work.

20           You heard the testimony yesterday afternoon of Senator

21   Leah Landrum Taylor.  She was the minority leader,

22   African-American.  The first one the State of Arizona has ever

23   had.  She said Ms. Adams' work was exemplary.

24           You heard the testimony today of Senator Barbara

25   McGuire.  She's driven from Pinal County to be here this

1    morning to testify on my behalf.  She said Ms. Adams was one of

2    the best policy advisors she had ever had staff her in the

3    Arizona State Legislature, whether it was the House chamber or

4    the Senate chamber.

5         You heard the testimony of Catherine Miranda.  She

6    said Ms. Adams was awesome.  She said she was so intelligent

7    and clear in her briefing.  Ms. Miranda said Ms. Adams made her

8    a better senator.

9         Ms. McGuire said -- the Silver King Mine is the mine

10   that she was referencing.  Generations of a family trying to

11   activate a mine to get an aquifer permit couldn't get it done.

12        These are the senators that are representing us and

13   have represented us down at the Arizona State Legislature, and

14   that is what makes the Arizona State Legislature such a special

15   place to work.  Because there are members there that are

16   working very hard to create legislation and laws and make

17   things happen in their districts for their constituents.  They

18   are there to serve.  They are there because they care deeply

19   about our state.  They are there because they believe in the

20   laws.  They are there because they want to make a difference.

21        And when I got to the Arizona State Senate, what I

22   realized as I began doing this work was that there are members

23   there, Republicans and Democrats, trying to make a difference.

24   Trying to make an impact.  And that's why I loved this job, and

25   that's why I am suing to redeem my reputation and for my own

1    reconciliation.

2           It has been extraordinary the last four and a half

3    years.  And like the senators that you heard from today,

4    yesterday, I questioned, why am I being treated differently?

5    Why am I making less than my white male counterparts that are

6    staffing the same committees?  Why am I not receiving a salary

7    increase?

8           We learned from Ms. Reilly it's because the process is

9    subjective, she said.  If you want to obtain a raise, the way

10   you get it is your supervisor has to recommend it.  She said

11   there were no policies or procedures in place.  She stated

12   there was no policy handbook.  There was no protocol.  It was

13   arbitrary.  Under those terms and conditions, Ms. Adams was

14   never going to get a raise, and in fact, she never did.

15          When her son got sick, you heard Ms. Baldo say

16   Mr. Winkler, the chief of staff, had given her approved leave

17   to go be with her son.  You heard Mr. Winkler say Ms. Adams had

18   abandoned her job.  You heard him testify in this court

19   yesterday he had called her numerous times.

20          You heard Ms. Hobbs say Ms. Adams did not show up to

21   work on Monday morning.  You see the cell phone records where

22   Mr. Winkler can't identify a single call.  He text her two

23   times, at the time in which he said he was on the floor.  She

24   returned -- she called him within four minutes.  She's away

25   with a sick son.  She's worried.  And she's still working.

1    Because that Arizona State Senate was my life.

2           The burden before you is a burden of proof, and I am

3    the plaintiff and it is my job to prove it.  And I'd like you

4    to turn to page 13, if you can, in your packet.

5           This decision is a simple decision for the jury.  It

6    is your job today to decide whether it's more probably true

7    than not that Ms. Adams was paid a lower salary than her white

8    male counterparts; whether it's more probably true than not

9    that Ms. Adams did not receive a salary increase; that there

10   was disparate treatment regarding her compensation time,

11   regarding her vacation accrual rate, regarding fringe benefits

12   at the Arizona Senate.

13          A preponderance of the evidence, it sounds really

14   fancy legalese.  What it really is is just a probability.  It's

15   51 percent/49 percent.  Just a little bit over the top that

16   perhaps Ms. Adams' race and/or gender was a motivating factor

17   when the Arizona State Senate treated her differently than her

18   similarly situated Caucasian policy advisors.

19          Second aspect of this case is the retaliation case.

20   And as it relates to retaliation, the standard is slightly

21   different.  Retaliation -- under the retaliation case, you --

22   plaintiff, Ms. Adams, is required to prove that I opposed an

23   unlawful employment practice by complaining about

24   discrimination, by complaining about the fact that I was being

25   treated differently, and that after I complained, the employer

1    took adverse action against me.

2          You've seen this testimony.  I met with Wendy Baldo on

3    February 5th, 2015, the chief of staff.  We had conversations

4    about disparate treatment.  I was concerned about the imbalance

5    of -- imbalance of my workload, yes.  I felt like, yes, I was

6    being set up to fail, and I communicated that to her.

7          And also, as the only African-American in the entire

8    Senate chamber, and the only African-American female, I felt

9    like I was being treated substantially different.

10          On Thursday, February 12th, the Arizona Capitol Times

11   issued that article.  And that was the first time in which I

12   understood that I was not only the lowest paid licensed

13   attorney working in a policy advisor role at the Arizona State

14   Senate, myself and the other women on the Democratic Caucus

15   were the only individuals that didn't receive raises.

16          You saw Jeff Winkler's raise, or promotion, go from

17   63,000 to $95,000 a year.  He has a high school diploma, he

18   testified.

19          Senator Bradley said Ms. Osmon, Patsy Osmon, she had

20   been serving 14 years.  Caucasian woman.  Direct experience at

21   the Arizona State Senate.  Loves her job.  Started in her 30s.

22   Was 50-something years old.  Recommended by this committee that

23   Senator Bradley sat on for the chief of staff role.  Senator

24   Hobbs gave it to Mr. Winkler.

25          Ms. Osmon had a law degree.  She had a law license.

1    And I can tell you, while some people take this job as a

2    government job and leave at 5:01 p.m., there were plenty of

3    nights that myself and Patsy Osmon stayed well beyond midnight,

4    working not because we were required to but because we cared.

5    Because we cared deeply.  Because we want to support our

6    senators.  They are our clients.

7            And if a policy advisor's client is a senator, then it

8    would just seem right that if a policy advisor was being

9    terminated for cause, for abandoning a job, for not doing a

10   briefing, for providing inept service, those senators would not

11   only know about it, they would have participated and maybe

12   called for it.  They are the beneficiaries of my work product.

13   I work for them, and in that legislature, they are working on

14   behalf of constituents.

15           In this time, I am to ask you for a favor.  Not really

16   a favor.  I'm to ask you to do your job.  And I'm not good at

17   asking for help.  I grew up 200 percent below the federal

18   poverty level.  My family needed help a lot.  And, yes,

19   sometimes that help was from the government.

20           And it is these public policies, it is these laws, it

21   is these senators, it is this Arizona State Senate that creates

22   the law that has instilled in me a passion for this work, for

23   kids today that are growing up 200 percent below the poverty

24   level.  The result of that is in adulthood, it's very hard for

25   me to ask for help.

1          I believe in self-sufficiency.  I believe in working

2     hard.  I have worked very hard to build a career.  And so to be

3     fired for the first time at the age 36 over the telephone,

4     while in the -- in the Seattle area with a sick son that has

5     been in the ER and hospitalized overnight, it was devastating.

6          I'm not going to tell you how to do your job, but I am

7     going to ask you this:  In the verdict form that Judge Rayes

8     will go over with you shortly, there is an amount that you all

9     are to determine that Ms. Adams should be compensated if she

10    has proven her burden, preponderance of the evidence,

11    51 percent, just a tiny bit more probable than not, that her

12    race and/or sex as an African-American female was a factor with

13    the Arizona State Senate to treat her differently as it relates

14    to employment compensation and subsequently abruptly fire her.

15         You will determine an amount.  You have to decide for

16    yourself individually, as the judge has instructed, and then

17    deliberate collectively.

18         I'm not going to suggest an amount to you.  But I am

19    going to ask that you award an amount that you believe is just

20    and fair to the pain and suffering that myself and my children

21    and my reputation and my career has suffered.  I am going to

22    ask that you enter an amount that is fair and just as it

23    relates to the loss of enjoyment of life that myself and that

24    my children and that my family has suffered as a result of the

25    Arizona State Senate.

1          And I would ask, as you consider that amount, that it

2     be an amount that when we all walk out of here, the government

3     and its five lawyers that are sitting in this room don't smirk

4     when they -- and snicker when they get to the first floor.

5          Thank you, Your Honor.

6          THE COURT:  Mr. Moberly?

7          MR. MOBERLY:  Yes, Your Honor.  Thank you.

8          May it please the Court, Ms. Adams, ladies and

9     gentlemen of the jury, thank you for the opportunity to talk to

10    you.

11         Unlike Ms. Adams, I actually think this is not an easy

12    case in one respect.  The respect is the job you all have to

13    do.  Cases are always hard.  Trials are always hard.  They're

14    hard on the staff.  They're hard on the judge.  They're hard on

15    the attorneys.  They're hard on the witnesses.  But they're

16    really hard for you folks, because you're the ones who have to

17    make a decision.

18         And as you heard at the outset of this trial when we

19    were picking a jury, people remember things differently, they

20    perceive things differently, and that doesn't make anybody

21    wrong.  It makes your job tougher.

22         But I want to give you a couple of early hints here or

23    suggestions as to how this case can be a little bit easier for

24    you.  Because I think there's a bit of a danger of misdirection

25    based on the argument you just heard.

1          I agree that pages 12 and 13, in particular, of the

2     jury instructions are very critical.  But I think the

3     importance is to read them carefully.  Okay?  And that is that

4     there are only two issues in this case at this point:  whether

5     Ms. Adams was discriminated against on the basis of her race

6     and sex, in terms of how she was compensated -- that's one.

7     And that's the only discrimination issue here.

8          There is not an issue about whether Patsy Osmon should

9     have gotten the general counsel job.  There's not -- or the

10    chief of staff job.  There is not an issue about whether

11    Ms. Adams should have been appointed general counsel and was

12    not because of her race or sex.  There's not even an issue

13    about whether she was terminated because of her race or sex.

14    If you look at the jury instructions, the only discrimination

15    issue is whether she, in fact, was compensated differently.

16    And we'll go over that in a minute.

17         The only termination issue is whether she was

18    retaliated against for complaining about discrimination on the

19    basis of race or sex.  That's the only termination issue.  And

20    that is reflected again on pages 12 and 13, to some extent on

21    page 11.

22         So when you go to the jury room, I really want you to

23    focus on that.  And as Ms. Adams said, the form of verdicts,

24    take a look at the questions you're being asked there and

25    answer those questions, please.

1          One more thing about that, I guess.  The jury

2    instructions -- I'm sure you all know cases don't start at the

3    trial stage.  There are preliminary things.  There are

4    depositions that are taken.  The parties make motions, and the

5    Court rules on those motions, and that has occurred in this

6    case.

7          And the jury instructions, as I just described them to

8    you, are a reflection of an order the Court issued earlier this

9    year -- excuse me -- yes, earlier this year in which the Court

10   decided that the only issues in this case are whether the

11   plaintiff's claim that she was discriminated against in terms

12   of pay, compensation time, and accrual rate because of her race

13   and sex; and then, secondarily, whether she was terminated in

14   retaliation for complaining about perceived discrimination in

15   pay.

16         So this is -- this is a very finite description of

17   what you're going to see in your jury instructions.

18         Now, I'm going to tell you something else that I think

19   may be of assistance.  I'm sorry.  Maybe I should step back

20   here.

21         With respect to the exhibits that I would like you to

22   focus on when you go to the jury room -- and I think this will

23   help you decide the case.  And we'll go over them again in a

24   minute.

25         210, 238, 239, and 244.  There are only four of them,

1   but I think they're going to help you decide this case.

2          So let's take a look at that first issue, as to

3   whether Ms. Adams was discriminated against in terms of her

4   compensation because she was African-American and/or female.

5          Could we publish Exhibit 210 to the jury, Your Honor?

6          THE COURT:  Yes, you may.

7          MR. MOBERLY:  And you remember we took a look at this

8   early in the trial, and this is the payroll schedule.

9          If we could flip to year 2013 first, please.  And then

10  make -- perhaps zoom in a little, if it's possible.

11          So you recall here we have the list and the -- list of

12  various staffers, including all the policy employees, policy

13  advisor employees, and this is the first year Ms. Adams was on

14  this.

15          And you will see with respect to the minority staff

16  that she is paid exactly the same as Mr. Winkler.  She's paid

17  exactly the same as Mr. Latham, even though he actually had a

18  secondary dual role, and she's paid 13,000 more than

19  Mr. Fetherston.  And we know, in fact, that all three of those

20  individuals are white males.  Okay.

21          If we could turn forward to Exhibit -- or to the first

22  page, then.

23          This was the following year.  And we see with respect

24  to those four individuals the same situation, with one

25  exception.  And that is, Mr. Winkler and Mr. Latham have

received the 5 percent increase that was automatic that you
heard about.  That was an automatic increase that Ms. Adams and
Mr. Fetherston were not eligible for, not because of their race
or sex, which of course was different in both cases, but
because they were not employed at the eligibility date of
September 2012.

So here we have no indication that those individuals
are treated any differently based on their race or sex.  What
they are treated differently than is the majority staff that
shows up on both of those.  The majority staff gets paid more,
okay?  They do.  And that may not be fair.  Actually, clearly,
Ms. Adams doesn't think it's fair.  Some other witnesses,
including two witnesses that I brought in, don't think it's
fair.

But it's not discrimination.  It's not based, clearly,
on race or sex since all of the minority staffers suffer from
that same problem, be they male, female, African-American,
Anglo.

The system has worked this way, right or wrong, since
before Ms. Adams was hired, during the time she was there, and
after the time she left.  It's still the system.  People are
wrestling with it constantly, but it is not based on race or
sex.

We also know -- and you heard me just read from the
Court's order -- the other two components of compensation were

1   the compensatory leave time and the annual accrual leave rate.

2   And that's reflected -- part of that is reflected here, and

3   there's some other exhibits, but let's just remember right now,

4   rather than burdening you with too many exhibits again -- I

5   know we've seen this a lot.

6          The compensatory leave time, Mr. Fetherston was

7   treated exactly the same as Ms. Adams.  Exactly the same.  So

8   to the extent they made less, I think it was 16 hours less in

9   that first year than somebody else did, it could not have been

10  because of race or sex discrimination, because Mr. Fetherston

11  is an Anglo male and Ms. Adams is an African-American female.

12         With respect to annual accrual rate, the testimony was

13  that that is formulaic.  It's based on seniority.  There's no

14  subjective element.  And there's been no evidence that

15  Ms. Adams was treated outside of that formula.

16         This brings us really to the second issue, which is

17  whether -- whether Ms. Adams was terminated because she

18  complained about perceived race or sex discrimination in terms

19  of her pay.  Okay, that's, again, a critical limitation.

20         I'm going to submit to you that I don't believe

21  Ms. Adams even felt that way until after --

22         MS. ADAMS:  Your Honor, I'm going to object.

23         THE COURT:  Overruled.

24         MR. MOBERLY:  Thank you, Your Honor.

25         THE COURT:  Hang on a second.  What is the basis of

1    your objection?

2              MS. ADAMS:  He's speculating about how Ms. Adams felt.

3              THE COURT:  Overruled.

4              Go ahead.

5              MR. MOBERLY:  Thank you.  Thank you, Your Honor.

6              The key points about this issue are this:  First of

7    all, Ms. Adams did not even attempt to refute the testimony

8    that was given that when she went to Seattle and left the

9    staffers, her intern, Mr. Winkler without any briefing, she

10   does not even attempt to refute that she did not do anything to

11   assist that week.

12             She says she was working remotely, but she doesn't

13   tell us what she was doing.  There is no indication that any

14   material was ever sent down here to assist these individuals.

15   That is undisputed testimony.  Okay.  Undisputed testimony.

16             The only thing we know she did was attempt to look up

17   an amendment that was posted somewhere online.  There's no

18   documentary evidence of anything that she shipped down to

19   assist her intern, even though she claims to have been working.

20             Second, every witness that was involved in the

21   termination decision -- and there were four of them, you'll

22   recall -- Ms. Baldo, Senator Hobbs, Mr. Winkler, and Ms. Reilly

23   mostly as an observer.

24             But all four of them testified that there was

25   absolutely no discussion of race or gender or a claim of

discrimination about race or gender during the termination

decision.  And each of those individuals indicated they were

not aware of any such claim of discrimination ever having been

made.

In fact, not one person here has testified that

Ms. Adams told them she felt she was being discriminated

against on the basis of her race or sex in terms of her

compensation.  Not even any of the witnesses she called

indicated that was true.

And some of them actually directed -- directly refute

it, including, critically, Senator Bradley, who was the

individual we might most have expected to have heard something

like that.  Because as you'll recall, he's the counselor,

former counselor, that she was talking to confidentially.  And

he told us two things that are important:  Number 1, yes, she

was experiencing tension, there was distress, but she never

tied it to race or sex discrimination; and secondly, and almost

as important, is he offered to go talk to some people on her

behalf, and she asked him not to.

Now, I ask you, why would she do that if she was

already talking to people about feeling that she'd been

discriminated against?

But one more thing, and probably the most and

telling -- telling part of all this, is this:  Ms. Adams

testified twice, once on Tuesday afternoon, and once yesterday

1   morning, and then she repeated it today in her argument, that

2   the first time she ever learned what anyone else was making at

3   the Senate was when that report came out from the Arizona

4   Capitol Times on February 12th of 2015.

5          What's important about that is you can't complain

6   about discrimination unless you've got somebody to compare

7   yourself to.  So any complaint about discrimination in terms of

8   compensation would have had to occur after February 12th.

9   Okay.

10          What do we know happened since then?  One thing we

11  know for sure is that Ms. Adams never had another conversation

12  with anybody at the Senate that we've been told about other

13  than with Ms. Baldo on February 20th, when she was told about

14  her termination.  So any complaint about discrimination in

15  terms of compensation or pay would have had to occur in the

16  documentation that was exchanged between February 12th and

17  February 20th.

18          And what do we have there?  These are the exhibits I

19  want you to take a look at, okay?

20          Ms. Adams wrote to Ms. Baldo on February 13th.  That's

21  Exhibit 238.  Okay.  And what she said there was:  I would like

22  to know the protocol to request a raise.

23          Not one word about discrimination of any sort there.

24          You'll recall Ms. Baldo wrote back and said:  Through

25  your leadership.

1          And what happened then is that Ms. Adams wrote to

2     those six -- five or six senators and said:  I would like to

3     discuss my current status on the Democratic staff.

4          Again, no mention of discrimination at all.

5          When Senator Hobbs then wrote to her and said that's

6     inappropriate, we go through Mr. Winkler -- and that's

7     Exhibit 241 -- she responded by apologizing, you'll recall.

8     This is Exhibit 244.  And she said:  I apologize.  And then she

9     says:  Jeff, I have an issue I would like to discuss;

10    specifically, a salary increase.

11         Again, no mention of discrimination.

12         We then know that the following day -- that chain of

13    emails that I just referenced, as you'll recall, occurred on

14    February 13th, the day after the report had come out from the

15    Capitol Times.

16         We then know that on February 14th, Saturday, from

17    Ms. Adams' testimony, that she flew to Seattle and she never

18    returned to the Senate.  There were some discussion and

19    exchanges all about work or whether she was doing it and all

20    about her kid -- her child, I'm sorry.  Chris, I believe is his

21    name.  Nothing about discrimination.  Nothing even, again,

22    about the raise or the pay.

23         And then on February 20th, we have the phone call with

24    Ms. Baldo.  You heard both of them testify to it.  No

25    indication whatsoever that there was any discussion about

1   discrimination, when I think you would expect Ms. Adams to make

2   a claim about that if she felt that actually was what was

3   occurring.

4        So she never complained to anybody about

5   discrimination in her pay, which means her termination case

6   clearly must fail.  Claiming you're underpaid is not the same

7   thing as claiming race discrimination or sex discrimination.

8   Asking for a raise is not the same thing.

9        Our laws do not require an employer to assume that

10  merely because an employee is female, African-American, or any

11  other kind of minority, that if they ask for a raise or even

12  complain that they're underpaid, they're doing that because

13  they feel like they're being discriminated against.

14       Our law, our society, will be in a bad place if we

15  ever get to that point.  We clearly are not there.

16       I do also briefly want to respond to Ms. Adams'

17  argument about damages.  I'm not here to tell you that a

18  termination is not traumatic.  It clearly can be.

19       But Ms. Adams has clearly landed on her feet.  She

20  finished that MBA degree at Thunderbird.  While she was not a

21  licensed attorney when she was hired by the Senate, she is now.

22  She indicated she has her own law firm.  You can clearly see

23  from her performance during this trial that she is not only

24  enthused about that job, but she's got an aptitude for it.

25       So I don't think it's appropriate to suggest that her

1   life has been crushed on a going-forward basis.  And in fact,

2   we -- not to get too far in the weeds, but we don't have any

3   indication of emotional distress that you would typically

4   expect when a request like this is being made.  We don't have a

5   prognosis.  We don't have a diagnosis.  We don't have a

6   doctor's note.  We don't have a bill for an office visit.  We

7   don't even have a bill from -- or a receipt from CVS, for

8   example, for medication.

9       I don't think it's necessary or appropriate for you to

10  get to the damages issue because of the reasons I described a

11  minute ago, but if you were to do so, I think the award would

12  be very minimal at this point.

13      Really, that's all I have.  I appreciate very much

14  your time.  Thank you for serving.

15      And thank you, Your Honor.

16      THE COURT:  Ms. Adams, I just want to make one

17  comment.

18      Mr. Moberly, in his closing, talked about what he

19  believed Ms. Adams believes.  It's up for you to decide what to

20  believe.  His opinions about what he believes isn't appropriate

21  for you to consider.  You just consider the evidence.

22      Okay.  Ms. Adams.

23      MS. ADAMS:  Thank you, Your Honor.

24      I just want to clarify a couple of things.

25      Yes, I'm a lawyer, and I'm proud of that.  Am I a

1    litigator?  No.  Is this my first trial?  Yes.  Have I made

2    many mistakes?  I'm sure you've witnessed them.  So there's

3    that.

4            Mr. Moberly wants you to believe that the way

5    discrimination works is someone feels like they've been

6    discriminated against and then they send an email and say,

7    "Hello.  I'd like to speak to you because I've been

8    discriminated against based on my race."

9            Mr. Moberly wants you to believe that when someone

10   feels discriminated against based on their sex, they pick up a

11   pen and write a note and say, "I'm writing to notify you that

12   I've been treated differently on the basis of my sex."

13           The truth of the matter is, is that most people don't.

14   And the truth of the matter is, is that the bulk of the times

15   that individuals feel like they've been violated or their

16   rights have been breached, they don't speak up.  Women know

17   this from rape victims.

18           Mr. Moberly and the Arizona State Senate, a place

19   where the laws are made but not followed, wants to have

20   apparently, for the rest of us, a documentation protocol that

21   the Senate itself does not have.

22           We heard Sandy Reilly sit there and say, there's no

23   documentation process.  You want to fire somebody, you come,

24   you tell me.  You just tell me, and I'll start canceling their

25   bus card.  I have a checklist.  And if I make an error, we'll

1    never know about it unless they sue.

2           And then two years later, this Arizona State Senate

3    will allege that Ms. Adams was fired on the same day that she

4    sent an email to Ms. Baldo at 11:04 a.m.  Yes, look at these

5    documents he's telling you, but interpret them for yourself.

6    Think independently for yourself.

7           You guys are the most powerful people in this room

8    right now.  This case is going to be turned over to your hands

9    for you to decide.  You sat here.  Don't let them say, "Where

10   is the evidence?"

11          Where is the evidence?  They don't have a job

12   description for Ms. Adams.  Where is the evidence?  They can't

13   tell you the date she was terminated.  Where is the evidence

14   written down that she had experienced race discrimination?

15   Where is the evidence written down she was terminated?  We

16   don't have that.

17          What we do have is the same day she sends Ms. Baldo an

18   email and then requests to meet with these senators to talk

19   about her status on the Democratic Caucus -- which, yes, was

20   going to include race -- prior to that, on February 4th, it's

21   in the evidence, she said:  Wendy, can I speak to you and talk

22   to you about an HR issue.

23          You think she was talking about workload?  Should she

24   have put it in an email?

25          They approved her to go on emergency medical leave and

Case 2:17-cv-00822-DLR   Document 188   Filed 07/21/19   Page 26 of 32

1   then fired her, knowing her son was sick.  They would have

2   hauled her out of there.  Make no mistake about what the

3   standard is, about what the evidence is and how to weigh it.

4        Mr. Moberly says there is nothing about a raise or a

5   pay that is discrimination.  Well, if the race -- if a person's

6   race is a motivating factor for why you do not give them a

7   raise ever, and they're performing -- not only are they

8   performing, you heard these senators, she's knocking it out of

9   the park.  They can't give her a raise.

10       And when she asks for one, do they respond?  She asks

11  about a raise.  She asks about FMLA, the Family Medical Leave

12  Act.  Jeff Winkler text her and says, Senate is exempt from

13  FMLA.

14       And the response to the raise, after Mr. Winkler in

15  December of 2014, not represented on the document that

16  Mr. Moberly said -- that document ends in June of 2014.  In

17  December of 2014, Mr. Winkler gets this $37,000 raise.

18       John Fetherston, whose race Senator Hobbs has no idea

19  what it is, Mr. Moberly tells you he's white, gets a $5,000

20  raise.

21       Aaron Latham gets a $5,000 raise.  Mr. Moberly also

22  tells you he's white.

23       These Republican -- these Republican staffers, they're

24  sitting in Ms. Adams' same committees, and they're making tens

25  of thousands of dollars more than her.  She is showing up every

1    day.  She is doing this job.  She is heart and souling it

2    because she cares.  And at some point in time in her third

3    legislative session, she says, wait a minute.  I am being

4    treated differently.

5          Salary is one piece.  The other piece is the

6    compensation.  Ms. Adams knew in the first year she had less

7    compensation than others.  It's not that, oh, the moment you

8    know, you're being discriminated against.  You could be

9    discriminated against and not be able to articulate the data,

10   especially in a place like the Senate that has documentations

11   of nothing.

12         Peter Silverman said, well, I didn't hand it off.  I

13   just -- you know, I left it there.  It's public record.  It's

14   at the Senate.  I don't really know.

15         Jeff Winkler can't point to a single cell phone call.

16   He doesn't have his cell phone records.  He has no records, and

17   yet you are supposed to believe that he was in his office at

18   7:30?  No.

19         Senator Hobbs said, Ms. Adams did not show up.  She

20   did not call.  She was called numerous times.  Look at those

21   cell phone records.  Mr. Winkler's number there is there.

22         And when we're talking about treating a person

23   differently on the basis of sex, it does make -- it does make a

24   difference how other women are being treated.  And when a

25   standout woman that has given her career -- it is her life's

1    work, she still works there -- to the Arizona State Senate is

2    passed over for an individual that told you he has spent the

3    majority of his time being a stay-at-home dad, it speaks to how

4    the Senate operates.

5           When Sandy Reilly says it's subjective, you got to

6    have a supervisor like you, they got to go up to bat for you,

7    they got to come up with the numbers, and if they don't, you

8    will sit down there and you will do this work.

9           People like Patsy Osmon are not leaving.  And people

10   like Talonya Adams weren't leaving either.  Why?  Because they

11   love the job.  Because they love the work.  Because they're

12   making a difference.

13          When he's saying asking for a raise is not the same

14   thing as discrimination, when it's motivated, a motivating

15   factor, not the sole factor, not the singular factor, if it's

16   motivated on a person's gender.  Right?

17          If all the men in December, oh, it's Christmastime.

18   Good for the men, right?  They get $5,000 raises.  And all the

19   women, you heard Senator Hobbs say it, are getting zero.  It's

20   a difference that's being made.  Whether it's known to the

21   women or not, it is a difference that this employer is acting

22   and making.  And it seems to be, if you're a white male, you

23   get the raise; and if you're female, you get the work.

24          Mr. Moberly said, oh, you know, Ms. Adams doesn't have

25   doctors' notes.  We haven't seen a single receipt.  Ms. Adams

1   hasn't provided a psychiatrist.  We don't have an expert

2   witness.  She suffered nothing.

3           Really?  She's been living without health insurance

4   for four years.  She's been relying on her mother and her

5   faith, and she's been wrangling a litigation well outside of

6   her expertise for nearly the same amount of time.

7           He says, she's better off because she finished that

8   Thunderbird degree.  Thunderbird degree was a 20-month program.

9   The tuition alone was $91,500.  The additional expenses to the

10  three different international regions was about $30,000.

11  Ms. Adams holds that debt, earning interest right now.

12          Thunderbird requires employer approval.  Why?  Because

13  they do not want an executive professional to enter their

14  program and be terminated in the process of it or have to leave

15  the program.

16          The Senate gave that approval.  They weren't providing

17  one dime of tuition reimbursement, you heard Wendy Baldo say.

18  Not one dime.  Ms. Adams was using her vacation time to attend

19  on the Fridays once or twice a month.

20          They agreed, and then five months into that program,

21  after the Thunderbird school is going to vanish and go away,

22  they refused to make any accommodation.  Ms. Adams said, okay.

23  And then they fired her.

24          And so now Ms. Adams, who's been earning $60,000 for

25  three consecutive years because the Senate won't give her a

1    raise, has what option?  To drop out of the Thunderbird school

2    and still bear the $91,500 worth of debt?

3              No.  She must do what she always has done:  Persist.

4    Put one foot in front of the other and grind it out.  And

5    that's what she did.

6              Mr. Moberly said, Ms. Adams is not a licensed attorney

7    when she was at the Arizona State Senate.  The first day

8    Ms. Adams walked into that Arizona State Senate and took that

9    oath of office, that oath of office to the United States

10   Constitution and to the State of Arizona, to do work not on

11   behalf of the Democratic Party but to do work on behalf of

12   Arizona's citizens because they are all affected by the laws,

13   she was licensed.  She was a licensed attorney.  She was

14   licensed in Washington State.

15             You heard Sandy Reilly say they paid her Bar dues.

16   They weren't paying Bar dues for Washington State.  They were

17   paying Bar dues for the State of Arizona.  And so when

18   Ms. Adams was working at the Arizona State Senate, when she

19   applied for the general counsel role, she was a lawyer.

20             Lastly, Mr. Moberly says, you can't complain about

21   discrimination unless you have someone to compare it to.  Yes,

22   you can.  And he's double-speaking to you when he says, she

23   only knew on Thursday, and from Thursday, well, they fired her

24   the next day.

25             And if they don't consider that firing, then we just

1   have a disagreement about what happens when a person stops

2   receiving a salary but then apparently is still required to

3   work.  It is discriminatory treatment to tell a person, you can

4   go on emergency leave and go look after your child -- or "kid,"

5   as Mr. Moberly would put it -- and then say they abandoned

6   their job.

7           While I was at the -- when Ms. Adams was at the

8   Arizona State Senate, people went on leave.  The chief of staff

9   covered the work.  We've all been employees.  Things come up.

10  The fact that somebody would have a child hospitalized and

11  require to wait 36 hours, to the next business day, and then

12  show up before the start of business is discriminatory

13  treatment.

14          So in a place where there is no policies, and there

15  are no documents, what you have before you is the evidence that

16  you're going to take back there.  You have that verdict form.

17  And I would ask that, yes, you do read closely the instructions

18  on forms -- on pages 12 and 13.  And do not think that because

19  a person asked for a raise, is that discriminatory?  No.  The

20  employer's basis for giving it or not giving it could be.

21          And it doesn't have to be just that.  It just has to

22  be one single factor:  more probable than not.

23          (Further proceedings held on the record not

24  transcribed herein.)

25

1                  C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 21st day of July,

13  2019.

14

15

16
                        s/Jennifer A. Pancratz_____
17                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25