## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Talonya Adams, | ) | |
| | ) | No.  CV-17-00822-PHX-DLR |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 10, 2019 |
| Arizona Senate, | ) | 10:46 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**


**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**


**JURY TRIAL DAY 2 - TESTIMONY OF DAVID BRADLEY**


Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

<u>**A P P E A R A N C E S**</u>

For the Plaintiff:

    Talonya Adams, Esq.
    In propria persona
    2 N. Central Avenue, Suite 1800
    Phoenix, AZ 85004

For the Defendant:

    Michael D. Moberly, Esq.
    Ryley Carlock & Applewhite PA
    1 N. Central Avenue, Suite 1200
    Phoenix, AZ 85004

1                              **I N D E X**

2

3    <u>**WITNESSES FOR THE**</u>           <u>**DIRECT**</u>    <u>**CROSS**</u>    <u>**REDIRECT**</u>    <u>**RECROSS**</u>
     <u>**PLAINTIFF:**</u>

4

     **David Bradley**
5    By Ms. Adams                  4
     By Mr. Moberly                          42

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2              (Prior proceedings held on the record not transcribed

3    herein.)

4              (Jury not present.)

5              THE COURT:  Please be seated.

6              Who's our next witness?

7              MS. ADAMS:  Senator David Bradley, Your Honor.

8              THE COURT:  Is he in the courtroom?

9              MS. ADAMS:  Excuse me?

10             THE COURT:  Senator Bradley, would you come up here,

11   please?  And as soon as the clerk gets here, she's going to

12   swear you in, right -- standing right here.

13             SENATOR BRADLEY:  All right.

14             THE COURT:  She's gathering the jury right now.

15   That's the spot right there.

16             (Jury present.)

17             THE COURT:  Please be seated.

18             Our next witness is Senator Bradley.

19                        DAVID BRADLEY,

20   called as a witness herein by the Plaintiff, having been first

21   duly sworn or affirmed, was examined and testified as follows:

22                     DIRECT EXAMINATION

23   BY MS. ADAMS:

24   Q.  Good morning, Senator Bradley.  How are you?

25   A.  Good.  Thank you.

1  Q.  Great.

2        Can you introduce yourself to the jury and state

3  currently where you reside and the district you represent.

4  A.  All right.  Yeah, my name is David Bradley.  I'm a state

5  senator from District 10 in Tucson, so that's my home of

6  residence.  I am -- I am currently the minority leader of the

7  State Senate.

8  Q.  Okay.  And how long have you been involved in politics?

9  A.  A long time.  Formally, since about 1990 or so, in that

10 ballpark, yeah.  I've been in public office since 2003.

11 Q.  Okay.  And how long have been a senator?

12 A.  I've been a senator -- this is my seventh year.

13 Q.  Okay.  And after eight years, you will term out of the

14 Arizona State Senate?

15 A.  Yes, I will.

16 Q.  And then run for governor?

17 A.  No.

18 Q.  Great.  Okay.

19        How is it that you came to know Talonya Adams?

20 A.  Talonya was a staffer when I -- I was in the House of

21 Representatives, I was out for two years, and then got elected

22 to the Senate.  And I believe that Talonya was there when I

23 took office.

24 Q.  Okay.  And did she -- do you recall her staffing committees

25 that you were on?

DAVID BRADLEY - DIRECT EXAMINATION                      6

```
 1    A.  No.  She did not staff any of my committees, no.
 2    Q.  Okay.  But you were a member of the Democratic Caucus, and
 3    she staffed the caucus?
 4    A.  Yes.
 5    Q.  And do you recall working with Ms. Adams on legislation and
 6    programming for pediatric dental care?
 7    A.  Yes.  I remember having discussions on that topic, yes.
 8    Q.  And do you recall working with Ms. Adams on a firearm
 9    omnibus bill?
10    A.  Now that you bring it up, yes.  Yes.
11    Q.  Okay.  What was your characterization of Ms. Adams as a
12    policy advisor at the Arizona State Senate?
13    A.  Very professional.  I thought you were -- Talonya was
14    always efficient and was thorough in her research and very
15    clear in her presentations, yeah.
16    Q.  Were you ever -- did you ever know that Ms. Adams' policy
17    advisor role was a junior or entry level policy advisor role?
18    A.  No, I did not know that.
19    Q.  Okay.  Do you know of a junior or entry level policy
20    advisor role at the Arizona State Senate?
21    A.  Not in any formal way.  I mean, there's people that come in
22    who are new to the job, but I don't know that anybody is
23    assigned that title, per se.
24    Q.  Okay.  And so to the best of your knowledge, Ms. Adams was
25    just a policy advisor; is that correct?
```

DAVID BRADLEY - DIRECT EXAMINATION

1   A.  Yes.

2   Q.  Okay.  And she also had a law degree; is that correct?

3   A.  Yes.

4   Q.  And a law license; is that correct?

5   A.  Yes.  As far as I know, yes.

6   Q.  At the time in which Ms. Adams was hired at the Arizona

7   State Senate, you weren't the minority leader; is that correct?

8   A.  That's correct.

9   Q.  Okay.  Who was the minority leader?

10  A.  When I was elected?  Ever?

11  Q.  When -- around when Ms. Adams was hired.  So she was hired

12  in December of 2012.

13  A.  All right.  So I -- yeah, I took office in January of 2013,

14  so that was Senator Leah Landrum Taylor was the minority leader

15  at that time.

16  Q.  Okay.

17  A.  Yeah.

18  Q.  And when an individual is elected to minority leadership,

19  as you sit now, what is the term of a minority leader?

20  A.  Typically, it's the two-year term, because we all have

21  two-year terms and the minority leader is elected typically for

22  that term.

23  Q.  Okay.  So you will be minority leader for two years; is

24  that correct?

25  A.  Presumably, yes.  It's not definitive.  I mean, either I

1    can step down or the people that I work for, the other members

2    could say, "Hey, thanks, but no thanks" and remove me.

3    Q.  Yeah.

4    A.  But typically it's two years.

5    Q.  I understand.

6         In the history of the Arizona State Senate, in your

7    involvement, are you aware of any period in time in which a

8    minority leader has been ousted out of the role?

9    A.  Yes.  And it was -- Senator Landrum Taylor was, in the end

10   of 2013, as I recall.

11   Q.  Anyone else?

12   A.  Not -- not in my knowledge, no.

13   Q.  And is Ms. Landrum Taylor -- do you know why she was

14   removed?

15   A.  I -- let's see.  I don't know -- the removal was abrupt and

16   unexpected.  At the time, the caucus -- when a caucus is called

17   for the purpose of election, it's one of the few times that we

18   meet without other people being in the room.  And so the

19   assistant leader in 2013, at the end of 2013, resigned her

20   Senate seat.

21   Q.  And was that Senator Linda Lopez?

22   A.  Senator Linda Lopez, yeah.

23   Q.  Okay.

24   A.  And so myself and a few others, we were -- thought we were

25   convening to replace her as the assistant leader, and so the

1    caucus was convened for that purpose.  And so everybody --

2    that's one of the few times -- excuse me -- that we meet

3    without other people being present, the public being present.

4    Q.  Okay.

5    A.  And at that meeting, the motion was made to replace Senator

6    Landrum Taylor, which was unexpected or un- -- for me, and

7    for -- subsequently I discovered from Senator Taylor -- Landrum

8    Taylor herself did not know that that was going to happen, that

9    that was the purpose of the meeting.

10   Q.  Okay.  So can you explain what the leadership structure

11   looks like within a caucus?

12   A.  Typically -- in the minority, it's the minority leader is

13   chosen first, typically, then an assistant leader, and a whip.

14   And in the recent past, the Senate has had two whips, which is

15   kind of outside the typical protocol.

16           And I can't -- I'm trying to recall if we had two

17   whips at that point.  I don't think we did.  I think we just

18   had the one, yes.

19   Q.  Okay.  And so assistant minority leader Linda Lopez was

20   resigning from the Arizona State Senate to go into the private

21   sector --

22   A.  Yes.

23   Q.  -- is that correct?

24   A.  Yes.

25   Q.  Okay.  And so there was an opening for assistant minority

1  leader, correct?

2  A.  Yes.

3  Q.  And it was your understanding that the caucus was meeting

4  in private for purposes of selecting a replacement for the

5  assistant minority leader, correct?

6  A.  Yes.  Correct.

7  Q.  And what happened?

8  A.  Was -- a motion was made to replace the leader.

9  Q.  Okay.

10  A.  And so in order to do that, they needed -- you need a

11  majority vote.  It's a simple majority, so at that -- I think

12  we had 13 members at that time, and so the majority would have

13  been 7 votes to replace her.

14          And so they -- the folks that were intending to do

15  that, unbeknownst to myself, Senator Landrum Taylor and a

16  couple others did not know that that was about to happen.  And

17  the motion was made and carried, and Senator Landrum Taylor was

18  replaced right there.

19  Q.  Okay.  And what is the race of Senator Landrum Taylor?

20  A.  She's African-American.

21  Q.  And what is her gender?

22  A.  Female.

23  Q.  Okay.  And in the time that you've been involved in

24  politics, have you known of any other minority leader being

25  voted out prior to the completion of the two-year term?

1   A.  Not -- not in the Senate.  I think subsequent to this, a

2   minority whip was replaced in the House, I think.

3   Q.  Okay.

4   A.  Yeah.  That was -- oh, I'm sorry.  That was actually

5   immediately prior.  I'm sorry.  I'm recalling that wrong, yeah.

6        I think it was the session before that, the minority

7   whip in the House was replaced.

8   Q.  Okay.  So minority leader Landrum Taylor is voted out by

9   her own caucus, and then a new minority leader is selected; is

10  that correct?

11  A.  Yes.

12  Q.  And who was that?

13  A.  That was Senator Tovar.

14  Q.  Okay.  And was an assistant minority leader selected?

15  A.  Yes.

16  Q.  And who was that?

17  A.  From Yuma.  She's now a county supervisor, and I'm

18  forgetting her name.  But anyway, yeah.

19  Q.  I'm trying to help you.  I'm trying to think of her name

20  too.  Okay.

21  A.  Pancrazi, I'm sorry.  Senator Pancrazi.

22  Q.  Okay.  Very good.

23        And during that time, Senator Bradley, were you aware

24  or did you have any knowledge as to who had hired Talonya

25  Adams?

1    A.  No.  I would -- I could only assume that the minority

2    leader and the chief of staff had input into that.

3    Q.  Okay.  But you don't have any knowledge that the only

4    African-American minority leader the State of Arizona had, has

5    ever had, hired the only African-American policy advisor

6    working at the Arizona State Senate, do you?

7    A.  I'm sorry.  I guess I need you to rephrase the question.

8    Q.  Ms. Landrum Taylor is the only African-American minority

9    leader the --

10   A.  That I know of, yes.

11   Q.  -- State of Arizona has had; is that correct?

12   A.  I believe that to be true, yes.

13   Q.  Okay.  And Ms. Adams was the only African-American policy

14   advisor working at the Arizona State Senate; is that right?

15   A.  Yes.  Yes.

16   Q.  All right.  And you, then or now, have no knowledge that

17   Ms. Landrum Taylor hired Ms. Adams, do you?

18   A.  No.  I mean, I did not -- because I was not involved in

19   that process, so I don't know.  In terms of -- if you're asking

20   me whose decision it was, the final decision, I don't know.

21   Q.  Okay.  Is it your opinion that a minority leader can

22   unilaterally appoint an individual that they might like into a

23   policy advisor role?

24   A.  I -- again, during -- I can only speak to how it's happened

25   since I've been minority leader, and that is a -- we went

1    through a process of -- in our case of -- recently of

2    evaluating folks, having an open call out to -- for people to

3    apply, doing paper referrals, and then interviewing a few of

4    them and then choosing a person.

5           And my understanding of the process is that we choose,

6    and that ultimately the chief of staff of the Senate has the

7    final say, as I understand it.

8    Q.  And who is the chief of staff of the Senate?

9    A.  It's Wendy Baldo.

10   Q.  Okay.  And at the time when Senator Landrum Taylor was the

11   minority leader, who was the chief of staff at the Senate?

12   A.  Wendy Baldo.

13   Q.  Okay.  At some point, Senator Bradley, prior to the

14   legislative session, the Democrats get together and they have a

15   retreat; is that correct?

16   A.  Yes.

17   Q.  Okay.  And Peter Silverman was a chief of staff for the

18   minority leader in 2012; is that correct?

19   A.  Yes.  Yeah -- well, yes.  I was not there, but yes.  That's

20   my understanding, yeah.

21   Q.  In 2013?

22   A.  '13, yes, I was there.

23   Q.  He was?

24   A.  Yes.

25   Q.  And you were there, and he was the --

1    A.  Chief of staff, yes.

2    Q.  -- chief of staff, okay.

3           And then in 2014, Peter Silverman left the Senate; is

4    that correct?

5    A.  Yes.  After -- after the session, as I recall, yes.

6    Q.  Okay.

7    A.  Yeah.

8    Q.  And so the Democratic Caucus was hiring for Peter

9    Silverman's role; is that correct?

10   A.  Yes.

11   Q.  And Peter Silverman, at the Arizona State Senate, in 2014

12   was both the general counsel and the chief of staff; is that

13   correct?

14   A.  Yes.  That is my recollection, yes.

15   Q.  Okay.  And individuals applied for the role; is that right?

16   A.  Of chief of staff?

17   Q.  For general counsel and chief of staff, yes.

18   A.  Yeah.  I don't know if we -- at that point I think we

19   separated out the positions, as I recall.

20   Q.  Okay.

21   A.  I'm not positive about that, but that's my recollection,

22   yeah.

23   Q.  Okay.  And were they all internal applicants, or were there

24   external applicants as well?

25   A.  For both positions, there were both internal and external

DAVID BRADLEY - DIRECT EXAMINATION

1    candidates, yes.

2    Q.  And when you say "both positions," what positions are you

3    speaking of?

4    A.  For the chief of staff and general counsel.

5    Q.  Okay.

6    A.  Yeah.

7    Q.  So Peter Silverman had a dual role as general counsel and

8    chief of staff, and upon his departure, those roles were

9    separated and there was the general counsel role and the chief

10   of staff role; is that correct?

11   A.  Yes.  Yeah, that's what I recall.

12   Q.  Okay.  And the internal candidates that applied for the

13   chief of staff role, do you recall who they were?

14   A.  It was Jeff Winkler and Patsy Osmon, and I -- as far as my

15   recollection is only those two internal, as I can recall.

16   Q.  Did Aaron Latham also apply for the role?

17   A.  Yes.  Yeah, now that you say that, yes.

18   Q.  Okay.  And they had sat on Democratic staff in a policy

19   role prior to their application for the chief of staff; is that

20   right?

21   A.  Yes.

22   Q.  Okay.  Ms. Adams did not apply for this role, correct?

23   A.  Not that I know of, no.

24   Q.  Okay.  And you sat on -- in on the interviews, did you?

25   A.  Yes.

1  Q.  Okay.

2  A.  Yes.

3  Q.  What was the process to select the chief of staff?

4  A.  All the candidates were -- as they were interviewed, there

5  was a standard set of questions that we went through and then

6  scored them in some fashion, a 1 to 5 scale or something, as I

7  recall.

8        And then went through that -- I don't believe that

9  we -- I think the process was to interview everybody without

10  talking about them, as I recall.

11  Q.  Okay.

12  A.  Yeah.

13  Q.  And then upon the conclusion of interviews, then each

14  individual would reveal their score?

15  A.  Right.  Then we'd talk about how people were scored.  And

16  you weren't required, but you may have -- a person may have

17  given an explanation as to why they gave the score they gave,

18  yeah.

19  Q.  Okay.  And at the end of that process, who was selected as

20  the chief of staff?

21  A.  At the end -- the final recommendation -- the committee

22  gave a recommendation and -- to the minority leader, and the

23  minority leader chose Jeff Winkler.

24  Q.  Okay.  What was the recommendation to the minority leader?

25  A.  I think the recommendation to the minority leader was Patsy

DAVID BRADLEY - DIRECT EXAMINATION

1  Osmon.

2  Q.  And Patsy Osmon, what is her race?

3  A.  Caucasian.  White.

4  Q.  And gender?

5  A.  Female.

6  Q.  Okay.  And had she been working at the Senate a while?

7  A.  Yes.  Yes.

8  Q.  More than ten years?

9  A.  As far as I -- because she was in -- she was there when I

10  was in the House, and that was like ten years prior, so, yeah,

11  at least that amount of time.  I don't know exactly how long.

12  Q.  Okay.  And she was a licensed attorney; is that correct?

13  A.  Yes.

14  Q.  And she was the recommendation based on the scoring that

15  had been conducted and the interviews to be the minority chief

16  of staff, correct?

17  A.  That's my recollection, yes.

18  Q.  And then what happened?

19  A.  Again, it was a recommendation to the minority leader at

20  the time.  And I don't know what process -- if she did

21  subsequent interviews or anything, I don't know anything about

22  that.  But the decision -- the decision gets made to choose

23  Mr. Winkler, yeah.

24  Q.  Okay.  And the minority leader at the time, who was that?

25  A.  Katie Hobbs.

DAVID BRADLEY - DIRECT EXAMINATION

1  Q.  Okay.  And how was Mr. Winkler's scoring as it relates to

2  the committee?

3  A.  I honestly could not recall.  I don't remember rank

4  ordering or saying here, they're one, two, three.  I just

5  remember there being -- that Patsy was the person who scored

6  the best.

7  Q.  Okay.

8  A.  That's what I remember, yeah.

9       (Court reporter clarification.)

10      THE WITNESS:  That Patsy was the person who scored the

11  highest.

12  BY MS. ADAMS:

13  Q.  After minority leader Tovar -- she just serves the

14  remainder of Senator Leah Landrum Taylor's term; is that

15  correct?

16  A.  Yes.

17  Q.  After she departs in the minority leader role, who is

18  elected as the minority leader?

19  A.  Katie Hobbs.

20  Q.  And when does that occur?

21  A.  That would be November of '14.

22  Q.  November of 2014?

23  A.  Yeah.

24  Q.  Okay.  And November of 2014 is also when Peter Silverman

25  left and these interviews commenced?

19

1  A.  Correct.

2  Q.  Okay.  And so there was also a general counsel role; is

3  that correct?

4  A.  Yes.

5  Q.  Okay.  And did you speak to Ms. Adams about applying for

6  the general counsel role?

7  A.  I don't recall that conversation, no.  I don't recall that.

8  Q.  Do you know whether or not Ms. Adams did apply for the

9  general counsel role?

10  A.  Yes, she did.

11  Q.  And you sat in on the interviews for the general counsel

12  role; is that correct?

13  A.  Yes, I did.

14  Q.  And what was the process as relates to the committee's role

15  in evaluating interviewees for the general counsel role?

16  A.  Similar to the chief of staff role, where there was

17  predetermined questions and then a scoring mechanism or scoring

18  on a 1 to 5 scale, as I recall.

19       And then same process of not -- when a person would

20  leave the room, we would not discuss that person.  We went

21  through all of the applicants.

22  Q.  Okay.  And upon the conclusion, was Ms. Adams selected as

23  the recommendation from the committee?

24  A.  No, she was not.

25  Q.  Who was selected?

DAVID BRADLEY - DIRECT EXAMINATION

1   A.  Lisette Flores.

2   Q.  Okay.  And upon your evaluation of Ms. Adams in the

3   interview process, what score did you give her?

4   A.  I gave her a high score.  I don't know if it was the

5   highest, but I gave her a high score, personally.

6   Q.  So you were deposed in this case in March of 2018; is that

7   correct?

8   A.  Yes.

9   Q.  And at the time of your deposition, do you recall saying

10  the score ranking was a 1 to 5?

11  A.  I believe so.  I -- yeah.

12  Q.  Do you recall stating you gave Ms. Adams a 5?

13  A.  I -- yes.  I -- I know I scored her high, yes.

14  Q.  And why did you score Ms. Adams high?

15  A.  Because in terms of the questions that were asked, I

16  thought her responses were comprehensive and thorough and

17  because she had -- having worked in the Senate, had more

18  familiarity with the process.

19  Q.  Was Ms. Adams the only African-American that applied for

20  the general counsel role?

21  A.  Yes.

22  Q.  And what is the race of the individual that was selected,

23  Lisette Flores?

24  A.  Hispanic.

25  Q.  Okay.  As it relates to Ms. Adams' job performance at the

1   Arizona State Senate, are you aware of any criticisms of her

2   work performance?

3   A.  No.  No, I was never privy or no one came to me to say

4   anything negative about Ms. Adams.

5   Q.  Did you have anything to say negative about Ms. Adams or

6   her work performance?

7   A.  No, I did not.

8   Q.  Did you have any issue with Ms. Adams' work product?

9   A.  No, I did not.

10  Q.  Were you aware of Ms. Adams being absent or missing from

11  the Arizona State Senate without anyone knowing where she was?

12  A.  No, I was not aware.

13  Q.  Did you trust Ms. Adams?

14  A.  Yes.

15  Q.  Did you find her to be reliable?

16  A.  Yes.

17  Q.  Did you find her to be professional?

18  A.  Yes.

19  Q.  Did you think that Ms. Adams liked her job at the Arizona

20  State Senate?

21  A.  I knew that Ms. Adams had a degree of tension about the

22  job.  I mean, I think in terms of the duties that she was

23  assigned, I think she was comfortable in doing those things,

24  but there was a level of tension for her personally.

25  Q.  How did you know this?

DAVID BRADLEY - DIRECT EXAMINATION

```
1   A.  She met with me separately.

2   Q.  And when did she meet with you separately?

3   A.  Again, time frames, it would be -- it was during session,

4   and I would say either the middle or towards the end of

5   session.  I can't remember exactly.

6   Q.  Do you recall what year?

7   A.  I'm doing the math.

8   Q.  Was Katie Hobbs --

9   A.  2015.  Katie Hobbs was the --

10  Q.  Minority leader?

11  A.  -- minority leader, yeah.

12  Q.  Okay.

13  A.  So it would be 2015?  Is that right?

14  Q.  2015?  Okay.

15       And when Katie Hobbs became the minority leader, the

16  leadership structure you talked about changed a little bit; is

17  that correct?

18  A.  Yes.

19  Q.  So staff did not have a liaison or anyone that they could

20  speak with prior to Katie Hobbs becoming the minority leader;

21  is that correct?

22  A.  Correct.

23  Q.  And you became -- you received the title of staff liaison;

24  is that correct?

25  A.  It wasn't -- it was kind of a unique -- I was -- the title
```

1    I was given, and again, it's not an elected position in the

2    caucus, but it was more of an honorific one in terms of I was

3    the minority leader pro tem, is what it was, which to that

4    point, as far as I know, had never existed before.

5    Q.  What did you understand your role to be as minority leader

6    pro tem?

7    A.  My understanding of the role -- yeah, I think as I

8    understood it, because as we discussed, the process in the

9    previous session was difficult when Senator Landrum Taylor was

10   removed, that in the following session, I think -- and I was

11   one of the people, one of -- there was five or six of us who

12   were taken aback by that whole process and had a difficult time

13   operating in the context of the caucus because of levels of

14   trust and other things.

15           And so when the new session started, there was an

16   attempt to try to -- let's try to heal this rift as much as we

17   possibly can.  And so that's where we came up -- I think that's

18   where we came up with this notion of having two -- two whips.

19           So there -- historically, there's a minority leader,

20   assistant leader, and a whip, and I think at this point is

21   where we came up with the two-whip idea, with the idea of

22   getting more people engaged in the leadership.  And then I'm

23   not sure where the idea came from to appoint me in this

24   position that heretofore had not existed and was not in the

25   hierarchy of the Senate typically.

1       So because I was kind of seen as being on the other

2   side of other people, I think the idea was to make -- you know,

3   try to make amends, and I agreed with that.  I said, we got to

4   start over.  We got to try to figure out how to work better

5   together.

6       And that in my role, because my background is child

7   welfare and behavioral health and I've managed -- I was the

8   administrator of a psychiatric hospital.  I ran a child welfare

9   agency for 20-some years, so I had, you know, a fair amount of

10  experience of hiring and firing and those type of things.

11      And so I just offered, I said, gee, if I can help in

12  terms of, you know, personnel things I'd be glad to do that.

13  But there was no job description per se of my role.  As I

14  understood it, was just to be helpful to the minority leader in

15  whatever capacity she wanted me to do.

16  Q.  As it relates to personnel things?

17  A.  So -- right.  And because a function of my background, she

18  said, yeah, well, let's -- let's figure out how -- how to be

19  helpful with personnel, specifically with policy staff.

20  Q.  Right.  Because three of the five policy staffers had just

21  applied for roles, right?

22  A.  Right.

23  Q.  Well, four of the five, if you include Ms. Adams.

24  A.  Yes.

25  Q.  Right?

DAVID BRADLEY - DIRECT EXAMINATION

1    A.  Yes.

2    Q.  One, Jeff Winkler, received it.  Right?

3    A.  Correct.

4    Q.  And did that create some tension in the basement as it

5    relates to the policy advisors that had applied for chief of

6    staff?

7    A.  Yes, but I was not -- no one came to me as a function of

8    that saying, "Gee, I'm upset" or "I'm distressed" or whatever.

9    But just based on what happened, one could assume that there

10   would be tension, yeah.

11   Q.  Okay.  And so at the Democratic retreat that occurred prior

12   to the 2015 legislative session, do you recall it being at the

13   Arizona Education Association?

14   A.  Yes.

15   Q.  Okay.

16   A.  Yeah.

17   Q.  Do you recall your role as minority leader pro tem being

18   announced to the staff?

19   A.  Yes.  I think it was -- there was an explanation to the

20   staff about what I was supposed to be doing or trying to do,

21   yeah.

22   Q.  Okay.  And do you recall at that retreat asking Ms. Adams

23   to step out of the room for a minute to have a discussion?

24   A.  I'm sorry, I do not recall that.

25   Q.  Okay.  So how is it that Ms. Adams -- you and Ms. Adams

1   began to meet?

2   A.  Ms. Adams made an appointment to see me in my office at

3   some juncture during the session.  And again, I can't be

4   specific about when that first meeting occurred, but at some

5   point just came to see me relative to tensions that she was

6   experiencing in her job.

7   Q.  Okay.  And do you recall what she shared with you?

8   A.  Well, I -- my recollection is is that she felt that her

9   work was not being respected or was not being -- that there was

10  some feedback about it not being comprehensive enough or

11  something to that effect.  And then there was an issue relative

12  to attending classes, as I recall, and there was some problem

13  relative to that.

14  Q.  Did it have to do with the merger of ASU and Thunderbird

15  School of Global Management?

16  A.  I think the classes -- I don't know if the merger was

17  germane or relevant to that tension or not, I don't know, but I

18  think it was a function of attending classes at Thunderbird, I

19  think, yes.

20  Q.  And so you met with Ms. Adams on one occasion or more than

21  one occasion?

22  A.  More than one occasion.  I can't really say how many.  I

23  would say a handful, at most.

24  Q.  Okay.  So you would say --

25  A.  Four, five.

1   Q.   Four or five times?

2   A.   Something like that, yes.

3   Q.   And in the times when you met with Ms. Adams, did she tell

4   you that she felt like she was being treated differently?

5   A.   Well, I think her level of tension was high, and it was

6   getting -- it seemed, as my recollection is, is it was evolving

7   to a point where she was getting more and more stressed.

8            My -- you know, I'm a licensed counselor by

9   discipline, and so my approach is that -- is getting people to

10  reflect back about what's going on with them.  And I -- I

11  advise folks to try to be -- you know, to help them be clear

12  about what they're feeling, what they're thinking, and then in

13  their interactions with other people, to be reflective of what

14  you're hearing, to say, "Here's what I hear you saying" --

15  Q.   Yes.

16  A.   -- and that type of approach.  That, as I recall, was the

17  type of advice that I was giving her.

18  Q.   Okay.  And you weren't offering Ms. Adams any kind of

19  professional services?

20  A.   No.

21  Q.   No?

22  A.   No.

23  Q.   You were simply inviting her to come to your office under

24  the function of this pro tem role to have discussion around --

25  A.   Well, I was accepting her setting up -- meeting with me.  I

UNITED STATES DISTRICT COURT

1    didn't go out aggressively, I mean, to invite her in.  She

2    asked me if she could meet with me and I agreed, and I didn't

3    have any problem with that.

4    Q.  Okay.  And when you were deposed, Senator Bradley, we had a

5    conversation about whether or not Ms. Adams mentioned she felt

6    like she was being discriminated against.  Do you recall what

7    you stated?

8    A.  I don't recall specifically, no.

9    Q.  Okay.  Do you recall Ms. Adams stating to you she felt like

10   she was being discriminated against?

11   A.  I don't recall those specific words.  I don't recall that.

12   Q.  Do you recall --

13   A.  That doesn't mean it didn't happen.

14   Q.  Do you recall any words as it relates to Ms. Adams stating

15   that she was being treated differently, that she was concerned

16   being the only African-American policy advisor there, that she

17   had issues with taking on the work of her male counterparts?

18   A.  Yeah.  I think the focus of her conversations with me was

19   an -- an inequitable workload, that folks were -- from her

20   perspective, that she was being -- there was more being asked

21   of her, and in terms of the number of, like, bills and things

22   that she had to review, that she was beginning to feel that the

23   workload was not being distributed equally, as I recall.

24         I don't recall her saying to me as a function of her

25   being an African-American that that was the case, but that

1   perhaps for other interpersonal issues or whatever, it was her

2   hypothesis, I think, about other problems that she was -- or

3   stress that she was experiencing.

4   Q.  Okay.  Do you ever recall Ms. Adams making any statements

5   to you as it relates to race or -- race discrimination in

6   particular?

7   A.  I honestly don't recall her saying that, no.

8   Q.  Okay.  What about sex discrimination?

9   A.  No.

10  Q.  Okay.  Do you ever recall hearing anyone at the Arizona

11  State Senate complain of race or sex discrimination?

12  A.  No, I do not.  I don't.

13  Q.  When Senator Leah Landrum Taylor was ousted from her role,

14  did you speak to her about her -- whether or not she felt like

15  she had been discriminated against?

16  A.  Yes.  Yes.  That was her feeling, yes.

17  Q.  That's what she communicated to you?

18  A.  Yes.  Yeah.

19  Q.  And it was discrimination on the basis of what?

20  A.  Well, I think she was trying to -- as all of us, again,

21  going back to the scene or the time, that those of us who were

22  supportive of Senator Landrum Taylor, which I was one of those,

23  were baffled by what happened.

24          And so we were, I think -- I remember sitting in her

25  office with -- there was four or five of us that were in this

1   position, not just myself and Senator Landrum Taylor.  Because

2   Senator Lopez was still there at that time, so she was included

3   in that.

4            And so, you know, we were trying to just make sense of

5   this.  Because we had had a fairly successful session.

6   Medicaid passed, Medicaid expansion passed, and other things

7   happened, and so we were -- we were taken aback as to what's

8   the logic of this and --

9   Q.  Was Senator Hobbs in the room there?

10  A.  No.

11  Q.  Was Senator Hobbs a part of the group that felt Ms. Landrum

12  Taylor should have been removed?

13  A.  The vote is secret, secret ballot, but just the logic of

14  needing seven votes, she was not one of the five that walked

15  out of the room after it happened, so it's safe to assume that

16  she was part of that, yes.

17  Q.  Okay.  There had been a statement made that Ms. Landrum

18  Taylor had lost the trust of her caucus.  Had you heard that?

19  A.  I think after the fact, as we -- and, again, the tension

20  was pretty palpable at the time.  And, you know, over time, as

21  things settled down and we were trying to, you know, process

22  it, the part of the explanation was is that she wasn't

23  communicating with some of the members adequately enough and

24  that was the justification for doing what they were -- what

25  they did.

 1   Q.  Did you ever hear specifically that she had lost the trust

 2   of her caucus?

 3   A.  As a complaint from some of them, yes.  Yes.

 4   Q.  Okay.

 5   A.  Yeah.  As their reasoning for doing what they did.

 6   Q.  Okay.

 7   A.  Yeah.

 8   Q.  And did you ever lose trust in Senate Minority Leader Leah

 9   Landrum Taylor?

10   A.  No.  No, I had known her for many, many years.

11   Q.  Are there any senators at the Arizona State Senate that you

12   don't have trust in?

13   A.  In the sense of --

14   Q.  I'll strike the question.

15          As it relates to staffers, did you ever lose the trust

16   of Ms. Adams?

17   A.  No.

18   Q.  What about other staffers at the Arizona State Senate?

19   A.  No.  No.  I mean -- I mean, over the years -- I mean,

20   again, looking back, this is my 16th year -- 15th year.  So in

21   the course of that time, gee, were there times when I thought a

22   staffer may have not done as good a job as they could have

23   done?  Perhaps.  I mean, over that time, I'm sure I had that

24   feeling occasionally.

25          But in regard to Ms. Adams, no, never.

1  Q.  In regards to the staffers where you had the feeling, were

2  they fired?

3  A.  No.  No.

4  Q.  Were you aware of -- are you aware of a discrimination --

5  antidiscrimination policy at the Arizona State Senate?

6  A.  Yes.  Yes.

7  Q.  What does it say?

8  A.  Well, I think in the most recent past we've been having

9  brief sessions relative to discrimination relative to various

10  issues that have come up, particularly in regards to sex.

11  Q.  Okay.  Is that -- is part of that the scandal that happened

12  with Senator Shooter, former Senator Don Shooter?

13  A.  Yes.

14  Q.  And also former Senator Montenegro?

15  A.  Yes.  I think that -- to the environment, yes.  I don't

16  know that Senator Montenegro was formally accused of anything,

17  but in a general sense, yes.

18  Q.  Okay.  Do you think the Senate has an issue as it relates

19  to sex discrimination?

20  A.  I think over the years, I think the line gets crossed

21  between, you know, flippancy and people saying things that

22  they, you know, on reflection probably wouldn't have said or

23  should have said.  That would probably be true.

24  Q.  Okay.  Do you think the Senate has an issue as it relates

25  to race discrimination?

DAVID BRADLEY - DIRECT EXAMINATION

1    A.  It has not been my experience that that has manifested

2    itself overtly.

3    Q.  Okay.  What do you mean when you say "overtly"?

4    A.  Where one could say, gee, that decision that somebody just

5    made was a function of discriminating on a basis race.

6    Q.  Okay.

7    A.  Yeah.

8    Q.  How many African-American policy advisors work at the

9    Senate now?

10   A.  In the Democratic staff, there are none.  And as far as --

11   I can't speak to the other two staffs off the top of my head,

12   but I do not believe there is one at this time, no.

13   Q.  Okay.  As it relates to your working relationship with

14   Ms. Adams, did you find her friendly?

15   A.  Yes.

16   Q.  Did you socialize with her outside of work?

17   A.  No.

18   Q.  Did you have any difficulties in the working relationship?

19   A.  None.

20   Q.  Did the nature of the relationship with Ms. Adams change at

21   any time for you?

22   A.  Only in the sense of the subsequent meetings that we had

23   that her -- her letting me know about her level of stress.

24   Q.  Okay.

25   A.  So that -- that was different, yeah.

1    Q.  Did -- did Ms. Adams treat you with respect?

2    A.  Yes.

3    Q.  Did you ever see her openly disrespect you or other

4    coworkers or --

5    A.  Never, no.

6    Q.  -- anyone at the Senate?

7    A.  Never, no.

8    Q.  When Ms. Adams was terminated, do you know the reason why

9    she was terminated from the Arizona State Senate?

10   A.  I do not.

11   Q.  Did you know she was terminated over the telephone?

12   A.  I did not know that.

13   Q.  Did you know she was terminated while she was out of the

14   office on approved leave?

15   A.  I did not know that, no.

16   Q.  Did you know her son had fallen ill and had been

17   hospitalized?

18   A.  No.

19   Q.  Okay.  When did you learn she was terminated?

20   A.  Obviously after the fact.  And I don't know the time frame,

21   but I would estimate, you know, sometime within the week or a

22   couple of days thereafter.  I don't know specifically.

23   Q.  Okay.  So you're the sitting minority leader pro tem --

24   A.  Uh-huh.

25   Q.  -- honorary or not --

DAVID BRADLEY - DIRECT EXAMINATION

1    A.    Uh-huh.

2    Q.    -- to address personnel issues, and Ms. Adams is

3    terminated, and you don't learn of it until after she is

4    already terminated?

5    A.    Correct.

6    Q.    And do you recall how you learned she was -- had been

7    terminated?

8    A.    I don't remember specifically.  I don't know if it was by

9    email or by someone saying something to me directly.  I don't

10   recall specifically, no.

11   Q.    And did you know of any actions or conduct that Ms. Adams

12   had engaged in that would -- that should have resulted in a

13   termination?

14   A.    No, I do not.

15   Q.    Were you surprised?

16   A.    Yes.

17   Q.    Did you seek out and try to identify why Ms. Adams had been

18   terminated?

19   A.    I think at that point, I remember speaking with Senator

20   Hobbs and saying to her that obviously that, as you just

21   mentioned, if my role in this pro tem position was to be

22   helpful relative to personnel issues and I was not consulted

23   about anything, that obviously the role doesn't mean anything.

24          So I didn't -- I don't remember formally resigning

25   from it, but I think we both left the conversation just kind of

1    saying, well, that, you know, it -- the role is basically done,

2    although, again, I didn't formally do anything relative to

3    resigning from it.

4          But I didn't do anything thereafter relative to

5    personnel issues.

6    Q.  And Senator Hobbs accepted your resignation?

7    A.  Again, it wasn't a formal --

8    Q.  Yeah.

9    A.  -- but it was accepted that I wasn't going to be doing --

10   that she was not going to ask me to do those things, to do

11   anything.

12   Q.  Okay.  And, Senator Bradley, I know I'm asking you the

13   questions but please talk to the jury, because they're the ones

14   really trying to capture the facts of this case.

15         As it relates to you meeting with Senator Hobbs, did

16   you ask why Ms. Adams was terminated?

17   A.  I don't -- I think -- again, I -- the level of trust

18   probably among us was still fragile from the previous -- the

19   previous session.

20   Q.  And when you say "us," you mean yourself and --

21   A.  Members.

22   Q.  -- Senator Hobbs?

23   A.  Members, yes.

24   Q.  Members, okay.

25   A.  As a general kind of thing.

1          And then specifically between Senator Hobbs.  I was

2    trying to be as helpful as I could to, again, heal this rift

3    that had happened prior.  And -- and I -- you know, as a

4    function of having run an agency and being involved in

5    personnel issues, I didn't press her to try to tell -- she had

6    no duty or -- to explain to me her -- that decision.  If she so

7    chose to tell me, that -- if, in fact, it was her final

8    decision, I don't even know that.  I did not press her to

9    explain that.

10   Q.  I understand.

11          So Senator Hobbs was part of the faction that elected

12   to oust Leah Landrum Taylor, the only African-American minority

13   leader --

14   A.  Presumably, yes.

15   Q.  -- the state has had, correct?

16          THE COURT:  Whoa, whoa, whoa.  Let's -- please slow

17   down.

18          MS. ADAMS:  Yes.

19          THE COURT:  And please wait till she finishes her

20   question before you begin your answer.

21          And please wait till he finishes his answer before you

22   begin your next question.

23          MS. ADAMS:  Yes, Your Honor.

24          THE WITNESS:  I'm sorry.  Yes.

25

1   BY MS. ADAMS:

2   Q.  And the basis was a loss of trust?

3   A.  That was the subsequent explanation given to us, given --

4   and when I say "us," I meant the members who did not vote that

5   way.

6   Q.  I understand.

7   A.  Yeah.

8   Q.  And then Senator Hobbs was the decision-maker to terminate

9   Ms. Adams in the middle of session, in --

10  A.  What --

11  Q.  -- February of 2015?

12  A.  All I can say is that she -- it's safe to assume that she

13  was part of that decision.  Whether the final decision was hers

14  to make, I don't know that.

15  Q.  Okay.

16  A.  But she was certainly -- I would -- it's safe to assume

17  that she was involved.

18  Q.  And was the basis loss of trust, or you do not know?

19  A.  I don't know the specifics of what the --

20  Q.  Very good.

21  A.  -- infraction was.

22  Q.  Okay.  Senator Bradley, I am short on time here, so I want

23  to talk to you about similarly situated policy advisors in the

24  Arizona State Senate.

25  A.  Okay.

**DAVID BRADLEY - DIRECT EXAMINATION**

1  Q.  So there's the Republican staffers, they have policy

2  advisors; the Democratic staffers, they have policy advisors.

3  We've heard testimony today that Republican staffers are paid

4  more to be policy advisors because, you know, one of two

5  things:  They come out of the intern pool, and so if they were

6  an intern for four months while in college, then they're

7  eligible to serve on the Republican staff and apparently stack

8  those years as experience; if -- and also, they just have a

9  harder job.

10        Is that your perspective, that Republican policy

11  advisors in the Arizona State Senate have a more difficult job

12  than the Democratic policy advisors in the Arizona State

13  Senate?

14  A.  No.

15  Q.  Why not?

16  A.  Well, I would almost -- if I were to make any comparison, I

17  would assert the reverse.  Because typically the Democratic

18  staff are fewer in number, sometimes as a function of their

19  membership over the years.  That's varied in terms of the

20  number of members, so that's a factor.

21        But in terms of their workload, they still have to

22  process basically the same amount of information, usually with

23  less support, typically, than the majority staff has.  So I

24  would -- I would not agree to that assessment.

25  Q.  For individuals that are staffing the same committees -- so

1   Ms. Adams staffed the Government Committee, she staffed the

2   Public Safety Committee, at times she staffed Rural Affairs and

3   Environment Committee.  For Republican staffers that are

4   staffing those same committees, is it your opinion that the

5   workload is similar?

6   A.  Assuming -- yes.  I mean, yes.  Yeah.

7   Q.  So in each committee, there's a Republican policy advisor

8   that is staffing the Republican members of that committee, and

9   there is a Democratic policy advisor that is staffing the

10  Democratic members of that committee.  Correct?

11  A.  Yes.

12  Q.  And the work flow of the committee is based on the agendas

13  and the bills; is that correct?

14  A.  Yes.

15  Q.  So irregardless of the number of senators that are sitting

16  on the committee, the work flow is the same because all bills

17  must be vetted; is that correct?

18  A.  Yes, that's correct.

19  Q.  For Republican staffers that are also staffing the chair on

20  the committee, on each committee, that all the Republican --

21  all the chairs on the committees are Republican; is that

22  correct?

23  A.  Yes.

24  Q.  They get to help with the agenda; is that correct?

25  A.  I can't say I know that for an absolute fact, but it's a

1    safe assumption.

2    Q.  So they might have early information about which bills are

3    actually in play for a committee?

4    A.  Yes.

5    Q.  And be able to prioritize their workload to the bills that

6    are actually being heard and not the bills that are actually

7    listed?

8    A.  Correct.

9    Q.  Is that correct?

10   A.  That's correct.

11   Q.  Okay.  Is there any reason why you think Ms. Adams should

12   have been paid less than her Republican policy advisor

13   counterparts?

14   A.  No.  No.

15   Q.  Is there any conduct that Ms. Adams engaged in that was

16   similar to any other individual there that has been terminated?

17   A.  No.

18   Q.  Are you aware of any other policy advisor that's been

19   terminated?

20   A.  No, I'm not.  Off the top of my head, no.

21   Q.  Are you aware of any policy advisor that's been terminated

22   in the middle of session?

23   A.  No.

24   Q.  Were you aware of any performance appraisals as relates to

25   Ms. Adams?

1   A.  No.

2   Q.  What is your sense of Ms. Adams' reputation at the Arizona

3   State Senate when she was a policy advisor?

4   A.  She was respected for the work that she did and was

5   thorough and comprehensive in her response.  And if a question

6   was asked of her that she didn't know, she was quick to

7   acknowledge that she didn't know and that she would follow up

8   quickly, getting the issue resolved.

9   Q.  And Ms. Adams was a licensed attorney, but she didn't

10  serve -- her title wasn't attorney; is that correct?

11  A.  That's correct.

12  Q.  And were you aware that the Arizona State Senate was paying

13  Ms. Adams' Bar Association dues with the Arizona State Bar?

14  A.  No, I did not know.

15  Q.  Do you believe the Arizona [sic] benefitted from Ms. Adams'

16  legal education, background, and Bar license?

17  A.  Yes.

18          MS. ADAMS:  I have no further questions, Your Honor.

19          THE COURT:  Mr. Moberly?

20          MR. MOBERLY:  Thank you, Your Honor.

21                      CROSS-EXAMINATION

22  BY MR. MOBERLY:

23  Q.  Hello, Senator.

24  A.  Hi.

25  Q.  My name's Mike Moberly, and I represent the Senate.

DAVID BRADLEY - CROSS-EXAMINATION

1    A.  Sure.

2    Q.  Do you have any personal knowledge of the experience levels

3    of the Republican policy advisors that were in the Senate at

4    the time Ms. Adams was there?

5    A.  No.  I would -- no.

6    Q.  I think you indicated that the vote to oust Senator Landrum

7    Taylor was by secret ballot?

8    A.  Yes.

9    Q.  And the people that are involved in that ballot are

10   strictly senators, aren't they?

11   A.  Yes.

12   Q.  Ms. Baldo certainly wouldn't be involved in that, would

13   she?

14   A.  No, she would not.

15   Q.  And you've never spoken with Ms. Baldo about Ms. Adams'

16   performance, have you?

17   A.  No, I have not.

18   Q.  Do you recall, in your conversations with Ms. Adams about

19   the tension she was feeling, whether you ever got the

20   impression that there were any other tensions in her life that

21   were contributing to what she was experiencing?

22   A.  Again, my recollection is that I believe she had a -- has a

23   son that was -- I think there was a medical issue, as I recall.

24   I don't know.  I can't remember what it was specifically.

25   Q.  Anything else you remember?

1   A.  No.  I think she was seeking, as was discussed earlier -- I

2   don't know if -- I'm assuming she was working on a degree from

3   Thunderbird and was trying to balance work and that issue as

4   well.

5   Q.  You had a sense she was a little bit overwhelmed, didn't

6   you?

7   A.  I had a sense that she was distressed.  I would -- yeah.

8   Q.  Do you recall Ms. Adams asking you not to tell anyone else

9   about the things she had been telling you?

10  A.  I don't remember her saying that.  I -- my recollection is

11  is that I offered to her that did she want me to talk to

12  someone about what she was talking to me, and she asked that I

13  not do that so I didn't.

14  Q.  Right.  You did not; is that correct?

15  A.  I did not.

16          MR. MOBERLY:  Yeah.

17          No further questions, Your Honor.  Thank you.

18          THE COURT:  Okay.  Any redirect?

19          MS. ADAMS:  No further questions, Your Honor.

20          THE COURT:  Okay.  You may step down.

21          THE WITNESS:  Thank you.

22          (Witness excused.)

23          (Further proceedings held on the record not

24  transcribed herein.)

25

1              C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 9th day of August,

13   2019.

14

15

16

                        s/Jennifer A. Pancratz_____ _____ ____
17                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25