### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Talonya Adams, | ) | |
| | ) | No.  CV-17-00822-PHX-DLR |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 11, 2019 |
| Arizona Senate, | ) | 3:52 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL DAY 3 – TESTIMONY OF KATIE HOBBS**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

For the Plaintiff:

3
        Talonya Adams, Esq.
4       In propria persona
        2 N. Central Avenue, Suite 1800
5       Phoenix, AZ 85004

6   For the Defendant:

7       Michael D. Moberly, Esq.
        Ryley Carlock & Applewhite PA
8       1 N. Central Avenue, Suite 1200
        Phoenix, AZ 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          **I N D E X**

2

3   **WITNESSES FOR THE          DIRECT    CROSS     REDIRECT   RECROSS**
    **DEFENDANT:**

4

    **Katie Hobbs**
5   By Mr. Moberly              4                    40
    By Ms. Adams                          26

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED  STATES  DISTRICT  COURT

1                    **P R O C E E D I N G S**

2              (Prior proceedings held on the record not transcribed

3    herein.)

4              (Jury present.)

5              THE COURT:  Mr. Moberly, you may call your next

6    witness.

7              MR. MOBERLY:  Thank you.  We call Katie Hobbs, Your

8    Honor.

9              THE COURT:  Senator Hobbs, would you come up, please,

10   and be sworn.

11                         KATIE HOBBS,

12   called as a witness herein by the Defendant, having been first

13   duly sworn or affirmed, was examined and testified as follows:

14              THE COURT:  You may proceed.

15              MR. MOBERLY:  Thank you, Your Honor.

16                      DIRECT EXAMINATION

17   BY MR. MOBERLY:

18   Q.  Afternoon.  Can you state your name for the record.

19   A.  Yes.  Katie Hobbs.

20   Q.  And what's your occupation, Ms. Hobbs?

21   A.  I'm currently the Secretary of State.

22   Q.  And how long have you held that position?

23   A.  Since January of 2019.

24   Q.  That's an elected position?

25   A.  Yes.

1    Q.  So you were just recently -- well, not quite recently, but

2    just relatively recently elected to that position?

3    A.  Yes.

4    Q.  Prior to that time, you had served in the Senate?

5    A.  Yes, for six years.

6    Q.  Why don't you tell us a little bit about your background.

7    A.  Sure.  Starting -- I was born in Arizona, raised here.

8    Grew up mostly in Tempe.  Went to Catholic grade school and

9    high school in Tempe and Chandler.  Had a pretty middle-class

10   background growing up.  There were a lot of times where we

11   struggled, and I think a lot of those times really contributed

12   to my going into social work as a career.

13         I studied social work and got my bachelor's degree at

14   Northern Arizona University and then my bachelor's at Arizona

15   State -- or my master's at Arizona State University.

16   Q.  And if you recall, roughly, what time period did you get

17   your master's -- your bachelor's and then your master's?

18   A.  I was at Northern Arizona from 1988 to 1992, and ASU from

19   1992 to 1995.

20   Q.  And did you go to NAU straight out of high school?

21   A.  Yes.

22   Q.  Okay.  And what did you do after you got your master's

23   degree?

24   A.  So during graduate school I was working at Tumbleweed, a

25   program for homeless and runaway youth.  I was a youth care

1  worker there.  Staffed the facility and provided support and

2  guidance to the residents there.

3          Immediately following graduate school, I worked for a

4  while as a school social worker, and then I was in a behavioral

5  health facility doing case management for about three years.

6  Sorry, four -- four years.

7  Q.  Okay.  And what next, Secretary?

8  A.  After I left the behavioral health organization, I went to

9  the Sojourner Center, which is -- became one of the largest

10 domestic violence programs in the country, providing shelter

11 and support to women and their children -- well, anyone,

12 really, who was fleeing domestic violence.

13         I -- in that role, I was a senior manager.  I oversaw

14 all of our government contracts as well as working a lot on

15 public policy issues with the -- in the legislature here, which

16 really is kind of what led me into policy work and running for

17 the legislature.

18 Q.  So you weren't doing case work at that time?

19 A.  No.  It was purely administrative.

20 Q.  Had you done case work in your prior experiences?

21 A.  Yes.

22 Q.  And then what happened next?

23 A.  So I was at the Sojourner Center for 11 years, 2000 to

24 2011.  I ran for the State House of Representatives in 2010 and

25 won that election in November so started serving in the House

1    in January of 2011.  I was there for one term and then went to

2    the Senate.

3    Q.  I think your career -- I think you've told me your career

4    has a little bit of tie to Senator Sinema's career?

5    A.  Certainly.  When I first got involved in politics, Senator

6    Sinema was at that time running for the House of

7    Representatives and the seat that I eventually won.  So I

8    helped her and was knocking on doors for her every day, and

9    then kind of stuck around and waited for her seat to be open

10   and then ran for it, so...

11   Q.  And I think you just told me, but I'm going to ask you to

12   repeat it because I didn't make a note of it.  When were you

13   elected to the Senate?

14   A.  In November of 2012.

15   Q.  Okay.  Do you know Ms. Adams?

16   A.  Yes.

17   Q.  How do you know her?

18   A.  Prior to coming to the Senate, Ms. Adams and I served on a

19   board together.  It was a training program that trained women

20   to run for office.  I had been through the program and

21   Ms. Adams had been through the program as well.

22   Q.  Can you describe or quantify the amount of interaction you

23   had with her in that role?

24   A.  I -- I don't remember the time frame.  I know I served on

25   the board from 2005 until 2013.  I don't remember what time we

1    were both on the board together, and I don't remember a lot of

2    interaction outside of actual board meetings.

3              THE COURT:  Can you slow down just a bit, please?

4              THE WITNESS:  Yes.  Sorry.

5              MR. MOBERLY:  We've all been talking too fast.

6    BY MR. MOBERLY:

7    Q.  There came a time when you and Ms. Adams were both at the

8    Senate together.  Do you remember that?

9    A.  Yes.  I believe she was hired as a policy advisor in the

10   Senate right after that election in November of 2012 when I was

11   elected to serve in the Senate.

12   Q.  So you both started there roughly the same time period?

13   A.  Yes.

14   Q.  Do you have a recollection of your dealings with her in

15   those early months?

16   A.  Yes.  As you've said, we were both new on the job.  I was

17   assigned to the Government Committee, and Ms. Adams was the

18   policy advisor for the Government Committee.

19              And so in that capacity, I'm sure you've heard all

20   about what the policy advisor role entails, but just briefly,

21   as a member of that committee, Ms. Adams would prepare

22   briefings on all the bills that were on the agenda.  And we

23   scheduled a weekly briefing to go over those so that we were

24   prepared for the committee hearings and knew what to expect.

25              And that briefing entailed not just kind of what the

```
1    bill does, a lot of information about the negative potential

2    consequences and what kind of stakeholders were supporting and

3    opposing.  And if it was something that, you know, we wanted to

4    try to oppose, strategy -- we talked about strategies how to do

5    that.

6              So that was during the session.  Also, if there were

7    any bills that I, as a member, wanted to propose that were

8    within the policy area that Ms. Adams staffed, she helped to

9    draft that legislation.  And for the most part, that was the

10   role that policy advisors played in -- in our role as

11   legislators.

12   Q.  Did you formulate any view of Ms. Adams' skills at that

13   time?

14   A.  Yeah.  I think she was very competent in that role.  You

15   know, the -- as legislators, we have things coming at us a

16   million miles a minute all the time and have to make decisions

17   about our position, about where we stand, about, you know, a

18   lot of things dealing with those.

19             And we really rely on the policy advisors to provide

20   information on that.  They're hired for their expertise in the

21   particular subject areas, so -- so, yeah, I felt prepared for

22   committees and -- yeah.

23   Q.  Okay.  At some point, I understand you attained a

24   leadership position in the Democratic Caucus?

25   A.  Yes.  The caucus reorganized every two years after the
```

1    election, so after the 2014 election, which was the first

2    Tuesday of November, then that following Thursday we had our

3    reorganization meeting and I was elected as the Senate Minority

4    Leader in November of 2014.

5    Q.  Okay.  Did you have interactions with Ms. Adams in your

6    leadership role?

7    A.  Sure.  As the minority leader, the sort of staff

8    supervision went through -- the chief of staff is who I relied

9    on to, you know, conduct the daily supervision and overseeing

10   the staff, but then that line flowed through me, essentially,

11   as well as the majority chief of staff, Wendy, signed -- made

12   final decisions on staffing matters.

13           So -- but, yeah, so it was not necessarily a

14   supervisory role, but as the supervisor of the chief of staff

15   of the minority caucus, in that regard.

16           THE COURT:  Please slow down.

17           THE WITNESS:  Okay.

18   BY MR. MOBERLY:

19   Q.  Do you recall Ms. Adams coming to you with respect to a

20   request for an education-related leave?

21   A.  Certainly.  Very shortly after I was elected to my

22   leadership role, Ms. Adams requested a meeting with me to

23   discuss this -- the program that she was in at the Thunderbird

24   school and a requirement for an out-of-country travel that was

25   taking place sometime in the legislative session in the spring.

1   Q.  Did you meet personally with her about that?

2   A.  Yes.  We did --

3   Q.  Slow down just a little bit --

4   A.  Yes.

5   Q.  -- and tell the jury what you remember about that.

6   A.  So Ms. Adams brought the request to me, and I remember from

7   the meeting that I told her I would look at -- I would look at

8   the request.

9          Subsequent to that, I went -- this was a period of

10   time where the chief -- the chief of staff who had been with

11   the previous administration had left and was no longer -- I

12   can't -- I don't remember his exact day of leaving and if he

13   was still in place at the time of this meeting or not, but I

14   hadn't hired any chief of staff.

15          So I followed up with Mr. Silverman, who was the

16   previous chief of staff, to find out what he knew about this

17   agreement -- or about this educational plan.  This had already

18   been discussed.  There had already been an agreement in place

19   with the previous leader, with the majority staff in terms of

20   what leave could be taken during session.

21          So I followed up with Mr. Silverman to get this

22   information.  I also reached out to Ms. Tovar, who was the

23   former -- who was my predecessor as the Senate leader, and then

24   confirmed all the details with Ms. Baldo, who had -- who showed

25   me the actual signed agreement that was in place.

KATIE HOBBS - DIRECT EXAMINATION

1   Q.  So what do you recall the agreement saying, in a nutshell?

2   A.  I believe the agreement addressed Fridays during session

3   when the classes were actually taking place.

4           And when we're in legislative session, legislators

5   don't meet on Fridays so there's not as much going on at the

6   actual Senate on Fridays, so she was allowed leave on Fridays,

7   which was an exception to normal policy during the legislative

8   session.  And then the agreement addressed the out-of-country

9   travel and that it wouldn't be allowed during the legislative

10  session.

11  Q.  What happened next, Secretary Hobbs?

12  A.  I believe that I -- I think I went back to Ms. Adams and

13  relayed this information and asked her to kind of hold tight

14  until we had a new chief of staff in place, and that I would be

15  willing to discuss it with the new chief of staff and Ms. Baldo

16  at that time.

17  Q.  And then what happened?

18  A.  And then we discussed it.  I -- I believe that Ms. Adams

19  and Mr. Winkler and myself did meet again about the agreement,

20  but I'm not positive about that.

21          We also -- during this time, there was kind of a

22  lot -- a lot happening.  I was new at my job.  Jeff,

23  Mr. Winkler, was new at his job.  And we were all trying to

24  kind of get our bearings.

25          And so, you know, there's a lot happening.  I think

1  that at one point Ms. Adams had gone, after a meeting with Jeff

2  and I where we said that the agreement was going to stand, and

3  went to Ms. Baldo to revisit the agreement again.  And we asked

4  Ms. Adams to follow a protocol if there were issues of going

5  directly to Jeff, and then if she couldn't resolve it at the

6  level with Jeff, with Mr. Winkler, that he would involve me at

7  that time, but to not go directly to Ms. Baldo.

8       And that was sort of an agreement that Jeff and --

9  Mr. Winkler and Ms. Baldo and myself had come to together.

10  Q.  Okay.

11  A.  And this -- and that was not out of the norm of anything

12  that we were asking any other staff member to do.

13  Q.  Do you recall what happened next?

14  A.  There -- --

15  Q.  Do you remember she raised the issue again?

16  A.  Yeah.  Yes.  I think at the beginning of December, we had

17  another meeting about -- about the educational program and the

18  agreement.

19       And one of the things that Mr. Winkler and I both

20  offered to Ms. Adams was to help her with any negative

21  consequences this might have on her academic program in terms

22  of talking to the dean, talking to, you know, Dr. Crow at ASU.

23  At this time, Thunderbird was being assumed by ASU.

24       And so if there was anything we could do to help in

25  that matter, we were willing to do that.  And we proposed this

KATIE HOBBS - DIRECT EXAMINATION                      14

1    to her.  It was never -- we were never taken up on that offer.

2    Q.  Okay.  Anything else you recall about that series of

3    events?

4    A.  I don't think so.

5    Q.  Do you know if Ms. Adams ever pursued it any further?

6    A.  I don't think so.

7    Q.  What happened next with respect to your interactions with

8    Ms. Adams?

9    A.  So the other -- so the outgoing chief of staff, he left

10   after the election.  Had nothing to do with me.  He just took

11   another job.  But he was -- acted in the capacity of chief of

12   staff and legal counsel.

13        And so when we hired -- when I hired Mr. Winkler as

14   the chief of staff, the caucus had expressed a desire to split

15   those positions out, that having the legal counsel and chief of

16   staff was unique to our caucus and the other caucuses operated

17   with separate counsel and chief of staff, and our caucus

18   expressed a desire to do that.

19        I talked with Ms. Baldo.  We got approval for having

20   it as two positions, and that was how we decided to move

21   forward.  There was not anyone interviewing for chief of staff

22   that wanted to be legal counsel.  Jeff's not an attorney so

23   wasn't qualified to be legal counsel.

24        And so he was hired as chief of staff, and then we

25   moved forward with legal counsel interviews.  And we had --

1   Ms. Adams applied for that position.  It was not offered to

2   her, so we hired another legal counsel.

3           I think there was definitely some dissatisfaction as a

4   result of that decision.  And these things all happened prior

5   to session.  Then session started in January, and you know, we

6   kind of jumped into the craziness of legislative session.

7           THE COURT:  Mr. Moberly, can you tighten it up with

8   the questions and answers, please?

9           MR. MOBERLY:  Yeah.

10          Yeah, just a little less narrative and I'll ask you

11  the question.

12          THE WITNESS:  Okay.

13  BY MR. MOBERLY:

14  Q.  Do you remember the -- well, let me back up for a second.

15          When you said you thought there was some

16  dissatisfaction, what makes you say that?

17  A.  There was one particular meeting that we were having.  We

18  had regular weekly strategy meetings between all of the

19  Democratic Caucus staff and all of the Democratic Caucus

20  members.  So there were in my office 13 members and 6 staff.

21          And the -- Ms. Flores, who we hired as legal counsel,

22  was briefing on an amendment on a judiciary bill, and Ms. Adams

23  continued to speak over her, interrupt her, answer members'

24  questions that were directed to Ms. Flores in a way that was --

25  seemed belligerent, aggressive, and just unprofessional, and a

1    way that would really demean her -- demean Ms. Flores in front

2    of the entire membership and her colleagues on the staff.

3    Q.  Did you speak to Ms. Adams about that?

4    A.  I don't -- I don't think so.  And I think -- again, there

5    was a lot going on, and this happened really shortly before the

6    termination.

7    Q.  Do you remember having been copied on an email request from

8    Ms. Adams on February 1st that was directed to Mr. Winkler?

9    Does that ring a bell with you?

10   A.  Yes.

11   Q.  First part of February?

12          What do you remember about that?

13   A.  Yes.  Ms. Adams wanted to meet to talk about her workload.

14   Q.  And did that -- did you participate in a meeting as a

15   result of that email?

16   A.  Yes, I did.

17   Q.  Do you recall when that occurred?

18   A.  Early in February.  I think it was the 4th.

19   Q.  Going slowly, what do you remember about that meeting?

20   A.  Ms. Adams presented information about her workload.  She

21   had gone through and, you know, listed how many bills were

22   assigned to the committees that she staffed, which wasn't

23   necessarily relevant in the workload because the workload is

24   based on the bills that are on the committee agenda.

25          And so -- and we told her that.  We told her if she

1   needed -- once we saw the committee agendas for the week, if

2   she needed help and support in briefing for those agendas, that

3   we would do what we could to help her.  If there were bills

4   that weren't in her subject area expertise, for example,

5   election bills that in the previous session were in a different

6   committee, that we would provide the help that she needed.

7          That was never acted upon.

8   Q.  Do you remember discussion in that meeting about hourly

9   versus salary?

10  A.  Yes.  Yes.  And the policy advisors are salary, nonexempt

11  employees.

12  Q.  And you had that conversation?

13  A.  Yes.

14  Q.  Okay.  What about a discussion of a pay increase?  Do you

15  remember that being part of that meeting at all?

16  A.  No.

17  Q.  Anything else about that meeting you remember?

18  A.  No.  I think that's the gist.

19  Q.  At any time during that meeting, did Ms. Adams say she felt

20  she was being paid or treated differently than others because

21  of her race?

22  A.  Absolutely not.

23  Q.  Did she indicate at any time during that meeting that she

24  felt she was being treated differently because of her gender?

25  A.  Absolutely not.

1    Q.  At any time during your experience at the Senate, did she

2    ever make that contention -- either of those contentions to

3    you?

4    A.  No.

5    Q.  Did anyone else ever tell you that she had made either of

6    those contentions to them?

7    A.  No.

8    Q.  Do you remember an email in which -- I believe this is

9    mid-February, where Ms. Adams requested a meeting with the

10   Democratic Senate leadership to discuss her status on the

11   staff?

12   A.  Yes.  Ms. Adams sent an email to me and copied the rest of

13   the members of the leadership team asking for a meeting.  This

14   was on February 13th, which was a Friday, and asked for a

15   meeting on Monday.

16   Q.  Do you recall what prompted that request?

17   A.  Yes.  I believe the Arizona Republic or the Arizona Capitol

18   Times, one of the two, had published a list of all the

19   legislative staff salaries.  This is something that is an

20   annual exercise, and it's beyond frustrating.

21        Our -- at the time, the Senate Democratic Caucus staff

22   were the lowest paid staff of all the legislative staff.  And

23   it's, you know -- we're in a position where we're trying to

24   fight for increased pay.

25        And prior to the legislative session starting,

1    Mr. Winkler had gone to Ms. Baldo about some legislative

2    salaries, and we had an agreement that we would come back at

3    the end of session to revisit all the staff salaries.

4           And -- and that had been shared, I believe, with

5    Ms. Adams, I think prior to this email.

6    Q.  You recall her request came on a Friday, February 13th?

7    Does that ring a bell?

8    A.  Yes.  Yeah.

9    Q.  And do you recall when the -- when the Capitol Times had

10   reported those salaries?

11   A.  I think it was the previous day.

12   Q.  Previous day, okay.

13          And what happened when she sent that email?

14   A.  I was disturbed by it because, again, we had talked to her

15   about the protocol that we asked staff to follow if they had

16   issues, any personnel issues that they wanted to discuss

17   related to their employment.  And that was not part of the

18   protocol.

19          So I responded to Ms. Adams -- I responded to the rest

20   of the leadership team and asked them not to respond to

21   Ms. Adams.  And then I responded to Ms. Adams, reiterated the

22   protocol, and told her that Jeff and I would be happy to set up

23   a meeting with her on Monday.

24   Q.  And how did she respond to that?

25   A.  I believe she apologized for the email.  I believe she

1    asked Mr. Winkler for information about FMLA and that he -- and

2    he said he would get the information she needed and would clear

3    his schedule to meet with her Monday morning.

4    Q.  Do you recall that exchange occurred on an email?

5    A.  Yes, on Friday evening.

6    Q.  And were you copied on those?

7    A.  Yes.

8    Q.  And then what happened?

9    A.  Then Monday came and I was going about my day, and I got a

10   call from Mr. Winkler that Ms. Adams hadn't come to work that

11   day.  She hadn't communicated with anyone that she wasn't going

12   to be at work that day, and she hadn't -- most importantly,

13   hadn't messaged her direct supervisor.

14          And he had tried to reach out to her to have the

15   discussion that he thought that they had set up for Friday

16   morning -- or for Monday morning, and she wasn't returning his

17   phone calls.

18   Q.  Okay.  And what occurred next?

19   A.  So I believe there were brief -- legislate -- committee

20   briefings that needed to be prepared for the committees that

21   Ms. Adams staffed, and so Jeff worked with Ms. Adams'

22   legislative intern to get those briefings prepared.

23          And Ms. Adams did call Mr. Winkler at 1:30 that day.

24   And the reason that, you know, that is significant is because

25   we go to the floor at 1:30, which makes availability pretty

1    difficult.  And that's something that Ms. Adams would have

2    known.

3    Q.  So I understand these events prompted a series of meetings

4    that week?

5    A.  Uh-huh.

6    Q.  Can you tell the jury a little bit about that?

7    A.  Sure.  I think that -- and again, there were many meetings

8    that took place, a combination of myself, Mr. Winkler,

9    Ms. Baldo, and at some point involving Ms. Reilly, who was

10   the -- who oversaw HR for the Senate.

11          And, you know, discussed what was essentially seen as

12   Ms. Adams abandoning her job, not doing a handoff of work that

13   needed to be done, and what action could take place, and

14   ultimately resulted in the decision to terminate employment.

15   Q.  Do you recall when that meeting occurred?

16   A.  That last meeting was I believe on Thursday of that week,

17   the 19th.

18   Q.  You -- might it have been on Friday?

19   A.  It may have been on Friday.

20   Q.  Okay.  Do you recall -- you spoke in that meeting, I

21   assume, didn't you?

22   A.  Yes.

23   Q.  Okay.  Can you tell the jury what your role in that meeting

24   was, what you said?

25   A.  I mean, I think that ultimately it's never an easy decision

1    to terminate someone's employment.  I think we all agreed that

2    we had lost trust and confidence in Ms. Adams, and that was why

3    that decision was made.

4           I think that -- yeah.  I don't -- I don't remember

5    specifically, but I know that that was a big part of the

6    discussion.

7    Q.  Was that your view, that you'd lost trust and confidence?

8    A.  Yes.

9    Q.  And did you express that at that meeting?

10   A.  Yes.

11   Q.  Okay.  Do you recall how Ms. Adams was to be notified of

12   the termination?

13   A.  Yes.  Ms. Baldo was going to call her and request a meeting

14   on Monday.  So this was Friday, and when Ms. Baldo placed the

15   call, Ms. Adams asked her if she was being terminated.  And so

16   instead of, you know, letting her know in the meeting Monday,

17   she let her know on the phone on Friday.

18   Q.  Is that something Ms. Baldo later told you?

19   A.  Yes.

20          MR. MOBERLY:  I have nothing further, Your Honor.

21   Thank you.

22          THE COURT:  Okay.  We're almost done with this

23   witness.  Can we -- does any member of the jury have a problem

24   staying later tonight to get this done?

25          Okay.  Let's take a short recess.  It's been 90

1     minutes, so let's come back at 4:35 -- 4:40.

2              (Jury not present.)

3              THE COURT:  Please be seated.

4              I just want to make a record.  We had an

5     off-the-record discussion at the sidebar here, and I'd asked

6     Ms. Adams if she wanted to use her time arguing minutiae with

7     that witness, and she said she only had one question left and

8     that's how we ended it.

9              Both parties -- everybody agree that's what was said?

10             MS. ADAMS:  Yes, Your Honor.

11             MR. MOBERLY:  Yeah.

12             THE COURT:  All right.  Ms. Adams, how much time are

13    you going to need for this witness, cross-examination?  You're

14    pretty much out of time, so I'm trying to work with you on

15    this, but you need to focus your questions because you got --

16    you spent a lot of time with irrelevant questions trying to

17    chase down every little thing that last witness said, and that

18    really wasn't useful or relevant.

19             So hopefully this one will be more direct.

20             MS. ADAMS:  Understood, Your Honor.

21             THE COURT:  Do you have a time estimate?

22             MS. ADAMS:  I think it will be about five to eight

23    minutes.

24             THE COURT:  Okay.

25             All right.  Well, then we'll finish up with this

1   witness, and then you're going to rest?

2          MR. MOBERLY:  Am I going to rest?  Yes.

3          THE COURT:  Yeah.

4          Okay.  And, Ms. Adams, are you going to have any

5   rebuttal witnesses or any rebuttal evidence?

6          MS. ADAMS:  Are we talking about tomorrow morning?

7          THE COURT:  Well, I'm trying to find out what you have

8   left.

9          MS. ADAMS:  I have one rebuttal -- I have one rebuttal

10  witness that may or may not be needed.  But I would -- I do

11  have about three to five questions to redirect Ms. Baldo.

12         THE COURT:  Okay.  All right.  And that's for

13  rebuttal?

14         MS. ADAMS:  Pardon me?

15         THE COURT:  That's rebuttal evidence; right?  To rebut

16  what's been presented by the defense.

17         MS. ADAMS:  Well, I never had an opportunity to --

18         THE COURT:  No, you did.  You had an opportunity to

19  finish up your redirect.  I asked you if you wanted to, and you

20  said you had no further questions, and Mr. Moberly told me the

21  same thing.

22         So -- so if you have -- if you have some rebuttal that

23  you want to get out of her, that's fine.

24         MS. ADAMS:  Okay.

25         THE COURT:  But you're not going to be able to bring

```
 1   her back in for a whole new area of discussion.
 2            MS. ADAMS:  Yes, I understand.  Okay, Your Honor.
 3            THE COURT:  Okay?
 4            MS. ADAMS:  Yes.
 5            THE COURT:  All right.  So what we'll do tonight is
 6   we'll finish up with this witness, we'll excuse her, defense
 7   will rest, I'll send the jury home, we'll stay and work on jury
 8   instructions and get them finalized, and forms of verdict.
 9            When we come back tomorrow you'll call your rebuttal
10   witnesses, and then we will give the jury the final
11   instructions and closing arguments.  All right?  That's the
12   plan.
13            MS. ADAMS:  Yes, Your Honor.
14            THE COURT:  Anything else?
15            Anything else?
16            MR. MOBERLY:  No.
17            MS. ADAMS:  No.
18            THE COURT:  Okay.
19            (Recess taken, 4:24 p.m. to 4:41 p.m.)
20            THE COURT:  Ms. Hobbs, retake the witness stand,
21   please.  We're going to bring the jury in.
22            Please be seated.
23            (Jury present.)
24            THE COURT:  Please be seated.
25            Ms. Adams, you may proceed.
```

1          MS. ADAMS:  Thank you, Your Honor.

2          May the clerk provide Ms. Hobbs with Exhibit 30, 238,

3  and 241.

4                        CROSS-EXAMINATION

5  BY MS. ADAMS:

6  Q.  Good afternoon, Ms. Hobbs.

7  A.  Hi.

8  Q.  You testified earlier that on Friday, February 13th,

9  Ms. Adams had sent an email to the entire leadership --

10  Democratic leadership staff; is that correct?

11  A.  Yes.

12  Q.  Okay.

13  A.  Not --

14  Q.  You've answered.

15          MS. ADAMS:  Your Honor, I move -- I'd like to publish

16  Exhibit 238.

17          THE COURT:  Is it in evidence?

18          MS. ADAMS:  It is in evidence, yes, Your Honor.

19          THE COURT:  Okay.  You may.

20          MS. ADAMS:  Thank you.

21  BY MS. ADAMS:

22  Q.  And you testified that you had responded to Ms. Adams that

23  the email you -- that she had sent was not appropriate; is that

24  correct?

25  A.  Yes.

1    Q.  Okay.  Or at least the request to meet with the entire

2    leadership team, the meeting was not appropriate; is that

3    correct?

4    A.  Yes.

5    Q.  Okay.  And you also testified that there was a protocol

6    that you wanted Ms. Adams to engage in; is that correct?

7    A.  Yes.

8    Q.  And you wrote that in an email so it was a written

9    document; correct?

10   A.  It was -- in the email that you're referring to?

11   Q.  Yes.

12   A.  Yes.

13   Q.  Okay.  And prior to that, had that protocol been written or

14   was there a policy that was written that had been shared with

15   policy advisors?

16   A.  My understanding is that Mr. Winkler, as the chief of staff

17   and direct supervisor of all of the Democratic Caucus staff,

18   had shared protocols such as this one with the staff and asked

19   them to follow that in terms of any personnel employee-related

20   matters, that they would go first to him; if it couldn't be

21   resolved at that level, that Jeff would engage me.

22   Q.  Okay.  And so Mr. Winkler told you that he had told the

23   staff that; is that correct?

24   A.  Yes.  And --

25   Q.  But you weren't there when Mr. Winkler made these

1    statements; is that correct?

2    A.  I was there in several meetings with you where Mr. Winkler

3    and I reiterated that protocol with you specifically.

4    Q.  Okay.  On what date?

5    A.  There were several meetings that you and Mr. Winkler and

6    myself had.  The one on February 4th.  There was one at the

7    beginning of December.  I don't remember -- I don't know the

8    other dates off the top of my head.

9    Q.  Okay.  And prior to November of 2014, prior to

10   November 20th of 2014, Mr. Winkler wasn't the chief of staff;

11   is that correct?

12   A.  Correct.

13   Q.  Okay.  So you can cite two dates maybe in which the

14   protocol may have been shared verbally?

15   A.  Correct.

16   Q.  Okay.  Can you look at Exhibit 238 here.

17          Do you see at the bottom an email from Aaron Latham?

18   A.  Yes.

19   Q.  And is this the document you were referencing when you said

20   you weren't sure if it was Arizona Republic or Capitol Times

21   that put out the Senate salaries?

22   A.  I suppose so.

23   Q.  Okay.  Does that look like the legislative report from

24   February 12th, 2015, to you?

25   A.  Yes.

1    Q.  Okay.  You said raises were going to be dealt with at the

2    end of the legislative session in 2015; correct?

3    A.  Yes.

4    Q.  Okay.  But raises had been given on Democratic Caucus staff

5    in December of 2014; is that correct?

6    A.  Yes.

7    Q.  And who received those raises?

8    A.  I believe it was Aaron Latham and John Fetherston.

9    Q.  Okay.  And what -- what is the race of Aaron Latham?

10   A.  I don't know.

11   Q.  What is the race of John Fetherston?

12   A.  I don't know.  I've never asked.

13   Q.  What is the gender of Aaron Latham?

14   A.  Male.

15   Q.  What is the gender of John Fetherston?

16   A.  Male.

17   Q.  Are there any other male policy advisors on the Arizona

18   Senate Democratic Caucus at that time?

19   A.  No.

20   Q.  Okay.  The rest were women; is that correct?

21   A.  Yes.

22   Q.  Okay.  Do you know the amount of raises that were given to

23   them?

24   A.  No.

25   Q.  Okay.  Let's turn the page and find out.

1              Actually, I think it ends on -- I think it starts on

2    this page here, where it says "Senate Salaries" there; is that

3    right?

4              "Senate Staff Salaries."  Do you see that?

5    A.  Are you asking me that question?

6    Q.  Yes, I am.

7    A.  What page are you on?

8    Q.  I'm on page 1, Bates stamped AZSEN 092, Exhibit 238.

9    A.  Okay.

10   Q.  You see that last paragraph there?

11   A.  Uh-huh.

12   Q.  And it says the largest raise went to Jeff Winkler; is that

13   right?

14   A.  Yes.  He was promoted to chief of staff.

15   Q.  Okay.  So he -- what was his bump in pay?

16   A.  I -- you're asking me to do math on this right now?

17   Q.  No, I'm just asking you what was his salary prior to the

18   raise.

19   A.  $63,000, which was commensurate with a policy advisor.  And

20   he was raised to $95,000, which is commensurate with a chief of

21   staff position, and I might mention, is the lowest paid chief

22   of staff in the legislature.

23   Q.  Are you suggesting that Mr. Winkler should have been paid

24   more?

25   A.  I'm suggesting that it's on the low end of the scale for a

1   chief of staff.

2   Q.  Okay.  In the Arizona State Senate?

3   A.  In the legislature.

4   Q.  In the legislature.

5           Compared to other policy advisors -- or other chief of

6   staffs?

7   A.  Yes.

8   Q.  Republican or Democrat?

9   A.  Yes.

10  Q.  Okay.  We're going to turn the page, please.

11          And so here it says Peter Silverman was making how

12  much money?

13  A.  What page are you on?

14  Q.  On the second page.  It's Bates stamped AZSEN 0393.

15  A.  I don't see Peter Silverman.

16  Q.  Do you see the text at the top?

17  A.  Yes.

18  Q.  Jeff replaced Peter Silverman; right?

19  A.  Yes.

20  Q.  Okay.  And Peter Silverman was working in a general counsel

21  role and a chief of staff role; is that correct?

22  A.  Yes.

23  Q.  Peter Silverman was a licensed attorney; is that correct?

24  A.  Uh-huh.

25  Q.  And Peter Silverman was paid $110,000; is that correct?

1   A.  Yes.

2   Q.  And then Jeff was paid $95,000 to be just the chief of

3   staff; is that correct?

4   A.  Yes.

5   Q.  Okay.  And then it looks like the Democrats hired Lisette

6   Flores as a staff attorney for $80,000?

7   A.  Yes.

8   Q.  Okay.  And then other raises were given; is that right?

9   A.  Not other than the two that were just mentioned.

10  Q.  Do you see where it says $5,000 was given to

11  Mr. Fetherston, $5,000 was given to Mr. Latham?

12  A.  Yes.  Those were the two that you --

13  Q.  Oh, those were the two?

14  A.  Yes, they were mentioned.

15  Q.  Okay.  And so this is an article that you are stating for a

16  fact you know that this is correct?

17  A.  This is correct to the best of my recollection, yes.

18  Q.  Okay.  Very good.  Thank you.

19          I'm sorry.  We're going to stay on this exhibit

20  because I just want to show you -- it looks like here, if you

21  turn to the first page, Bates stamped AZSEN 0392, Mr. Latham

22  sent this out to Senate Democratic members and the staffers; is

23  that correct?

24  A.  Uh-huh.  Yes.

25  Q.  Okay.  And then Ms. Adams forwarded the email to Ms. Baldo.

KATIE HOBBS - CROSS-EXAMINATION                    33

1    Does that look right?

2    A.  It looks like it from this document, yes.

3    Q.  Okay.  And she asked Ms. Baldo:  "What is the protocol to

4    request a raise in the Senate?"

5    A.  Yes.

6    Q.  And what did Ms. Baldo tell her?

7    A.  "Through your leadership."

8    Q.  And what is the date and time of that email?

9    A.  Friday, February 13th, at 11:01 a.m.

10   Q.  Okay.  And so when Ms. Adams sent the email to leadership,

11   did she also cc Wendy Baldo, to your knowledge?

12   A.  I don't know.  Is that -- do I have that in front of me?

13   Q.  You do not.

14   A.  I don't know the answer to that question.

15   Q.  Okay.  Can you take Exhibit 241, please?

16            MS. ADAMS:  Permission to publish to the jury.

17            THE COURT:  Is it in evidence?

18            MS. ADAMS:  It is in evidence, Your Honor.

19            THE COURT:  You may.

20            MS. ADAMS:  Thank you.

21   BY MS. ADAMS:

22   Q.  Do you recognize this document?

23   A.  Yes.

24   Q.  Okay.  Did you send this document?

25   A.  It would appear that I did, yes.

1   Q.  Okay.  And Ms. Adams requested to meet with the Democratic

2   leadership to discuss her current status, and you wrote back

3   and said that -- what did you say?

4   A.  Do you want me to read this?

5   Q.  Sure, the first sentence.

6   A.  "Jeff and I have previously met with you regarding your

7   concerns."

8   Q.  You can stop there.

9        Did you know what concerns Ms. Adams wanted to discuss

10  with the Democratic Caucus?

11  A.  From the email that you sent, it says to discuss your

12  current status on the Democratic Caucus staff.

13  Q.  Okay.

14  A.  So I -- no, not specifically.

15  Q.  Okay.  Thank you.

16        Ms. Hobbs, you were deposed in this case; is that

17  right?

18  A.  Yes.

19  Q.  And that was in March of 2018?

20  A.  I believe so, yes.

21  Q.  Okay.  If you take Exhibit 30, you can see your deposition

22  testimony there.

23        When you were deposed, you stated from Jeff's

24  perspective, there was a loss of trust; is that correct?

25  A.  Where?

1    Q.  You can look at page 33, lines 1 through 7.

2    A.  I don't have a page 33.

3    Q.  It's in the upper right-hand corner.

4    A.  133?

5    Q.  133, yes.

6    A.  What was the question?

7    Q.  The question is, you were asked, from Jeff's perspective --

8    you were asked about a loss of trust in Ms. Adams, and you

9    said, from Jeff's perspective, there was a loss of trust; is

10   that correct?

11   A.  I don't see where it says that here.  In lines 1 through 7?

12   Q.  Lines 1 through 7, uh-huh.

13   A.  I don't see that here.

14   Q.  Okay.  You were then asked to speak from your perspective;

15   is that right?  At line 8?

16   A.  Sure.

17   Q.  Okay.  And what was your response as it relates to your

18   perspective and Ms. Adams and trust?

19   A.  I said that there was a lack of trust.

20   Q.  Okay.  And why was there a lack of trust?

21   A.  You're asking me to answer this question from my deposition

22   that I don't have context for, so I'm not sure.

23   Q.  No, but today right here, sitting right now -- you can put

24   the deposition back in the folder and just state why there was

25   a lack of trust at that time, in 2015 when Ms. Adams was

1    terminated.

2    A.   I -- was that when this part of the -- because I don't know

3    what this part of the deposition refers to.

4    Q.   That's okay.  We can put the deposition aside, and you can

5    just answer right now.

6              In 2015, why had you lost trust in Ms. Adams?

7    A.   Ms. Adams failed to show up or respond to a meeting request

8    that she had made with her direct supervisor, Mr. Winkler, and

9    in doing so -- and also failed to show up for her job,

10   failed --

11   Q.   Okay.  Can I stop you there?

12   A.   -- to have --

13   Q.   Sorry.  Can we just pause there?

14   A.   Uh-huh.

15   Q.   When you say "failed to show up," you mean on Monday,

16   February 16th, 2015, at 7:30, Ms. Adams did not show up or call

17   in to the Arizona State Senate that she had requested to meet

18   with Mr. Winkler?

19   A.   Ms. Adams did not show up at all at any time on Monday,

20   February 16th.

21   Q.   Okay.  And did you know her son was ill?

22   A.   I don't know if I knew that at the time.

23   Q.   Okay.  Had you been cc'd on emails regarding an ill son and

24   the need to travel to Seattle?

25   A.   I -- if that was in the email chain that started on

1   February 13th and I was copied on those, then yes.

2   Q.  Okay.  But you don't recall that today?

3   A.  I don't recall the content exactly of those emails.

4   Q.  Okay.  At some point did you know Ms. Adams was in Seattle

5   with an ill child?

6   A.  I did not know that Ms. Adams was in Seattle.

7   Q.  Okay.  Did you know --

8   A.  I know that she requested to meet with Mr. Winkler to talk

9   about FMLA, and there was a reasonable expectation that that

10  meeting would take place on Monday, February 16th.  And there

11  was no communication that Ms. Adams was out of state and not

12  going to be in that meeting and not going to call to have a

13  discussion about anything that she had requested a discussion

14  on.

15  Q.  Okay.  And you know this because you were there or you know

16  this because someone told you?

17  A.  Because Mr. Winkler, who I entrusted as the chief of staff

18  and direct supervisor of all of the staff, told me this.

19  Q.  And you believed him?

20  A.  Yes.

21  Q.  Do you trust Mr. Winkler?

22  A.  I do.

23  Q.  Okay.  Have you lost trust in anyone else at the Arizona

24  State Senate besides Ms. Adams?

25  A.  That's a very broad question.  Are you talking about people

1    that I directly oversaw?

2    Q.  Sure.

3    A.  Or people that I work with every day in the Senate?

4    Q.  How about both categories.

5    A.  There's a lot of senators I never had trust in in the first

6    place.  But of the Democratic Caucus staff, no.

7    Q.  Okay.  And as it relates to the Democratic Caucus senators?

8    A.  Not specifically that I can think of.

9    Q.  Okay.  When Senator Landrum Taylor was ousted by the

10   Democratic Caucus, you were in that meeting; is that right?

11   A.  Yes.

12   Q.  And do you remember making statements after the fact that

13   she lost the trust of her caucus?

14   A.  I don't know if I made that exact statement.  She misled

15   the caucus on a really important issue, and that was what led

16   to the majority of us making the decision to vote for another

17   leader.

18   Q.  What was the issue?

19   A.  At the reorganization that took place after the 2012

20   election, the previous Senate president had been Senator Steve

21   Pierce.  He had a reasonable expectation that he was going to

22   be reelected as the Senate president, and he was not.

23          We told our leader, Landrum Taylor, that we would give

24   our caucus votes to Senator Pierce to be president if he had

25   enough votes in his caucus to do so.  What we found out was

**KATIE HOBBS - CROSS-EXAMINATION**

```
1   that she told -- that Mr. Pierce had told her he wanted our
2   votes to be leader -- to be president, and she told him that we
3   weren't interested in delivering that to him.  So directly --
4   Q.  Thank you.  You've asked and answered.  I appreciate that.
5           Ms. Hobbs, do you have a hard time trusting
6   African-American women?
7   A.  Absolutely not.
8   Q.  Are there African-American women that you trust?
9   A.  Yes.
10  Q.  You're the Secretary of State; is that right?
11  A.  Yes.
12  Q.  Okay.  Are there African-American women in your
13  administration?
14  A.  Yes, there are.
15  Q.  What are their names?
16  A.  Renata Fisher.
17          I -- I'm sorry.  You put me on the spot.  I'm not good
18  with names, and I am blanking on names.  But there are
19  African-American women that work in the Secretary of State's
20  Office, yes.
21  Q.  That you've hired?
22  A.  I have hired four people in my office.  The rest of the --
23  Q.  The question before you is are there African-American women
24  that you have hired?
25  A.  No.
```

1  Q.  Are there African-American men that you have hired in your

2  administration?

3  A.  No.

4        MS. ADAMS:  No further questions.

5        THE COURT:  Redirect.

6        MR. MOBERLY:  Thank you, Your Honor.

7                    REDIRECT EXAMINATION

8  BY MR. MOBERLY:

9  Q.  Secretary Hobbs, you were in the middle of answering a

10  question about Ms. -- or Senator Landrum Taylor, and you were

11  interrupted and not allowed to finish.  Go ahead and finish if

12  you would.

13  A.  I think I had mostly finished the situation.  It was just

14  that she -- as her caucus, we asked her -- we made a specific

15  request of her.  We would have elected Steve Pierce as the

16  Senate president.  She told him directly the opposite, that we

17  didn't want to do that.

18        And the consequence of that was very substantial

19  related to policy that happened during that subsequent

20  legislative session.  So I think it wasn't just an issue of,

21  like, who won or lost.  It was really consequential

22  policy-wise.

23        MR. MOBERLY:  Thank you, Your Honor.

24        THE COURT:  All right.  Thank you for staying late.

25  You're excused.

1          THE WITNESS:  Thank you.

2          (Witness excused.)

3          (Further proceedings held on the record not

4   transcribed herein.)

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 9th day of August,

13   2019.

14

15

16

17                    s/Jennifer A. Pancratz_____
                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25