# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Talonya Adams, | ) | |
| | ) | No.  CV-17-00822-PHX-DLR |
|      Plaintiff, | ) | |
| | ) | |
|      vs. | ) | Phoenix, Arizona |
| | ) | July 10, 2019 |
| Arizona Senate, | ) | 11:39 a.m. |
| | ) | |
|      Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**<u>REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS</u>**

**<u>JURY TRIAL DAY 2 - TESTIMONY OF SANDY REILLY</u>**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2

For the Plaintiff:
3
        Talonya Adams, Esq.
4       In propria persona
        2 N. Central Avenue, Suite 1800
5       Phoenix, AZ 85004

6   For the Defendant:

7       Michael D. Moberly, Esq.
        Ryley Carlock & Applewhite PA
8       1 N. Central Avenue, Suite 1200
        Phoenix, AZ 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED  STATES  DISTRICT  COURT

1                                **I N D E X**

2

3      **WITNESSES FOR THE**          **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**
       **PLAINTIFF:**

4

       **Sandy Reilly**
5      By Ms. Adams                  4                      69
       By Mr. Moberly                        63

6

7

8

9                                **E X H I B I T S**

10     **NO.**              **DESCRIPTION**                      **REC'D**

11      2     Adams Personnel Record                          38

12      4     1/19/2017 S. Reilly re: "fringe benefits"       40

13      5     T. Adams Policy Advisor/ESQ Business Card        42

14     20     T. Adams Personnel File                         44

15     63     Employee Salary Increases                       47

16     22     S. Reilly #6 Re: Policy Advisor Salary Increases  51

17     34     Adams 2/13/15 Separation Record                 60

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2              (Prior proceedings held on the record not transcribed

3    herein.)

4              (Jury present.)

5              THE COURT:  Ms. Adams, do you have another witness?

6              MS. ADAMS:  I do -- can I have a moment to find out?

7              THE COURT:  Sure.

8              MS. ADAMS:  Thank you.

9         If not, we can proceed with redirect for Wendy Baldo.

10             THE COURT:  So should we have Ms. Baldo retake the

11   stand then?  Is that what you're saying?

12             MS. ADAMS:  Your Honor, we do have a witness.

13             MR. MOBERLY:  May I be excused for just a moment?

14             THE COURT:  Sure.

15                            SANDY REILLY,

16   called as a witness herein by the Plaintiff, having been first

17   duly sworn or affirmed, was examined and testified as follows:

18             THE COURT:  You may proceed.

19             MS. ADAMS:  Thank you, Your Honor.

20                        DIRECT EXAMINATION

21   BY MS. ADAMS:

22   Q.  Good morning, Ms. Reilly.  How are you?

23   A.  Fine.

24   Q.  Good.

25             Can you state your name to the jury and tell them what

**SANDY REILLY - DIRECT EXAMINATION**

1    your role is at the Arizona State Senate.

2    A.  My name is Sandy Reilly, and I'm the comptroller.

3    Q.  And what is the role of the comptroller?  What are your

4    duties?

5    A.  I do budget, finance, benefits for the employees, payroll.

6    Q.  Okay.

7    A.  That's about it.

8    Q.  And when Ms. Adams was employed at the Arizona State

9    Senate, were you in that comptroller role in 2012?

10   A.  No.

11   Q.  Okay.  When did you join the Arizona State Senate?

12   A.  December of 2014.

13   Q.  Okay.  And in your time at -- prior to the Arizona State

14   Senate, where did you work?

15   A.  Secretary of State's Office.

16   Q.  And how long did you work there?

17   A.  Six years.

18   Q.  And what was your role?

19   A.  CFO, which is basically the same as a comptroller.

20   Q.  Okay.  And so you left the Secretary of State's Office and

21   you joined the Arizona State Senate in 2014?

22   A.  Yes.

23   Q.  Okay.  And while you're at the Arizona State Senate, did

24   you process terminations?

25   A.  Yes.

1    Q.  You did?

2            How many?

3    A.  I have no idea.  Are you talking about at that time period

4    or as a whole every year or --

5    Q.  Just at the Arizona -- your time at the Arizona State

6    Senate.

7    A.  I do a lot of terminations or separations.  We have a lot

8    of temporary employees that come, 40 or 40-plus every year for

9    session, so I'm constantly onboarding and offboarding those

10   people.

11   Q.  Okay.  So when you say "terminations," you're ending active

12   employment for temporary employees?

13   A.  I'm sorry, say that again.

14   Q.  When you say "termination," you mean that you're ending

15   active employment for temporary employees; is that correct?

16   A.  Correct.  The term "termination" is an Arizona Department

17   of Administration term.  It basically is a separation --

18   Q.  Okay.

19   A.  -- whether it's resignation or dismissal or whatever.  It's

20   just called a termination.

21   Q.  Okay.  So you would define many different categories of how

22   an individual leaves by using the term "termination"?

23   A.  Correct.

24   Q.  But if an individual is fired, you would define that as a

25   dismissal?

SANDY REILLY - DIRECT EXAMINATION

1  A.  It's still a termination.  They're all called terminations.

2  Q.  I understand that.  But firing is distinctly different;

3  yes?

4  A.  In the computer it's not, but in you and I talking, I

5  suppose it is.

6  Q.  Okay.  So how many terminations in the dismissal or fired

7  category did you process at the Arizona State Senate?

8  A.  In the last four years?

9  Q.  Yes, in the time that you've been there.

10  A.  I -- I really don't know.  A very small amount.  Two,

11  three, maybe.  I didn't -- I don't know that information off

12  the top of my head.

13  Q.  Okay.  Was Ms. Adams' termination firing one --

14  A.  Yes.

15  Q.  -- of the terminations that you processed?

16  A.  Yes.

17  Q.  What is the process?

18  A.  The process is I'm usually informed by someone that an

19  employee is either resigning, retiring, or has been dismissed.

20  I have a form that I print, and it has a checklist of things

21  that I need to do to remove that employee from the payroll

22  system.

23  Q.  What's the name of the form?

24  A.  Employee Exit Checklist.  It's an internal form; it's not a

25  State form.

```
 1    Q.  When you say "internal," you mean it's Senate-specific?

 2    A.  Correct.

 3    Q.  Did you create that document for yourself?

 4    A.  No.  It was created before I came.

 5    Q.  Okay.  And what are some of the things that are listed on

 6    this Employee Exit Checklist?

 7    A.  Canceling a bus card if a person has a bus card, notifying

 8    security to turn -- to turn off badge access, putting an end

 9    date on a direct deposit.

10          I keep a -- on a spreadsheet, I have a list of

11    employees and their EIN numbers.  I would remove it from that.

12    I -- also, I take the permanent file out of my active filing

13    cabinet and scan all those documents.

14    Q.  Okay.  What do you do with the scanned documents?

15    A.  They're on the computer.  I scan them into a file of

16    inactive employees.

17    Q.  Inactive, okay.

18          When Ms. Adams was fired, who informed you?

19    A.  Ms. Baldo.

20    Q.  And how did she tell you?

21    A.  Verbally.

22    Q.  Okay.  Is that the process?

23    A.  Yes, sometimes.  Sometimes it comes in an email.  We don't

24    have a -- there's not a set process.  It just depends on what

25    department you're in and how the information comes to me.
```

1   Q.   Okay.

2   A.   It can come from a director.

3   Q.   On what day did she tell you?

4   A.   I do not know the exact date.  I know that it was a Friday.

5   Q.   Okay.  Do you know that it was a Friday in February?

6   A.   Yes.

7   Q.   And the year was 2015?

8   A.   Yes.

9   Q.   So it could have been Friday, February 13th; is that

10  correct?

11  A.   I don't -- I honestly don't know.

12  Q.   Okay.  And it could --

13  A.   I just remember it was a Friday because I remembered that I

14  was told that Ms. Baldo was going to call you and ask you to

15  come to meet with her on a Monday, the following Monday.

16  Q.   Okay.

17  A.   So that's how I know it was a Friday.

18  Q.   So it could have been Friday, February 20th; is that

19  correct?

20  A.   Could have been.

21  Q.   Okay.  But you're not sure?

22  A.   Nope.

23  Q.   But you might have some document that says what date it is;

24  is that correct?

25  A.   I have the letter.  And I don't know if there's a date on

1    the letter, but I know the letter states that the 20th was the

2    last day of employment.

3    Q.  Okay.

4    A.  But I don't know that I have anything that specifically

5    states that date.

6    Q.  Okay.  And I just want to see if I can find that letter

7    quickly.

8              MS. ADAMS:  Can the clerk hand the witness

9    Exhibit 253?

10             Oh, strike that.  250.

11             THE COURTROOM DEPUTY:  2-5-0?

12             MS. ADAMS:  Yes.  Thank you.

13             Your Honor, Exhibit 250 is in evidence.  I would like

14   permission to publish it to the jury.

15             THE COURT:  Okay.  You may.

16             MS. ADAMS:  Thank you.

17   BY MS. ADAMS:

18   Q.  Is this the letter you're referencing, Ms. Reilly?

19   A.  Yes.

20   Q.  Okay.  And this letter is dated February 20th, 2015; is

21   that correct?

22   A.  Yes.

23   Q.  And it says here that the letter is giving official notice,

24   right?

25   A.  Yes.

1    Q.  Is this a letter that looks similar to other termination

2    letters that are sent out once an -- when an individual is

3    fired?

4    A.  Yes.  Pretty common verbiage, yes.

5    Q.  Okay.  And this letter was FedEx'd to Ms. Adams; is that

6    correct?

7    A.  Yes.

8    Q.  Did you FedEx it?

9    A.  No.  We have a supply room that did the FedEx.

10   Q.  Okay.  Why was it sent FedEx?

11   A.  I don't know.

12   Q.  Okay.  Do you know why Ms. Adams was terminated over the

13   telephone?

14   A.  I -- this is all hearsay, but I guess --

15   Q.  Oh, then don't share it.  The question is "yes" or "no."

16   A.  Repeat the question, please.

17   Q.  Do you know why Ms. Adams was terminated over the

18   telephone, or notified that she had been terminated over the

19   telephone?

20   A.  No.

21   Q.  Okay.  Do you know why Ms. Adams was terminated?

22   A.  I was in a room with -- with Ms. Baldo, Senator Hobbs, and

23   Jeff Winkler, who is chief of staff of the Democratic Party,

24   and -- when that decision was made.

25   Q.  Okay.  What was stated?

SANDY REILLY - DIRECT EXAMINATION

1  A.  That Ms. Adams was going to be terminated.

2  Q.  Why were you there?

3  A.  Because I'm the human resource person, and sometimes I'm

4  included, sometimes I'm not.  Depends on the discussion.  And I

5  think it was just -- I'm a bipartisan person, and so sometimes

6  I'm there just to listen.

7  Q.  Okay.  Were you asked about whether or not there might be

8  any HR impact in terminating Ms. Adams?

9  A.  I don't know if I asked if there was any HR impact.  I

10  think there was discussion if -- since Ms. Adams was out on

11  sick leave, if that was the best time to dismiss someone.

12  Q.  Okay.  Your understanding is Ms. Adams was sick?

13  A.  No.  Her child --

14  Q.  What was your --

15  A.  Her child was sick.

16  Q.  Her child was sick?

17  A.  Uh-huh.

18  Q.  Okay.  And what was wrong with her son?

19  A.  I don't know.

20  Q.  Okay.  But you knew, as the comptroller of the Arizona

21  State Senate, that the week of February 16th Ms. Adams was out

22  on sick leave with an ill child?

23  A.  Yes.

24  Q.  And so the question was whether or not it would be a good

25  idea to terminate this mother while she's out on approved

1   medical leave?

2   A.  Yes.

3   Q.  And the answer was yes?

4   A.  Yes.

5   Q.  Okay.  You keep the personnel files at the Arizona State

6   Senate?

7   A.  Yes.

8   Q.  Okay.  And did Ms. Adams have a personnel file?

9   A.  Yes.

10  Q.  Was there a disciplinary record?

11  A.  No.

12  Q.  Had Ms. Adams ever been promoted?

13  A.  I don't know that.  I had just started there, so I don't --

14  I can't answer that question.

15  Q.  When you say "just started," what do you mean?

16  A.  I had only been there two months, so I have no idea, for

17  the length of time that Ms. Adams worked there, if she had ever

18  been promoted.

19  Q.  Okay.  So you started in what month in 2014?

20  A.  December.

21  Q.  Oh.  So you began working at the Senate in December of

22  2014?

23  A.  Uh-huh.

24  Q.  And then Ms. Adams was terminated on a Friday in February

25  of 2015?

1    A.  Yes.

2    Q.  Okay.  And when the decision was being made to fire

3    Ms. Adams, you were called in to a meeting with Ms. Baldo,

4    Ms. Hobbs, and Mr. Winkler; is that correct?

5    A.  Yes.

6    Q.  And did you guys also call an attorney out at the Attorney

7    General's Office?

8    A.  No.  We called a -- an attorney at the Arizona Department

9    of Administration.

10   Q.  Okay.  During that meeting?

11   A.  Yes.

12   Q.  And you don't know what day that meeting was?

13   A.  No.

14   Q.  Okay.  And why did you call an ADOA attorney?

15   A.  To -- to actually talk to them about the -- their -- they

16   wanted -- we wanted there to be a termination, or they wanted

17   there to be a termination, and --

18   Q.  And when you say "they," who do you mean?

19   A.  The people in the room.

20   Q.  And who are they?

21   A.  Senator Hobbs, Jeff Winkler, and Wendy Baldo.

22   Q.  Okay.  So they desired to fire Ms. Adams?

23   A.  Senator Hobbs and Jeff Winkler expressed that desire, yes.

24   Q.  Okay.  And so why did you call an ADOA attorney?

25   A.  To see if we could do that while Ms. Adams was out on sick

SANDY REILLY - DIRECT EXAMINATION

1     leave.

2     Q.  Was there some urgent reason why Ms. Adams needed to be

3     terminated while she was out on sick leave?

4     A.  I -- I don't know.

5     Q.  Okay.  Was there some conduct that Ms. Adams had engaged in

6     that was so inflammatory that she needed to be, you know,

7     immediately fired?

8     A.  I do not know the background.  At that time, I did not know

9     any of the background.  I was strictly there as more of an

10    observer and to help with any questions that they might have.

11    I did not ask the reasons.

12    Q.  Did you document the meeting?

13    A.  No.

14    Q.  Did you add it to Ms. Adams' file?

15    A.  No.

16    Q.  So this is a meeting about the termination of a State

17    employee of one of the largest public agencies in the State,

18    and you didn't document the meeting?

19    A.  No.

20    Q.  In Ms. Adams' file, were there any performance evaluations?

21    A.  No.

22    Q.  No disciplinary actions, correct?

23    A.  Correct.

24    Q.  Was there any criticisms of her work performance?

25    A.  No.

1    Q.  Was there any documentation of any concerns that anyone at

2    the Arizona State Senate had about Ms. Adams?

3    A.  No.

4    Q.  Was there any documentation of any meetings that may have

5    been had to discuss Ms. Adams' behavior?

6    A.  No.

7    Q.  Why not?

8    A.  They were never -- if there was any by a department or

9    whatever, it was never given to me to add to the personnel

10   file.

11   Q.  And by "department," where -- if someone had criticisms of

12   Ms. Adams -- and by the department, you mean the chief of

13   staff?

14   A.  Correct.

15   Q.  Okay.  And so as relates to the chief of staff that was --

16   that was -- the chief of staffs that were there during

17   Ms. Adams' tenure, Mr. Silverman and Mr. Winkler, they had

18   provided no written documentation, commentary, calendaring, or

19   any information as it relates to concerns they had about

20   Ms. Adams or her employment at the Arizona State Senate?

21   A.  They were not given to me.  I don't know if they had their

22   own files or not.

23   Q.  Were they in the file that you had?

24   A.  No.

25   Q.  They were not.

1          And that's the file that you scan into the system when

2    employment ends; is that correct?

3    A.  Yes.

4    Q.  And when you scanned that file in, there was no criticism

5    of Ms. Adams or her work performance by the chief of staffs

6    that supervised her or Ms. Baldo; is that correct?

7    A.  Yes.

8    Q.  What's the Senate's policy concerning documentation?

9    A.  I don't believe there is a written policy on documentation.

10   The only policy there is is standard forms when an onboarding

11   happens with an employee, and all those are to be kept in the

12   personnel file.

13   Q.  Okay.  So if someone's going to terminate someone, they

14   don't really have to document it; they can just verbally tell

15   you, and then you will take out your checklist and begin

16   completing the task of deactivating a bus card and a -- and

17   notify security?

18   A.  That's correct.

19   Q.  Are you aware of any warnings that Ms. Adams was given of

20   employment deficiencies prior to her termination?

21   A.  I -- I don't know that.

22   Q.  You don't know the answer?

23   A.  No one ever said anything to me.

24   Q.  Okay.  And --

25   A.  As -- as my role.

1   Q.  And -- and as you processed Ms. Adams' personnel file, did

2   you -- were there any warnings in the file as it relates to

3   employment deficiencies prior to her termination?

4   A.  No.

5   Q.  Does the Senate keep a -- when you go to the -- do policy

6   advisors at the Arizona State Senate, do they clock in when

7   they come to work?

8   A.  No.

9   Q.  Does the Senate keep attendance?

10  A.  There are not time cards.  Attendance is kept through a --

11  when an employee fills out a time card about their attendance

12  and then their supervisor approves that time card.

13  Q.  Okay.  Do salary employees keep attendance?

14  A.  Every employee has to keep a time card.

15  Q.  And that's the -- by "time card," you mean these are the

16  hours that you're entering in into the employee time system for

17  purposes of getting paid?

18  A.  Yes.

19  Q.  Okay.  But the time an individual arrives to work and the

20  time that they leave from work or the amount of time that they

21  spend at their desk, is that tracked for policy advisors?

22  A.  No.

23  Q.  No.

24          Did you see any of that represented in Ms. Adams'

25  personnel file?

1    A.  Her time records?

2    Q.  Yes.

3    A.  No.  We don't keep time records in personnel files.

4    Q.  Did you see any commentary as relates to Ms. Adams -- the

5    time that she was at the Senate or specifically at her desk in

6    her personnel file?

7    A.  No.

8    Q.  Outside of the personnel files that you keep for the

9    Arizona State Senate and the possible files that you suspect

10   different departments may keep, is there any other personnel

11   records that are kept on employees?

12   A.  No.

13   Q.  Okay.  And so you'd say Ms. Adams had no prior disciplinary

14   record in the personnel file; is that correct?

15   A.  That's correct.

16   Q.  And no prior action, to your knowledge; is that correct?

17   Disciplinary action?

18   A.  That's correct.

19   Q.  And so the first disciplinary employment action for

20   Ms. Adams is termination; is that correct?

21   A.  For my tenure there, for the two months, yes.

22   Q.  And from the record, is the first termination -- is the

23   first disciplinary action that Ms. Adams receives termination?

24   A.  In the personnel file, yes.

25   Q.  Yes.

1              Are you aware of any written policies as relates to an

2    employee handbook at the Arizona State Senate?

3    A.  Yes.

4    Q.  What's the purpose of it?

5    A.  There is -- there was one on the computer when I got there.

6    We had not given -- we had not given employees a handbook.  It

7    was a guideline reference for me.

8    Q.  Okay.  So not to -- it wasn't distributed to policy

9    advisors?

10   A.  Correct.

11   Q.  Okay.  Is it updated?  Is that handbook updated?

12   A.  Yes.  I go in and update if there's any changes.

13   Q.  But that's just for your own personal use?

14   A.  At the -- at that time, yes.

15   Q.  Okay.  For the chief of staff -- so Mr. Winkler was new to

16   the chief of staff role, too; is that right?

17   A.  Yes.

18   Q.  Yeah.

19              So he had become chief of staff in December of 2014,

20   probably around the time you were being hired; is that correct?

21   A.  I think it could have been November, but around that time

22   period, yes.

23   Q.  Okay.  And do you know if there's a policy handbook that's

24   given to chief of staffs or any training that's given to chief

25   of staffs?

SANDY REILLY - DIRECT EXAMINATION                    21

1    A.  Not that I'm aware of.

2    Q.  Okay.  Is there an orientation?

3    A.  I don't know.  I can't answer that question.

4    Q.  Is there a discrimination policy at the Arizona State

5    Senate?

6    A.  Yes.

7    Q.  What is it?

8    A.  I don't have it in front of me to read to you.

9    Q.  Okay.  Is there a harassment policy at the Arizona State

10   Senate?

11   A.  Yes.

12   Q.  What is it?

13   A.  I do not have that in front of me to read to you.

14   Q.  Where can it be located?

15   A.  Well, we have a new harassment policy now.

16   Q.  Okay.  In the time that Ms. Adams worked at the Arizona

17   State Senate, to your knowledge, was there a harassment policy

18   in place?

19   A.  Yes.  I believe it was created in 2005.

20   Q.  Okay.  And was that given to employees as a part of an

21   employee handbook?

22   A.  Not that I'm aware of.

23   Q.  Okay.  As relates to personnel policies and procedures,

24   what is the policy and procedure regarding performance

25   evaluations?

1  A.  We don't have performance evaluations at the Senate.

2  Q.  So how does an individual get a raise?

3  A.  Usually it comes from their department head, who goes to

4  the chief of staff or the president of the Senate and requests

5  more money based on their performance or -- but it's not a

6  written performance.  It's just their recommendation for

7  raises.

8  Q.  So it's subjective?

9  A.  Correct.

10  Q.  Were the Senate's policies regarding -- well, does the

11  Senate have any progressive discipline policies?

12  A.  No.

13  Q.  Okay.  And so when you say "no," it just means that a

14  person could be performing wonderfully and then find themself

15  terminated; is that correct?

16  A.  I assume that if someone is terminated, there is some type

17  of a pattern of some type of behavior that has been exhibited

18  to their supervisor or director or whatever in order -- I don't

19  think you just fire somebody to be firing them.

20  Q.  Okay.

21  A.  There's usually cause.  Whether that cause is written or

22  not, I can't answer that question.

23  Q.  Okay.  And so you say you would assume -- you say "I would

24  assume."

25          Are you -- when you say "I would assume," are you

1    saying, "I, Sandy Reilly, as the comptroller, is assuming"?

2    You're assuming that as the comptroller, that's what happens at

3    the Senate, or is this your personal belief?

4    A.  This is my personal belief.

5    Q.  Okay.  So I'd like to know, in your role as comptroller at

6    the Arizona State Senate, whether or not the disciplinary

7    policy allows for the first disciplinary action to an employee

8    be termination.

9    A.  Is that my belief as the comptroller that that can happen?

10   Q.  I'd like to know specifically about the Arizona State

11   Senate's personnel policy.

12   A.  We do not have a personnel policy on dismissal of

13   employees, what that structure is.

14   Q.  Okay.

15   A.  Whether it's, you know, one time, two times, three times,

16   we don't have a written policy.

17   Q.  Okay.  So there's no policy for how individuals get raises;

18   it's just recommended by their supervisor.  And there's really

19   no policy for how individuals get terminated, either; it's just

20   recommended --

21             THE COURT:  Slow it down, please.

22             MS. ADAMS:  Yes, sir.

23             THE COURT:  Start over.  Just go slower so we can keep

24   up.

25             MS. ADAMS:  Okay.  Where shall I pick up?

1          (Record read.)

2          THE WITNESS:  Yes.  There are times when there are

3    merit raises, which are given across the board to every

4    employee that can happen, and that's not done off of the

5    recommendation.  That's done off of what our budget can bear.

6    BY MS. ADAMS:

7    Q.  Okay.

8    A.  And a lot of times that's what raises are based on, too.

9    Just because someone recommends someone for a raise doesn't

10   mean they're necessarily going to get it.  We have to see what

11   our budget can bear.

12   Q.  Okay.  But the process to obtain a raise requires a

13   supervisor to recommend it?

14   A.  Yes.

15   Q.  Okay.

16   A.  Usually at the end of session every year, there's --

17   supervisors submit requests for raises for their staff.

18   Q.  Okay.  And you had written a declaration in September of

19   2017, and you stated Ms. Adams was eligible for a raise; is

20   that correct?

21   A.  I'm sorry.  Could you repeat that question?

22   Q.  Sure.

23          At or around 2017, you wrote -- and I said

24   "declaration."  Let me correct myself.  You had written a

25   statement on behalf of the Senate.  And you said that Ms. Adams

1  was eligible for a raise during her tenure.

2  A.  Could I see that statement?

3  Q.  Yes.

4        Do you understand that to be true?

5  A.  I'm not understanding it.  That's why I'd like to see the

6  statement.

7  Q.  Okay.  I'm going to just -- I'm going to hold that -- I'm

8  going to hold the question.

9        You had indicated that the Arizona Senate procedures

10  do not require the use of progressive discipline, correct?

11  A.  Correct.

12  Q.  Is it possible that progressive use -- discipline can be

13  used at the Arizona State Senate even though there's not a

14  policy?

15  A.  Yes.

16  Q.  Okay.  As it relates to Ms. Adams, were you aware of a

17  pattern or a -- as you had stated before, are you aware of a

18  pattern that she had had that resulted in her termination?

19  A.  As I stated before, I had just gotten employed there and

20  was learning about the Senate, and I have no knowledge of what

21  Ms. Adams' work --

22  Q.  Do you know whether or not there was consideration to use

23  progressive discipline against Ms. Adams as opposed to firing

24  her?

25  A.  I don't have an answer for that.  I don't know.

SANDY REILLY - DIRECT EXAMINATION

1  Q.  Okay.  When you were in that meeting, it didn't come up?

2  A.  No.

3  Q.  Are you aware of any policies or procedures governing how

4  an employee might communicate a grievance around discrimination

5  or harassment?

6  A.  That would be reported to my office.  I am also the human

7  resource person, so an employee would come to my office with

8  that grievance.

9  Q.  Okay.  And then what would you do with it?

10  A.  Counsel them.  See what the grievance is.  Talk to where --

11  you know, it depends on what the grievance is that they're

12  talking to me about is how I would handle it.

13  Q.  Okay.  All right.  As it relates to Ms. Adams' termination

14  and the letter that was sent, you stated Wendy Baldo verbally

15  informed you Ms. Adams had been terminated?

16  A.  Yes.

17  Q.  But you were -- and then you stated that you were in the

18  meeting when the decision was made.  Is that right?

19  A.  But I did not know that the termination had -- the

20  termination did not happen in my office.

21  Q.  Okay.  When she informed you, what action did you take?

22  You took out your checklist?

23  A.  I'm sure I didn't do that that moment.  I think the letter

24  was prepared.  The letter was sent.

25        I don't typically take out my checklist and do

1    anything until all the pay has gone to an employee or -- I

2    can't take them out of the system until I know that they've

3    received all their compensation, so I would not have taken out

4    my checklist that day, no.

5    Q.  Okay.  How do you know all the pay has been paid out?  How

6    do you know how that works?  You --

7    A.  When a person leaves employment, if they're not

8    transferring to another agency, they're just leaving

9    employment, I have to pay them out any annual leave that they

10   still have on the books.  And depending upon when they leave in

11   a pay period, they could have accrued some leave, and I have to

12   pay them out for that.

13          And so that has to all be paid out and make sure that

14   their balance is zero before I can take them out of the system.

15   Q.  And annual leave, that could be compensation time.  That

16   could also be vacation time?

17   A.  It is only vacation time.  Annual leave.

18   Q.  Okay.  And you did that for Ms. Adams?

19   A.  If there was any to be paid out, yes, I did.

20   Q.  Okay.  When we look at the letter here, Ms. Baldo makes a

21   statement to Ms. Adams that the Arizona Department of

22   Administration will be mailing COBRA information, which is

23   critical enrollment dates, directly to you.

24          Is that correct?

25   A.  Yes.

1   Q.  How would the Arizona Department of Administration know to

2   mail Ms. Adams her COBRA packet?

3   A.  It's triggered by the date that's put into the computer of

4   the separation date.

5   Q.  Who puts the date in the computer?

6   A.  I do.

7   Q.  And when you entered the date for Ms. Adams, what date of

8   termination did you use?

9   A.  2/20.

10  Q.  And how are you so sure?

11  A.  Because I entered it.  I don't know.  What do you mean, why

12  am I so sure?

13  Q.  Well, earlier you said you weren't sure the date that

14  Ms. Adams was terminated, correct?

15  A.  No, I didn't say I didn't know what date she had been --

16  Q.  You said I --

17  A.  -- terminated.

18  Q.  You said, "I know it was a Friday."

19          THE COURT:  Whoa, whoa, whoa, whoa.

20          Let her finish, ma'am.

21          THE WITNESS:  I said I knew that you had -- that

22  Ms. Baldo had talked to you on a Friday.  I did not know what

23  the termination date was.

24  BY MS. ADAMS:

25  Q.  Okay.

SANDY REILLY - DIRECT EXAMINATION

1  A.  You asked me what day was that Friday.  I didn't know if

2  that day -- and you stated was it the 13th or the 20th, and I

3  told you I did not remember which date it was.

4  Q.  Okay.  And when you were speaking to that, you weren't

5  speaking to the date of termination?

6  A.  No.

7  Q.  Okay.  You were speaking -- you were saying you're not sure

8  of the day that Ms. Baldo called me --

9  A.  Correct.

10  Q.  -- called Ms. Adams?

11        Okay.  I understand.

12        So the date Ms. Adams was terminated is what day?

13  A.  The final termination date was February 20th, 2015.

14  Q.  And when you say "the final termination date," was there a

15  different termination date prior to February 20th, 2015?

16  A.  Yes.

17  Q.  What was it?

18  A.  February 13th.

19  Q.  What year?

20  A.  2015.

21  Q.  So there's two termination dates?

22  A.  When -- if you want me to explain, there's -- when you

23  enter a separation date in the computer, there is a temporary

24  termination date where you put them in a status which is a

25  temporary termination date until you make sure everything's

1  been paid out, and then you go in and you put in a final

2  termination date.

3          And I think the reference of the 2/13 was when I went

4  in on February 27th into the computer to put in the temporary

5  termination date, I put in February 13th in error.  I don't

6  know if I looked at the calendar wrong or what.  Didn't even

7  know that I had done it.

8          But when I went in to do the final termination date on

9  March 2nd, after I knew everything had been paid out, I put in

10  a date of February 20th, not aware that I had put in the wrong

11  date the week before.

12  Q.  So your testimony is -- today is you had inadvertently

13  fired Ms. Adams on the same day that she complained?

14  A.  I did not fire Ms. Adams.

15  Q.  Very good.

16          Your testimony today is that you had inadvertently

17  ended Ms. Adams' active employment on the same day that she

18  complained?

19  A.  I don't know that that was the same day.  All I know is

20  that -- and I didn't -- I did not notice, and Ms. Adams did not

21  notice for at least two years, that the temporary termination

22  date was different than the final termination date.

23  Q.  So after Ms. Adams commences litigation, you realize you

24  made a mistake?

25  A.  After Ms. Adams called Arizona Department of Administration

SANDY REILLY - DIRECT EXAMINATION

1   and asked them about the two dates, I talked with

2   administration -- Department of Administration and told them

3   that I was not even aware that I had put in the wrong date.  It

4   was a clerical error.  Had I noticed it at the time, I would

5   have asked them to do a history correction and fix it.  I

6   didn't even realize I had done it.

7   Q.  What was the impact of your clerical error?

8   A.  What was the impact?

9   Q.  Yes.

10  A.  There was a week difference in the COBRA packet that was

11  sent to Ms. Adams.

12  Q.  When you entered -- when you entered the data that ended

13  Ms. Adams' active employment on February 13th, 2015, did her

14  dental insurance end that day?

15  A.  I would have to look at the pay period end dates to know

16  for sure, because our insurance runs by pay period end dates,

17  and I would have to look.

18       If the pay period end date was on the 20th,

19  insurance -- active insurance would not have ended until the

20  21st even if a termination was the 13th.

21  Q.  Okay.  But if the pay period ended on February 13th --

22  A.  Uh-huh.

23  Q.  -- and you entered the information to trigger the COBRA

24  notification --

25  A.  Yes.

1    Q.  -- did Ms. Adams' dental insurance end on February 13th,

2    2015?

3    A.  I do not know that it ended.  It is a possibility that it

4    could have ended.

5    Q.  Based on your entry that her employment ended on

6    February 13th; is that correct?

7    A.  Yes.

8    Q.  Okay.  And what about her vision insurance?

9    A.  It would have been the same.

10   Q.  And what about her medical healthcare?

11   A.  It would have been the same.

12   Q.  Okay.  And as it relates to an individual's termination

13   process when they've been fired at the Arizona Senate, you said

14   you pay out all of the annual leave; is that correct?

15   A.  Yes.

16   Q.  Ms. Adams was a salaried employee?

17   A.  Yes.

18   Q.  Yes.

19         And so salary employees, if you're working at the

20   Arizona State Senate and it takes 80 hours to do the work, you

21   get paid the same amount; is that correct?

22   A.  Yes.

23   Q.  And if it takes 20 hours to do the work -- employees

24   generally are required to work 40 hours; is that correct?

25   A.  Yes.

1    Q.  Yeah.

2            And Ms. Adams worked the week of February 16th; is

3    that your understanding?

4    A.  She was not in the building that week, but she was paid for

5    that week.  Because she was out.

6    Q.  She was paid her salary?

7    A.  She was -- she was paid sick leave.

8    Q.  She was paid sick leave.

9            THE COURT:  Is this a good place for a break?

10           MS. ADAMS:  Yes, Your Honor.

11           THE COURT:  Let's break for lunch.  We'll come back at

12   1:30.

13           MS. ADAMS:  Thank you, Your Honor.

14           (Jury not present.)

15           THE COURT:  Please be seated.

16           Anything to take up?

17           MR. MOBERLY:  No, Your Honor, not from us.

18           MS. ADAMS:  No, Your Honor.

19           THE COURT:  Jury instructions.  There were some

20   disagreements, but I don't think there really were

21   disagreements.

22           Would you guys meet after trial today and come up with

23   a final set of instructions?

24           MR. MOBERLY:  Certainly.

25           THE COURT:  Yeah, I don't think -- I didn't -- I had

1  the sense there were just some disagreements on the elements of

2  the claim regarding causation, but I don't think there was a

3  disagreement.  I just think there were just two different sets

4  proposed.

5          Let's get a final -- and then we'll focus on the ones

6  you can't agree on when we go over final instructions.  But

7  tonight I'd like you to meet and confer on that.

8          We'll be breaking at 4:30.  I have a 4:30 scheduling

9  conference this afternoon, so we'll go till 4:30, but you'll

10  have time after that to meet and confer.

11          Anything else?

12          MS. ADAMS:  Not at this time.

13          MR. MOBERLY:  No, Your Honor.

14          THE COURT:  Okay.  What are we looking at as far as

15  witnesses this afternoon?

16          MS. ADAMS:  I need to quickly check, Your Honor.  My

17  understanding is Ms. Reilly will -- Ms. Reilly will come back.

18  I need to make some calls during the break.  Senator Landrum

19  Taylor will follow her.

20          And I need to make -- just make calls and get folks in

21  queue.

22          THE COURT:  And who else?

23          MS. ADAMS:  I don't know at this time, Your Honor.

24          THE COURT:  Okay.

25          All right.  And from the defense, how many witnesses

1   are you going to call?

2          MR. MOBERLY:  Well, Your Honor, five total, and

3   obviously one of them is on the stand now and Ms. Baldo's

4   another, so there will be three --

5          THE COURT:  All right.

6          MR. MOBERLY:  -- three in addition to those.

7          THE COURT:  Okay.

8          All right.  I'm just concerned about time then.  You

9   have 3 hours and 12 minutes left, and defense has 6 hours and

10  31 minutes left.

11         Okay.  We'll stand in recess.

12         MS. ADAMS:  Thank you, Your Honor.

13         (Recess taken, 12:20 p.m. to 1:32 p.m.)

14         THE COURT:  Please be seated.

15         Ms. Reilly, you want to retake the witness stand?

16         (Jury present.)

17         THE COURT:  Please be seated.

18         Ms. Adams, you may continue with your examination of

19  Ms. Reilly.

20         MS. ADAMS:  Thank you, Your Honor.

21  BY MS. ADAMS:

22  Q.  Ms. Reilly, prior to the break I had asked you whether or

23  not Ms. Adams was eligible for a raise and referenced a

24  document that you had completed.

25  A.  Yes.

1   Q.  Yes.  And upon further review, it was not your statement,

2   so I just wanted to clarify that with you.

3   A.  Okay.

4   Q.  Okay.  But to your knowledge, do you know whether or not

5   Ms. Adams was eligible for a raise?

6   A.  Yes.  Every employee at the Senate is eligible for a raise.

7   Q.  Okay.  Thank you.

8       MS. ADAMS:  Will the clerk please give Ms. Reilly

9   Exhibits 2, 4, 5, 20, 22?

10      THE COURTROOM DEPUTY:  That's all?

11      MS. ADAMS:  For the moment, yes.  Thank you.

12  BY MS. ADAMS:

13  Q.  And while she's looking, Ms. Reilly, if someone had a

14  criticism of a Senate employee, what is the process to note or

15  document that criticism?

16  A.  Every employee is probably different.  They would probably

17  go to their supervisor and note that.  If it was the supervisor

18  that they had criticism about or whatever, they would probably

19  come to me as the human resource person.

20  Q.  Okay.  But if someone in management at the Arizona State

21  Senate had a criticism of an employee that they were

22  supervising, how would they document that?

23  A.  I don't know.  Everybody documents things differently.  I

24  guess I would have to ask the department heads how they do

25  that.

1   Q.  Okay.  So the Senate doesn't have a uniform personnel

2   policy around documenting employees' conduct?

3   A.  Well, conduct, we -- there are ethics and things like that

4   as far as conduct, so I'm not sure --

5   Q.  Okay.  What are they?

6   A.  -- what you mean.

7       I do not have the ethics document in front of me.  I

8   can't answer that.

9   Q.  Okay.  But you are the comptroller at the Arizona State

10  Senate, correct?

11  A.  Yes.

12  Q.  Okay.  And that is the only HR department -- human -- and

13  by "HR," I mean human resources department that the Arizona

14  State Senate has; is that correct?

15  A.  That's correct.

16  Q.  Okay.  And you're not certain or able to speak today as it

17  relates to any process or procedure that a supervisor might

18  have to document a concern or issue that they are having with

19  an employee?

20  A.  That's correct.

21  Q.  Okay.  Can you pick up Exhibit No. 2, please.

22      Do you recognize this document?

23  A.  Yes.

24  Q.  Okay.  What is it?

25  A.  It is a page in the State's personnel system.  This is

1   probably Tab 2 or 3, that is a specific section of an

2   employee's electronic file with the State that gives

3   information.

4   Q.  Okay.  And when you say "the State," you mean the State of

5   Arizona?

6   A.  Yes.

7   Q.  Okay.  And you make that as a distinction from the Arizona

8   State Senate?

9   A.  Every agency uses the same system.  We're all in the same

10  one.

11  Q.  Okay.  And so the Arizona State Senate is an agency of the

12  State of Arizona; is that correct?

13  A.  Correct.

14  Q.  Okay.

15        MS. ADAMS:  Your Honor, I would offer into evidence

16  Exhibit 2.

17        MR. MOBERLY:  No objection.

18        THE COURT:  Exhibit 2 is admitted into evidence.

19        (Exhibit No. 2 admitted into evidence.)

20        MS. ADAMS:  Your Honor, I'd like to publish to the

21  jury.

22        THE COURT:  You may.

23  BY MS. ADAMS:

24  Q.  And so whose personnel file is this document a part of?

25  A.  Talonya Adams.

```
 1    Q.  Okay.  And here it says that the rate of pay is $28 and
 2    maybe 88 cents; is that correct?
 3    A.  Yes.
 4    Q.  Okay.  And was Ms. Adams paid hourly?
 5    A.  No.  Salary.
 6    Q.  She was paid salary.
 7            And when you're paid salary, you get paid just
 8    bimonthly at the Senate?
 9    A.  Biweekly.
10    Q.  Biweekly, okay.
11            And it's the same rate of pay based on your salary; is
12    that correct?
13    A.  Yes.
14    Q.  And so Ms. Adams' salary equivalent was $60,000?
15    A.  Yes.
16    Q.  Okay.  Can you pick up Exhibit No. 4, please.
17            Do you recognize this document?
18    A.  Yes.
19    Q.  What is it?
20    A.  It's a document that I typed.
21    Q.  Okay.  It's an email you sent to Ms. Adams?
22    A.  Yes.
23    Q.  Okay.
24            MS. ADAMS:  Your Honor, I'd offer into evidence
25    Exhibit No. 4.
```

1          THE COURT:  Any objection?

2          MR. MOBERLY:  Well, there's an embedded document here.

3          I only have one page.  Is it simply one page?

4          MS. ADAMS:  It's simply the email.

5          MR. MOBERLY:  No objection.

6          THE COURT:  Exhibit No. 4 is admitted into evidence.

7          (Exhibit No. 4 admitted into evidence.)

8          MS. ADAMS:  Your Honor, request to publish to the

9    jury.

10         THE COURT:  You may.

11   BY MS. ADAMS:

12   Q.  In this email, you state that policy advisors at the

13   Arizona State Senate receive a fringe benefit?  Is that

14   correct?

15   A.  Yes.

16   Q.  And what is that fringe benefit?

17   A.  We pay the Bar dues.

18   Q.  Okay.  And what are Bar dues?

19   A.  It's a yearly due that attorneys have to pay to the Bar to

20   stay an attorney, I guess.

21   Q.  To the Arizona State Bar?

22   A.  Yes.

23   Q.  Okay.  Do you pay Bar dues for nonlawyers?

24   A.  No.  You can't pay Bar dues if you're not an attorney.

25   Q.  Okay.  So Bar dues are a fee charged by the -- by the

1    Arizona State Bar, which holds the license of sitting lawyers;

2    is that correct?

3    A.  Yes.

4    Q.  Okay.  And did the Arizona State Senate pay Bar dues for

5    Ms. Adams?

6    A.  I paid them, yes, in 2015.

7    Q.  Okay.

8    A.  January.

9    Q.  Thank you.

10           Can you pick up Exhibit No. 5, please.

11           Do you recognize this document?

12   A.  I don't know that I recognize it, but I'm looking at it.

13   Q.  Okay.  Have you seen it before?

14   A.  I don't remember if I've seen it before or not.  It's

15   obviously Talonya Adams' business card.

16   Q.  Okay.

17   A.  But I don't know that I have personally seen Talonya Adams'

18   business card.

19   Q.  Okay.  Do you know how business cards are distributed at

20   the Arizona State Senate?

21   A.  They're ordered through the supply department, and then the

22   supply department person delivers them to the employee.

23   Q.  Okay.  And is this the format that the Arizona State Senate

24   uses for business cards?

25   A.  It looks like it, yes.

SANDY REILLY - DIRECT EXAMINATION

1  Q.  Okay.

2        MS. ADAMS:  Your Honor, I would offer into evidence

3  Exhibit 5.

4        MR. MOBERLY:  No objection.

5        THE COURT:  Exhibit 5 is admitted into evidence.

6        (Exhibit No. 5 admitted into evidence.)

7        MS. ADAMS:  Permission to publish to the jury.

8        THE COURT:  You may.

9  BY MS. ADAMS:

10  Q.  So this is Talonya Adams' business card; is that correct?

11  A.  Yes.

12  Q.  And what does it state that her title is?

13  A.  Policy advisor.

14  Q.  Does it say Democratic policy advisor?

15  A.  No.

16  Q.  Does it say junior policy advisor?

17  A.  No.

18  Q.  And after her name, what does it state?

19  A.  ESQ.

20  Q.  And do you have any idea what those credentials represent?

21  A.  I think it means you're an attorney.

22  Q.  Okay.  And the Arizona State Senate issues these cards; is

23  that correct?

24  A.  Yes.

25  Q.  And as it relates to the telephone number and the email

1    address and the fax number, do you recognize those?

2    A.  I do not recognize the phone number or the fax number.  I

3    recognize the email as the standard email addresses for every

4    Senate employee.

5    Q.  Okay.  And as it relates to the prefix (602) 926, do you

6    recognize that to be --

7    A.  Yes.

8    Q.  -- standard prefix for the Arizona State Senate?

9    A.  Yes.

10   Q.  Okay.  And when an employee is employed at the Arizona

11   State Senate, they're assigned a telephone number and a fax

12   number and an email address; is that correct?

13   A.  They're assigned an email address.

14   Q.  Okay.

15   A.  I don't know that they're -- every individual person has a

16   fax number, and I don't know that every individual person has

17   their own phone.  I can't testify to that.

18   Q.  Okay.  Can you testify as to whether or not telephone

19   numbers and fax numbers are assigned for policy advisors?

20   A.  I do not know if they have their own.  To be honest with

21   you, when I'm looking at this, this looks like the receptionist

22   phone number.

23   Q.  Okay.  And by "receptionist," who do you mean?

24   A.  The receptionist for Democratic staff.

25   Q.  Okay.  Thank you.

1           Can you pick up Exhibit No. 20, please.

2           Do you recognize these documents?

3   A.  Yes.

4   Q.  The first document that you're holding, can you look in the

5   lower right corner and state what it says?  Should be an

6   alphanumeric number, AZSEN.

7   A.  AZSEN 0174.

8   Q.  Okay.  Is it followed by 0175, the next document?

9   A.  Yes.

10  Q.  And 0178?

11  A.  Yes.

12  Q.  Okay.

13          MS. ADAMS:  Your Honor, I'd offer Exhibit No. 20 into

14  evidence.

15          MR. MOBERLY:  No objection.

16          THE COURT:  Exhibit 20 is admitted into evidence.

17          (Exhibit No. 20 admitted into evidence.)

18          MS. ADAMS:  Permission to publish to the jury.

19          THE COURT:  You may.

20  BY MS. ADAMS:

21  Q.  When you look at Exhibit 20, with the Bates stamp number

22  ending in AZSEN 0174, do you see where it says "Seniority"?

23  A.  Yes.

24  Q.  And do you see what date it says there?

25  A.  I think it says 11/29 of 2010.

SANDY REILLY - DIRECT EXAMINATION

1   Q.  Okay.  Thank you.

2          When you look at the document Bates Stamp No. AZSEN

3   0175 --

4   A.  Yes.

5   Q.  -- is this the personnel record for Talonya Adams?

6   A.  Yes.

7   Q.  Does it state what department she's in?

8   A.  Yes.

9   Q.  And what department is that?

10  A.  Democratic staff.

11  Q.  And does it state who her direct supervisor is?

12  A.  Wendy Baldo.

13  Q.  Thank you.

14         Can you look at the last document in Exhibit 20, Bates

15  stamped AZSEN 178.

16  A.  Yes.

17  Q.  Is this the personnel record of Talonya Adams?

18  A.  Yes.

19  Q.  And does it have personally identifiable information as

20  relates to her?

21  A.  Yes.

22  Q.  Does it state that -- her marital status?

23  A.  Yes.

24  Q.  And what does it say?

25  A.  Single.

SANDY REILLY - DIRECT EXAMINATION

1  Q.  Does it state her gender?

2  A.  Yes.

3  Q.  And what does it say?

4  A.  Female.

5  Q.  Does it state her ethnicity?

6  A.  Yes.

7  Q.  And what does it say?

8  A.  Black, not Hispanic.

9  Q.  Okay.  And is this a typical record for Senate employees at

10  the Arizona State Senate?

11  A.  Yes.

12  Q.  Okay.  Over the course of the last few years, you have

13  submitted responses to public records requests by Ms. Adams; is

14  that correct?

15  A.  Yes.

16  Q.  Okay.  Do you recognize the document in Exhibit -- marked

17  Exhibit 63?

18  A.  Yes.

19  Q.  What is it?

20  A.  It is a document that I prepared for a public records

21  request asking for salary increases.

22  Q.  Okay.  And is it Bates stamped AZSEN 530 or 0530?

23  A.  Yes.

24  Q.  And subsequently, AZSEN 0531?

25  A.  Yes.

1          MS. ADAMS:  Your Honor, I would move to admit

2    Exhibit 63 into evidence.

3          MR. MOBERLY:  No objection, Your Honor.

4          THE COURT:  Exhibit 63 is admitted into evidence.

5          (Exhibit No. 63 admitted into evidence.)

6    BY MS. ADAMS:

7    Q.  If you take the first page, Ms. Reilly, marked AZSEN 0530,

8    it gives a salary increase based on the date and the amount; is

9    that correct?

10   A.  Yes.

11   Q.  And it's an hourly amount; is that correct?

12   A.  Yes.

13   Q.  And some of these individuals are paid by salary; is that

14   correct?

15   A.  Yes.

16   Q.  But they received -- the increase is represented per hour?

17   A.  Yes.

18   Q.  Okay.  And so one of those individuals might be John

19   Fetherston; is that correct?

20   A.  Yes.

21   Q.  Okay.  And so on December 22nd, 2014, he received an

22   increase of $2.41 per hour, correct?

23   A.  Yes.

24   Q.  Okay.  And that wasn't part of this Jan Brewer

25   administration 5 percent increase, correct?

1   A.   No.

2   Q.   And then Mr. Winkler again -- or, I'm sorry, Mr. Fetherston

3   again on 5/23/2015, some five months later, received a salary

4   increase of $4.80 per hour; is that correct?

5   A.   Yes.

6   Q.   Okay.  And it's your understanding salary increases are

7   given by recommendation of the direct supervisor?

8   A.   Correct.

9   Q.   So Mr. Fetherston received those increases as a result of a

10  recommendation by his direct supervisor?

11  A.   Yes.  Unless there's a job change or promotion or

12  something.

13  Q.   Okay.

14  A.   Those are separate from the recommendations from the --

15  Q.   To your knowledge --

16  A.   -- supervisors.

17  Q.   -- does Mr. Fetherston have a job change or was he

18  promoted?

19  A.   I cannot make a comment on the 12/22.

20  Q.   Okay.

21  A.   Because I don't know.

22  Q.   Okay.

23  A.   I was not -- that was actually my start date.

24       The May 23rd, 2015, that was based on a recommendation

25  when session ended for Democratic staff.

1    Q.  Okay.  And who gave that recommendation?

2    A.  Mr. Winkler.

3    Q.  Okay.  And then Lisette Flores, right, she's on Democratic

4    staff?  She's new; is that correct?

5    A.  I don't know her hire date.

6    Q.  Okay.  In May 23rd, 2015, she received a pay increase of

7    $2.40 per hour --

8    A.  That's correct.

9    Q.  -- correct?  Okay.

10          And then Garth Kamp, he received a pay increase on

11   December 12th, 2011; is that correct?

12   A.  Yes.

13   Q.  In what amount?

14   A.  $4.80.

15   Q.  And then Aaron Latham, he's on the Democratic staff,

16   correct?

17   A.  Yes.

18   Q.  He received a pay increase on December 22nd, 2014?

19   A.  Yes.

20   Q.  In what amount?

21   A.  $2.41.

22   Q.  Was that part of the Jan Brewer administration 5 percent

23   increase?

24   A.  No.

25   Q.  Are any of the figures represented in this document,

1  Exhibit 63, part of the Jan Brewer 5 percent automatic accrual?

2  Or rate -- salary increase?

3  A.  No.

4  Q.  Okay.  So if we go down, we see Patsy Osmon.  Looks like on

5  January 10th, 2011, she receives a pay increase of $1.20 per

6  hour?

7  A.  Yes.

8  Q.  And then again on December 12th, 2013, she receives a pay

9  increase of $2.40 per hour?

10 A.  Yes.

11 Q.  And then again on May 23rd, 2015, she receives a pay

12 increase of $1.20 per hour?

13 A.  Yes.

14 Q.  Okay.  If you turn to the second page, Mr. Winkler is the

15 only policy advisor listed here.

16         And on December 8th, 2012, he received a pay increase

17 of $6.25 per hour; is that correct?

18 A.  Yes.

19 Q.  Okay.  Can you take Exhibit 22?

20 A.  Okay.

21 Q.  Do you recognize this document?

22 A.  Yes.

23 Q.  Did you create the document?

24 A.  Yes.

25         MS. ADAMS:  Your Honor, I offer Exhibit 22 into

1    evidence.

2              MR. MOBERLY:  Give me just a moment, Your Honor.

3              No objection.

4              THE COURT:  Exhibit 22 is admitted into evidence.

5              (Exhibit No. 22 admitted into evidence.)

6              MS. ADAMS:  Permission to publish to the jury.

7              THE COURT:  You may.

8    BY MS. ADAMS:

9    Q.  And so this -- what does this document represent,

10   Ms. Reilly?

11   A.  It was based on a public records request.  I don't know

12   exactly what the public records request was at the time, but by

13   looking at this, it looks like there were certain individuals

14   that I was asked to put their starting salary, when they

15   started at the Senate, and any raises they received while

16   there.

17   Q.  Okay.  And so that's what you did; you completed it,

18   correct?

19   A.  Yes.

20   Q.  Okay.  And do you know the category of these individuals,

21   what their job titles are?

22   A.  I believe it is -- oh.  Some of them, yes.  Some of them

23   were prior to me being there.

24   Q.  Okay.  And where there is a salary increase based on the

25   retention pay in 2013, you've indicated that; is that correct?

1    A.  Yes.

2    Q.  Okay.  So when Garth -- when we just saw moments ago Garth

3    Kamp that had received a raise in the amount of $4.80, that's a

4    $10,000 annual raise, right?

5    A.  Yes.

6    Q.  And that's what we see right here represented as it relates

7    to his $4.80 an hour raise, correct?

8    A.  Yes.  It looks like that was for a promotion.

9    Q.  Okay.  And then it looks like when Patsy Osmon received her

10   initial increase, it was retention, and subsequent increases

11   were just salary increases based on recommendation, correct?

12   A.  Yes, as far as I know, that's correct.

13   Q.  Okay.  Then there's a second page there; is that correct?

14   Bates stamped AZSEN 0278?

15   A.  Yes.

16   Q.  And here we have Mr. Winkler, who started at $47,000

17   salary, correct?

18   A.  Yes.

19   Q.  He received a pay increase on December 8, 2012, for

20   $13,000, correct?

21   A.  Yes.

22   Q.  That had nothing to do with retention pay, right?

23   A.  Correct.

24   Q.  And then at the $60,000 salary, he received a 5 percent

25   increase based on retention pay?

1    A.   Correct.

2    Q.   Okay.  And then again in December 22nd of 2014, he received

3    a promotion to chief of staff, and received $32,000 increase in

4    his pay; is that correct?

5    A.   Yes.

6    Q.   Okay.  Do you know anything about Mr. Winkler's education?

7    A.   I do not.

8    Q.   Do you pay Bar dues for Mr. Winkler?

9    A.   No, I do not.

10   Q.   Is he a lawyer?

11   A.   Not that I'm aware of.

12   Q.   Does he have a law degree?

13   A.   Not that I'm aware of.

14   Q.   Does he have any college education?

15   A.   I have no idea.

16   Q.   Okay.  Same thing with Aaron here.  We see he gets --

17   Aaron -- Mr. Latham receives the retention pay and receives two

18   subsequent pay increases in the amount of $15,000; is that

19   correct?

20   A.   Yes.

21   Q.   Here we see Lisette receives a $5,000 pay increase,

22   correct?

23   A.   Yes.

24   Q.   And then we see Talonya Adams, and her start salary is

25   $60,000, correct?

1    A.  Yes.

2    Q.  And her end pay is $60,000, correct?

3    A.  Yes.

4    Q.  Ms. Reilly, the clerk is handing you Exhibit No. 34.

5           Do you recognize this document?

6    A.  Yes.

7    Q.  What is it?

8    A.  It is the same payroll system that the other documents came

9    from.

10   Q.  Okay.  And earlier you stated you made a mistake that

11   possibly could have terminated Ms. Adams' employment, health

12   insurance, dental, medical, and vision, but you didn't realize

13   until two years after, when litigation commenced; is that

14   correct?

15   A.  Yes.

16   Q.  And so in this document here, here where it says "effect,

17   2/13/2015," and the action is separation?

18   A.  That's correct.

19   Q.  Okay.  And that was created on what day?

20   A.  February 27th.

21   Q.  And what year?

22   A.  2015.

23   Q.  And then it says "changed by," and there's an alphanumeric

24   number there.

25           Do you know what that is?

1    A.  That's my power user number.

2    Q.  Okay.  And that's Slr 27820?

3    A.  Yes.

4    Q.  And then it says "change detail"; is that right?

5    A.  Yes.

6    Q.  And that -- what's the date of that?

7    A.  2/27 of 2015.

8    Q.  So on February 27, 2015, you created -- you went into the

9    system and you created a -- you began to terminate Ms. Adams'

10   employment; is that correct?

11   A.  Yes.

12   Q.  Okay.  And when it said the date of termination, you

13   entered February 13th, 2015; is that correct?

14   A.  Yes.

15   Q.  Okay.  So your earlier testimony prior to the lunch hour

16   was that you maybe needed to do this temporary pause because

17   depending on the way the pay cycle went, it wasn't clear -- you

18   know, you got to cash out all of a person's accrual leave; is

19   that correct?

20   A.  Yes.

21   Q.  Okay.  And so you testified earlier that on February 20th,

22   Ms. Adams was terminated or notified of the termination.  You

23   were in a meeting prior to that and aware that she was being

24   terminated.  And yet a week later, you went into the system and

25   terminated her benefits on February 13th, 2015?

1    A.  Yes.  On 2/27, I put in the temporary separation of

2    2/13/2015.

3    Q.  Why did you do that?

4    A.  I have no idea.  I told you it was a clerical error.  I

5    don't know whether I looked at the calendar wrong or what, but

6    I put in the wrong date.

7    Q.  Have you ever made this mistake in going through your

8    employment termination processes with any other employee?

9    A.  Not that I'm aware of, but I didn't know I made this one

10   either so I'm sure there could be something out there.  I'm not

11   without making errors.

12   Q.  Okay.  Yeah.  We all make mistakes, certainly.

13          But when you realized the mistake, you said it was --

14   two years had passed; is that correct?

15   A.  Yes.

16   Q.  Okay.  So then what was happening on March 5th, 2015, when

17   you went back into the system?

18   A.  March 5th is when I went in to actually do the final

19   termination and put in the date of 2/20/2015.

20   Q.  Okay.  And so here we see that right here, 2/20/2015.

21   Ms. Adams is terminated, or "separation," it says, is the

22   action.

23   A.  Uh-huh.

24   Q.  And you did that on March 5, 2015, and then here's your

25   credentials indicating that?

SANDY REILLY - DIRECT EXAMINATION

1  A.  Yes.

2  Q.  Right.

3       And then what was the impact of that termination, of

4  that separation and that activity in the system?

5  A.  The second one?

6  Q.  Yes.

7  A.  Are you asking me what the effect of that was?

8  Q.  Yes.  Thank you.

9  A.  That actually electronically separates the employee on a

10 permanent basis, where the first one was temporary.

11 Q.  Did it reinstate her medical benefits?

12 A.  No.

13 Q.  Did it reinstate her dental benefits?

14 A.  No.

15 Q.  Did it reinstate her vision benefits?

16 A.  No.

17 Q.  So when you entered in your documentation and the

18 separation date of February 13, 2015, that was the last time in

19 which Ms. Adams had medical, dental, or vision benefits; is

20 that correct?

21 A.  I would have to look in the electronic file to verify that.

22 I cannot verify that without looking.

23 Q.  At any time did you go into the system and strike the

24 February 13th, 2015, separation?

25 A.  No.  When it was discovered two years later and Ms. Adams

1    talked to the Arizona Department of Administration, they, I

2    believe, offered to go in and do a history correction at that

3    time and pay any claims that Ms. Adams may have had, medical,

4    dental, or vision, for that week.

5    Q.  And by "claims," you mean had Ms. Adams gone to the dentist

6    or the doctor the week of February 16th and incurred an

7    obligation there, then they would have retroactively come back

8    and paid it?

9    A.  Correct.

10   Q.  Okay.  But based on the terms of her employment, she was

11   entitled to fringe benefits that included medical health

12   insurance; is that correct?

13   A.  Yes.

14   Q.  And for that week she didn't have it; is that correct?

15   A.  That's correct.

16   Q.  And for every week after that, she did not have it as it

17   relates to her employment with the Arizona State Senate; is

18   that correct?

19   A.  She was eligible for COBRA at that point.

20   Q.  Okay.  And why was she eligible for COBRA?

21   A.  Every employee is eligible for COBRA.

22   Q.  And by COBRA, you know, what are the qualifications for --

23   what's the eligibility requirements for COBRA?

24   A.  When you leave State service -- it could be in the private

25   sector as well.  I haven't been in the private sector for a

1    while -- anybody who loses health insurance has the ability to

2    get COBRA for 18 months after the end of that employment until

3    they can get other health insurance.  They provide that.

4    Q.  And they pay for that out of pocket; is that correct?

5    A.  Yes.

6    Q.  So your testimony here today is when you went in there on

7    February 27th and made the mistake of entering in Ms. Adams'

8    termination date of February 13th, she was eligible for COBRA?

9    A.  Yes.

10   Q.  Okay.  The clerk is providing you Exhibit No. 35.

11           THE COURT:  Is that Exhibit 34 you were just showing

12   the witness?  That last --

13           MS. ADAMS:  Exhibit No. 35, Your Honor.

14           THE COURT:  The last exhibit, was it 34?

15           MS. ADAMS:  No, Your Honor.  Exhibit No. 22.

16           THE COURT:  Okay.

17           THE WITNESS:  No.  I'm sorry.  It says 34, the one we

18   just looked at.  Sorry.

19           MS. ADAMS:  Yes.

20           THE COURT:  Exhibit 34 is not in evidence.

21           MS. ADAMS:  Your Honor, I'd move to admit Exhibit 34

22   into evidence.

23           THE COURT:  Any objection?

24           MR. MOBERLY:  No.

25           THE COURT:  Exhibit 34 is admitted into evidence.

1              (Exhibit No. 34 admitted into evidence.)

2         MS. ADAMS:  Thank you, Your Honor.

3   BY MS. ADAMS:

4   Q.  Are you familiar with Exhibit No. 35?

5   A.  Yes.

6   Q.  What is it?

7   A.  It's a document created by me in response to a public

8   records request.

9   Q.  Okay.  And is it the employee payroll schedule for fiscal

10  years 2016, 2017, 2018, and 2019?

11  A.  Yes.

12        MS. ADAMS:  Your Honor, I would move to admit Exhibit

13  No. 35 into evidence.

14        MR. MOBERLY:  I do object to this, Your Honor, on the

15  basis of relevance, and it falls within your motion in limine

16  ruling.

17        THE COURT:  Yeah.  I think the claim for damages for

18  lost wages is something that will be decided later if there's a

19  verdict.  Isn't that what we -- so I'm trying to -- so how is

20  this relevant to what you're offering in evidence?

21        MS. ADAMS:  Your Honor, I think it's relevant in the

22  sense that it shows the payroll schedules at the Arizona State

23  Senate from 2016 forward.

24        THE COURT:  Okay.  That's what it is, but I'm asking

25  how is that relevant?

1          MS. ADAMS:  Well, I think it's relative [sic] for

2   comparative purposes as to what they are paying their policy

3   advisors.

4          THE COURT:  Okay.  I'm going to sustain the objection.

5          MS. ADAMS:  Okay.

6   BY MS. ADAMS:

7   Q.  Ms. Reilly, you stated that you had fired two other people;

8   you had gone through the termination process of two other

9   people that had been fired?

10  A.  I said it could be up to two people.  I did not know.

11  Q.  Oh, okay.  Do you recall what the process was during their

12  termination?

13  A.  No.

14  Q.  You don't?  Okay.

15          As comptroller, can -- you had stated someone could be

16  fired because they're at-will; is that right?

17  A.  Yes.

18  Q.  Okay.  What do you mean by that?

19  A.  That's a terminology that the State has that basically says

20  you're an at-will employee, that you can be terminated at the

21  will of whomever your employer is.  Unless it's for dem --

22  discrimination, harassment, those types of things, you can be

23  released for no cause.

24  Q.  Okay.  And you also stated that you were new to the Arizona

25  State Senate in December of 2014, correct?

1   A.  Yes.

2   Q.  Okay.  And so did you ever have a conversation with

3   Ms. Adams regarding her employment?

4   A.  No.

5   Q.  Did she ever reach out to you to meet with you for an

6   HR-related issue?

7   A.  No.

8   Q.  Okay.  And when you became aware that her supervisor had

9   complaints about her, at least in that meeting that day, when

10  the termination was decided, did you reach out to Ms. Adams?

11  A.  No.

12  Q.  In your role as HR, do you have any obligation to an

13  employee to communicate any issues as relates to their

14  personnel record or concerns regarding their personnel?

15  A.  With their personnel records, perhaps, but not -- in the

16  case of them being terminated, I don't reach out to them.

17  Q.  Okay.  So that decision was made and you weren't consulted

18  or you didn't participate in that --

19  A.  I did not participate in the decision, no.

20  Q.  Okay.  And you weren't asked to try to work with Ms. Adams

21  as an HR -- in your HR role as it relates to the concerns that

22  were stated; is that right?

23  A.  No.

24  Q.  Okay.

25          MS. ADAMS:  I have no further questions for you.

1    Thank you.

2              THE COURT:  Cross-examination.

3              MR. MOBERLY:  Just a bit, Your Honor.

4                      CROSS-EXAMINATION

5    BY MR. MOBERLY:

6    Q.  Ms. Reilly, you told us that before working at the Senate,

7    you worked at the Secretary of State's Office?  Is that

8    correct?

9    A.  Yes.

10   Q.  And how long at the Secretary of State?

11   A.  Six years.

12   Q.  Take us back a little earlier.  What did you do prior to

13   going to work for the Secretary of State?

14   A.  I worked for a private oil company in Prescott for 35

15   years.

16   Q.  Name of that oil company?

17   A.  Bennett Oil Company.

18   Q.  Did you live in Prescott?

19   A.  Yes.

20   Q.  Do you still live there?

21   A.  Yes.

22   Q.  You don't commute, do you?

23   A.  Every Monday and Friday.

24   Q.  Monday and Friday?  Okay.

25              So you spend weekends in Prescott and the rest of the

1    week down here?

2    A.  Yes.

3    Q.  And you've been doing that for seven --

4    A.  11 years.

5    Q.  Nine [sic] years, okay.  Thanks for helping me.  Not that

6    you're counting.

7    A.  I know in my brain it's 11 years.

8    Q.  Okay.  And how did you come to work at the oil company in

9    Prescott?

10   A.  Well, I was 18 years old.  I don't remember.  I think it

11   was through a recommendation.

12   Q.  Okay.  And what prompted you to leave there?

13   A.  I -- as a part of the Bennett Oil family, Ken Bennett was

14   appointed as Secretary of State, and he needed a chief

15   financial officer.  And he asked me if I would go down with

16   him.

17   Q.  You followed him to the Secretary of State's Office?

18   A.  Yes.

19   Q.  Okay.  And why did you leave the Secretary of State's

20   Office?

21   A.  Secretary Bennett was termed out, and so I didn't know if I

22   was going to stay or not, so...

23   Q.  Did you immediately go to work for the Senate?

24   A.  Yes.

25   Q.  How did that come about?

1    A.   An introduction to Ms. Baldo.

2    Q.   Did you interview for the job?

3    A.   Yes.

4    Q.   And what were your duties?  What are your duties, in

5    general terms, as the comptroller for the secretary -- or for

6    the Senate?

7    A.   I help employees with their benefits, which health,

8    retirement.  I do payroll, balance payroll.  I do the budget.

9    Anything that has to do with the finances.

10   Q.   And I think you told us that your duties at the Secretary

11   of State's Office were similar, weren't they?

12   A.   Yes.

13   Q.   Did you have any interaction with Talonya Adams while she

14   was employed at the State, any personal interaction?

15   A.   No.

16   Q.   Do you recall when you first had personal interaction with

17   her?

18   A.   Other than maybe seeing her in the hall was when Ms. Adams

19   came to pick up her personal belongings.

20   Q.   You're the one who met with her?

21   A.   Yes.

22   Q.   Do you recall shortly before her termination an issue

23   having arisen with respect to leave issues with respect to

24   Ms. Adams, FMLA in particular?

25   A.   Yes.  Ms. Adams had sent me an email -- well, I think I got

1    an email from Jeff Winkler, could have been from her.  I

2    apologize.  I think I did get an email from Ms. Adams asking me

3    to confirm that we did not honor FMLA.

4    Q.  She'd apparently been told that?

5    A.  Yes.  I believe Mr. Winkler had told her that we do not

6    honor FMLA, and she was confirming that with me.

7    Q.  And how did you reply to that?

8    A.  That, yes, we were exempt from FMLA.

9    Q.  Okay.  Does the Senate provide alternative leave other than

10   or outside of the FMLA?

11   A.  We follow the basic guidelines of FMLA, which -- the

12   difference is we don't require documentation from a doctor for

13   a person to -- let's say you break your leg and the doctor says

14   you need six weeks off.  We just don't require the

15   documentation from the doctor.  The employee is still allowed

16   to take the time off and use their sick and annual, just like

17   they would if they were on FMLA.

18   Q.  You indicated that you were present during the meeting in

19   which the termination decision was made; is that correct?

20   A.  Yes.

21   Q.  The other participants were Senator Hobbs, Mr. Winkler, and

22   Ms. Baldo; is that correct?

23   A.  Yes.

24   Q.  And then an attorney on the phone at some point?

25   A.  Yes.

 1   Q.  What do you recall being discussed in that meeting by

 2   Senator Hobbs, Mr. Winkler, and Ms. Baldo?

 3   A.  I remember Senator Hobbs and Mr. Winkler saying that they

 4   had lost trust --

 5            MS. ADAMS:  Objection, Your Honor.  Hearsay.

 6            THE COURT:  Your response?

 7            MR. MOBERLY:  I'll move on, Your Honor.  They'll be

 8   here so --

 9            THE COURT:  Okay.

10   BY MR. MOBERLY:

11   Q.  Let me ask you this:  Do you recall whether there was any

12   discussion during that meeting of Ms. Adams' race?

13   A.  No.

14   Q.  No, you don't recall, or no, there was --

15   A.  Oh, I'm sorry.  No, there was no discussion.

16   Q.  What about her gender?

17   A.  No discussion on that as well.

18   Q.  Was there any discussion about whether she had complained

19   that she'd been subjected to discrimination?

20   A.  No.

21   Q.  So the issue you were concerned about from a human

22   resources standpoint was this notion of whether you should be

23   terminating her while she was on what you called sick leave

24   earlier; is that it?

25   A.  Correct.

1    Q.  Any other issue that you were concerned about?

2    A.  No.

3    Q.  You're familiar with how accrued annual leave is

4    compensated or handled at the State; is that correct?

5    A.  Yes.

6    Q.  Can you describe that for the jury.

7    A.  There's a tiered program where -- the Senate has their own

8    policy that kind of mirrors the other State agencies.  It's

9    just a little bit different.  Ours progresses a little faster

10   than theirs.

11           So if you're there from zero to two years, it's one

12   rate; and then from two to five years, it goes up to another

13   rate; and then after five years is the last rate; and then it

14   caps -- all State agencies cap at the same amount, which is

15   6.47 hours per pay period.

16   Q.  Is there any subjective component to it?

17   A.  No.

18   Q.  Have you had occasion to take a look at Ms. Adams' -- the

19   application of formula to Ms. Adams lately?

20   A.  Yes.

21   Q.  And what did you conclude?

22   A.  I concluded that it was given at the correct two-year --

23   exact two-year increment that it should have been.

24   Q.  What happens with prior employment?

25   A.  The prior employment counts as a part of that two years'

1    waiting period to get to the next level, as long as there's not

2    been more than a two-year break.  If you've been out of State

3    service for more than two years, then you have to kind of start

4    over at zero.

5    Q.  You've seen some documentation that reflects that at a

6    given point in time Ms. Adams was receiving annual leave at a

7    different percentage rate than Mr. Fetherston?

8    A.  Yes.

9    Q.  And can you explain that?

10   A.  Ms. Adams had one month prior State service before she came

11   to the Senate.  Mr. Fetherston had six months prior service, so

12   his annual rate kicked in about five months before hers.

13   Q.  So he'd be adjusted five months earlier is what you're

14   telling us?

15   A.  Correct.

16          MR. MOBERLY:  I have no further questions, Your Honor.

17   Thank you.

18          THE COURT:  Is there any redirect?

19                      REDIRECT EXAMINATION

20   BY MS. ADAMS:

21   Q.  Ms. Reilly, you stated that there is a policy in place that

22   provides for annual accrual at a tiered rate, and there's three

23   tiers; is that correct?

24   A.  Yes.

25   Q.  What are the tiers?

1    A.  From zero to two years is 3.7 hours per pay period

2    accumulation; from two to five years is 4.62 accumulation; and

3    five and over is 6.47.

4    Q.  Okay.  And where is that policy located?

5    A.  Verbally, or it's in my guidelines.  Usually when an

6    employee comes to work, they're told that.

7    Q.  Do they receive any handbook that says, hey, you have this

8    accrual rate benefit.  It accrues per cycle, and it accrues in

9    this three-tiered amount that you just explained?

10   A.  We have that in place now, but we did not in 2015.

11   Q.  Okay.  Did you have it in place in 2014?

12   A.  No.

13   Q.  How about 2013?

14   A.  No.

15   Q.  How about 2012?

16   A.  No.

17   Q.  You said Ms. Adams' accrual rate was revised at the exact

18   two-year increment; is that correct?

19   A.  Yes.

20   Q.  When was it?

21   A.  October of 2014.

22   Q.  And that was based on what?

23   A.  The two-year mark.

24   Q.  Okay.  And when an employee receives -- does an employee

25   receive a paycheck from the Arizona State Senate?

1    A.  Yes.  From the Arizona -- from the State of Arizona.  I'm

2    sorry.

3    Q.  Okay.  So employees of the Arizona State Senate receive

4    their paycheck from the State of Arizona?

5    A.  Yes.

6    Q.  Okay.  And are they employees of the State of Arizona?

7    A.  Yes.

8    Q.  Okay.  Do they -- do they receive a hard copy check?

9    A.  No.  It's direct deposit.

10   Q.  And is that required?

11   A.  Yes.

12   Q.  Okay.  So they receive their check in their bank account

13   based on the Senate's mandatory direct deposit, correct?

14   A.  The State's mandatory direct deposit.  Based on that.

15   Q.  Oh, thank you for the correction.  The State's mandatory

16   direct deposit.

17        Where can they find out where their accrual rate

18   amount is?

19   A.  They all have access to the electronic filing system that

20   they can log in with their employee ID number, and that has all

21   their personal information.  That's where they fill out their

22   time card, and it also provides them with their accrual rates.

23   Q.  Okay.  And do you have documentation of that for Ms. Adams?

24   A.  Documentation of the accrual rates?

25   Q.  The accrual rate, uh-huh.

1          Yeah.  You created documents with the accrual rate,

2    correct?

3    A.  Yes.  I think I did a printout, I don't think it was any of

4    the exhibits, that showed what the accrual rate was and when it

5    changed.

6    Q.  Okay.  And you relied on other documents to create that

7    document; is that correct?

8    A.  No.  The accrual rates are changed -- they are changed

9    automatically --

10   Q.  Okay.

11   A.  -- in the system.  It's all date driven, and it's done

12   automatically.  I don't change accrual rates.

13   Q.  So when you created the document that showed the accrual

14   rates for policy advisors, what information did you use?  What

15   data did you use?

16   A.  I have the ability to go into each employee, and it's

17   called a drill-around area, where I can go in and I can look at

18   specific things.

19          And I went into that area to look to see what the

20   accrual rates for the employees were.

21   Q.  Okay.  But you didn't provide that documentation.  You

22   simply created an Excel spreadsheet?

23   A.  Correct.

24   Q.  Understood.

25          You stated Ms. Adams had one month prior State

1   service; is that correct?

2   A.  Yes.

3   Q.  Where was it at?

4   A.  I have no idea.

5   Q.  How do you know it was for one month?

6   A.  It's in the system.  On one of these exhibits, it shows the

7   original hire date and then a termination date, or maybe it

8   just shows the hire date, and then an adjusted hire date.

9   Q.  Okay.  What is an adjusted hire date?

10  A.  Adjusted hire date is -- can be pretty confusing.  We'll

11  use Ms. Adams as an example.

12          When she came to work at the Senate and there was less

13  than a two-year break, you look at when she was employed

14  someplace else, what her start date was and what her end date

15  was, and you take that one month per se, and then you adjust

16  the hire date back to -- it moves a month.  I really don't know

17  how to explain this.

18          So now instead of her employment date showing as

19  November of 2014, they change it to October 2014 to show that

20  she had another month of employment.  And that's the adjusted

21  hire date.  And everything is based off that adjusted hire

22  date.

23          So they look at that adjusted hire date of October

24  now, even though she was hired with the Senate in November, her

25  adjusted is October, to give her credit for that one month at

1   another agency.  That's what the accrual rate is -- that's what

2   drives that accrual rate, is that adjusted hire date.

3          And if there's not an adjusted hire date -- for

4   example, there's not one for me because I've never had a break

5   in service.  Mine is just my hire date.  It defaults to

6   adjusted and then back to the hire date if there's not an

7   adjusted.

8   Q.  Okay.  I don't believe I have any further -- oh, yeah, one

9   last question for you, I think, as it relates to the

10  termination of Ms. Adams.

11         When the meeting was being held, were you notified in

12  advance that you need to show up to that meeting?

13  A.  The meeting was in my office.

14  Q.  Okay.  The meeting was in your office, okay.  Did you --

15  A.  So I was asked if I was available for a meeting.

16  Q.  Okay.  But you did not call the meeting?

17  A.  No, ma'am.

18  Q.  Okay.  Were you aware that the meeting was around -- had to

19  do with Ms. Adams, had something to do with Ms. Adams?

20  A.  I don't recall if I knew that or not.  I'm asked a lot if

21  people can come to my office, and I just say yes.

22  Q.  Okay.  So Ms. Baldo, Ms. Hobbs, and Mr. Winkler all joined

23  you in your office to have a meeting about Ms. Adams the week

24  of February 16th?

25  A.  I don't know the exact date, but yes, the meeting was in my

**SANDY REILLY - REDIRECT EXAMINATION**

1    office.

2    Q.  Okay.  Prior to that, had you been involved in any other

3    meetings regarding Ms. Adams or her employment at the Arizona

4    State Senate?

5    A.  No.

6              MS. ADAMS:  Okay.  Thank you.  No further questions.

7              THE COURT:  Okay.  You may step down.  Thank you for

8    coming.

9              THE WITNESS:  Thank you.

10             (Witness excused.)

11             (Further proceedings held on the record not

12   transcribed herein.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 12th day of August,

13   2019.

14

15

16

                        s/Jennifer A. Pancratz_____ _____
17                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25