**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

```
Talonya Adams,                )
                              )   No.  CV-17-00822-PHX-DLR
          Plaintiff,          )
                              )
          vs.                 )   Phoenix, Arizona
                              )   July 10, 2019
Arizona Senate,               )   2:41 p.m.
                              )
          Defendant.          )
_____)
```

**BEFORE:   THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL DAY 2 - TESTIMONY OF LEAH LANDRUM TAYLOR**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1          **A P P E A R A N C E S**

2

For the Plaintiff:
3
        Talonya Adams, Esq.
4       In propria persona
        2 N. Central Avenue, Suite 1800
5       Phoenix, AZ 85004

6   For the Defendant:

7       Michael D. Moberly, Esq.
        Ryley Carlock & Applewhite PA
8       1 N. Central Avenue, Suite 1200
        Phoenix, AZ 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2

3   **SUMMARY OF COURT PROCEEDINGS**                    **PAGE:**
    Sidebar Conferences                                18

4

5

6   **WITNESSES FOR THE**          **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**
    **PLAINTIFF:**

7

    **Leah Landrum Taylor**
8   By Ms. Adams               4

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED  STATES  DISTRICT  COURT

1                    **P R O C E E D I N G S**

2              (Prior proceedings held on the record not transcribed

3    herein.)

4              (Jury present.)

5              THE COURT:  Okay.  You may call your next witness.

6              MS. ADAMS:  Thank you, Your Honor.  Plaintiff calls

7    former Senator Leah Landrum Taylor.

8              THE COURT:  Senator Landrum Taylor, would you come up

9    here, please.  Step up right in front of the clerk, and she's

10   going to swear you in.

11                         LEAH LANDRUM TAYLOR,

12   called as a witness herein by the Plaintiff, having been first

13   duly sworn or affirmed, was examined and testified as follows:

14             THE COURT:  You may proceed.

15             MS. ADAMS:  Thank you, Your Honor.

16                         DIRECT EXAMINATION

17   BY MS. ADAMS:

18   Q.  Good afternoon, Senator.  How are you?

19   A.  Good.

20   Q.  Good.

21             You're currently not a sitting senator; is that

22   correct?

23   A.  That's correct.

24   Q.  But most people still call you by your last title; is that

25   correct?

1  A.  That's correct.

2  Q.  Okay.  Can you turn to the jury and introduce yourself to

3  the jury, state the district that you served on behalf of at

4  the Arizona State Legislature and your time in public office.

5  A.  Yes.

6       My name is Leah Landrum Taylor, and I served in

7  District 27.  And I served in the Arizona House as well as in

8  the Senate for a total amount of 16 consecutive years.

9  Q.  Thank you.

10      And at what point in time did you begin your service

11 in the Arizona State Senate?

12 A.  In the State Senate, I started -- well, I started my time

13 in 1998, so eight years from there.  That was 2005, I believe

14 it was.

15 Q.  Okay.

16 A.  Uh-huh.

17 Q.  And when you were in the Arizona State Senate, you at some

18 point in time became involved in leadership; is that correct?

19 A.  That's correct.

20 Q.  And what was your role?

21 A.  I served in different roles.  I had an opportunity to serve

22 as the minority whip as well as the minority assistant leader

23 and the minority leader.

24 Q.  Okay.  And when you became the minority leader in the

25 Arizona State Senate, were you the first African-American

1  minority leader that the State of Arizona has had?

2  A.  That is correct.

3  Q.  Okay.  And do you recall the year in which that occurred?

4  A.  Yeah.  That was in 2012.

5  Q.  Okay.  And in 2012, you were elected minority leader by

6  your caucus; is that correct?

7  A.  That's correct.

8  Q.  Okay.  And the members of your caucus, you had served with

9  for some duration of time in these prior years?

10  A.  That's correct.

11  Q.  Both in the House and the Senate?

12  A.  Yes.  Many of them.

13  Q.  Okay.  So you knew them very well?

14  A.  Most of them, yes.

15  Q.  Okay.  And at some point in time, Ms. Adams came to work at

16  the Arizona State Senate; is that correct?

17  A.  That is correct.

18  Q.  Okay.  Did you know Ms. Adams prior to her working at the

19  Arizona State Senate?

20  A.  No, I did not.

21  Q.  Okay.  Did you appoint Ms. Adams to her role as a policy

22  advisor at the Arizona State Senate?

23  A.  No, I did not appoint her to that position.

24  Q.  As a minority leader in the Arizona State Senate, did you

25  have the authority to appoint an individual into a policy

1    advisor role?

2    A.  No, I did not have the authority to do that.

3    Q.  At any time when you were at the Arizona State Senate, were

4    you aware of a diversity initiative to increase the number of

5    individuals of color at the Arizona State Senate?

6    A.  No, not at all.  I was not aware of that.

7    Q.  Was Ms. Adams hired as part of some affirmative action or

8    diversity initiative at the Arizona State Senate?

9    A.  No.  No.  Not that I was ever aware of anything like

10   that --

11   Q.  Okay.

12   A.  -- no.

13   Q.  When Ms. Adams went to interview at the Arizona State

14   Senate, you interviewed her; is that correct?

15   A.  That is correct.  It was myself as well as others that

16   interviewed on the panel.

17   Q.  Who else was there?

18   A.  There was at the time the assistant minority leader.  There

19   was also another rank and file member that was there present

20   and then the chief -- at that time, the chief of staff was

21   present.

22   Q.  And who was the chief of staff?

23   A.  It was Peter Silverman.

24   Q.  Peter Silverman, okay.

25        And then the assistant minority leader, was that Linda

1    Lopez?

2    A.  That's correct.

3    Q.  Okay.  And then the other rank and file individual, was

4    that another policy advisor?

5    A.  That is correct.

6    Q.  Okay.  And do you remember who that was?

7    A.  No.  I actually cannot remember who was on the -- on the

8    panel at that point.

9    Q.  Okay.  Could it have been Patsy Osmon?

10   A.  That is correct, yes.

11   Q.  Okay.

12   A.  I remember now.

13   Q.  And Ms. Osmon had been with the Senate for 14 years at that

14   time; is that correct?

15   A.  That is correct.

16   Q.  And she is a licensed attorney; is that correct?

17   A.  That's correct.

18   Q.  Okay.  And when you interviewed Ms. Adams, was it -- the

19   panel that you just described, did you simply interview

20   Ms. Adams and then decide to hire her?

21   A.  No.  There were others that were interviewed as well.  It

22   was the process that was followed through the human resources,

23   so that was the process that we worked with.  It wasn't an

24   appointment.  It was actually an interview process that took

25   place.

1   Q.  Okay.  And so it was a typical hiring process where there

2   were internal applicant -- were there internal applicants for

3   this role?

4   A.  I cannot remember.  There may have been.

5   Q.  Okay.

6   A.  I do know there were quite a few applicants that had

7   applied for the position and individual -- we had an

8   opportunity to follow through, just as we do with any other

9   position that came open, and then to interview the individuals

10  that qualified to be -- to fit for interview.

11  Q.  And Ms. Adams was in that pool of individuals that

12  qualified for an interview?

13  A.  That is correct.

14  Q.  And she was ultimately selected to be the policy advisor?

15  A.  Yes.  She had the highest score.

16  Q.  Okay.  And she -- her initial salary offer was $60,000; is

17  that correct?

18  A.  That's correct.

19  Q.  Okay.  And then she provided a counteroffer?  Did you

20  recall that?

21  A.  I don't remember what that -- I don't remember the

22  counteroffer.  I don't remember that one.

23  Q.  Okay.  Thank you.

24          When Ms. Adams was hired, how did the position become

25  open?  You said, if we have an opening.  There was an opening?

1   Someone had departed the Senate?

2   A.  Uh-huh.  Then it goes through the regular process of making

3   sure the position is posted and then at that point you have a

4   chance to look through the various résumés that are submitted.

5   And then from there you -- you know, there's a selection of

6   those who would come forward to be able to be interviewed.  And

7   that's how the process works.

8   Q.  Okay.  So you didn't create this process for Ms. Adams, did

9   you?

10  A.  Oh, absolutely not.

11  Q.  Do you ever recall going to Wendy Baldo and saying to her,

12  I'd like to create a position?

13  A.  No.  This was an open position that was open and it was

14  needed to be filled.

15  Q.  Okay.  And so Ms. Adams is hired on, and her role is a

16  policy advisor; is that correct?

17  A.  That is correct.

18  Q.  Were you aware of Ms. Adams being a junior level policy

19  advisor?

20  A.  No.  Not from -- no, nothing from my memory.  I just

21  remember her coming in as a policy advisor, regular policy

22  advisor.  I didn't know we had levels.

23  Q.  Okay.  You're not aware of any level --

24  A.  No.

25  Q.  -- junior level or entry level policy advisor?

1    A.  No, I'm not aware of that.

2    Q.  No.

3         And so her job title as policy advisor is simply what

4    was on her business card and what -- the role she was hired to

5    do?

6    A.  That's from my understanding.

7    Q.  Okay.  And at the policy advisor -- at the Senate, there

8    are Republican policy advisors and Democratic policy advisors;

9    is that correct?

10   A.  I know that we have policy advisors that are hired on, and

11   it just all depends on which ones will be selected to serve in

12   either the minority or majority roles and staff those

13   individuals.

14   Q.  Okay.  So Ms. Adams begins working, and how was your

15   working relationship with Ms. Adams?

16   A.  I would say a really, really good working professional

17   relationship.  Very hardworking.  Very dedicated.  Always

18   there.  Never could quite figure out how Ms. Adams was able to

19   put in all the hours that she did, but she did.

20        But certainly had really good feedback from the

21   members, and in the position that I was in at the time, I would

22   hear various feedback.  If it was something that would have

23   been a concern, I would have heard of it.

24   Q.  And did you -- did you ever socialize with Ms. Adams

25   outside of work?

1   A.  No.

2   Q.  Did you have any difficulties in your working relationship

3   with Ms. Adams?

4   A.  No.

5   Q.  Did you ever receive any complaints from members or even

6   just any -- anyone at the Arizona State Senate regarding

7   Ms. Adams?

8   A.  No.  Not to my -- my memory, no.

9   Q.  Were you ever in communication with HR regarding issues

10  that Ms. Adams may have had?

11  A.  No.

12  Q.  To your knowledge, does the Arizona State Senate give

13  performance evaluations?

14  A.  Not to my knowledge.  Keeping in mind the position that I

15  served as a senator, we didn't do any performance evaluations

16  of any of the staff members.  However, not quite sure what the

17  chief of staff and what that process was and what it would have

18  looked like.

19          So at that point -- at this point, I could only assume

20  if it was something done or not, but we -- I didn't do it

21  personally --

22  Q.  Okay.

23  A.  -- in my role.

24  Q.  Okay.  And so you didn't participate in any HR function,

25  per se, as it relates to policies and handbooks and

1    orientations and things like that?

2    A.  No, I did not; that is correct.

3    Q.  Okay.  Did you have the ability to unilaterally fire a

4    policy advisor in your role as Senate Minority Leader?

5    A.  I guess the ability could have been there.  However, I

6    wouldn't look at that as being a wise practice, being the fact

7    that it's the chief of staff that actually supervises the

8    individual.

9            So myself personally, I would not look at that as

10   being a proper protocol in going forward, though everyone did

11   have the pleasure at serving in any position -- any hired

12   position, had the pleasure of serving under the Senate

13   President.  But there are processes in order to do that.

14   Q.  Okay.  And so we've heard this before, that individuals at

15   the Arizona State Senate serve at the pleasure of the

16   president.  At the time, who was the president of the Arizona

17   State Senate?

18   A.  It was President Andy Biggs.

19   Q.  Okay.  And when you say an individual can serve at the

20   pleasure of the president, what exactly do you mean by that?

21   A.  Whatever the need of the chamber is, so far as looking at

22   the budget and the responsibility, the president pretty much

23   serves as like the CEO of the Senate.  However, you know, just

24   in knowing processes and procedures were very important to

25   those of us that were serving at that time.

1    Q.  Okay.  At some point in time, you leave the Senate; is that

2    correct?

3    A.  That's correct.

4    Q.  When did you leave the Senate?

5    A.  I left out in 2015, I believe, yeah.

6    Q.  And why did you leave the Senate?

7    A.  Well, I reached to the end of my term, and I just thought

8    this was a good time to go ahead and leave after serving for 16

9    years.  Was able to get a lot of things accomplished, and it

10   was time to take on some roles that I felt I could pour my

11   passion into.

12   Q.  Okay.  So you served eight years in the House of

13   Representatives, and then you were termed out; is that correct?

14   A.  That is correct.

15   Q.  And then you served eight years in the Arizona State

16   Senate, and then you were termed out; is that correct?

17   A.  That is correct.

18   Q.  Okay.  And so prior to being termed out, did you complete

19   your two-year term of being the minority leader?

20   A.  Unfortunately, no.

21   Q.  What happened?

22   A.  There was an ousting that occurred at the time.  Did not

23   have any idea why, but it was something that had happened with

24   my caucus.

25   Q.  And when you say "ousting," what do you mean?

1    A.   There was a decision to vote me out of the role of minority

2    leader.

3    Q.   Okay.  And was this at a regular election of the caucus?

4    A.   No, it was not at a regular election.  There was a vacancy

5    that was going to come up from another one of the leadership

6    members, and then it happened without any type of knowledge

7    that this was coming forward.

8    Q.   Okay.  So you were surprised?

9    A.   Absolutely.

10   Q.   Okay.  And what was the result of that meeting?

11   A.   The --

12   Q.   Those votes?

13   A.   The result -- I don't know what the overall votes were, but

14   it takes a simple majority to be able to move forward with

15   that.  I do know there were members that spoke against it, but

16   at the same time -- and in speaking against it, they did talk

17   about the fact that this is not a normal process or procedure.

18        And again, as I mentioned before, it's something that

19   though -- many of us that had served in the legislature really

20   respected the process of how things move forward, and at that

21   time, even including the Senate president.  Very respectful of

22   processes.

23   Q.   Okay.  And so the individuals -- can you tell the

24   individuals that came and spoke against your removal from

25   minority leadership?  Can you tell the jury who those

1   individuals were?

2   A.  Well, the individuals were other -- they were other members

3   that were there a part of the caucus, so they were the rank and

4   file members that were there.  So --

5   Q.  And when you say "members," you mean senators?

6   A.  Other senators, yeah.

7   Q.  And was Katie Hobbs one of those senators that came

8   forward?

9   A.  To speak against or --

10  Q.  Yes.

11  A.  -- in favor?

12          Not to speak against.

13  Q.  Okay.  You believe she was in favor of your removal?

14  A.  Yes.

15  Q.  We heard testimony today, you weren't in the room, but as

16  it relates to the decision of the caucus to take that vote, in

17  a year in which there had been some pretty big successes for

18  Democrats, including the bipartisan expansion of Medicaid in

19  the State of Arizona, were you aware that members of your

20  caucus had lost trust in you?

21  A.  No.  I was not aware of that.  We had -- we had -- as you

22  stated, we had made a lot of significant successes with

23  expansion of Medicaid as well as working, you know, across the

24  aisle.  There was great staff across the aisle, individuals

25  that we worked with in helping to get a significant amount of

1    bills put forward for Democrats that really hadn't been done

2    before.

3    Q.  And that was done under your leadership?

4    A.  Yes.

5              THE COURT:  Ms. Adams, is this a good place for a

6    break?

7              MS. ADAMS:  Yes, Your Honor.

8              THE COURT:  Let's take our afternoon recess.  We'll

9    come back at 3:15.

10             (Jury not present.)

11             THE COURT:  Please be seated.

12             Is there anything else to take up?

13             MR. MOBERLY:  No, Your Honor.

14             THE COURT:  Ms. Adams?

15             MS. ADAMS:  Your Honor, Catherine Miranda is on her

16   way to testify, and I just want to check on the status of that.

17             THE COURT:  Okay.  You can check on -- we're going to

18   recess this evening at 4:30.

19             MS. ADAMS:  Understood.

20             THE COURT:  And you've got an hour and 54 minutes

21   left.

22             MS. ADAMS:  Okay.

23             THE COURT:  We'll stand in recess.

24             MS. ADAMS:  Thank you.

25             (Recess taken, 2:59 p.m. to 3:17 p.m.)

1              THE COURT:  Counsel approach, please?

2              (At sidebar on the record.)

3              THE COURT:  I don't want to tell you how to run your

4    case, but you're getting into a lot of repetitive testimony

5    that you've already covered before, and you're getting short on

6    time.

7              MS. ADAMS:  Okay.

8              THE COURT:  So just be cautious of that.

9              MS. ADAMS:  Yes, Your Honor.

10             MR. MOBERLY:  Could I raise one other issue since

11   we're here?

12             I'm really reluctant to suggest a witness that's come

13   down not testify, but we did have this issue with Senator

14   Miranda about the nondisclosure.  She was the one we were going

15   to look at the 26 and see.

16             I don't think she's in there.  But I also understand,

17   unfortunately, that she's been in the courtroom during the last

18   part of the testimony.

19             THE COURT:  She's been -- the rule's been invoked.  I

20   think you invoked the rule.

21             MS. ADAMS:  Yes.

22             THE COURT:  Your witness can't be in the room to watch

23   you testify.

24             MS. ADAMS:  Your Honor, I didn't see her when she came

25   in.

1          MR. MOBERLY:  I'm sure it was inadvertent.

2          THE COURT:  Well, I'm sure it is, but that's a

3    violation of the rule.  And that's -- I mean, does she have

4    something to add that no one else has testified to?

5          MS. ADAMS:  I think she does.

6          THE COURT:  But she wasn't disclosed, or was she?

7          MS. ADAMS:  She was disclosed.

8          MR. MOBERLY:  Well, she -- your point that she was in

9    the motion for -- she was in the motion for subpoenas, but

10   she's not in the Rule 26 disclosures that I'm aware of.

11         MS. ADAMS:  I believe she is in the earlier

12   disclosures.

13         THE COURT:  I thought you guys were going to talk

14   about that --

15         MR. MOBERLY:  Well, that's --

16         THE COURT:  -- and you were going to show him where it

17   was.

18         Because where -- I didn't know this still was an

19   issue.  I wish you would have raised it sooner, because we're

20   in the middle of a trial now.

21         MR. MOBERLY:  I'm not sure I would have raised it if

22   there wouldn't have been the rule issue.  I was just told on

23   the break that she was in the courtroom.  And I'm not sure what

24   to do about that.

25         THE COURT:  All right.  Let's finish up this witness.

1          (End of discussion at sidebar.)

2          (Jury present.)

3          THE COURT:  Please be seated.

4          MS. ADAMS:  Senator Landrum Taylor.

5          THE COURT:  Where is she?

6          Would you please retake the witness stand?

7          You may proceed.

8          MS. ADAMS:  Thank you, Your Honor.

9   BY MS. ADAMS:

10  Q.  Senator Landrum Taylor, when we finished, we were just

11  having a final discussion around the time in which you were

12  removed from the minority leadership at the Arizona State

13  Senate; correct?

14  A.  That's correct.

15  Q.  And you had indicated that it was a shock to you based on

16  your history and leadership at the Senate; is that correct?

17  A.  That is correct.

18  Q.  Okay.  And Ms. Baldo didn't participate in any decision as

19  it relates to your removal as the minority leader; is that

20  correct?

21  A.  Absolutely not.

22  Q.  Okay.  And did Peter Silverman participate in, to your

23  knowledge, your removal as the minority leader?

24  A.  Not to my knowledge.  I do know staff is typically aware of

25  various meetings that will occur, but not to my knowledge.

1   Q.  Okay.  And how about Senator Katie Hobbs?

2   A.  Actually, Senator Katie Hobbs at that time did speak in

3   favor of the removal.

4        And I would just like to state that this is not

5   something that is a precedence that occurs.  It is really like

6   never heard of to have something like this happen.  So it

7   definitely was unprecedented, and it was just a -- it was not

8   only a shock to members of the caucus that were just astounded

9   that this type of behavior was going on, but it was throughout

10  our entire Senate body.

11  Q.  In your time as elected official, have you ever been told

12  that someone has lost their trust in you?

13  A.  During the time that this occurred with the ousting, that

14  was one of the things that was shared later, that the -- it was

15  the confidence that was lost by a few of the members that had

16  pushed for this to occur.

17  Q.  Okay.  And did they give you any specifics?

18  A.  There were no specifics given.  I did want to know, but

19  there were no specifics given at all.  The only thing that we

20  had was the record of what had occurred, and that was making

21  sure that members had an opportunity that never really ever had

22  an opportunity to get bills put forward and then working very

23  hard to get significant measures pushed forward to help out our

24  state.  And that was -- that was what occurred.

25        And another big concern that did come up was there was

1    a point to where some of the members that were pushing forward

2    for this were really upset because I had a reputation of

3    working with both sides of the aisle, and that was not

4    something they -- that they liked, I guess.

5    Q.  Okay.  And after eight years of service in the Senate, you

6    departed the Senate; correct?

7    A.  That's correct.

8    Q.  And Ms. Adams was still employed as a policy advisor at

9    that time; is that correct?

10   A.  That is correct.

11   Q.  During the time in which you were at the Senate and you

12   were the minority leader, were you aware of any conduct or any

13   issues as it relates to Ms. Adams?

14   A.  No.  I wasn't aware of any type of conduct or issues

15   regarding Ms. Adams.  The only thing I had always heard was the

16   exemplary service as well as making sure that -- whether it was

17   a brief that was done, briefings were done in an excellent

18   fashion, and keeping members informed.  The members spoke very

19   highly of her ability to carry forward with her job and her

20   duties.

21   Q.  And under your leadership, was there any reason in which

22   you felt Ms. Adams should have been disciplined, including and

23   up to termination?

24   A.  Not under my leadership.  Again, I had never heard any

25   complaints at all regarding Ms. Adams, and so there was no

1    reason even for anything about her to be on a radar.

2              MS. ADAMS:  Okay.  Thank you.

3              No further questions.

4              THE WITNESS:  You're welcome.

5              THE COURT:  Cross-examination?

6              MR. MOBERLY:  No, Your Honor.  We have no questions.

7              THE COURT:  You may step down.  Thank you for coming.

8              THE WITNESS:  Thank you.

9              (Witness excused.)

10             (Further proceedings held on the record not

11   transcribed herein.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           C E R T I F I C A T E

2

3              I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7              I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12             DATED at Phoenix, Arizona, this 13th day of August,

13   2019.

14

15

16                           s/Jennifer A. Pancratz_____   _____   ___

17                           Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25