**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

```
Talonya Adams,                )
                              )   No.  CV-17-00822-PHX-DLR
          Plaintiff,          )
                              )
          vs.                 )   Phoenix, Arizona
                              )   August 14, 2019
Arizona Senate,               )   9:09 a.m.
                              )
          Defendant.          )
_____)
```

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**EVIDENTIARY HEARING**</u>

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

   For the Plaintiff:
3
        Talonya Adams, Esq.
4       In propria persona
        2 N. Central Avenue, Suite 1800
5       Phoenix, AZ 85004

6  For the Defendant:

7       Michael D. Moberly, Esq.
        Ryley Carlock & Applewhite PA
8       1 N. Central Avenue, Suite 1200
        Phoenix, AZ 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                              **I N D E X**

2

3    **WITNESSES FOR THE**          **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**
     **PLAINTIFF:**

4
     **Sandy Reilly**
5    By Ms. Adams                    40

6    **Talonya Adams**
     Direct Testimony                51                     85
7    By Mr. Moberly                           72

8    **Wendy Baldo**
     By Ms. Adams                    89
9

10

11                            **E X H I B I T S**

12
     <u>NO.</u>                    <u>DESCRIPTION</u>                         <u>REC'D</u>
13
     1       EEOC Notice of Charge of Discrimination dated      42
14           7/27/2015

15   273     Statute 42 USC Section 2000e-5                     75

16   270     Plaintiff's Fifth Amended and Supplemental         79
             Discovery Protocol Disclosures for Employment
17           Cases Alleging Adverse Action

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2              (Proceedings commenced at 9:09 a.m.)

3              THE COURTROOM DEPUTY:  Civil Case No. 17-822, Adams

4    versus Arizona Senate, on for evidentiary hearing.

5              Counsel, please announce for the record.

6              MS. ADAMS:  Talonya Adams, plaintiff.

7              THE COURT:  Good morning.

8              MR. MOBERLY:  Good morning, Your Honor.  Michael

9    Moberly on behalf of the defendant.

10             THE COURT:  Good morning.

11             Okay.  We have three issues I think we need to resolve

12   today:  One is the statutory cap, the second is the back and

13   front pay, and third is the question of reinstatement.

14             I don't want to hear any argument or spend any time

15   with the motion for remittitur.  I'll rule on that on the

16   paper.

17             First, the statutory cap.  We're looking at 42 USC

18   Section 1981a(b)(3).

19             And if I understand the parties' positions, the

20   defendant's position is that the employer and the named

21   defendant in this case is the Senate, and the State has not

22   been named as a defendant.  And the number of employees at the

23   State Senate are less than 200, so therefore, the statutory cap

24   that should apply is $100,000.

25             Mr. Moberly, have I correctly summarized the position

UNITED STATES DISTRICT COURT

1      of the defense?

2              MR. MOBERLY:  You have, Your Honor.

3              THE COURT:  And then the plaintiff's position is that,

4      no, the Senate isn't the employer; it's the State.  And the

5      State has more than 500 employees, so the statutory cap should

6      therefore be $300,000.  Ms. Adams, is that your position?

7              MS. ADAMS:  Yes, Your Honor.

8              THE COURT:  And is it your position or are you arguing

9      that if the State is not the employer, then the Senate has more

10     than 200 employees?

11             MS. ADAMS:  Your Honor, primary position before the

12     Court is that the Arizona State was --

13             THE COURT:  I know your primary position.  I'm asking

14     what's your secondary.

15             If I find that the State is not the employer, is it

16     your position that there are more than 200 employees at the

17     Senate?

18             MS. ADAMS:  Yes, Your Honor.

19             THE COURT:  And are you prepared to present evidence

20     on that?

21             MS. ADAMS:  Yes, Your Honor.

22             THE COURT:  And you have witnesses or exhibits you're

23     going to show on that?

24             MS. ADAMS:  I do not have witnesses, Your Honor.  I do

25     believe I have exhibits.

1              THE COURT:  Okay.  All right.

2              Okay.  Then with regard to the back and front pay,

3      Ms. Adams, tell me, what are you claiming in regard to that?

4              MS. ADAMS:  Thank you, Your Honor.

5              Your Honor, on Docket No. 159, Your Honor ordered

6      plaintiff to provide a computation of damages pursuant to an

7      order on June 17, 2019.  Plaintiff provided that computation,

8      and plaintiff today is arguing that she is entitled to

9      pre-termination damages from December of 2012 until February

10     2013 -- 2015.

11             The amount asserted and not contested by the Arizona

12     State Senate at the time in which the Court raised the issue at

13     the pretrial conference was $53,740.94.

14             Post-termination --

15             THE COURT:  53,700 what?

16             MS. ADAMS:  40 dollars and 94 cents.

17             THE COURT:  These are pre-termination damages from

18     December 2005 until February 2013?

19             MS. ADAMS:  December 2012.

20             THE COURT:  I'm sorry.  2012.

21             And what do these damages reflect?  What's the basis

22     of your calculation?

23             MS. ADAMS:  Your Honor, the basis of the calculation

24     here is Ms. Adams' base salary of $60,000.  And I believe there

25     was a -- there was an averaging of the salaries between Rodney

1    Ross, a policy advisor at the Arizona State Senate, and Garth

2    Kamp, a policy advisor at the Arizona State Senate.  I think

3    respectively, those salaries at the time for purposes of the

4    pre-termination damages was $80,000 and $85,000 respectively.

5    The difference is $82,250 minus the $60,000 that Ms. Adams was

6    paid.

7            THE COURT:  Okay.  So I see what you did.  So you took

8    the two policy advisors, added up their salaries, divided by

9    two, and then calculated that's what you should have had --

10   that's what you should have been paid during that period from

11   December 2012 to February 2013?

12           MS. ADAMS:  Yes, Your Honor.

13           THE COURT:  And that comes up to the $53,000 figure

14   that you've come up with?

15           MS. ADAMS:  Yes, Your Honor.  And there is an Excel

16   spreadsheet, if I have a moment to find it, Your Honor.  I

17   think it does also -- it may or may not include salary

18   increases that -- no, it does not.  I don't believe it includes

19   salary increases that those individuals received.

20           THE COURT:  Okay.  Is that an exhibit you're going to

21   offer in this hearing or that you've already -- did you put it

22   in evidence at the trial, or where will I find that?

23           MS. ADAMS:  I would like to testify to it today, Your

24   Honor.  As it relates to the salaries that were -- that the

25   policy advisors received at the Arizona State Senate during the

1   pre-termination period, that is in evidence before the Court at

2   the trial.

3           THE COURT:  Okay.

4           All right.  What other damages?

5           MS. ADAMS:  Post-termination damages, Your Honor.

6   Plaintiff claims from February -- in the document presented

7   pursuant to Docket No. 159, February 16, 2015, to the judgment,

8   there is a dispute between counsel, and also Your Honor reduced

9   the damages substantially as it relates to the Arizona State

10  Senate's motion in limine for post-wage damages.

11          THE COURT:  Okay.  Give me the time frames again.

12  February 2015?

13          MS. ADAMS:  February 16, 2015.

14          THE COURT:  Till?

15          MS. ADAMS:  To judgment.

16          THE COURT:  And what's the amount you're claiming

17  there?

18          MS. ADAMS:  Well, Your Honor had a ruling that we

19  would like to seek clarification.  I -- the amount claimed in

20  the filed computation of damages was $336,079.

21          THE COURT:  Yeah.  This we -- I've already ruled on

22  that, and we've talked about it multiple times.

23          MS. ADAMS:  Yes, Your Honor.

24          THE COURT:  I thought it was very clear.  Because you

25  refused to produce evidence of your income after termination,

1    which you -- I had ordered you to do, I wasn't going to allow

2    you to submit any damages other than the time period for which

3    you received unemployment compensation.

4              MS. ADAMS:  Correct, Your Honor.

5              THE COURT:  So do you have -- do you not understand

6    that?

7              MS. ADAMS:  Yes, I do understand, Your Honor.

8              THE COURT:  Okay.  So what's the uncertainty, then?

9              MS. ADAMS:  As it relates to post-termination damages,

10   Your Honor, plaintiff claims from February 16 to February --

11   February 16, 2015, to November 2015, the third week in

12   November of 2015, she received unemployment compensation

13   incongruently.  That was her testimony at the pretrial

14   conference when the Court ruled.

15             And plaintiff would argue that from that period of

16   time, February 16, 2015, to November -- the third week in

17   November of 2015, she would be entitled to damages in an amount

18   equal to the salaries received, I suppose at that point, by

19   Mr. Garth Kamp.

20             THE COURT:  So let me just see if I understand you.

21   That's about nine months, right?

22             MS. ADAMS:  Excuse me?

23             THE COURT:  The period you're seeking post-termination

24   damages is about nine months?

25             MS. ADAMS:  Yes, Your Honor.

1          THE COURT:  And if we took the salary you feel you

2    should have been receiving, the 82,250, and took 9/12 of that,

3    that would be the number you're asking for, 3/4 of 82,250.

4    True?

5          MS. ADAMS:  I think that's fair, Your Honor.

6          THE COURT:  Okay.

7          All right.  What other damages?

8          MS. ADAMS:  Next category is past lost benefits, the

9    first of which is compensation time pay, Your Honor.  As Your

10   Honor is aware, the jury indicated that Ms. Adams was

11   discriminated against based upon her compensation time pay.  In

12   the June 17, 2019, Docket No. 159 filing, plaintiff asked for

13   $22,048 in compensation time.

14         THE COURT:  That's comp time for time that you'd work

15   beyond the 40 hours for which you weren't compensated for?

16         MS. ADAMS:  That is correct --

17         THE COURT:  40 hours per week.

18         MS. ADAMS:  -- in part, Your Honor.  The past lost

19   benefits aren't calculated pre-termination and

20   post-termination.  So it -- the lion's share of the $22,048 is

21   occurring in years 2015, in which plaintiff received zero

22   hours; 2016 to present.

23         THE COURT:  To present?

24         MS. ADAMS:  Yes, Your Honor.

25         THE COURT:  You're claiming compensation time pay

1    until today?

2            MS. ADAMS:  In the document, Your Honor, I believe it

3    asks for compensation time paid until the second quarter of

4    2019.

5            THE COURT:  And how did you calculate the $22,000

6    figure?

7            MS. ADAMS:  I believe the initial -- again, Your

8    Honor, plaintiff has historically used the 82,250 as a

9    compromise salary.  Case law supports $85,000 salary

10   compensation.

11           For here, plaintiff used, in 2013, the 16 hours that

12   she did not receive but worked at the Arizona State Senate.  In

13   2000 -- on February 16, 2015, eight hours of compensation pay

14   that was granted to individuals that worked.  Trial testimony

15   was Ms. Adams worked remotely while she was away with her son

16   in Seattle, yet did not receive that benefit.

17           2015, Ms. Adams worked --

18           THE COURT:  Whoa, whoa.  I thought that was 2015, that

19   eight hours.  Is that 2014?

20           MS. ADAMS:  Oh, yes, that is 2015, Your Honor.

21           THE COURT:  Okay.

22           MS. ADAMS:  In 2014 --

23           THE COURT:  I don't need you to explain it to me right

24   now.

25           MS. ADAMS:  Okay.

1          THE COURT:  You can do that when you testify.  I just

2     want to try and understand --

3          MS. ADAMS:  I understand.

4          THE COURT:  -- where these are coming from.

5          MS. ADAMS:  Okay.  Broad strokes, plaintiff had a

6     deficit of compensation time of 16 hours in 2016, received full

7     compensation in 2014.  There's no ask there.  In 2015 there's

8     an ask of 88 hours.

9          THE COURT:  Oh, 88 hours?

10         MS. ADAMS:  Total, yes.

11         THE COURT:  I thought you said 8, okay.  Go ahead.

12         MS. ADAMS:  In 2016, 2017, 2018, and second quarter of

13     2019, an ask of 80 hours for each respective year.

14         THE COURT:  Okay.

15         MS. ADAMS:  Vacation accrual rate, Your Honor.  At the

16     Arizona State Senate, Ms. Reilly testified vacation accrual is

17     paid out upon an employee leaving State service.  Ms. Adams is

18     asking for $33,833.80.

19         THE COURT:  Vacation accrual?

20         MS. ADAMS:  Correct.

21         THE COURT:  And so you've done the same thing from

22     2013 all the way through 2019?

23         MS. ADAMS:  Yes, Your Honor.

24         THE COURT:  And how much is the number you're asking

25     for?

1          MS. ADAMS:  Monetarily?

2          THE COURT:  Yeah.

3          MS. ADAMS:  $33,833.80.

4          THE COURT:  All right.

5          MS. ADAMS:  The total number of vacation leave hours

6   is $650 -- or 650.65 hours.

7          THE COURT:  And that's the number of hours that you

8   would have accumulated had you stayed employed through the date

9   of the judgment?  Is that what you're saying?

10         MS. ADAMS:  Your Honor, these -- these hours go

11   through June 20, 2019.

12         THE COURT:  Okay.  That's pretty close to the date of

13   the judgment.

14         Okay.  All right.  Anything else?

15         MS. ADAMS:  Sick leave accrual rate, Your Honor, same

16   amount, $33,833.80, for a total of sick leave of 650.65 hours.

17   The same calculation.

18         THE COURT:  All right.  Anything else?

19         MS. ADAMS:  Arizona State Retirement, Your Honor.

20   Ms. Adams was a State employee.  She was a part of the Arizona

21   State Retirement System.  The system requires mandatory --

22   requires a mandatory contribution of 10 percent.

23         THE COURT:  I understand all that.  I just want to

24   hear numbers.

25         MS. ADAMS:  $23,442.

1          THE COURT:  And what does this reflect?  Does this

2     reflect the State's part of the contribution towards your State

3     retirement?

4          MS. ADAMS:  Yes, Your Honor.  It is the amount of

5     the -- first calculation is the amount of the pre-termination

6     damages, that 53,000 and change, times 1.06, minus the

7     pre-termination damages.

8          THE COURT:  Wait a minute.  I'm trying to understand

9     how you calculated what your loss for the contribution to the

10    Arizona State Retirement System would be.

11         MS. ADAMS:  Yes.

12         THE COURT:  First tell me, what time period are we

13    talking about?

14         MS. ADAMS:  So we are talking about January 2013 to

15    June 20, 2019.

16         THE COURT:  All right.  And for each year, did you use

17    the same method of calculating?

18         MS. ADAMS:  Yes, Your Honor.

19         THE COURT:  And are you -- does this $23,000 figure

20    represent the State's portion of its contribution towards the

21    Arizona Retirement System?

22         MS. ADAMS:  The 6 percent match, yes, Your Honor.

23         THE COURT:  Okay.  So this is the 6 percent -- this is

24    what the State would have contributed during that time frame,

25    from January 2013 to June 2019, in your name had you stayed

1    employed during that entire period at the $82,250 figure?

2            MS. ADAMS:  Correct, Your Honor.

3            THE COURT:  Okay.  What else?

4            MS. ADAMS:  Special damages.  The initial amount is as

5    relates to student loan forgiveness.  After ten years of State

6    service, State employees are entitled to student loan

7    forgiveness under the Student Loan Forgiveness Act.  There's

8    not a designation.  That was reserved for jury determination

9    and not presented to the jury.

10           Early retirement withdrawal penalty.  Ms. Adams has

11   withdrawn over $36,000 in her retirement to live and has

12   subsequently incurred a 10 percent penalty fee.  That is $3,500

13   listed.

14           THE COURT:  Anything else?

15           MS. ADAMS:  So Thunderbird field trip seminar to Asia

16   in the amount of $8,750.  There was testimony, lots of

17   testimony as relates to Thunderbird --

18           THE COURT:  I understand that.  I just want to know,

19   what is this?  You didn't go?

20           MS. ADAMS:  Calculation is Ms. Adams was unable to go

21   in lock step with her class.  Even though she had already --

22   she no longer had her job, she had missed the visa deadline and

23   the filing deadline and incurred a cost that she otherwise

24   would not have.

25           THE COURT:  Okay.  And how much is that?

1          MS. ADAMS:  $8,750.

2          THE COURT:  Okay.  Anything else?

3          MS. ADAMS:  Arizona State Bar Association dues from

4     2016 to 2019 in the amount of $2,005.

5          THE COURT:  2,005?

6          MS. ADAMS:  Correct, Your Honor.

7          THE COURT:  Anything else?

8          MS. ADAMS:  Medical benefits for a hospital CAT scan

9     in the amount of $512.

10         THE COURT:  512?

11         MS. ADAMS:  Correct.

12         THE COURT:  Anything else?

13         MS. ADAMS:  Attorneys' fees and costs are listed here.

14    That number is substantially higher post-trial.

15         Compensatory damages --

16         THE COURT:  Wait, wait.  Attorneys' fees for your

17    time?

18         MS. ADAMS:  No, Your Honor.

19         THE COURT:  For what?

20         MS. ADAMS:  Initially, Ms. Adams was represented by

21    counsel --

22         THE COURT:  Okay.

23         MS. ADAMS:  -- and paid legal fees.  There's

24    approximately $4,100 spent in depositions, court costs and

25    litigation costs, transcripts.

```
 1              THE COURT:  Okay.  Fees and costs are different.  So
 2  are these fees or costs we're talking about?
 3              MS. ADAMS:  As it relates to attorneys' fees listed,
 4  $6,500 pretrial were submitted in this document.
 5              THE COURT:  Okay.  And costs, taxable costs are
 6  normally submitted in the form of statement of costs at the end
 7  of the judgment.
 8              MS. ADAMS:  Okay.
 9              THE COURT:  Okay?
10              MS. ADAMS:  Okay.
11              THE COURT:  And there are statutory costs that are
12  recoverable.  Not everything you spend is a recoverable cost.
13  You just go to the statute and match them up.
14              MS. ADAMS:  Thank you, Your Honor.
15              THE COURT:  Anything else?
16              MS. ADAMS:  Yes, Your Honor.
17              Plaintiff is asking for prejudgment interest as it
18  relates to all damages.
19              Plaintiff is asking for gross-up interest or gross-up
20  amount to address --
21              THE COURT:  What are you asking for gross-up?  I don't
22  understand that.
23              MS. ADAMS:  The gross-up amount is an additional sum
24  of back pay to compensate for the increased tax liability that
25  plaintiff will likely incur from receiving damages -- a damage
```

1    award as a lump sum rather than in annual wage.

2          THE COURT:  Okay.  What you're saying is it puts you

3    in a higher tax bracket, and therefore they should pay the

4    taxes and not you?

5          MS. ADAMS:  Correct, Your Honor.

6          THE COURT:  Okay.  Anything else?

7          MS. ADAMS:  Reinstatement.  Or front pay in lieu of.

8          Plaintiff, in this July 17 --

9          THE COURT:  Wait a minute.

10          Front pay in lieu of?  Tell me what the front pay

11    would be.

12          MS. ADAMS:  Your Honor, are you asking for the

13    monetary amount or are you asking for the legal basis for front

14    pay?

15          THE COURT:  The monetary amount.

16          MS. ADAMS:  Front pay is not calculated.  Plaintiff

17    does have three -- three proposed calculations based on a

18    five-year term, a ten-year term, and a --

19          THE COURT:  Are you assuming you won't be able to find

20    a job for five or ten years?

21          MS. ADAMS:  No, Your Honor.  That is -- that's not

22    plaintiff's assumption.  Plaintiff's position is that front pay

23    is allowed in the event that -- I won't get into the case law.

24          No, Your Honor, plaintiff does not believe she will

25    not be able to find a job for five to ten years.  Plaintiff

1    does believe she will not be able to find a job that would make

2    her whole had she remained employed at the Arizona State Senate

3    and the sex, racial -- and racial discrimination had not

4    occurred.

5           THE COURT:  So what you're saying is you don't think

6    you'll find a job for five or ten years that pays $82,000?  Is

7    that what it comes down to?

8           MS. ADAMS:  I don't think the number is $82,000

9    anymore, Your Honor.  Policy advisors at the Arizona State

10   Senate are receiving a hundred thousand dollars and north of

11   that number.

12          So a front pay -- even reinstatement, Ms. Adams is not

13   seeking reinstatement at $82,250.

14          THE COURT:  Okay.  And, now, the reinstatement.  What

15   evidence are you going to put on on that?

16          MS. ADAMS:  There is -- I think just testimony

17   evidence as it relates to reinstatement.  Ms. Adams did file

18   for reinstatement --

19          THE COURT:  I understand that.  I'm just trying to

20   understand what the evidence is going to be.

21          So it will be your testimony?

22          MS. ADAMS:  Testimony and then also --

23          THE COURT:  Whoa, whoa, whoa, whoa.  Just so I --

24   answer my question.  Will it be your testimony?

25          MS. ADAMS:  In part.

1          THE COURT:  Will there be other witnesses?

2          MS. ADAMS:  I believe Ms. Baldo can speak to

3    reinstatement as well.

4          THE COURT:  All right.  So it would be you and

5    Ms. Baldo?

6          MS. ADAMS:  Yes, Your Honor.

7          I also believe that there is evidence that was --

8    that's in the record that has been disclosed as it relates to

9    the current -- the current salaries, fringe benefits, and

10   compensation.

11         But if not, if that evidence is disallowed, Sandy

12   Reilly can certainly speak to --

13         THE COURT:  Well, I think anything that's been

14   testified to at the trial is in evidence for this case.  But

15   you'll need to point me to it if you have something

16   specifically you want me to consider.  Okay?

17         MS. ADAMS:  Yes, Your Honor.  And --

18         THE COURT:  All right.  Anything else?

19         MS. ADAMS:  As it relates to damages, Your Honor, no,

20   sir.

21         THE COURT:  Okay.

22         All right.  Mr. Moberly, let's talk first about the

23   first issue, and that's the -- well, let me ask Ms. Adams --

24         Ms. Adams, the statutory cap issue.

25         MS. ADAMS:  Yes, Your Honor.

1          THE COURT:  You want me to find that the State is the

2     employer, and therefore, we will apply the number of employees

3     at the State when we determine what the cap is.  And as we

4     talked, the larger the number of employees, the higher the cap

5     is.

6          So tell me, is there any case law or any authority

7     that you've found that would allow me to find that a nonnamed

8     party is your employer?  That's a yes or no.

9          MS. ADAMS:  Yes, there is case law, Your Honor.

10          THE COURT:  Okay.  Can you give it to me?

11          MS. ADAMS:  I'm trying -- I'm grappling with the

12     Court's --

13          THE COURT:  This is probably the most important

14     question that you probably anticipated was coming, and I

15     assumed you'd have it right at your fingertips.  Now, where is

16     the authority for me to make this finding?

17          MS. ADAMS:  I need a moment to find it.  I think if

18     Your Honor is making the assumption that the respondent is the

19     employer --

20          THE COURT:  No, I'm not making any assumption.  I'm

21     waiting to -- I'm trying to understand.  You've only named the

22     Senate, but now you want me to say, no, it's not the Senate,

23     it's the State.  So I'm trying to find how we can do that, and

24     the only way I can do that is if I've got some authority that

25     allows me to do it.

1          So I'm asking you, give me the authority.  I've got to

2    have some basis to do it.

3          MS. ADAMS:  Your Honor, may I just have a moment?

4          THE COURT:  No.  Let's move on then.  We only have

5    limited time this morning.  After you find it, let me know, but

6    let me know before we finish up this morning.

7          MS. ADAMS:  Thank you, Your Honor.

8          THE COURT:  Okay.  My next question is, why didn't you

9    name the State as a defendant?

10         MS. ADAMS:  Your Honor, at the time I filed the

11   litigation, I was represented by legal counsel.  I didn't

12   participate in making a determination as to who would be

13   captioned other than Ms. Adams as Jane Doe.  I --

14         THE COURT:  Do you have any understanding as to why

15   when your lawsuit was filed, the State, if that's truly the

16   employer, wasn't named as a defendant in the case?

17         MS. ADAMS:  No, I do not, Your Honor.  There was a

18   question between counsel -- I can give you the cursory

19   discussion -- as it relates to why Arizona Senate as opposed to

20   even Arizona State Senate was not named in the caption, and --

21         THE COURT:  Okay.  I think you've answered my

22   question.  I don't mean to cut you off, but we only have

23   limited time today, and we need to --

24         MS. ADAMS:  Yes, Your Honor.

25         THE COURT:  So you don't know why the State wasn't

1    named as a defendant in this case?

2              MS. ADAMS:  I did not participate in that

3    conversation -- that decision, Your Honor.  I relied on legal

4    counsel.

5              THE COURT:  All right.

6              Okay.  Mr. Moberly.

7              MR. MOBERLY:  Yes, Your Honor.

8              THE COURT:  I first want to talk about the statutory

9    cap issue before we talk about the other damages.

10             MR. MOBERLY:  Okay.

11             THE COURT:  Is there any evidence to contradict the

12   testimony of Sandy Reilly cited in plaintiff's objection to

13   your motion to conform to the statutory cap?

14             MR. MOBERLY:  The testimony with respect to the fact

15   that these people are State employees?

16             THE COURT:  Yes.

17             MR. MOBERLY:  No, there's none.

18             THE COURT:  Okay.  And it's your position that the

19   State is not the employer; is that true?

20             MR. MOBERLY:  No.  It's our position that the State's

21   not the named respondent and that the statute refers to the

22   named respondent.

23             THE COURT:  But the State is actually the employer?

24             MR. MOBERLY:  The State is technically the employer,

25   that's correct.

1          THE COURT:  Okay.  So if she had named the State,

2    there wouldn't have been any basis to argue that it is not her

3    employer?

4          MR. MOBERLY:  Correct.

5          THE COURT:  And if I calculated the cap based on the

6    State as her employer, does that fact that the State was not a

7    party create some prejudice to the State?

8          MR. MOBERLY:  Well, it costs them 200,000, obviously.

9    I mean, it's the same pool of funds.

10         THE COURT:  So the only prejudice would be -- the fact

11   that we use the State as the employer would be the amount of

12   the damages we calculate in this case but nothing pertaining to

13   the merits of the case?

14         MR. MOBERLY:  That's correct.

15         THE COURT:  Okay.

16         All right.  You're more familiar with the damages that

17   she's claimed than I am, so are there any damages here that you

18   want to address before we start with our proceedings?

19         MR. MOBERLY:  Could we go back for one issue --

20         THE COURT:  Sure.

21         MR. MOBERLY:  -- on that?

22         THE COURT:  Yeah.

23         MR. MOBERLY:  Only with respect to the inquiry you've

24   made of Ms. Adams as to whether there's any case law that

25   supports her position.  If there is, obviously, she didn't cite

1    it in the objection I saw this morning.  If she comes up with

2    some, I can tell you there's some that won't support that.

3              THE COURT:  Well, are you aware of any case law that

4    supports her position?

5              MR. MOBERLY:  That supports her position?

6              THE COURT:  Yeah.

7              MR. MOBERLY:  No, I'm not.

8              THE COURT:  Okay.  So I assume you've researched this.

9              MR. MOBERLY:  I have.

10             THE COURT:  And you're saying that you haven't found

11   any case where a nonparty was determined to be the employer

12   when it came to calculation of the cap?

13             MR. MOBERLY:  A nonnamed party, correct.

14             THE COURT:  Okay.

15             MR. MOBERLY:  That's correct.

16             THE COURT:  All right.  So it's the naming of the

17   party that is critical for the calculation on the cap as to

18   what the actual facts on the ground are?  Is that what your

19   position is?

20             MR. MOBERLY:  That's correct.

21             THE COURT:  Okay.

22             MR. MOBERLY:  And I will add to that.  I mean, there

23   are reasons, strategic, whether they were discussed or not,

24   whether you might want to name one particular entity as opposed

25   to another.

1        THE COURT:  So you're saying there's a strategic --

2   there's a reason why the plaintiff may not name the State in

3   this case?

4        MR. MOBERLY:  Just to give you one example, in her

5   closing argument, she argued -- fairly effectively, I

6   thought -- "I'm an employee of the Senate.  That's the entity

7   that makes the laws but doesn't believe it's bound to follow

8   them."

9        That's a much more persuasive argument if the Senate

10   is the named defendant.

11        THE COURT:  Well, why couldn't she make that argument

12   if she'd named both the Senate and the State?

13        MR. MOBERLY:  She could make it.  I just don't think

14   it's -- well, if she named both of them?

15        THE COURT:  Yeah.

16        MR. MOBERLY:  Probably could.  She didn't.

17        THE COURT:  And she could have done that.

18        MR. MOBERLY:  I presume she could, yeah.

19        THE COURT:  Yeah.

20        MR. MOBERLY:  Yeah, I -- yes.

21        THE COURT:  All right.  Let's talk about damages now.

22        MR. MOBERLY:  Sure.

23        Do you want to start or do you want me to?

24        THE COURT:  Well, I have my note.  Do you want me to

25   direct you to the specific damages?

1          MR. MOBERLY:  Well, I think I can start based on the

2    document that Ms. Adams referred to, which just to begin

3    with -- and I'll try to be fairly brief, Your Honor.

4          To refresh your recollection, this document was

5    presented prior to your motion in limine ruling.  So it really

6    doesn't make -- the document itself really doesn't make much

7    sense in light of that ruling.

8          THE COURT:  Okay.  Well, let's just break it down.

9          First, the pre-termination damages.

10         MR. MOBERLY:  Yeah.

11         THE COURT:  She's claiming $53,740.94.

12         MR. MOBERLY:  Correct.

13         THE COURT:  What's your position with regard to that?

14         MR. MOBERLY:  Well, without waiving the argument that

15    we -- the substantive argument with respect to the comparators

16    and the fact that it's somewhat arbitrary to be averaging and

17    then making the comparison, I understand this, and I'm not

18    going to wear myself out trying to argue that the numbers

19    should be different.  So --

20         THE COURT:  Okay.  So do you agree that she's entitled

21    to some pre-termination damages, and the $53,000 is kind of in

22    the range?

23         MR. MOBERLY:  Roughly close, yes.  I agree with both

24    of those things.

25         THE COURT:  All right.  So we're not -- that's not an

1    issue we're really going to have to spend much time on.

2          MR. MOBERLY:  That's correct.

3          THE COURT:  Okay.  Post-termination damages.  She came

4    up with $82,250, 75 percent of that, because of the nine

5    months.  I believe that's what we --

6          MR. MOBERLY:  Yeah.  Are you asking my position?

7          THE COURT:  Yeah.  What's your position on that?

8          MR. MOBERLY:  Yeah.  To the extent that was the right

9    time period, I would agree that's roughly correct.  We will

10   present --

11         THE COURT:  Well, the right time period meaning the

12   time that she received unemployment compensation?

13         MR. MOBERLY:  Correct.

14         THE COURT:  And we can get the exact number of days

15   from the evidence.

16         MR. MOBERLY:  Correct.

17         THE COURT:  But whatever those days are, you agree

18   she's entitled to post-termination damages?

19         MR. MOBERLY:  Correct.

20         THE COURT:  Okay.

21         MR. MOBERLY:  Without --

22         THE COURT:  What I'm hearing, I think, is that you

23   don't agree that it should be calculated based on an $82,250 a

24   year salary.  Or do you?

25         MR. MOBERLY:  Well, I don't waive the argument that I

```
1    think that's an arbitrary determination, but I don't know how

2    else --

3              THE COURT:  Okay.

4              MR. MOBERLY:  I'm not sure how to phrase that.

5              THE COURT:  So we don't need to spend a lot of time on

6    that either then.  True?

7              MR. MOBERLY:  With the exception that we don't -- we

8    don't agree with the period -- there will be evidence with

9    respect to the period she was receiving unemployment.

10             THE COURT:  Okay.  Well, whatever the period is, I

11   think you agree that she's entitled to post-termination

12   damages.

13             MR. MOBERLY:  I'm sorry.  You already asked me that.

14   That's correct.  I'm sorry.

15             THE COURT:  Okay.

16             All right.  Past lost benefits:  Compensation time.

17             MR. MOBERLY:  Well, I have -- I have two thoughts for

18   that.  Number one, any of these additional benefits would

19   logically be subject to the same ruling that you made with

20   respect to the lost compensation, because it's all a matter of

21   what evidence was presented with respect to efforts to

22   mitigate.  So this period is far, far too long, number one, for

23   that reason.

24             THE COURT:  Okay.  Let me just see if I summarize what

25   you're saying.
```

1              You're saying that you're entitled to know what her

2     compensation has been since the time she has left employment so

3     that you can factor in your right to claim mitigation?

4              MR. MOBERLY:  Right.

5              THE COURT:  And without the information that she

6     didn't give you, you can't do that calculation, and even though

7     these are benefits and not salaries, they all are subject to

8     mitigation.

9              MR. MOBERLY:  Sure, yeah.

10             THE COURT:  That's your position?

11             MR. MOBERLY:  Yep.

12             THE COURT:  So you're saying her compensation time pay

13    should be limited to the time period that we're talking about,

14    her post-termination pay, the period for which she received

15    unemployment compensation?

16             MR. MOBERLY:  Correct.

17             THE COURT:  Okay.  Would that be the same with regard

18    to vacation accrual, sick leave?

19             MR. MOBERLY:  It would, yes.  Retirement benefits too.

20             THE COURT:  State retirement?

21             MR. MOBERLY:  Yep.

22             THE COURT:  Student loan forgiveness?

23             MR. MOBERLY:  Well, I have a different argument for

24    that.  I think all these special damages were actually for the

25    earlier trial.  They're compensatory issues.  They're not

1   lost -- they're not back pay and front pay issues.

2           THE COURT:  Okay.  So you're saying that the special

3   damages, the student loan forgiveness, the early retirement

4   withdrawal penalty, the Thunderbird field trip, the Arizona

5   State Bar dues, and the medical benefits, those would be

6   special damages which should have been argued and presented to

7   the jury during the jury trial?

8           MR. MOBERLY:  Or at least subsumed within the verdict

9   that it issued.

10          THE COURT:  Okay.  Well, let me ask you this:  If

11  these special damages exceeded $300,000 and she has a $300,000

12  cap, then she would be precluded from even recovering her

13  special damages in that case?

14          MR. MOBERLY:  To the extent it exceeded the cap,

15  that's right.

16          THE COURT:  Okay.

17          MR. MOBERLY:  Oh, no, I'm sorry.  I'm sorry, I

18  misspoke.

19          That statute actually -- and, I'm sorry, I didn't

20  bring it with me.  It reflects only pain and suffering-type

21  damages.  The cap does not apply to hard costs.  I misspoke.

22          THE COURT:  So if she had presented this evidence to

23  the jury and they came up with special damages, then this would

24  be set aside and we'd be putting a cap only on the pain and

25  suffering and emotional distress damages, and this would be in

1    addition to that?

2         MR. MOBERLY:  Yeah.  And we would have presumably had

3    a slightly different form of verdict so that we could have

4    worked with that easier, but that's correct.

5         THE COURT:  All right.  What about attorneys' fees and

6    costs?

7         MR. MOBERLY:  Well, attorneys' fees and costs, I would

8    not -- I mean, we don't have those numbers actually laid out in

9    the fashion that we will at some point.

10        THE COURT:  Okay.

11        MR. MOBERLY:  She's entitled to them.  You know, we --

12        THE COURT:  And prejudgment interest?

13        MR. MOBERLY:  Yeah, prejudgment interest, I would

14   think.

15        THE COURT:  And what about her gross-up for increased

16   taxes?

17        MR. MOBERLY:  I mean, that -- I've never seen that

18   happen.  That seems ridiculous to me.

19        THE COURT:  All right.  And the front pay?  She's

20   claiming that she's unlikely to find a job in the next five or

21   ten years that will be equivalent with all the benefits and pay

22   and increase in pay she would received had she stayed with the

23   State Senate.

24        MR. MOBERLY:  Well, two arguments for that.  Number

25   one, the one you alluded to, which is -- I mean, there's plenty

1    of case law out there that says that front pay period is

2    limited, and it can vary some, but it's usually a year or two,

3    frankly.  I mean, sort of five, ten years, that, you just don't

4    see any of those cases.

5            But more fundamentally, that issue, those damages are

6    subject to the exact same mitigation ruling that you made.  It

7    makes no sense to say she can't recover back pay from the time

8    she ceased receiving unemployment benefits up to the date of

9    judgment but then, whoa, all of a sudden she can receive the

10   same type of loss for front pay from judgment forward.  So --

11   because mitigation applies to both.  So I think those damages

12   are precluded here.

13           THE COURT:  And finally, what's your position with

14   regard to her request for reinstatement?

15           MR. MOBERLY:  You know, we recognize, number one, that

16   reinstatement is the presumptive remedy here.  I'm not sure

17   what testimony Ms. Adams will give, so I want to reserve a

18   little bit of wiggle room on that.

19           THE COURT:  Well, let me ask you this:  Is it your

20   position that you're against it?

21           MR. MOBERLY:  No.

22           THE COURT:  Okay.

23           MR. MOBERLY:  Not based on -- we may change our

24   position based on testimony, but no, I -- no, we're not opposed

25   to it.

1          THE COURT:  Okay.  I think we've discussed all the

2     issues here.  I think all we're going to present evidence on,

3     then, is with regard to the damages.  We're not going to --

4     we're not going to have to have any more evidence or argument

5     regarding the cap unless Ms. Adams has evidence that there are

6     more than 200 employees at the State Senate.  Okay?

7          So I'm going to give -- if I gave each side an hour,

8     would that be ample time for presentation of evidence in this

9     case?

10          MS. ADAMS:  I believe so, Your Honor.

11          THE COURT:  Mr. Moberly?

12          MR. MOBERLY:  Definitely for us, Your Honor.

13          THE COURT:  Okay.  So each side has an hour.

14          And, Ms. Adams, you have the burden of proof on these

15     damages.  If you wish to proceed, you may, with your evidence.

16          MS. ADAMS:  Thank you, Your Honor.

17          THE COURT:  And for this portion of the hearing, you

18     won't need anybody to ask the questions for you.  You can just

19     get on the stand if you want to testify and tell me what you

20     have to say.

21          MS. ADAMS:  Oh, I understand.  Okay, great.  I have

22     counsel coming but not --

23          THE COURT:  I don't think that -- for trial to the

24     bench, I think we can have a discussion and you can testify and

25     explain things to me.  And if Mr. Moberly objects and it's a

1    sustainable objection, I'll sustain the objection.

2         MR. MOBERLY:  That's fine, Your Honor.  In the

3    interest of efficiency as well, there will obviously be some

4    foundational issues here.  I don't really want to be

5    interrupting this constantly to make them, but I don't want to

6    waive them either.

7         THE COURT:  No, no.  This is what this is for.  If

8    there's no foundation, I want you to raise the objection.

9         MR. MOBERLY:  Fair enough.

10        MS. ADAMS:  Thank you.  Thank you, Your Honor.

11        Do I understand Your Honor to say I should take the

12   witness stand?

13        THE COURT:  If that's -- if you're your first witness,

14   call yourself.  I'm not trying to tell you how -- I'm just

15   saying, when you are a witness, you can get on the stand and

16   testify without having someone ask you the questions.

17        MS. ADAMS:  I understand, Your Honor.  Thank you.

18        I am not sure if Sandy Reilly is present.

19        MR. MOBERLY:  She is.

20        MS. ADAMS:  Oh, okay.  I would like to call Sandy

21   Reilly.

22        THE COURT:  You don't need to ask her the same

23   questions you already asked her at the trial, which you

24   submitted in your objection, because I've already seen that and

25   considered it.

1          MS. ADAMS:  Yeah.  Your Honor, there is -- there is an

2      issue over the Senate payroll schedules for 2016, 2017, 2018,

3      and 2019.

4          THE COURT:  You mean the amounts?

5          MS. ADAMS:  No.  It's actually a document that

6      plaintiff offered for evidence, Mr. Moberly objected, and Your

7      Honor granted.

8          THE COURT:  Well, let me just -- he's agreed that you

9      are a State employee.  His only argument is that you didn't

10     name the State as a defendant.

11         So if this evidence is trying to establish that you

12     are a State employee, that's already been stipulated to,

13     essentially.

14         MS. ADAMS:  No.  I think the purpose of Ms. Reilly's

15     testimony is to establish the amount of salary and benefits

16     post-termination.

17         THE COURT:  Okay.  Well, you know, post-termination is

18     limited to those -- that nine -- approximate nine-month period

19     when you -- no, no, I'm sorry -- yeah.  When you were receiving

20     unemployment benefits.

21         You didn't produce the documents that you were ordered

22     to produce, and I excluded any claim of damages beyond that

23     time because the defendants weren't -- were entitled to

24     understand what the mitigation was and they couldn't do that

25     without the documents you were ordered to produce.

1          MS. ADAMS:  And to be clear, Your Honor, I disagree

2     with Mr. Moberly's assessment of the ruling.  I think the

3     ruling was explicitly clear that it was post-termination wage

4     damages and not benefits.  And I'd like the opportunity to look

5     at the ruling if I could.

6          THE COURT:  Well, if he's correct that he's entitled

7     to seek mitigation for all your post-termination employment,

8     then it applies to everything post-termination.

9          MS. ADAMS:  I don't think he cited any record, and I

10    don't think the Court's ruling was as it relates to mitigation.

11    Under the law, Your Honor --

12         THE COURT:  No, no.  It was explicitly related to

13    mitigation.  That's why I said you couldn't bring it in,

14    because he's entitled to that information so he can establish

15    what the mitigation is.  And we discussed that repeatedly.

16         MS. ADAMS:  Your Honor --

17         THE COURT:  So if it's -- if it's information that

18    pertains to income that you would have earned after your

19    unemployment, it's not going to be relevant or admissible.

20         MS. ADAMS:  And when you say "income," are you also

21    talking about compensation time?  Are you also talking about

22    vacation accrual?

23         THE COURT:  If Mr. Moberly is correct that he's

24    entitled to mitigation for that, yes, I am.  I don't know the

25    law on that without having looked at it.  If he's wrong, then

1   you're entitled to it.  But if he's right, and if it's

2   something that he's entitled to raise mitigation for, as

3   evidence against what you're presenting, then you can't do that

4   because you didn't present the evidence that he needed to

5   discuss mitigation.

6          MS. ADAMS:  Your Honor, the Court ruled on this matter

7   in the pretrial conference.  Mr. Moberly did not make this

8   objection.  He did not --

9          THE COURT:  Well, let me make it clear now.  If

10  it's -- if it's damages for which he's entitled to have your

11  income information so that he can present mitigation evidence

12  and you didn't present or produce that income information, even

13  though I ordered it, it's not going to come in.  Okay?

14         MS. ADAMS:  So as it relates to post-loss benefits,

15  the compensation time, the vacation accrual rate, the sick

16  leave accrual rate, the Arizona State Retirement match, it's

17  the Court's position that those -- those -- sick leave accrual

18  is subject to mitigation?  Vacation accrual is subject to

19  mitigation?

20         THE COURT:  No.  My position is if it is subject to

21  mitigation and you did not produce the evidence that he's

22  entitled to to establish the mitigation damages -- mitigation

23  of the damages, then it's not going to be considered as

24  damages.

25         Mr. Moberly has made a representation to me that he's

1    entitled to mitigation against that type of damage.  I haven't

2    researched that.  It sounds like it probably is.  I'm assuming

3    it probably is, because it's damages that could have been

4    mitigated by other income, but I don't know that for a fact.

5            You can present the evidence now, but if Mr. Moberly

6    is correct, the damages you're seeking beyond the time period

7    for which you were receiving unemployment compensation won't be

8    allowed.

9            MS. ADAMS:  I understand Your Honor's position.

10           I'd like to call Sandy Reilly, please.

11           THE COURT:  Okay.

12           MS. ADAMS:  And, Your Honor, to be clear, so we're

13   disallowing the testimony not knowing what the law is?  Is that

14   correct?

15           THE COURT:  No.  I'm saying I'm allowing it, but when

16   I rule on it I may not rule in your favor on it because of the

17   lack of production of documents ordered by the Court.

18           Ms. Reilly, would you come up here, please.  I know

19   you've already been sworn in, but we'll swear you in again.

20           MS. REILLY:  Okay.

21                       SANDY REILLY,

22   called as a witness herein by the Plaintiff, having been first

23   duly sworn or affirmed, was examined and testified as follows:

24           THE COURT:  You may proceed.

25           MS. ADAMS:  Thank you, Your Honor.

```
 1                    DIRECT EXAMINATION

 2    BY MS. ADAMS:

 3    Q.  Good morning, Ms. Reilly.

 4    A.  Good morning.

 5    Q.  When Ms. Adams filed the charge of discrimination with the

 6    employee -- the EEOC, were you the individual that provided the

 7    response?

 8    A.  Yes.

 9    Q.  And when you completed the response, you were completing it

10    on behalf of the Arizona State Senate?

11    A.  Yes.

12    Q.  And when you completed the number of employees that -- at

13    the Arizona State Senate, do you recall how many employees you

14    listed?

15    A.  No, I do not.

16            MS. ADAMS:  Okay.  Your Honor, I'd like to ask that

17    the witness be given Exhibit No. 1.

18            THE COURT:  Let me just -- so are we starting all over

19    again with a new numbering system for the exhibits from what we

20    had at the trial?

21            MS. ADAMS:  Yes, if that's okay, Your Honor.  If not,

22    I'm happy to re-mark it.

23            THE COURT:  No, I just need to know.

24            So this is not Exhibit No. 1 from the trial; this is

25    Exhibit No. 1 for this hearing?
```

1          MS. ADAMS:  Correct, Your Honor.

2          THE COURT:  Okay.

3          MR. MOBERLY:  In order to avoid confusion, I numbered

4     the witness -- or the exhibits that I presented today going

5     forward from the trial.

6          THE COURT:  Okay.  That's the way I would have

7     preferred it, but I don't want to take time to redo this, so

8     we'll just live with where we are.

9          Do we already have an Exhibit No. 1 at trial, Michele?

10    I assume we do.

11         MS. ADAMS:  I believe we do, Your Honor.

12         THE COURT:  Yeah.  We start with 1 normally.

13         Let me just ask, Michele, how confusing will this be

14    for you if we have two sets of numbers?

15         (The Court and the courtroom deputy confer.)

16         THE COURT:  All right.  So we're going to go ahead

17    with your numbering and not take time to renumber them.

18         MS. ADAMS:  Thank you, Your Honor.  It's my first

19    trial.  I apologize.

20    BY MS. ADAMS:

21    Q.  Do you have the document in front of you, Ms. Reilly?

22    A.  Yes.

23    Q.  Do you see the document Bates stamped AZSEN 0080?

24    A.  Yes.

25    Q.  And do you see where it says Arizona State Senate?

1   A.  Yes.

2   Q.  And to the right of that, do you see the number of

3   employees or members?

4   A.  I do.

5   Q.  And what is that number?

6   A.  500 or more.

7   Q.  Okay.

8   A.  I don't know where I got that, but --

9   Q.  You've answered the question.

10  A.  Yes.

11          MR. MOBERLY:  I'm sorry, Your Honor, I nodded off.

12  Did we move this into evidence or I --

13          MS. ADAMS:  Your Honor -- Your Honor, can I -- I offer

14  Exhibit No. 1 into evidence.

15          MR. MOBERLY:  No objection.

16          THE COURT:  Exhibit No. 1 is admitted into evidence.

17          (Exhibit No. 1 admitted into evidence.)

18          MS. ADAMS:  Thank you.

19  BY MS. ADAMS:

20  Q.  Ms. Reilly, when you submitted the respondent information,

21  do you recall the -- being asked the size or the number of

22  employees at the Arizona State Senate?

23  A.  No.

24  Q.  You don't?

25  A.  No.

1   Q.  Okay.  Do you recall submitting a number?

2   A.  No, I don't.

3   Q.  You do not?  Okay.

4           MS. ADAMS:  Your Honor, can I show the witness a

5   document?

6           THE COURT:  Yes.  You may approach.

7           MS. ADAMS:  Thank you.

8   BY MS. ADAMS:

9   Q.  Are you familiar with the document in front of you?

10  A.  No.

11  Q.  You have not seen it before?

12  A.  Not that I remember, but I'm looking.

13  Q.  Do you see where it says respondent information?

14  A.  Yes.  I don't know if this is a document I created, but --

15  I don't remember creating this document.

16  Q.  Okay.  Do you see the telephone number?

17  A.  I -- I see several -- I see yours.

18  Q.  Where it says respondent/charging party contact, respondent

19  information.

20  A.  Yes.

21  Q.  Arizona State Senate.

22  A.  Yes.

23  Q.  Is that your telephone number?

24  A.  No, it's not.  That is the phone number of the prior

25  comptroller.

1  Q.  Okay.  And do you see below, where it says the size?

2  A.  Yes.

3  Q.  What does it say?

4       MR. MOBERLY:  Objection.  Lack of foundation.  The

5  document isn't in evidence.  This witness doesn't -- isn't

6  familiar with it.

7       THE COURT:  What is this document?

8       MS. ADAMS:  Your Honor, this is the charge detail

9  inquiry from the Equal Employment Opportunity Commission in

10 which Ms. Reilly and/or respondent for the Arizona State Senate

11 submitted the size of employees as 501-plus employees.

12      THE COURT:  I'm not asking what's in it.  I'm just

13 asking what is it.

14      MS. ADAMS:  That's what it is.  It's a charge detail

15 inquiry.  It has contact information of both the charging party

16 and the respondent.

17      THE COURT:  Is this the EEOC or what is it?

18      MS. ADAMS:  The Senate produced the document.  It's

19 Bates stamped AZSEN 0079.

20      THE COURT:  I'm trying to understand.  Why was this

21 document -- I don't know what this document -- can I take a

22 look at it?

23      Thank you.

24      So it's an EEOC document?

25      MS. ADAMS:  Correct.

1              THE COURT:  Okay.

2         All right.  And the objection is what?

3              MR. MOBERLY:  Well, first of all, it's lack of

4    foundation; but secondarily, in view of that clarification,

5    it's also relevance.

6              THE COURT:  Well, if it has the number of employees

7    that is being alleged to be Senate employees and if it's a

8    statement from the Senate, that would be relevant, wouldn't it?

9              MR. MOBERLY:  Is that -- is that what it is, though?

10             THE COURT:  I don't know.  I'm just trying --

11             MR. MOBERLY:  That's sort of my objection.

12             THE COURT:  I think that's what she's offering it for.

13   But let me ask, what foundation is lacking?

14             MR. MOBERLY:  Whoever was the scrivener of the

15   document.  I mean, we don't know if that's actually -- look,

16   I've got a little bit of a problem in that we were not provided

17   with any of the exhibits that the plaintiff is using here

18   today, so I don't have that document in front of me.

19             THE COURT:  All right.  Sustained.

20             I think I ordered that the parties exchange exhibits

21   and witnesses before today.  And if that exhibit hasn't been

22   produced this late in the game, I'm going to sustain it based

23   on lack of disclosure.

24             MS. ADAMS:  Your Honor, a list of exhibits was sent to

25   Mr. Moberly.

1          THE COURT:  Was that document included?

2          MS. ADAMS:  There were no documents included.

3          THE COURT:  Okay.  Sustained.

4          MS. ADAMS:  Okay.

5    BY MS. ADAMS:

6    Q.  Ms. Reilly, you're the comptroller at the Arizona State

7    Senate, correct?

8    A.  Yes.

9    Q.  And do you participate in payroll for the Arizona State

10   Senate?

11   A.  Yes.

12   Q.  Do you know the salaries of individuals at the Arizona

13   State Senate?

14   A.  Yes.

15   Q.  Do you know the current salary of Garth Kamp?

16   A.  No.  I would have to look that up.

17   Q.  Okay.  What about Jeff Winkler?

18   A.  I do not.

19   Q.  And is Mr. Winkler still employed with the Arizona State

20   Senate?

21   A.  Yes.

22   Q.  And what is his role?

23   A.  He is the Democratic chief of staff.

24   Q.  Okay.  And he was the Democratic chief of staff when

25   Ms. Adams was at the Arizona State Senate; is that correct?

1   A.  He was one of the Democratic chief of staffs while she was

2   employed.

3   Q.  Okay.  He was the Democratic chief of staff when Ms. Adams

4   was terminated from her position; is that correct?

5   A.  Yes.

6   Q.  As it relates to the compensation time that the Senate

7   awards, are you familiar with the amounts that are awarded each

8   year?

9   A.  I'm sorry, could you rephrase that?

10  Q.  Yes.  The compensation time.  It's a fringe benefit --

11  A.  Oh, okay.  Uh-huh.

12  Q.  -- of being an employee; is that correct?

13  A.  Yes.

14  Q.  And are you familiar with the amount of compensation time

15  that's awarded each year?

16  A.  Yes.

17  Q.  And what is that amount?

18  A.  It varies for employees.

19  Q.  Okay.  For policy advisors, are you familiar?

20  A.  As I said, I don't know exactly what everybody gets.  I'd

21  have to have the sheets in front of me for all the years.

22  Q.  Okay.  You testified at trial the Senate pays Bar

23  Association dues; is that correct?

24  A.  Yes.

25  Q.  And that's for its licensed attorneys; is that correct?

1    A.  Yes.

2    Q.  And that's a continuation with the Arizona State Senate?

3    A.  Yes.

4    Q.  Okay.  Other fringe benefits received are medical, dental,

5    vision, and life insurance; is that correct?

6    A.  I don't know if you'd call it a fringe benefit, but it is a

7    benefit that's offered to employees.

8    Q.  Okay.  Is there additional benefits, fringe or otherwise,

9    that you would -- that you can think of?

10   A.  Other than benefits, annual leave, no.

11   Q.  Okay.  And annual leave is paid out to an employee when

12   they leave State service; is that correct?

13   A.  Yes.

14   Q.  And how is that calculated?

15   A.  It is calculated on the amount of hours that they need to

16   be paid out by their salary, their hourly rate.

17   Q.  Okay.  I don't think I have any further questions for --

18   oh, one question as it relates to COBRA.

19            Are you familiar with COBRA?

20   A.  A little.

21   Q.  Okay.

22   A.  Not very much.

23   Q.  Okay.  Arizona State employees that work at the Arizona

24   State Senate are entitled to receive COBRA benefits upon

25   termination; is that correct?

1    A.   Yes.

2    Q.   Okay.  And are you involved in arranging or participating

3    in a COBRA decision?

4    A.   No.

5    Q.   Okay.  And the COBRA is an extension of the healthcare

6    benefits that are provided to employees at the State of

7    Arizona?

8    A.   Yes.

9    Q.   And that includes healthcare insurance, vision, dental?

10   A.   Yes.

11   Q.   Okay.  Does it include the life insurance?

12   A.   No.

13   Q.   Okay.

14        MS. ADAMS:  Okay.  I don't believe I have any further

15   questions for you.  Thank you.

16        THE COURT:  Cross-examination.

17        MR. MOBERLY:  No, Your Honor.

18        THE COURT:  No cross-examination?

19        MR. MOBERLY:  No.

20        THE COURT:  Okay.  You may step down.  Thank you for

21   coming.

22        (Witness excused.)

23        THE COURT:  Ms. Adams, you may call your next witness.

24        MS. ADAMS:  Your Honor, I will take the stand.  I

25   would like to know if Mr. Reilly's going to object to any

1    exhibits that I offer.

2              THE COURT:  Mr. Reilly?  You mean Mr. Moberly?

3              MS. ADAMS:  Oh, thank you very much, Your Honor.

4    Mr. Moberly.

5              MR. MOBERLY:  Yes, Your Honor.  I do think the

6    plaintiff should be precluded from introducing any documentary

7    evidence based on her failure to comply with your order that we

8    exchange documents.

9              THE COURT:  Well, if there are documents that were

10   previously disclosed in the case, that's one thing.  But if

11   it's -- if these are brand-new documents that you've never

12   seen, that's another thing.

13             But I'm not going to rule now until she makes the

14   offer, so let's go ahead and -- you may take the stand.

15             MS. ADAMS:  Your Honor, all documents have been

16   previously disclosed, most by the Senate itself.

17             THE COURT:  No.  I know this is your first trial, but

18   when we say "disclosed," we talk about disclosed as exhibits at

19   trial, because there may be tens of thousands of documents and

20   I don't expect everyone to go through every one of them and

21   say, "I know all of these."  I want you to tell exactly what

22   documents are to be used at trial.  That's how we do it.

23             MS. ADAMS:  Understood, Your Honor.

24

25

1                          TALONYA ADAMS,

2    called as a witness herein by the Plaintiff, having been first

3    duly sworn or affirmed, testified as follows:

4              THE COURT:  You may proceed.

5              MS. ADAMS:  Thank you, Your Honor.

6              My name is Talonya Adams.  I'm the plaintiff in this

7    matter, and I am here providing testimony as it relates to

8    damages sustained by me after I was wrongfully terminated at

9    the Arizona State Senate.

10             THE COURT:  And to help me follow you, would you --

11   when you get to each damage, start with, "Now I'm going to talk

12   about this damage," so I know exactly which one you're talking

13   about.

14             MS. ADAMS:  Yes, Your Honor.

15             So at this point I would like to speak about the

16   pre-termination damages.  Pre-termination damages --

17             THE COURT:  Just -- I think you've got an agreement

18   from Mr. Moberly that you're entitled to those.  The only

19   question I think left is the amount of time that you were on

20   unemployment, so we can just do the math on how much you'd

21   receive during that period of time.

22             MS. ADAMS:  Okay.  Is that -- can we confirm that

23   agreement so I'm not subjected to the door being left ajar?

24             THE COURT:  Mr. Moberly's already said that.  He says

25   he agrees that you're entitled to pre-termination damages.  He

1    doesn't exactly agree with the way you've calculated it, but he

2    doesn't know a better way of calculating the base salary, so I

3    think he's essentially conceded the $82,250.  And -- but he

4    said, "I don't understand exactly how many weeks or months you

5    were on unemployment so that we can make that calculation."

6              MS. ADAMS:  Understood, Your Honor.

7              THE COURT:  Mr. Moberly, did I accurately state what

8    you've said?

9              MR. MOBERLY:  Said it even better than I did, Your

10   Honor.

11             THE COURT:  Okay, thank you.

12             All right.

13             MS. ADAMS:  I will speak to the post-termination

14   damages commencing on February 16, 2015.

15             THE COURT:  Okay.

16             MS. ADAMS:  As it relates to post-termination damages,

17   I was effectively terminated by the Arizona State Senate

18   February 13, 2015.  At that time my salary was $60,000.

19             The next day of business was February 16, 2015, and I

20   worked the entire week.  I was unpaid for that week.  I was a

21   salaried employee entitled to full salary benefits for any week

22   in which I worked.

23             I am seeking payment of salary benefits for the week

24   of February 16th.  February 16, 2015, was a holiday in which

25   eight hours of holiday pay was given to any employee that

1    worked.  Senate employees received eight hours of holiday pay.

2    I did not.  I worked on February 16, 2015.  I did not receive

3    holiday pay.

4             THE COURT:  Let me just interrupt.  Are you asking for

5    more than the full week's pay for that week?

6             MS. ADAMS:  Yes, Your Honor.  I'm asking for exactly

7    what every other Senate policy advisor received, which is one

8    week of salary's pay and eight hours of holiday pay.

9             THE COURT:  So when there's a holiday, State employees

10   at the Senate get both their pay plus an additional eight hours

11   of holiday pay?

12            MS. ADAMS:  I believe it's at the discretion of Wendy

13   Baldo, and it depends on whether the holiday is during the

14   legislative session or not.

15            THE COURT:  So during the holiday week, the Senate

16   employees get 48 hours for the week instead of just 40?

17            MS. ADAMS:  I believe they get their 40 hours of

18   salaried pay and then eight hours of vacation or holiday --

19   leave accrual.

20            THE COURT:  Okay.  Because my experience has been that

21   employees get the full 40 hours but they only work 32 hours.

22   That's different at the Senate?

23            MS. ADAMS:  It's not the case at the Arizona State

24   Senate.

25            THE COURT:  All right.  So you're claiming for the

1    week of February 16th, 48 hours; eight hours of -- 40 hours of

2    work plus eight hours of holiday pay?

3            MS. ADAMS:  Correct, Your Honor.

4            THE COURT:  Okay.  Does the Senate pay overtime?

5            MS. ADAMS:  It does not.

6            THE COURT:  Okay.

7            MS. ADAMS:  Continuing with post-termination damages,

8    I applied for unemployment on or about March 2nd of 2015.  I

9    received my last unemployment check on or about the third week

10   of November, 2015.

11           THE COURT:  Around November 21st?

12           MS. ADAMS:  I believe so, Your Honor.

13           THE COURT:  Okay.  During that period from March 2nd

14   through November 21st, was there any time when you did not

15   qualify for unemployment pay?

16           MS. ADAMS:  At all times I qualified for unemployment

17   pay, even beyond November of 2015.  There were times when I did

18   not receive unemployment pay.

19           THE COURT:  And do you know why?

20           MS. ADAMS:  In 2015, in July I believe of 2015, I

21   opened my law firm, and I did not draw unemployment that month.

22   I thought I was going to be just fine.

23           THE COURT:  All right.  So you opened your law firm,

24   and how many weeks did you not apply for and receive

25   unemployment pay?

1          MS. ADAMS:  I think it may have been about three to

2     four weeks.

3          THE COURT:  In July?

4          MS. ADAMS:  In July of 2015.

5          THE COURT:  Any other time?

6          MS. ADAMS:  I believe -- I believe that's -- I believe

7     that's it.

8          THE COURT:  Okay.  So if we were to take all -- your

9     unemployment compensation, you received unemployment

10    compensation from March 2nd, 2015, to November 21, 2015, except

11    for three weeks in July of 2015?

12         MS. ADAMS:  I think roughly, yes.

13         THE COURT:  Okay.  All right.

14         MS. ADAMS:  At all times -- well, from the date of

15    termination, February 13, 2015, until May of 2016, I was

16    attending an executive MBA program at the Thunderbird School of

17    Global Management.

18         After termination at the Arizona State Senate, I

19    continued with the program because the program cost $91,500

20    tuition, and I understood that I needed to mitigate my damages.

21         MR. MOBERLY:  Excuse me, Your Honor.  I assume I can

22    have a continuing objection with respect to the issues we

23    covered in terms of what's recoverable here as opposed to --

24         THE COURT:  Okay.  I'm allowing her to put on all the

25    evidence regarding damages because you haven't given me any

1    authority that says she's not entitled to recover these other

2    damages due to the lack of evidence regarding mitigation.

3            Once I have that authority, then I can sort it out.

4    But I want to get all the evidence in now so I can hear it.

5            MR. MOBERLY:  I just didn't want to waive or interrupt

6    unnecessarily.

7            THE COURT:  All right.

8            MS. ADAMS:  Your Honor, if there's an objection by

9    opposing counsel, I prefer that it be stated in real time or

10   waived.

11           THE COURT:  I'm sorry?

12           MS. ADAMS:  If he has an objection, I would prefer

13   that he state it in real time or that the objection be waived.

14           THE COURT:  Well, I don't want him interrupting you.

15   I know his objection is an objection about the damages you're

16   testifying about.  I've already talked about that.  You know

17   what his objection is.  I know what it is.  Let's don't waste

18   time with his objections.

19           MS. ADAMS:  Okay.  Thank you, Your Honor.

20           From 2000 -- July of 2015 until present, I have been a

21   sole practitioner lawyer at a law firm called 1700 West Law,

22   PLLC.  Upon commencing my law practice, I incurred substantial

23   cost to launch the firm and depleted -- and close to depleted

24   my retirement for purposes of moving forward in my business.

25           I've withdrawn roughly $36,000 in retirement benefits

1   to help fund my law practice and to subsidize my living

2   expenses after being wrongfully terminated at the Arizona State

3   Senate.

4          As a sole practitioner at 1700 West Law, I do not

5   receive compensation pay.  I do not receive vacation accrual.

6   I do not receive sick leave accrual.

7          I am required to pay my Bar dues to the Arizona State

8   Bar Association to maintain my Bar license, and I have done

9   that, in 2016 in the amount of $490; in 2017, in the amount of

10  $505; in 2018, in the amount of $505; in 2019, in the amount of

11  $505.  In addition, I pay continuing legal education courses to

12  maintain my Bar license.

13         THE COURT:  And those are courses that the State

14  Senate would have paid for had you stayed employed there?

15         MS. ADAMS:  They do pay -- they -- strike that, Your

16  Honor.

17         To my knowledge, they do not pay for continuing legal

18  education courses, but they do allow employees to leave and

19  participate in continuing legal education courses without a

20  reduction in their salary.

21         THE COURT:  Okay.

22         MS. ADAMS:  From February 13, 2015, until present, I

23  have been primarily without medical benefits.  In December of

24  2018, I was unexpectedly hospitalized, which resulted in a

25  hospital CAT scan in the amount of $512.  That remains

1    outstanding.

2              THE COURT:  And, Mr. Moberly, would you have any

3    objection if I considered her answers to my questions when we

4    had this first discussion as her testimony about these damages?

5              MR. MOBERLY:  I would not.

6              THE COURT:  Okay.  So, Ms. Adams, we had a discussion

7    and you laid out your damages for me.

8              MS. ADAMS:  Yes.

9              THE COURT:  You weren't under oath at the time, but

10   you previously were sworn before -- at the last trial.  I'm

11   going to consider that discussion as testimony for purposes of

12   establishing damages in this case.

13             MS. ADAMS:  Okay.

14             THE COURT:  Okay?

15             MS. ADAMS:  Yes, Your Honor.

16             THE COURT:  So you -- I think you've covered most of

17   all your damages.  Now I want any details you want to tell me

18   about.

19             MS. ADAMS:  Very good.

20             Your Honor, I want to make one clarification on the

21   record.  As it relates to post-wage damages, the calculation

22   is -- has not been made at $82,250.  And that is because unlike

23   Ms. Adams, whose salary remained frozen at $60,000 year in and

24   year out, every other policy advisor received pay increases and

25   pay raises well outside of $82,250.

TALONYA ADAMS - DIRECT TESTIMONY                                    59

1            THE COURT:  So I'm trying to understand.

2    Post-termination till judgment, I had the figure of $82,250,

3    and it was for a period of about nine months.

4            MS. ADAMS:  Of that calculation, yes.  And in my

5    calculation, I did not use the $82,250.

6            THE COURT:  What number did you come up with?

7            MS. ADAMS:  I used the number that my replacement --

8    my white male counterpart replacement was paid, which I believe

9    was the equivalent of $108,000 a year.

10            THE COURT:  So what are you claiming for your

11   post-termination damages for wages?

12            MS. ADAMS:  For the wages alone, and I do not waive

13   the benefits, I would claim that it's roughly nine months

14   times -- 9/12 of $108,000.

15            THE COURT:  So 3/4 of something gives me how much?  A

16   hundred and --

17            MS. ADAMS:  Eight.

18            THE COURT:  108,000?  So you're claiming roughly

19   $125,000 would be the salary you'd be employed at?

20            MS. ADAMS:  I think it would have to be less than

21   $108,000, Your Honor.

22            THE COURT:  Oh, for the total year?

23            MS. ADAMS:  Oh, yes.

24            THE COURT:  So the total amount you're claiming,

25   you're claiming nine months at $108,000 annual salary?

1          MS. ADAMS:  Correct, Your Honor.

2          THE COURT:  So it's 3/4 of 108?

3          MS. ADAMS:  Correct, Your Honor.

4          THE COURT:  Okay.  So that comes to 27,000 -- 27 times

5    3, that's 81,000?

6          Okay.  Go ahead.

7          MS. ADAMS:  Thank you, Your Honor.

8          In addition, while I was at the -- while I was at the

9    Arizona State Senate, individuals -- oh, I'm sorry we're not

10   talking about pre-wage.  Let me just go to the Thunderbird.

11         While I was at the Arizona State Senate, I signed an

12   employer agreement with the Arizona State Senate for purposes

13   of attending the Thunderbird School of Global Management.

14   During that period of time, Mr. -- Ms. Wendy Baldo was the

15   other signatory on that document.  And during that period of

16   time, it was agreed that I would be able to attend field

17   seminars outside of the legislative session.

18         In October of 2014, the Thunderbird School of Global

19   Management was acquired by Arizona State University and subject

20   to lose its accreditation within one year.  During that period

21   of time, I sought, pursuant to my agreement with Ms. Baldo and

22   the Arizona State Senate, an opportunity to travel with my

23   cohort in March of 2015.  It was denied.

24         Based on that denial, I did not submit the field

25   seminar deposit, I did not apply for visas to China, and I did

1    not attend the field seminar in March of 2015, although I had

2    been terminated the second week of February in 2015.

3            As a result, I incurred an out-of-pocket expenditure

4    that I would not have otherwise incurred in the amount of

5    $8,750.

6            THE COURT:  What was that for?

7            MS. ADAMS:  That was to travel with a -- with a group

8    of students for a field seminar -- it wasn't really a field

9    seminar.  They tried to re-create a field seminar for purposes

10   of me being able to meet graduation requirements in that now

11   one-year teach-out period.

12           THE COURT:  So you had to make up for not going to

13   China?

14           MS. ADAMS:  That's correct.

15           THE COURT:  And that cost you $8,100?

16           MS. ADAMS:  No.  It cost me about $8,750.

17           THE COURT:  Did you say 80,000?

18           MS. ADAMS:  No, 8,000 --

19           THE COURT:  8,000.

20           MS. ADAMS:  -- 750 dollars.

21           THE COURT:  All right.

22           MS. ADAMS:  Outside of the $91,500 I was already

23   paying for.  And I'm seeking reimbursement for that -- for that

24   figure.

25           THE COURT:  And that relates to what, the termination

1    or the discrimination or what?

2         MS. ADAMS:  Well, yes, Your Honor.  I think all of it

3    relates to the cascading damage and injury that Ms. Adams --

4    that I have suffered as it relates to this wrongful termination

5    and the race and sex discrimination retaliation based on my

6    employment at the Arizona State Senate.

7         THE COURT:  Whoa, whoa, whoa.  The reason you didn't

8    go is because they wouldn't authorize it.

9         MS. ADAMS:  They would not authorize it, correct.

10        THE COURT:  It's not because you were -- you already

11   made that determination that you couldn't go.  So the question

12   is, what is your belief as to why they did not authorize it?

13   Did you -- is there evidence that supports it was based on

14   something other than just a business decision they were making?

15        MS. ADAMS:  I believe so, Your Honor.  I think the

16   trial testimony was that Ms. Baldo had indicated she would

17   approve it if I could obtain the approval of the chief of staff

18   and the minority leader.  The minority leader and the chief of

19   staff indicate that's the basis of my termination is that I --

20   I think the word specifically was "just couldn't accept no for

21   an answer."

22        THE COURT:  Okay.  All right.

23        MS. ADAMS:  The student loan forgiveness, under the

24   Student Loan Forgiveness Act, the Arizona -- not just Arizona

25   State employees, but state employees, public servants are

1    eligible for student loan forgiveness after ten years of

2    service.

3              When I -- when I accepted the role as policy advisor

4    in the Arizona State Senate, the salary was lower than I had

5    requested or desired.  I provided a counteroffer.  It was

6    declined.

7              And part of my decision and rationale in accepting a

8    $60,000 job at the State of Arizona was that I would be

9    eligible for student loan forgiveness after ten years of

10   service.  And so that was a meaningful economic factor in

11   determining to take the role absent acceptance of the Senate's

12   counteroffer.

13             THE COURT:  What was your student loan amount at that

14   time when you took the offer?

15             MS. ADAMS:  At that time, I believe I had about

16   $180,000 in student loans.

17             THE COURT:  Okay.

18             MS. ADAMS:  And that does predate my enrollment in

19   Thunderbird.

20             I think that's the extent of the damages.

21   Initially -- I don't know if Your Honor is interested in

22   hearing about initial attorneys' fees or costs.

23             THE COURT:  That's something that will be cited at a

24   separate time, in a separate pleading.

25             MS. ADAMS:  Okay.

64

1          THE COURT:  You'll file an application for attorneys'

2     fees, and they'll have a chance to object if you have an

3     itemization.

4          MS. ADAMS:  Okay.  I don't believe I have any

5     further damages to speak to.

6          As it relates to preinterest judgment, I think that is

7     agreed and stipulated.

8          As it relates to gross-up, that is an amount that

9     is --

10          THE COURT:  I understand what it is.

11          MS. ADAMS:  Okay.

12          THE COURT:  It's just unusual.

13          MS. ADAMS:  I don't think it is unusual.

14          THE COURT:  Well, in court, it is.  I understand what

15     your damage is, and I think you may end up in a higher tax

16     bracket and may pay higher taxes.  I just don't know that

17     that's a recoverable damage.  I probably would want some

18     briefing on that.

19          MS. ADAMS:  I would be happy to brief on that, Your

20     Honor.

21          THE COURT:  I haven't seen that claim made before, but

22     that is a definite loss that you've sustained if that's what

23     happens with you.  If you have to pay higher taxes because of

24     the one-time payment, there is a loss.  The question is is it a

25     recoverable loss.  I just don't know that.

1          MS. ADAMS:  Thank you, Your Honor.

2          Reinstatement.  I originally pled for reinstatement of

3     my job.  When this litigation was filed and --

4          THE COURT:  Are you still seeking reinstatement?

5          MS. ADAMS:  Your Honor, my understanding of the case

6     law is that reinstatement must be sought if front pay in lieu

7     of reinstatement is desired.  I think reinstatement -- I do

8     seek to be reinstated as an Arizona State Senate policy

9     advisor.  I have my law practice in which I would need time to

10    wind the practice down.

11         I would accept equitable -- an equitable annual salary

12    of no less than a hundred thousand dollars and annual accrual

13    vacation and sick leave at a rate of 6.47 hours per pay cycle,

14    80 annual hours of compensation time, and also reinstatement of

15    my medical, dental, vision, and life insurance benefits at the

16    Arizona State Senate.

17         In addition to that, I would ask that my State service

18    seniority date remain intact of October of 2012.

19         THE COURT:  Okay.

20         All right.  This looks like a good time for a break.

21    Let's take 15 minutes, come back at 10 minutes to 11:00.

22         MS. ADAMS:  Thank you, Your Honor.

23         (Recess taken, 10:31 a.m. to 10:51 a.m.)

24         THE COURT:  Ms. Adams, do you have anything further to

25    present?

1          MS. ADAMS:  Yes, Your Honor, I do.

2          THE COURT:  Okay.  You may proceed.

3          MS. ADAMS:  Last week I went onto -- or earlier this

4    week, I apologize, I went onto the Arizona State employee

5    website, and I searched for names.  And under the search, I

6    looked for individuals that had worked at the Arizona State

7    Senate in a policy advisor role at the same time in which I

8    did.  And all but one was still remaining there at the Arizona

9    State Senate, including Mr. Jeff Winkler in his chief of staff

10   employment.

11          And so as it relates to the request for reinstatement

12   today, there is a request in tandem that the Court issue --

13   should the Court issue reinstatement and deem it appropriate,

14   that the Court, A, provide time for me to transition my

15   practice; B, allow for some recovery of damages as relates to

16   commercial lease -- my commercial lease; C, provide injunctive

17   relief as it relates to my return to the Arizona State Senate

18   to the extent that I will be managed by Mr. Winkler and

19   Ms. Baldo at the Arizona State Senate.  And --

20          THE COURT:  So what does that mean?

21          MS. ADAMS:  Your Honor, in my review of case law, the

22   Court can allow for reinstatement but also provide provisional

23   injunctive relief that in the event discriminatory acts

24   continue to occur and/or commence, I would be able to return

25   back to this court to seek injunctive -- you know, injunctive

1    relief as it relates to the discriminatory conduct at the

2    Arizona State Senate.

3              THE COURT:  Okay.  So I'm trying to understand.  When

4    you say you're asking me to issue injunctive relief, you're

5    basically asking me to give you the authority to come back and

6    ask for injunctive relief?  Is that what you're saying?

7              MS. ADAMS:  No, Your Honor.  I'm asking for injunctive

8    relief in tandem with any order to reinstate that would

9    allow --

10             THE COURT:  Okay.  Tell me specifically what the

11   injunctive relief is you're asking me to impose.

12             MS. ADAMS:  That the Senate not discriminate against

13   Ms. Adams or anyone else based on their race or sex or

14   retaliate against them based on -- you know, as a violation of

15   Title VII.

16             THE COURT:  Okay.  So you want me to order them to

17   obey the law.  Is there anything else you want me to order them

18   to do?

19             MS. ADAMS:  Your Honor, I would like the opportunity

20   to speak with counsel and reserve any additional elements to

21   that --

22             THE COURT:  Okay.

23             MS. ADAMS:  -- injunctive relief request.

24             THE COURT:  All right.  Anything else?

25             MS. ADAMS:  No, Your Honor.  I don't have anything

1  further.

2          THE COURT:  When we were first talking, we talked

3  about the idea that you wanted me to find the State to be the

4  employer even though the State was not a named defendant, and

5  you said you had case law.  Have you had a chance to research

6  that over the break and come up with the case law?

7          MS. ADAMS:  Yes, Your Honor.  I'm quite sleep

8  deprived.  I know the case law that I initially relied on was a

9  case --

10          THE COURT:  Just, all I need is the citation so I can

11  review that.

12          MS. ADAMS:  I believe it's *Diaz*, D-I-A-Z, *v. Oklahoma*

13  *Bureau of Narcotics*.  It's WD.Okla.2016.  The cite is

14  224 F.Supp.3d 1215.

15          THE COURT:  All right.  Thank you.

16          MS. ADAMS:  You're welcome.

17          THE COURT:  All right.  And with regard to other

18  briefing, there's an issue outstanding that I want counsel --

19  both sides to brief, no more than five pages, and that's the

20  effect of the failure to disclose evidence of income after

21  termination in light of my ruling that the lack of disclosure

22  precludes evidence or a claim for damages for which mitigation

23  could have been claimed, as it pertains to the damages she's

24  claimed -- that Ms. Adams is claiming now was not addressed in

25  my earlier ruling.

1            The ruling was basically that without the mitigation

2     evidence produced that was ordered, that certain evidence would

3     not -- certain damages would be precluded beyond a certain

4     point.  And I want to just -- both sides to address how the

5     lack of mitigation of damages and evidence would affect those,

6     if they would be any different than the damages that were

7     claimed as post-termination damages for lost wages, if those

8     other damages would be treated any differently under the law.

9            And secondly, some of the damages being claimed are

10    special damages that are being argued by the defense should

11    have been raised and presented to the jury and not at this

12    special hearing to determine the specific damages allowed under

13    the statute.  I'd like that to be briefed by no longer than

14    five pages by both sides.

15           So I want the defense to file the initial motion to

16    preclude those damages so that Ms. Adams knows specifically

17    which damages you are claiming are precluded by having not been

18    presented to the jury.  Okay?

19           And I'd like those briefings in -- how much time does

20    each side need?

21           Mr. Moberly, since you'll be filing the first opening

22    salvo, how much time do you need to get that brief in?

23           MR. MOBERLY:  The end of next week?  Is that too long?

24           THE COURT:  That's fine.  Okay.  So get that in to me

25    by next Friday, which would be the -- 27th?

1          THE COURTROOM DEPUTY:  23rd.

2          THE COURT:  23rd?  Okay.  The 23rd.

3          And, Ms. Adams --

4          MR. MOBERLY:  Excuse me, Your Honor.  Am I filing the

5     opener of both briefs?

6          THE COURT:  Yes.  File the opener of both so Ms. Adams

7     knows what you're claiming so she can address them.

8          Ms. Adams, how much time do you need to respond?

9     Would a week be enough time?

10          MS. ADAMS:  Your Honor, I would prefer ten days if I

11     could have it.

12          THE COURT:  Okay.  So the 23rd, and then

13     September 2nd?

14          MS. ADAMS:  I don't know what day that is, but yes.

15          THE COURT:  Oh, that might be a holiday.  Hang on.

16          Can we back up this up a few days?  Can you do your

17     response by no later than next Wednesday -- your opening brief

18     by next Wednesday?

19          MR. MOBERLY:  Yes, Your Honor.

20          THE COURT:  Because I don't want to get into these --

21     so the defense will file the opening briefs on both issues by

22     no later than a week from today, the 21st.

23          And then the response will be due August 31st.

24          MS. ADAMS:  Yes, Your Honor.

25          THE COURT:  That avoids the complications of the

1  holiday.

2          Okay.  All right.  Cross-examination.

3          MR. MOBERLY:  Please, Your Honor.

4          THE COURT:  Oh, and one last thing.  When we talk

5  about damages, reinstatement, Ms. Adams has asked me to order a

6  specific damage -- specific pay amount.  Include that in your

7  briefing as well.

8          I don't know if I can -- whether I have authority to

9  order, if I order reinstatement, a specific pay or anything

10  else specific along with that employment other than the

11  reinstatement at the usual and customary pay for someone in

12  that position, and assuming it will be without any prejudice or

13  racial bias or -- regarding the sex or race.

14          Okay.

15          MR. MOBERLY:  Did you want that briefing separately or

16  did you see it as fitting into one of the others?

17          THE COURT:  I see it fitting into the damages.

18          MR. MOBERLY:  Damages, okay.

19          THE COURT:  Is five pages enough?

20          MR. MOBERLY:  Five pages sounds pretty good to me,

21  Your Honor.

22          THE COURT:  Okay.

23          MR. MOBERLY:  Your Honor, may I approach the bench

24  just to give a list of exhibits that I may use?

25          THE COURT:  You may.

1        Ms. Adams, is five pages enough for you?

2        MS. ADAMS:  In each reply?

3        THE COURT:  Yeah.

4        MS. ADAMS:  Yeah.  I think as it relates to the

5   reinstatement, Your Honor, I would prefer to have a lengthened

6   page limit, if it's going to go into -- unless we can determine

7   what the proposed usual and customary pay would be today, it

8   would be helpful to know kind of what their baseline is.

9   They've made no offer of reinstatement or employment.  As of

10  two days ago, Mr. Reilly [sic] said there was no position

11  available for me.

12       THE COURT:  So seven pages, then, for your response?

13       MS. ADAMS:  Yes, Your Honor.

14       THE COURT:  Okay.  Mr. Moberly, you may proceed.

15       MR. MOBERLY:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. MOBERLY:

18  Q.  Ms. Adams, do you still have Exhibit No. 1 in front of you?

19  A.  Yes, I do.

20  Q.  Okay.  And that is -- that's the charge of discrimination

21  and a cover sheet; is that correct?

22  A.  Correct.

23  Q.  The charge document -- and this is the document that had

24  the number of employees, 500 or more.  You realize that

25  document is not prepared by the Senate, don't you?

1    A.  Yes, I -- yes, I do.

2    Q.  In fact, it's essentially your document, isn't it?

3    A.  No, it is not.

4    Q.  So your name doesn't appear on the bottom of it?

5    A.  I did sign the document, yes.

6    Q.  So the document is prepared by the EEOC in conjunction with

7    you, and you review it, and if it appears to be accurate, you

8    sign it; is that correct?

9    A.  I -- I believe so.

10   Q.  Okay.  And the date of your signature, it looks like, is

11   July 23rd, 2015?

12   A.  Yes.  The date of -- that is the date of the signature.

13   Q.  Okay.  Does that ring a bell as probably the time it was,

14   in fact, signed?

15   A.  I believe so.

16   Q.  Okay.  Are you familiar enough with Title VII to know what

17   the statute of limitations for back pay is?

18   A.  I -- I could venture a guess, but I'm happy to allow you to

19   tell me.

20   Q.  Okay.  Why don't I ask you, does two years sound familiar?

21   A.  It could sound familiar.

22   Q.  Okay.

23   A.  From what period of time?

24   Q.  We'll look at that, then, so we aren't just floundering a

25   little bit.

1    A.  Okay.

2    Q.  Take a look at Exhibit No. 273.

3    A.  I have it.

4    Q.  That looks like a statute, doesn't it?

5    A.  Yes.

6    Q.  Okay.  Would you turn to Section 2005 -- 2000e-5(g),

7    (g)(1).  I believe it's on page 1493.

8    A.  Yes.

9    Q.  And you look about two-thirds or three-quarters of the way

10   down, you see the sentence that says:  Back pay liability shall

11   not accrue from a date more than two years prior to the filing

12   of the charge with the Commission.

13           Do you see that?

14   A.  Can you give the subsection again?

15   Q.  Yeah.  It's 2005 -- 2000e-5(g)(1), page 1493, left-hand

16   column.

17   A.  Okay.

18   Q.  And about three-quarters of the way down, the sentence that

19   starts with "Back pay."

20   A.  Yes, I see it.

21   Q.  So it looks like two years -- running backwards, it's kind

22   of an unusual statute, but nothing recoverable prior to two

23   years before the date of the charge.  Is that how you read

24   that?

25   A.  I believe so.

1    Q.  Okay.

2           MR. MOBERLY:  Your Honor, I'd move the admission of

3    Exhibit 273.

4           THE COURT:  Is there any objection?

5           MS. ADAMS:  No objection.

6           THE COURT:  It's kind of unusual to put a statute into

7    evidence, but I'm going to --

8           MR. MOBERLY:  I recognize that, Your Honor.

9           THE COURT:  -- allow Exhibit 273 into evidence.

10          (Exhibit No. 273 admitted into evidence.)

11   BY MR. MOBERLY:

12   Q.  And if you'd look at Exhibit 210 for a moment, Ms. Adams.

13   A.  Yes.

14   Q.  You recall we looked at this document some during the --

15   during the prior hearing.  Does it look familiar?

16   A.  Yes.

17   Q.  And just to summarize, it's got the various salaries of

18   Senate employees, including policy advisors for both the

19   majority and minority staff for the years 2014 and 2013?

20   A.  And 2012, yes.

21   Q.  Yes.

22          And I believe you gave some testimony -- I'm just

23   going to look for a little clarification here -- that

24   originally -- and I think this was in response to the judge's

25   questions to us, that you did your pre-termination calculation

1   based on an averaging of the policy advisors in the majority

2   caucus; is that right?

3   A.  I believe I testified that I had averaged the salary of

4   policy advisor Rod Ross and the salary of policy advisor Garth

5   Kamp, which I believe their respective salaries were $85,000

6   for Mr. Ross and $80,000 for Mr. Kamp, and came up with an

7   amount of $82,250.

8   Q.  And how did you -- what was your thought process on

9   selecting that comparison?

10  A.  Based upon the trial verdict form that you drafted,

11  Mr. Moberly.

12  Q.  Okay.  So you thought those were the appropriate

13  comparators, but not either one of them, an average.  I guess

14  I'm asking, why did you average it as opposed to selecting one

15  or the other?

16  A.  You mean as opposed to just selecting Rod Ross and saying

17  $85,000?  Legal counsel has told me I should have done that.

18  Q.  Okay.

19  A.  Right.

20  Q.  Okay.  Then you give --

21  A.  And if I may, those are their salaries for 2015.  If you

22  look at the 2014 document, Bates stamped AZSEN 0021, Mr. Ross

23  is then making $89,250, and Mr. Kamp is making $84,000 in 2014.

24  So they're still well above my averaged number.

25  Q.  Okay.  You did give some testimony, and I wasn't clear on

1   this, that there was some comparison you made, and I think you

2   went back and clarified this, by using the salary that your

3   replacement -- I think his name was Mr. Bogart?

4   A.  Correct.

5   Q.  What was that -- just because I missed it, what was that

6   comparison?

7   A.  When you say the comparison, what do you mean?

8   Q.  Yeah, when you -- what were you clarifying?  What was the

9   damage calculation that you relied on Mr. Bogart as the

10  comparator for?

11  A.  For post-termination wages from February 16 forward,

12  Mr. Bogart was a policy advisor.  He replaced me.  His salary

13  was an annualized equivalent of $108,000, and based upon his

14  monthly wage, that's what I used as the calculation.

15  Q.  You do recall the testimony in the first trial that he only

16  stayed till the end of that legislative session, don't you?

17  A.  I believe that was stated in the first trial.

18  Q.  And that he was an independent contractor that had

19  substantial experience in the House of Representatives?

20  A.  I don't believe I recall that testimony.  I do recall the

21  admission of the employee listing from the Arizona State Senate

22  Journal that has Mr. Bogart listed as a policy advisor.

23  Q.  Can you find 238 in front of you there?

24  A.  Yes.

25  Q.  This is a sequence of emails that included the Arizona

1    Capitol reports that you -- that prompted you to indicate that

2    you wanted to talk to somebody about a raise; is that correct?

3    A.  Yes, it is.

4    Q.  Did this information or this document, the raised

5    information, did it play any role in your calculation of your

6    damages?

7    A.  It did -- I don't believe that it did.  I see Garth Kamp

8    here at $84,000.  I don't believe that it did.

9    Q.  Okay.  Take a look at Exhibit 270.

10   A.  Okay.

11   Q.  Do you recognize that document?

12   A.  I do.

13   Q.  Okay.  If you turn to page 9, that's your electronic

14   signature on the document?

15   A.  Yes.

16   Q.  And for the record, it's the Plaintiff's Fifth Amended and

17   Supplemental Discovery Protocol Disclosures for Employment

18   Cases Alleging Adverse Action, correct?

19   A.  Correct.

20   Q.  And that document includes as attachments information

21   pertaining to your unemployment compensation benefits, does it

22   not?

23   A.  It includes -- yes, it does include this information.

24        MR. MOBERLY:  Your Honor, I'd move the admission of

25   Exhibit 270.

1              THE COURT:  Any objection?

2              MS. ADAMS:  I have no objection, Your Honor.

3              THE COURT:  Exhibit 270 is admitted into evidence.

4              (Exhibit No. 270 admitted into evidence.)

5     BY MR. MOBERLY:

6     Q.  Now, if you'll look at page 1 and then page 4, page 1

7     begins with a caption that says:  Documents that plaintiff must

8     produce to defendant.

9              Correct?

10    A.  Yes.

11    Q.  And then we go to page 4, and subsection 8 -- H, I'm sorry,

12    H as in help -- requests documents concerning communications

13    with potential employers, job search efforts, and offers of

14    employment, job descriptions, income, and benefits of

15    subsequent employment, documents concerning the termination of

16    any subsequent employment.

17             Have I read that correctly?

18    A.  Yes.

19    Q.  And attached -- and in response to that is when you

20    attached Documents 423 -- this is the Bates stamps number --

21    423 through I believe 428.  Is that correct?

22    A.  That's -- that's what the document says.  I see additional

23    Bates stamps numbers beyond that, but that's what the document

24    says.

25    Q.  The additional documents don't pertain to the same issue.

1    They're responsive to a different question, are they not?

2    A.  Oh, they could be, yes.

3    Q.  Now, the period of time covered by Documents 423 through

4    428 is essentially from the 1st of March through the 11th of

5    April; is that correct?

6    A.  Week ending date, April 11, 2015, yes.

7    Q.  Yeah.  I'm looking in the -- I'm looking in the upper

8    right-hand corner of the document.

9    A.  Yes.

10   Q.  Now, you never produced any other documents reflecting your

11   unemployment compensation claims or the employment applications

12   that related to those claims, did you?

13   A.  I think there was additional job search -- I think there

14   was additional job search information that wasn't within the

15   unemployment claims benefit form.

16   Q.  Can you tell us what those were and where they were

17   produced?

18   A.  I would imagine in the initial production where it says

19   ADAM 001 to 0422.

20   Q.  Okay.  Do you know that to be the case, or are you just

21   saying based on the reading you're given of your own response

22   there?

23   A.  No.  I think there was additional job search information

24   outside of the unemployment insurance submission form.

25          There was also deposition testimony as it relates to

TALONYA ADAMS - CROSS-EXAMINATION

1   documents that would likely be responsive to -- to this, income

2   benefits, my job search efforts, mitigation efforts.

3   Q.  You recall after the conference that we had with the Court

4   in which the summary -- or the motion in limine rulings were

5   issued, I wrote you an email about this topic, don't you?

6   A.  After the conference in June -- on June 21st, 2019?

7   Q.  Yes.

8   A.  Yes.

9   Q.  Okay.  Take a look at Exhibit 271.

10  A.  Yes.

11  Q.  That's the email that I just asked you about, is it not?

12  A.  It is.

13          MR. MOBERLY:  I'd move the exhibit of 271 --

14          MS. ADAMS:  I object, Your Honor.

15          MR. MOBERLY:  -- admission --

16          THE COURT:  Okay.  What's your objection?

17          MS. ADAMS:  What's the purpose for admission?  What's

18  the relevance?

19          THE COURT:  The objection is relevance?

20          MS. ADAMS:  Yes.

21          THE COURT:  What's the relevance?

22          MR. MOBERLY:  Your Honor, the relevance is going to

23  show that I offered Ms. Adams the -- or I inquired of and

24  offered her the opportunity to direct me to additional evidence

25  that she produced on mitigation.

1          THE COURT:  Okay.  I'm going to overrule the

2    objection.  Exhibit 271 is admitted.

3    BY MR. MOBERLY:

4    Q.  Take a minute to review that email, because I don't want to

5    move too fast on you.

6    A.  Okay.

7    Q.  Okay.  I'm going to paraphrase, so you can correct me if

8    I'm wrong, but you will recall the context of that email

9    exchange was that you and I had been working on proposed

10   verdict forms; is that correct?

11   A.  I recall right after the June 2nd, 2019, conference, I went

12   back to my office and called you, and we had a discussion about

13   the unemployment issue.  And we both decided that we would

14   await to see how the ruling came down, and then you followed up

15   with this email.

16   Q.  Okay.  You see the second paragraph there where I indicate

17   that I have attached what's essentially Document 270; is that

18   correct?

19   A.  Yes, I do see that.

20   Q.  And I tell you that having gone back to the office, that's

21   the only evidence I could find in your discovery that pertained

22   to the issue of unemployment compensation benefits and the

23   mitigation required to obtain those benefits, don't I?

24   A.  Yes.

25   Q.  And I invite you there to say, if I've overlooked

1   something, please let me know and we'll consider revising the

2   draft of the verdict form that I was preparing to reflect a

3   longer period of time.  Correct?

4   A.  Yes.  I think this was the initial verdict form, and

5   certainly not the verdict form that went to the jury.

6   Q.  And you never responded to this email by telling me, take a

7   look at, you know, Document 232 or Disclosure 18 or anything of

8   that nature, did you?

9   A.  I think my response to you, Michael, was verbal in that I

10  said the Court has ruled that the duration of the

11  unemployment -- the end -- the duration of post-wage damages

12  are included through the end of Ms. Adams' unemployment

13  insurance.  I believe the ruling came down when we were talking

14  on the phone, and I said, "Oh, here it is, and I'm good with

15  that language" is what I said.

16          I don't perceive you as the Court in my position on

17  the unemployment benefits as it is today as it was then.  The

18  Court ruled.

19          THE COURT:  I'm trying to understand where we're going

20  with this.  Is it your position that even though she testified

21  that she received unemployment benefits for nine months, that

22  you haven't received any documentation supporting that

23  position?

24          MR. MOBERLY:  Right.  Yes.  Partly.

25          THE COURT:  Okay.  So you're saying that the

1    documentation you have about her unemployment compensation only

2    goes through what period of time?

3            MR. MOBERLY:  Six weeks as opposed to the eight

4    months.

5            THE COURT:  Okay.  Do you have any documentation for

6    that?

7            MS. ADAMS:  As -- other than my testimony today, Your

8    Honor, I do not.  And the Court ruled no additional evidence

9    could be submitted.  This actually is additional evidence, and

10   perhaps that should have been my objection.

11           But what it does say is that Ms. Adams --

12           THE COURT:  No, no, no, no.  Answer my question,

13   please.

14           I'm trying to find out -- he's taken the position that

15   your testimony's not consistent with the documentation.  All I

16   want to know is, is there documentation that supports the fact

17   that you received unemployment compensation for nine months?

18           MS. ADAMS:  Is there documentation that exists?  Yes.

19           THE COURT:  Okay.  And is it -- does it exist in this

20   case?  Has it been produced in this case?

21           MS. ADAMS:  I don't believe -- I don't believe it has.

22   If what he's looking for is unemployment claim forms for nine

23   months, no, that has not been produced.

24           THE COURT:  Okay.

25           MS. ADAMS:  Although I will say the employer is the

UNITED STATES DISTRICT COURT

1    State of Arizona, and unemployment insurance benefits come from

2    the State of Arizona, and there is case law that says they are

3    in -- they are in possession.

4            THE COURT:  Okay.  You've answered my question.

5            Go ahead.

6            MR. MOBERLY:  Thank you.

7            I think that's all I have, Your Honor.  Thank you very

8    much.

9            THE COURT:  Okay.

10           MS. ADAMS:  Your Honor, do -- can I just take one

11   moment to confer with counsel just for a quick rebuttal?

12           THE COURT:  Sure.

13           MS. ADAMS:  Thanks.

14           (Discussion held off the record.)

15           THE COURT:  Ms. Adams, do you have any other testimony

16   you want to present?

17           MS. ADAMS:  Yes, Your Honor.  Just follow-up

18   testimony, quickly.

19           Your Honor, I just want to reassert my objection to

20   Exhibit -- the admission of Exhibit 271 on the basis that the

21   Court has disallowed any new evidence into this matter.

22           This exhibit is dated June 25th, 2019.  It was

23   available --

24           THE COURT:  Let me -- I don't know what you're talking

25   about when I disallowed any additional evidence --

1        MS. ADAMS:  Your Honor, there was a telephonic

2   conference on Friday -- I'm sleep deprived.

3        THE COURT:  Okay.

4        MS. ADAMS:  This last -- this last Friday, we had a

5   telephonic conference in which the Court ruled no new evidence

6   would be admitted that had not previously been admitted.  No

7   new witnesses would be admitted.

8        THE COURT:  Oh, okay.  I think the statement was no

9   documents not previously disclosed and no witnesses not

10  previously disclosed would be allowed at this hearing.

11       MS. ADAMS:  Okay.

12       THE COURT:  And that's -- that's right.  So I guess

13  you're saying that you would have produced these documents had

14  you not heard that?  Is that what you're saying?

15       MS. ADAMS:  Your Honor, no.  I think what I'm saying

16  is that Mr. Moberly's email is new evidence.

17       THE COURT:  Oh, okay.  But he -- did you just see this

18  for the first time today?  Is that what you're saying?

19       MS. ADAMS:  He sent it to me on Monday, but I think

20  the Court's ruling says no new evidence that wasn't previously

21  included in the trial.

22       THE COURT:  Okay.  I see what you're saying.  I was

23  looking at -- I thought you were talking about the unemployment

24  application forms.  You're talking about the exhibit itself?

25       MS. ADAMS:  That's correct.

1          THE COURT:  Mr. Moberly, you want to address that?

2          MR. MOBERLY:  Yeah, absolutely.  Just two points, Your

3    Honor.

4          Number one, I wasn't at that conference, obviously,

5    but I did see your minute entry.  It said nothing that had not

6    previously been disclosed would be permitted.

7          This obviously was disclosed.  It was an email from me

8    to Ms. Adams.  It came long after the discovery had closed, but

9    there's certainly no prejudice.  And the point is, when she

10   says she saw it on Monday, she saw it back in June and didn't

11   respond to it at that time so --

12         THE COURT:  Well, I don't think it really matters, the

13   way she's testified that she didn't produce any additional

14   unemployment application forms other than those you've talked

15   to her about in that.

16         MR. MOBERLY:  Fair enough.

17         THE COURT:  So I'm going to sustain her objection that

18   this wasn't produced earlier.

19         And I think I've told both sides, when I talk about

20   production, I mean you identify documents that you're going to

21   use at a hearing or trial ahead of time.  Not just say that,

22   well, she has it because she sent it.  She doesn't know that's

23   going to be used as an exhibit in evidence.

24         So for that reason I'm going to exclude it.  But for

25   purposes of this hearing, I don't think it really matters

1    either way.

2            MR. MOBERLY:  I would agree with you, Your Honor.

3    Thank you.

4            THE COURT:  All right.  Anything else, Ms. Adams?

5            MS. ADAMS:  Yes, Your Honor.  I think as it relates to

6    the two-year date, based upon the charge of the filing of

7    adjudication, I will address that -- reserve any further

8    commentary on that and address that in my motion, as well as

9    preserve the opportunity to provide salary for current policy

10   advisors as it relates to specifying pay for purposes of

11   reinstatement.

12           THE COURT:  I don't know if I understood what you just

13   told me, but it sounds like you're trying to preserve

14   something?

15           MS. ADAMS:  Yes, Your Honor.  There is 2017, 2018,

16   2019 compensatory pay, vacation accrual, and salary rates and

17   increases that are represented in documentation that I would

18   like to -- that I would like to address in the briefing.

19           THE COURT:  Okay.  And the relevance?

20           MS. ADAMS:  And the relevance is what would customary

21   and equitable pay be --

22           THE COURT:  Oh, for reinstatement?

23           MS. ADAMS:  -- in the event of reinstatement, yes.

24           THE COURT:  Okay.  Yeah, because I don't know that I

25   can order a specific amount, but that's what I want you guys to

1    brief.  Okay?

2              MS. ADAMS:  Yes, Your Honor.

3              THE COURT:  All right.  Anything else you want to

4    present?

5              MS. ADAMS:  I do not -- I do not believe so, Your

6    Honor.

7              THE COURT:  Do you rest?

8              MS. ADAMS:  I would like to call Wendy Baldo.

9              THE COURT:  Okay.

10             MS. ADAMS:  Thank you.

11             THE COURT:  All right.  Ms. Baldo, I know you've been

12   sworn before, but let's do it again today and we'll start all

13   over again.

14                         WENDY BALDO,

15   called as a witness herein by the Plaintiff, having been first

16   duly sworn or affirmed, was examined and testified as follows:

17             THE COURT:  You may proceed.

18             MS. ADAMS:  Thank you, Your Honor.

19                      DIRECT EXAMINATION

20   BY MS. ADAMS:

21   Q.  Good morning, Ms. Baldo.

22   A.  Good morning.

23   Q.  I was calling you today because I wanted to talk to you

24   about the opportunity of reinstatement.

25             Do you have an opinion on that?

1   A.  If the Court rules that reinstatement is needed, that there

2   would be a position available for you.

3   Q.  Okay.  Do you have an opinion on Ms. Adams being

4   reinstated?

5   A.  No.

6   Q.  Mr. Winkler is still employed by the Arizona State Senate;

7   is that correct?

8   A.  That is true.

9   Q.  What is his salary?

10  A.  I believe it's 117.

11  Q.  $117,000?

12  A.  Yes, ma'am.

13  Q.  Okay.  And he -- what is his role?

14  A.  He is the chief of staff for the Democrat caucus.

15  Q.  And if Ms. Adams was reinstated, who would she report to?

16  A.  Mr. Winkler.

17  Q.  Okay.  And Mr. Winkler was found by this jury on July 12,

18  2019, to have discriminated against Ms. Adams based on her race

19  and her sex and have retaliated against her; is that correct?

20  A.  That is correct.

21  Q.  Has there been any disciplinary action taken against

22  Mr. Winkler as it relates to his discriminatory conduct?

23  A.  Not at this point.

24  Q.  Excuse me?

25  A.  Not at this point.

1    Q.  Okay.  Do you anticipate that there will be at a date and

2    time certain in the future?

3    A.  If Ms. Adams is reinstated?

4         THE COURT:  At any time.

5         THE WITNESS:  At any time?  That would have to be a

6    discussion with the minority leader.

7    BY MS. ADAMS:

8    Q.  And the minority leader at the Arizona State Senate is who?

9    A.  Senator David Bradley.

10   Q.  Okay.  And you would need to confer with him to decide

11   whether or not --

12   A.  That is correct.

13   Q.  Okay.  To decide what?

14   A.  To decide his status, his employment status.

15   Q.  At the Arizona State Senate?

16   A.  Yes, ma'am.

17   Q.  And, Ms. Baldo, you were included as one of three

18   decision-makers -- yourself, Katie Hobbs, and Jeff Winkler were

19   all found to be culpable in discriminating against Ms. Adams

20   based on her race, her sex, and retaliation on both; is that

21   correct?

22   A.  That is correct.

23   Q.  And do you -- have you received any disciplinary action as

24   it relates to your involvement in race or sex discrimination

25   against Ms. Adams?

WENDY BALDO - DIRECT EXAMINATION

1    A.  I have not.

2    Q.  Do you anticipate that you will?

3    A.  I do not.

4    Q.  And why is that?

5    A.  It has not been discussed.

6    Q.  If someone were to discuss it with you, would it be the

7    Senate president?

8    A.  It may be the Senate president.  It may be the minority

9    leader.

10   Q.  Okay.  If Ms. Adams was reinstated, do you think that she

11   could work at the Arizona State Senate in a professional and

12   nondiscriminatory environment?

13   A.  I do believe that we can make that work.  I honestly do.

14   Jeff Winkler works for me, and if there is any exhibition of

15   discriminatory behavior, he will be reprimanded.

16   Q.  But there has been --

17   A.  Disciplined.

18   Q.  -- right?  There has been discriminatory behavior.  Has

19   he --

20   A.  That is what the jury found.

21   Q.  Okay.  And he hasn't been reprimanded; is that right?

22   A.  That is correct.

23   Q.  Okay.  So if you find discriminatory behavior, you will

24   reprimand him; is that your testimony today?

25   A.  That is correct.

1    Q.  Okay.  But prior to the jury finding discriminatory

2    treatment, you hadn't found it; is that correct?

3    A.  The jury found discriminatory treatment, yes.

4    Q.  Okay.  And do you believe Ms. Adams was discriminated

5    against based on her race?

6    A.  That is what the jury verdict was.

7    Q.  The question before you is whether or not you, Ms. Baldo,

8    believe Ms. Adams was discriminated against at the Arizona

9    State Senate based upon her race.

10   A.  That is what the jury verdict was.

11   Q.  The question is not about the jury verdict.  It's about

12   your belief.

13   A.  I believe that Ms. Adams believes that she was

14   discriminated because of her race.

15   Q.  I'm not asking you to speculate as it relates to Ms. Adams.

16   A.  I'm not going to answer that question.

17          MS. ADAMS:  Your Honor, given that reinstatement was

18   originally pled and Ms. Baldo is culpable in the liability

19   found by this jury on June -- July 12, 2019, I would ask the

20   Court to ask Ms. Baldo to answer the question.

21          MR. MOBERLY:  Let me object to that characterization

22   of the jury's verdict.

23          THE COURT:  What about the question?

24          MR. MOBERLY:  That she answer the question?  That's

25   fine with me.

1              THE COURT:  Okay.

2              All right.  Can you answer the question?

3              THE WITNESS:  What was the question again?

4              MS. ADAMS:  Your Honor, may we have the court reporter

5   please read back the question?

6              THE COURT:  The question was, do you feel like

7   Ms. Adams was discriminated against?

8              THE WITNESS:  Yes.

9   BY MS. ADAMS:

10  Q.  Based on her race?

11  A.  I don't believe so.

12  Q.  Based on her sex?

13  A.  Yes.

14  Q.  Do you believe Ms. Adams was retaliated against?

15  A.  I don't believe so.

16  Q.  So you believe Ms. Adams was discriminated against based on

17  her sex, correct?

18  A.  Yes.

19  Q.  And did you believe that in 2015, or did you come to

20  believe that after the trial?

21  A.  I came to believe that after the trial.

22  Q.  Why is that?

23  A.  Because of the evidence presented.

24  Q.  And there were things that were unknown to you that became

25  known to you at the trial?

WENDY BALDO - DIRECT EXAMINATION

1   A.  There were things that were presented at the trial that

2   were unknown to me.

3   Q.  Okay.  Do you believe you discriminated against Ms. Adams

4   based on her sex?

5   A.  I did not.

6   Q.  Do you believe you discriminated against Ms. Adams based on

7   her race?

8   A.  I did not.

9   Q.  Do you believe you retaliated against Ms. Adams?

10  A.  I did not.

11  Q.  Who do you believe discriminated against Ms. Adams based on

12  her sex?

13  A.  It would have to have been the minority leader or the chief

14  of staff for the Democrat caucus.

15  Q.  And who are those individuals?

16  A.  Jeff Winkler and Katie Hobbs.

17  Q.  And if Ms. Adams was reinstated to the position and you saw

18  that perhaps, from your personal perspective, she was being

19  discriminated against based on her sex, you would take action?

20  A.  I would not allow that to happen.

21          MS. ADAMS:  Okay.  I have no further questions, Your

22  Honor.  Thank you.

23          THE COURT:  Are you comfortable that if Ms. Adams were

24  to return to her job, that it could be done smoothly without

25  discriminatory tactics or conduct against her?

1          THE WITNESS:  Yes, sir, I do.

2          THE COURT:  Okay.

3          All right.  Any cross-examination?

4          MR. MOBERLY:  No, Your Honor.

5          THE COURT:  All right, thank you.  You can step down.

6          THE WITNESS:  Thank you.

7          (Witness excused.)

8          THE COURT:  Ms. Adams, any further evidence?

9          MS. ADAMS:  No, Your Honor.  Plaintiff rests.

10         THE COURT:  Okay.  Defense?

11         MR. MOBERLY:  No, Your Honor.  No evidence.  We rest.

12         THE COURT:  Okay.  Then I'll take it under advisement.

13  You have your marching orders as far as briefing goes.

14         And we'll stand in recess.

15         MR. MOBERLY:  Your Honor, could I raise one question?

16         THE COURT:  Yes.

17         MR. MOBERLY:  I'm not clear.  Are you anticipating a

18  reply brief from us with respect to the cap?

19         THE COURT:  Yeah.  If you want a reply brief, you can

20  file a three-page reply within two days after the response.

21         MR. MOBERLY:  Okay.  Thank you, Your Honor.

22         THE COURT:  All right.  We'll stand in recess.

23         MS. ADAMS:  Thank you, Your Honor.

24         (Proceedings concluded at 11:37 a.m.)

25

1                C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 18th day of August,

13   2019.

14

15

16                        s/Jennifer A. Pancratz_____  _____ ____

17                        Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25