**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Talonya Adams, | ) | |
| | ) | No.  CV-17-00822-PHX-DLR |
|       Plaintiff, | ) | |
| | ) | |
|       vs. | ) | Phoenix, Arizona |
| | ) | July 10, 2019 |
| Arizona Senate, | ) | |
| | ) | |
|       Defendant. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**


**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**


**JURY TRIAL DAY 2 - TESTIMONY OF TALONYA ADAMS**


Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

For the Plaintiff:

3
      Talonya Adams, Esq.
4     In propria persona
      2 N. Central Avenue, Suite 1800
5     Phoenix, AZ 85004

6   For the Defendant:

7       Michael D. Moberly, Esq.
        Ryley Carlock & Applewhite PA
8       1 N. Central Avenue, Suite 1200
        Phoenix, AZ 85004

9

10   Also Present:

11      Gillmore Bernard, Esq.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                UNITED  STATES  DISTRICT  COURT

1                          **I N D E X**

2

3    **WITNESSES FOR THE          DIRECT    CROSS    REDIRECT    RECROSS**
     **PLAINTIFF:**

4
     **Talonya Adams**
5    By Mr. Bernard            5, 22

6

7                       **E X H I B I T S**

8    **NO.**                   **DESCRIPTION**                        **REC'D**

9
     21    T. Adams Loyalty Oath                              12
10
     18    T. Adams Cell Phone Records re: February 2015      19
11          (REDACT)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                 UNITED  STATES  DISTRICT  COURT

1          **P R O C E E D I N G S**

2          (Prior proceedings held on the record not transcribed

3     herein.)

4          (Jury present.)

5          THE COURT:  Ms. Adams, you have another witness?

6          MS. ADAMS:  Yes, Your Honor.  I am going to take the

7     stand myself.

8          THE COURT:  Okay.  You may proceed.

9          Do you have someone who's going to ask the questions?

10          MS. ADAMS:  I do.  Yes, Your Honor.

11          THE COURT:  Ms. Adams is representing herself.  So we

12     have a question and answer the way witnesses normally go,

13     Ms. Adams has prepared questions and the witness -- another

14     lawyer is going to be asking the questions of her.  He's not

15     representing her, but he is here to assist in asking the

16     questions so that she doesn't just sit up there and just have a

17     narrative.  That way everyone knows what the question is and

18     then we'll hear an answer.

19          So, Ms. Adams, you can take the stand, but first come

20     up here, please, and be sworn.

21          MS. ADAMS:  Okay.  And I just need a moment, Your

22     Honor, to gather my things.  Thank you.

23          THE COURT:  Okay.

24          And would you introduce yourself to the jury, please.

25          MR. BERNARD:  Thank you, Your Honor.

```
 1            Good afternoon, jury.  My name is Gillmore Bernard.
 2   I'm from the Blackwell Law Office.
 3                          TALONYA ADAMS,
 4   called as a witness herein by the Plaintiff, having been first
 5   duly sworn or affirmed, was examined and testified as follows:
 6            THE COURT:  You may proceed.
 7            MR. BERNARD:  Thank you, Your Honor.
 8                        DIRECT EXAMINATION
 9   BY MR. BERNARD:
10   Q.  Good afternoon, Ms. Adams.  Could you introduce yourself to
11   the jury.
12   A.  Good afternoon.
13            Hi, my name is Talonya Adams.  I am a plaintiff in
14   this case.
15   Q.  Now, Ms. Adams, where are you from?
16   A.  I am from Phoenix, Arizona.  I was born in Phoenix,
17   Arizona, down at Good Samaritan Hospital, and I grew up
18   primarily in Mesa, Arizona.
19   Q.  Did you go to school in Arizona?
20   A.  I did, yes.  I attended elementary school at Jefferson
21   Elementary, and then middle school I split between Fremont
22   Junior High and Mesa Junior High, and then I attended high
23   school at Mesa High.  I graduated in 1994.
24   Q.  Now, you weren't born a lawyer, were you?
25   A.  I was not, no.  That would have been lucky.  I didn't know
```

1  lawyers growing up.  I come from a very humble family.  My

2  family grew up about 200 percent below the poverty level, and

3  after my parents' divorce, my mom was an uneducated homemaker

4  that stayed home with myself and my other sisters.

5          I have a sister that has muscular dystrophy.  She's

6  disabled.  And so she was a single mom of five girls.  And over

7  the course of my childhood, we struggled quite a bit.  And that

8  really motivated me to pursue an education and become the first

9  person in my family to graduate from college.

10 Q.  Congratulations.

11 A.  Thank you.

12 Q.  Now, you said college.  Are you a Sun Devil?

13 A.  Kind of.

14 Q.  Why don't you explain to the jury.

15 A.  I left Mesa High on -- I received a track scholarship and

16 also some merit scholarship to go to college at the University

17 of Arizona.  And in my first semester at U of A, I became

18 pregnant with my son, Chris.  And I left Tucson and moved back

19 to Mesa with my -- what had been my high school sweetheart, and

20 I began attending community college.  And I had my son, Chris,

21 in 2000 -- I'm sorry, in 1995.

22          And eventually we moved to Seattle in about December

23 of 1998, my family.  I had a second son, Kaleum, in 1996, and

24 we moved to Seattle in 1998.

25          When we moved to Seattle, I was able to obtain my

1    Associate's of Arts degree from Bellevue Community College and

2    was admitted to the University of Washington, the Foster School

3    of Business there.

4    Q.  And what did you get your undergrad degree in?

5    A.  I graduated from the University of Washington, the Foster

6    School of Business, in 2002.

7    Q.  I'm sorry, what was the degree?

8    A.  It was a Bachelor's in Arts.

9    Q.  And how did you get your law degree?

10   A.  I was working full-time as I was going to the University of

11   Washington and taking some classes in the evenings.  I was

12   working at Microsoft in Redmond, Washington.  I worked in the

13   legal and corporate affairs group.  And in the role that I was

14   in there, I spent a lot of time working with lawyers.  And it

15   was the first exposure that I really had to lawyers and

16   paralegals and just kind of the legal environment within the

17   corporate setting but access to lawyers.

18        And the more time I spent with lawyers, I think the

19   more confident I became that I might be able to be one.  And I

20   began studying for the LSAT, which is the entrance exam for law

21   school.

22        And I applied to law schools, and I at this time was

23   divorced.  I had gotten into USC and I had gotten into ASU,

24   Pepperdine and a few other schools.  I intended to go to USC

25   but it was so expensive, and I really needed support with my

```
 1   boys.  And so I purchased a home in 2003 in Gilbert, and we
 2   relocated back to Phoenix to be here near my mom and family.
 3   And I attended law school at Arizona State University in the
 4   fall of 2003.
 5   Q.  Did you graduate?
 6   A.  I did.  I graduated in the summer of 2006.  And so while I
 7   was in law school, I didn't know really how things worked
 8   there, and so I tried lots of different things.  I worked with
 9   a criminal law -- lawyer.  I did an externship on the Court of
10   Appeals with Judge Kessler.  I got an opportunity to work as a
11   summer associate at Greenberg Traurig, which is a big box law
12   firm.  I also spent part of my summer at the Securities and
13   Exchange Commission in Los Angeles as a summer associate.
14   Q.  So during the summers where you're taking classes -- or,
15   I'm sorry, during the years that you're going to school, law
16   school, during the summer you're doing an externship?
17   A.  Internships, externships, summer associates, yes.
18   Q.  So after you graduate from law school in 2006, do you get
19   your -- or do you take the Bar?
20   A.  I did not.  I was scheduled to take the Bar in July of
21   2006, and I moved -- I relocate back to Washington state, and I
22   go back to work for the Microsoft Corporation.  Prior to
23   leaving Microsoft, I worked initially on the business side, in
24   the legal and corporate affairs group, and then I was offered a
25   job after graduation from the University of Washington on the
```

1  business side, in the sales, marketing, and services group.

2        And after I graduated law school, I was extended an

3  offer to go back to the sales, marketing, and services group.

4  I went there.  I also worked in the legal and corporate affairs

5  group as a paralegal.  There's lots of lawyers at Microsoft

6  that work for many years as a paralegal and then ultimately

7  transition into being a corporate lawyer at Microsoft.

8  Q.  So when did you first have an interest in getting into

9  politics?

10  A.  I was always quite curious about politics, so when I went

11  to the Arizona State University to law school there, the day

12  before classes started there was an orientation program, and

13  Kyrsten Sinema was there.  She was a second-year law student,

14  and she was called a 2L.  And I was a first-year law student,

15  which is called a 1L.

16        And she had invited me to dinner to go out with her

17  and a group of girls, and she was running for office at the

18  time.  And we -- I was really just fascinated, and we were

19  talking about it and I helped on her campaign.  She lost, but I

20  helped on her campaign.

21        And even while I was in law school, I was working at

22  Greenberg Traurig.  There was a lobbyist group.  I participated

23  in that, and we spent a lot of time down at the Arizona State

24  Legislature, learning about bills, building relationships with

25  the sitting members, trying to advocate for amendments and

1    policy, public policy on behalf of Greenberg Traurig's clients.

2    And I just always thought it was fascinating to think about how

3    our government works.

4    Q.   Now, I want to fast-forward a little bit and go to when you

5    first started working for the Senate.  Why did you choose to go

6    work for them?

7    A.   In 2010 I relocated back to Arizona, and I began working on

8    some political campaigns.  I worked on Greg Stanton's first

9    mayoral campaign.  I ran for office myself in Gilbert.  I was

10   living in my house in Gilbert, and I ran for the Gilbert Town

11   Council.  There was four seats available and 11 candidates.

12   And I did not win, but I learned quite a bit about politics,

13   and just learning so much about public policy.

14        And even in law school, just learning how public

15   policy is an incredible lever to really change lives.  I mean,

16   to really make a difference, specifically for people that are

17   being crushed on the bottom of the dog pile like my family was

18   growing up.

19   Q.   And did you have to apply to the Senate?

20   A.   I did.  In 2011 I applied to a vacancy at the Arizona State

21   Senate.  It had -- I found it on the Arizona State Senate

22   website, and I applied.  I was interviewed, and I did not get

23   the role.

24   Q.   You didn't get the role?

25   A.   I did not.  It was for a policy advisor position, and I

1    wasn't selected.

2    Q.  Then what happened?

3    A.  In 2012 there was another position that became available,

4    and I was called and asked -- invited to apply, and I applied

5    and was subsequently interviewed, took a written exam, and was

6    selected.

7    Q.  And what role -- what was your official title?

8    A.  Policy advisor.

9            MR. BERNARD:  Can the witness be given what's

10   labeled -- I think it's Exhibit 21?

11           THE WITNESS:  Thank you.

12           MR. BERNARD:  And we're also going to need 19, 6, and

13   1 as well.

14   BY MR. BERNARD:

15   Q.  Now, you have Exhibit 21 in front of you?

16   A.  Yes, I do.

17   Q.  What is this exhibit?

18   A.  This is a loyalty oath that I took when I was -- at the

19   time that I was hired at the Arizona State Senate.  So I was

20   required to go and complete paperwork, and I raised my hand as

21   I did today and gave a sworn oath.  And this is a copy of that

22   oath.

23           MR. BERNARD:  I'd like to move to admit Exhibit 21.

24           MR. MOBERLY:  No objection.

25           THE COURT:  Exhibit 21 is admitted.

1          (Exhibit No. 21 admitted into evidence.)

2          MR. BERNARD:  May I publish, Your Honor?

3          THE COURT:  You may.

4  BY MR. BERNARD:

5  Q.  Now, this isn't the same -- this is the same exact form

6  that you signed, is it?

7  A.  Yes, it is.

8  Q.  Oh, it is.  All right.

9          Now, when you signed this -- well, when you read it

10 the first time, what did it mean to you?

11 A.  When I read the oath on the second page?

12 Q.  Yeah.

13 A.  I -- I took it to mean this is the same oath that many

14 elected officials take to support the Constitution of the

15 United States and the laws of the State of Arizona, and to bear

16 faith and allegiance to the same.

17 Q.  Now, does this mean that it depends on what party you

18 represent?

19 A.  No.  I take it to mean that the work that is done at the

20 Arizona State Senate is one of the most serious of natures.  It

21 has incredible impact on citizens of our state, and I took it

22 to mean that I was taking this oath in this role as a policy

23 advisor to work on behalf of the citizens of our state pursuant

24 to the United States Constitution and the laws of our state.

25 Q.  Now, did you believe that you still had to uphold this oath

TALONYA ADAMS - DIRECT EXAMINATION

1   up until the day that someone told you that you were fired?

2   A.  Yes.  Yes, I did.  In addition, I believe the Senate has

3   clauses that disallow you to discuss information learned within

4   a certain period of time of your departure, and I believe it's

5   two years.

6   Q.  Now, let's talk about -- I want to talk to you about the

7   week of February 13th, 2015.  What was going on that week with

8   you?

9   A.  Yeah.  So February 13th, 2015, was a Friday.  The beginning

10  of the week, February 9th, 2015, I had went to work at the

11  Senate and had worked, you know, the prior weekend.  I had -- I

12  had heard from my son on the second day.  We normally talk

13  almost every day.  We text every day, many times a day.

14       And so I had heard from him.  At the time he was 19

15  years old.  He was attending Bellevue Community College on a

16  basketball scholarship, and it was his first season in

17  basketball.  It was his second semester in the year, but his

18  first season playing basketball there in -- Bellevue is just a

19  suburb of the Seattle area, so -- in Washington state.

20       And he had emailed me -- or he had sent me a text

21  message early -- I think Monday morning.  And then I didn't

22  hear from him for maybe about, you know, a day or day and a

23  half, and things were hectic at the Senate.  But I reached out

24  to him.  I sent him a text and just said, "Hey, how's it going?

25  I haven't heard from you.  What's going on?"

1          And he had wrote me back and said that everything --

2     you know, things are fine.

3          And then Tuesday he went to basketball practice and

4     had found himself in a situation where he had just lost

5     consciousness.  And he was talking to his coach right after a

6     scramble and he just, like, collapsed, and the coach caught him

7     so he didn't fall to the ground and subsequently called and got

8     him to the ER.

9          And when they got him to the ER, they began working to

10    try to understand, like, why he collapsed, so they wanted to

11    hydrate him and get him an IV, just typical things.  He's a

12    very healthy, very physical athlete, 19-year-old boy.  So there

13    wasn't any real concern, but I didn't know about it.  I was

14    working.

15         And his heart rate was accelerating, and they couldn't

16    get it -- they couldn't get it steady even after a period of

17    having been at the ER, and so they wanted to put him on a

18    monitor and they did.  And then they realized that the heart

19    rate was accelerating and then having these dips, and they were

20    thinking that that was what was causing him -- that may have

21    caused him to faint.

22         So they watched him overnight, put him in the

23    hospital, watched him overnight, and he seemed fine in the

24    morning.  They sent him home with a -- or discharged him with a

25    monitor, and he was to return in three days.

1          I spoke with -- or I text him Wednesday morning, and

2     he said, "I'm just leaving the hospital."

3          And I said, "Oh, what are you doing at the hospital?"

4          And he said, "Oh, well, I had this whole thing at

5     the -- you know, the practice yesterday."

6          And I was like, "Is everything okay?"

7          And he's like, "Yeah, I think it's fine.  I think I'm

8     just, you know, dehydrated and overexhilaration" and just

9     trying -- you know, maybe asserting himself too much.

10         And so he said he had the heart monitor, fine, and

11    that was that.

12         Thursday I -- there was an article that came --

13    Q.  Let me -- let me direct you a little bit more.

14         On Thursday, did you hear from your son again?

15    A.  Yes.  As it relates to my son, I did hear from him.  And he

16    said -- he had sent me a text message and said, "I'm back at

17    the hospital."

18         I said, "Why?"

19         And he said, "Because I'm -- I don't know, Mom."  He's

20    like, "I've never had a heart attack, but if I" -- he's like,

21    "but I feel like what's happening to me is like I'm having a

22    heart attack."

23    Q.  And as -- as a mother, now -- well, let me back up.  Strike

24    that question.

25         Is this your only son?

1    A.  I have two children, so Chris at the time was 19 and then

2    Kaleum was 18.  They're very close in age.

3    Q.  Now, as a mother, and your son tells you he feels like he's

4    having a heart attack, how did that make you feel at that

5    moment?

6    A.  I -- I mean, it -- he was kind of -- I felt like maybe he

7    was kind of saying it in jest, you know.  And I said, "Chris,

8    really, you're 19."

9             And he said, "No, serious, Mom.  I think something's

10   not right."

11            And I said, "So what are they doing?"

12            He said, "Well, they're going to keep me overnight and

13   see if we can get an EKG."

14            And then I started to be concerned because there had

15   been some stories at that time about very young kids, athletes

16   that had just collapsed and died, right, and I was concerned.

17   And I had reached out to Mr. Winkler and said, you know, "Chris

18   is having some issues, and I don't really know where this is

19   doing, but I'd like to just let you know that he's having some

20   issues that I'm concerned about healthwise."

21   Q.  Now, before you get to that, prior to this week, you made a

22   discovery about your own employment; correct?

23   A.  Prior -- no, this was the same week.  So on that same

24   Thursday, on February 12th, 2015, the Arizona Capitol Times

25   issued an article regarding the salaries of Senate employees

1   and -- the salaries and the raises that Senate employees had

2   received.

3           And Aaron Latham is a policy advisor and also does

4   communications at the Arizona Senate.  He sent that article out

5   to all of the Democratic staffers.

6   Q.  And when you got that information, what did you do?

7   A.  I forwarded Aaron's email that included the article to

8   Wendy Baldo, and I asked her, "What is the protocol to request

9   a raise at the Arizona Senate?"

10  Q.  Now, why did you send it to Wendy Baldo, Ms. Baldo?

11  A.  Because my understanding at the Arizona Senate is that

12  Wendy Baldo really is the decision-maker.  I had -- she signed

13  my employment -- my personnel records when they were signed.

14  She's listed as the supervisor in my employment history.  When

15  I needed to obtain employer approval, she signed employer

16  approval.  Anytime I went out to a district for a member to

17  speak with senators or speak on behalf of a senator or just

18  staff a senator at an event, Ms. Baldo signed the travel

19  reimbursement mileage request.

20  Q.  Was there any policy in place that you knew of of

21  requesting a raise?

22  A.  There was no policy in place that I was aware of to request

23  a raise.  I had never requested a raise before.  I had never

24  received a raise.  I had never received a performance

25  evaluation.  I never received a policy handbook.  I wasn't

1    clear.  But I did know that Wendy had -- Wendy Baldo had an

2    open-door policy and that she would know how to request a

3    raise.

4    Q.  Were you aware of other individuals who had the same job

5    title as you receiving raises prior to that day?

6    A.  Prior to Aaron Latham sending that article, I did not know

7    the salaries of any other policy advisor except for myself.  I

8    did not know that anyone had ever received a raise.

9    Q.  So let's fast-forward to after you sent an email asking

10   Ms. Baldo about the raise.  Then your child gets sick?

11   A.  Yes.

12   Q.  What did you decide to do with regards to your child on

13   that Friday?

14   A.  I had verbally told Jeff on Tuesday, after I had had the

15   second conversation and Chris had had the second incident in

16   such a short period of time, and I sent an email to him and I

17   cc'd Wendy Baldo and I cc'd Katie Hobbs.  And I said -- the

18   email was entitled "Family-Related Matter."

19          And I said, "I need to go and -- I think I need to go

20   to try to be with Chris.  He's having these undiagnosed

21   heart-related issues.  We're waiting on results for an EKG, and

22   I'm trying to work to get him a referral to a private

23   cardiologist to see if we can understand what's happening to

24   him."

25          And I received an email back from Jeff that said,

1    "Family comes first at the Arizona State Senate.  Go and do

2    whatever you need to do for your son, and we're praying for

3    him."

4    Q.  You have in front of you Exhibit 19.

5    A.  Yes, sir.

6    Q.  And what is that exhibit?

7    A.  This is an exhibit from the week before.  It is an email

8    that I wrote to Ms. Baldo regarding a request to meet with her

9    to discuss HR and an HR issue.

10   Q.  I'm sorry.  Exhibit 18.

11   A.  I do not have Exhibit 18 in front of me.

12           MR. BERNARD:  I'm sorry.  I thought that was --

13           THE WITNESS:  Yes.  This is my cell phone record.

14   BY MR. BERNARD:

15   Q.  How do you know it's your cell phone records?

16   A.  Up at the top is the telephone number of my cell phone at

17   the time and current cell phone number.

18   Q.  And what is the date range on the records?

19   A.  The bill close date is February 22nd, 2015, and the date

20   range is -- the one I have is February 13, 2015.

21           MR. BERNARD:  Okay.  Your Honor, we ask to admit

22   Exhibit 18 into the record.

23           MR. MOBERLY:  No objection.

24           THE COURT:  Exhibit 18 is admitted.

25           (Exhibit No. 18 admitted into evidence.)

1          MR. BERNARD:  May I publish, Your Honor?

2          THE COURT:  You may.

3   BY MR. BERNARD:

4   Q.  Now, I think you -- did you -- you testified that you made

5   a phone call to somebody?

6   A.  I had sent the email to Jeff and cc'd Wendy Baldo and Katie

7   Hobbs.  And then subsequently, there was also emails regarding

8   my request to meet with leadership to talk to them about my

9   status on the Democratic Caucus.

10         And Jeff Winkler had replied to that in the evening of

11  Friday, February 13th, and said that he had cleared his

12  calendar and that he would be available to speak with me on

13  Monday, February 16th, at 7:30 a.m. in the morning.

14  Q.  And was there a subsequent phone call to Jeff?

15  A.  I did call Jeff on Monday, February 16th, at 7:30 in the

16  morning.

17  Q.  And, let's see.

18  A.  Well, let --

19  Q.  On Exhibit --

20  A.  Please let me correct that.

21         I called Jeff Monday, February 16th, at 6:27 a.m.

22  Seattle time.  So I believe it's on the second --

23  Q.  What's the Bates stamp number on the --

24  A.  AZSEN 0118.

25  Q.  And I'm going to zoom out.

1              And I think you can touch your screen to show about

2      where is the phone call, and then I can zoom back in.

3      A.  I believe it's right there.

4      Q.  Try --

5      A.  So the number, 602-926-4471, at 6:27 a.m.

6      Q.  Right here?

7      A.  Correct.

8      Q.  So you had a conversation with Mr. Winkler at that time?

9      A.  I did not.  It was 6:27 a.m. in Seattle and it was

10     7:27 a.m. in Phoenix when I called.  I did not reach Jeff or

11     the receptionist, and he did not return my call that morning.

12              Can I clarify something as it relates to this exhibit?

13     Q.  Yes.

14     A.  On -- on the exhibit, AZSEN 0118, the first call that I

15     received back from the Arizona State Senate is the last call

16     listed.  I did not have a work cell phone number.  We used our

17     personal cell phone numbers.  This was the only number to reach

18     me at.

19              And the first time I receive a call back or -- from

20     the Arizona State Senate on February 16th, 2015, is at

21     2:27 p.m. in the afternoon.

22              THE COURT:  Whoa, whoa.  A short brief moment.

23              (Testimony interrupted with proceedings not

24     transcribed herein.)

25              THE COURT:  I'm sorry.  Ms. Adams, you may retake the

1    witness stand.

2                        TALONYA ADAMS,

3    called as a witness herein by the Plaintiff, having been

4    previously duly sworn or affirmed, resumed the stand and

5    continued to testify as follows:

6             THE COURT:  You may continue.

7             MR. BERNARD:  Thank you, Your Honor.

8                  DIRECT EXAMINATION (Continued)

9    BY MR. BERNARD:

10   Q.  When we left off --

11   A.  I --

12   Q.  -- you --

13   A.  I placed the exhibit -- thank you.  18.

14            MR. BERNARD:  May I publish, Your Honor?  This is

15   Exhibit 18.

16            THE COURT:  You may.

17   BY MR. BERNARD:

18   Q.  There was some testimony prior to your testimony today that

19   people were trying to get ahold of you.  Multiple people were

20   calling your cell phone, but you weren't answering.

21            Do you remember that testimony?

22   A.  Yes, I do.

23   Q.  And I think you were shown your cell phone records.  Do you

24   see any phone calls from the State Senate?

25   A.  Yes, I do.

1  Q.  Where are those calls?

2  A.  I think I actually misspoke.  There is not an incoming call

3  from the Arizona State Senate on the first page.  It looks like

4  on February 16th, 2016 [sic], I called the Senate at 6:27 a.m.

5  Seattle time, 7:27 a.m. Phoenix time, and then again I called

6  the Senate on February 16th, 2015, at 2:27 p.m.

7  Q.  And, I'm sorry, Ms. Adams, which page are you looking at?

8  A.  The page Bates stamped AZSEN 0118.

9  Q.  So if you want to look -- if you want to use the screen so

10  the jury can see where you called the Senate and then the

11  Senate called you on the 16th.

12       Do you need me to move it up?

13  A.  If you can enlarge it, I think it would be helpful.

14       So just above the red line that I just marked, that is

15  me calling the Senate on February 16, 2015, at 6:27 a.m.  And

16  it's going to Phoenix, Arizona, and it's going to 602-926-4471.

17       The second call that I made is on the last -- it's the

18  last call on this document, and I'll draw a line underneath it

19  now.  That is a call that I made on February 16th at -- 2015 at

20  2:27 p.m. to 602-926-4471.

21       Between those two periods of time, I had two incoming

22  calls -- or three incoming calls.  And you can see because it

23  says here "Incoming."  That's my mom calling.

24  Q.  It looks like -- do you see another phone call to the

25  602-926-4471 at 12:53?

1   A.  Yes, I do, actually.  Thank you.  So it's right above that

2   red line.

3   Q.  Now, there's another incoming call, 480-987-2773.  Is that

4   anyone from the State Senate?

5   A.  No.  That's my mom.

6   Q.  So on -- now I want to show you the next exhibit.

7   A.  Is this the same exhibit, and the second page?

8          THE COURTROOM DEPUTY:  Is this still Exhibit 18?

9          MR. BERNARD:  Yes, ma'am.

10          THE COURTROOM DEPUTY:  Okay.

11          MR. BERNARD:  I'm sorry.  I meant to say next page on

12   the exhibit.

13   BY MR. BERNARD:

14   Q.  Let's look at the incoming calls first.  There's one with a

15   prefix 770.  Is that from the State Senate?

16   A.  No.

17   Q.  There's a 602-618 number that's incoming.  Is that from the

18   State Senate?

19   A.  This one could be a member calling me.

20   Q.  And you go all the way -- if you go all the way across,

21   looks like you answered that phone call; correct?

22          It says, minutes, 3?

23   A.  Yes.  Yes, it does.

24   Q.  I'll clear that.

25          Just below that is a 602-926-4471.

1    A.  Yes.  That's me.

2    Q.  Outgoing?

3    A.  Calling the Senate.

4    Q.  Is that outgoing or incoming?

5    A.  It's outgoing, me calling the Senate.

6    Q.  Incoming -- the next incoming is 602-363-1542.  Is that

7    from the State Senate?

8    A.  No.

9    Q.  The next incoming is 770.  Is that from the State Senate?

10   A.  No.

11   Q.  Next one incoming is 602 -- or, excuse me -- 502-206.  Is

12   that from the State Senate?

13   A.  That is a senator calling me.

14   Q.  Is it Mr. Winkler?

15   A.  No.

16   Q.  Is it a senator that's testified?

17   A.  No.

18   Q.  The next incoming is a 480-987.  Is that from the State

19   Senate?

20   A.  That's my mom.

21   Q.  Next incoming that is left, 602-363.  Is that from the

22   State Senate?

23   A.  No.

24   Q.  So on -- is it fair to say on June -- or, excuse me,

25   February 16th, which is that Monday, you had one incoming call

1    from a senator, if we're looking at both the Bates stamped

2    ending in 1119 and 1118?

3    A.  Yes.  From a senator calling from their cell phone.

4    Q.  So the testimony before that multiple people from the State

5    Senate were calling you, is that an accurate statement or an

6    inaccurate statement?

7    A.  It is an inaccurate statement.  I did not receive a

8    telephone call from Mr. Winkler, Ms. Baldo, or Ms. Hobbs on

9    February 16th, 2015.

10   Q.  Now, going -- looking back at the same exhibit, how many

11   times would you say that you called the State Senate, which is

12   that 602 -- or that number ending in -- I think it was 4471.

13   A.  On February 16th?

14   Q.  Yes, ma'am.

15   A.  The first call was on February 16th at 6:27 a.m. Seattle

16   time.  The second call was at -- on February 16th at 12:53 p.m.

17   Seattle time.  The third call was on February 16th, 2:27 p.m.

18   Seattle time.

19          THE COURT:  Is this a good place to break?  Oh, you're

20   not done yet?

21          MR. BERNARD:  Your Honor, I just want to wrap up, then

22   we'll be --

23          THE COURT:  Okay.  Finish up, yeah.

24          THE WITNESS:  The fourth call was February 16th, 2015,

25   at 3:44 p.m.  And that would be a total of four calls on

1    February 16th.

2            MR. BERNARD:  Thank you.

3            This is a good time.

4            (Further proceedings held on the record not

5    transcribed herein.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 11th day of November,

13   2019.

14

15

16

                    s/Jennifer A. Pancratz_____ _____ ____
17                  Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25