**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Talonya Adams, | ) | |
| | ) | No.  CV-17-00822-PHX-DLR |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 11, 2019 |
| Arizona Senate, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**


**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**


**JURY TRIAL DAY 3 - TESTIMONY OF TALONYA ADAMS**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

  For the Plaintiff:
3
        Talonya Adams, Esq.
4       In propria persona
        2 N. Central Avenue, Suite 1800
5       Phoenix, AZ 85004

6  For the Defendant:

7       Michael D. Moberly, Esq.
        Ryley Carlock & Applewhite PA
8       1 N. Central Avenue, Suite 1200
        Phoenix, AZ 85004
9

10  Also Present:

11      Gillmore Bernard, Esq.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                 UNITED  STATES  DISTRICT  COURT

1                        **I N D E X**

2

3     **SUMMARY OF COURT PROCEEDINGS**                        **PAGE:**

4     Sidebar Conference                                        16

5     **WITNESSES FOR THE            DIRECT    CROSS    REDIRECT    RECROSS**
      **PLAINTIFF:**

6

7     **Talonya Adams**
      By Mr. Bernard                  5                    57
      By Mr. Moberly                           17

8

9

10                      **E X H I B I T S**

11    **NO.**                    **DESCRIPTION**                      **REC'D**

12    212    12-14-12 email between Talonya Adams and Leah       24
             Landrum-Taylor re: Policy Analyst position

13           accepted

14    228    11-21-14 email between Talonya Adams and Jeff       33
             Winkler re: Adams Senate/Employee Agreement -

15           MBA Program Enrollment

16    227    Talonya Adams' Leave Request March 2-6, 2015/       34
             40 hours

17

18    226    11-15-14 email between Talonya Adams and Katie      35
             Hobbs re: request meet - travel request

19           related to Thunderbird enrollment

20    234    2-1-15 email between Talonya Adams and Jeff         41
             Winkler re: meet requested to discuss

21           workload/hours/pay

22    235    2-3-15 email between Talonya Adams and Katie        42
             Hobbs/Jeff Winkler re: Availability to set

23           meeting

24    237    2-13-15 email re: Legislative Report Thursday,      48
             Feb. 12, 2015

25

                    UNITED STATES DISTRICT COURT

4

| | | |
|---|---|---|
| 269 | Cell phone records, Acct. No. 830241260, 2/22/15 | 49 |
| 239 | 2-13-15 email from Talonya Adams to Leadership re: request to meet to discuss current status on Democratic Caucus staff | 53 |
| 241 | 2-13-15 email between Talonya Adams and Katie Hobbs re: inappropriate meeting requested with full leadership | 54 |
| 243 | 2-13-15 email between Talonya Adams and Jeff Winkler | 55 |
| 244 | 2-13-15 email between Talonya Adams and Katie Hobbs cc Leadership team | 56 |
| 245 | 2-13-15 email between Talonya Adams and Jeff Winkler cc Leadership team re: meeting and FMLA protocols | 56 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    **P R O C E E D I N G S**

2              (Prior proceedings held on the record not transcribed

3    herein.)

4              (Jury present.)

5              THE COURT:  All right.  Ms. Adams, you may retake the

6    witness stand.

7                         TALONYA ADAMS,

8    called as a witness herein by the Plaintiff, having been

9    previously duly sworn or affirmed, resumed the stand and

10   continued to testify as follows:

11             THE COURT:  You may proceed.

12             MR. BERNARD:  Thank you, Your Honor.

13                    DIRECT EXAMINATION (Continued)

14   BY MR. BERNARD:

15   Q.  Good morning again, Ms. Adams.

16   A.  Good morning.

17   Q.  When we left off last -- yesterday, we were talking about

18   your cell phone records.

19             Do you remember that?

20   A.  Yes, I do.

21   Q.  After you were treating your son, when did you come back to

22   work?

23   A.  I did not return back to the Arizona State Senate.  I was

24   in Seattle on Friday morning, February 20th, 2015, and I had a

25   meeting -- my son Chris and I had a meeting with his coach at

1   Bellevue College.  And at that time, it was clear he was not

2   going to be able to return or be cleared to play basketball,

3   probably for the remainder of the season.

4          So we met with his coach that morning, and during the

5   time in which we met with his coach, Ms. Baldo had called my

6   cell phone.  So after Chris and I were leaving the meeting with

7   the coach, I had a missed call from the Arizona Senate and a

8   voicemail from Ms. Baldo asking me to meet with her the morning

9   of Monday, February 23rd, 2015, at 8:00 a.m. before office

10  hours.

11         And so I returned her call.  Chris ran back in, and I

12  spoke to her briefly in the car, in which she notified me about

13  my employment.

14  Q.  Did she say, "Ms. Adams, you are terminated"?

15  A.  No.  I called her and she answered.  And I said, "Hi,

16  Wendy.  It's Talonya."

17         And she said, "Hello."

18         And I said, "I got your voicemail, and I just wanted

19  to give you a call back."  I -- it was -- it was right after

20  the call when she had called that morning, and I called her

21  right back that morning after we got out of the meeting with

22  the coach.

23         And she had said, "Yeah, I want to meet with you

24  Monday morning before office hours, 8:00 a.m. sharp."

25         And I said, "Oh, okay."

1          And she sounded like there was some concern in her

2     voice, and so I said, "Is everything okay?"

3          And she said, "Um," and then she took a big sigh, and

4     she was quiet.

5          And I said, "Am I being reprimanded?"

6          And she said, "Um," and she took a big sigh again.

7     And she said, "Your services are no longer needed."

8          And I said, "I'm" -- like, I wasn't sure what she was

9     saying to me.  I said, "I'm being fired?"

10          And she said, "Yes."

11          And I said, "Whose decision is it?"

12          And she said, "Ultimately, it's -- I'm the chief of

13     staff.  It's mine."

14          And I said, "Wendy, I'm here with my son.  He is

15     having a hard time, and if I'm just going to return to the

16     Senate on Monday morning so you can terminate me, I'd prefer to

17     be able to stay with him."

18          And she said, "Okay."

19          And I said, "Okay."  And we hung up.

20     Q.  Were you shocked?

21     A.  I was.  I was really shocked.  I was confused.  I was

22     afraid.

23     Q.  Had you ever been terminated from a job before?

24     A.  No.

25     Q.  Have you ever been reprimanded from a job before?

8

1   A.   No.

2   Q.   Did she give you a reason why she was terminating you?

3   A.   She just said, "Your services are no longer needed."

4   Q.   Prior to that, had anybody said that you'd been doing an

5   inadequate job or unsatisfactory job --

6   A.   No.

7   Q.   -- at the Senate?

8   A.   No.

9   Q.   Looking back now, do you feel that you were being

10  discriminated against?

11  A.   I do.  I do.

12  Q.   Do you feel it was because of your race?

13  A.   Yes, I do.

14  Q.   Do you feel it was because of your sex?

15  A.   Yes, I do.

16  Q.   Do you feel it was because you asked for a raise?

17  A.   I think that was the response to my request for a raise.

18  On the same day, February 13th, 2015, I had inquired about the

19  raise and FMLA, Jeff had gotten back to me about FMLA and said

20  the Senate was excluded.  I never received a response from the

21  Senate regarding a salary increase.

22  Q.   Looking back at you being terminated, do you believe that

23  you were subjected to different terms and conditions of

24  employment based on your sex or race?

25  A.   I do.  I think that while I was working there, I did feel

1  like I was treated differently.  I knew I was the only

2  African-American female working there in a professional role.

3  They knew that.  I grew up in primarily white environments.  I

4  married a Caucasian male.  My children are biracial.  I feel

5  very comfortable, as I am in environments, often being the only

6  minority.

7        But I did feel like I was being treated differently at

8  the Arizona State Senate as it relates to my workload, as it

9  relates to once the employment record -- once the article was

10  written on February 12th, and Aaron Latham sent it out, as it

11  relates to being the lowest-paid law-licensed policy advisor,

12  as it relates to being required -- being out of approved to

13  leave the Senate to go be with my son.

14        I'm a single mom.  This kid has been in the hospital

15  no less than two times.  He's got unknown things happening with

16  his health.  And he's less concerned about his health and more

17  concerned about his ability to play basketball.  He was very

18  distraught, more about him not being able to play basketball

19  than he really was about his health.

20        But it was important for me to be there for my son.

21  And for them then to fire me, knowing I'm gone, requiring that

22  I work while I'm out of the office on revised agendas, new work

23  that hadn't even -- didn't even exist, new bills going through

24  committees that weren't even on the committee agenda the week

25  prior.

1          During my time at the Senate, people left the Arizona

2    Senate on leave for a lot of reasons.  They left because a kid

3    was graduating or going back to college or because their child

4    was drug-addicted and they're taking care of grandkids and they

5    didn't have child care.  And during those times -- or their

6    estranged father, who they hadn't spoke to, had fallen ill and

7    they needed to leave.

8          And during those times, myself and other policy

9    advisors covered that work.  We would never call out to a

10   person ill or on leave for any reason in an emergency and ask

11   them to be available to work and ask them to be available to

12   stand by on calls.

13         And so, yes, I felt like I was being treated

14   differently before I left there.  And then after I filed this

15   lawsuit, to see the disparity in treatment and the inequities

16   as it relates to my pay, as it relates to the last day I'm paid

17   a salary is February 13th, 2015.

18   Q.  Now, you said something that you felt that you were being

19   discriminated before you got terminated.

20   A.  I did.

21   Q.  Did you ever bring this issue up to Ms. Baldo?

22   A.  I did.  I raised the issue to both Senator Bradley and also

23   to Ms. Baldo, as well as some Senate members and staffers.  And

24   for the most part, I think people at the Senate believe

25   Ms. Baldo is a very pro-woman -- has a pro-woman perspective.

1    And at times I was encouraged to talk to her.

2             MR. BERNARD:  Your Honor, may I publish Exhibit 236?

3    I believe it's already in evidence.

4             THE COURT:  You may.

5    BY MR. BERNARD:

6    Q.  Is this an email that you sent Ms. Baldo?

7    A.  Yes.

8    Q.  It says -- tell me what it says.

9    A.  It says:  Good morning, Wendy.  I hope you find it -- I

10   hope this email finds you well.  I stopped in to see if you

11   were available to meet yesterday, and I briefly spoke with

12   Monica.  I'm sorry to learn of your broken foot.  Please be

13   gentle with yourself.  Once you return and get settled, I would

14   like to schedule a time to meet with you to discuss an HR

15   issue.  If there is someone else I should speak with, please

16   advise.  Take care.

17   Q.  Now, what did you mean by "an HR issue"?

18   A.  The day prior to the meeting, I had met with Senator Hobbs

19   and Mr. Winkler, and we had talked about -- we had in part

20   talked about my workload.  We had talked also about me feeling

21   like I was being treated very differently.

22             I was being assigned Jeff Fetherston's election bills,

23   all of them, even though he was the subject matter expert.  I

24   was being assigned ad hoc projects by Mr. Winkler under the

25   firearms bill because the new general counsel, Lisette Flores,

1  that they had hired was just ramping on, and so I was to help

2  her transition into that role.

3          And in addition to that, I had my other three

4  committees and I had an intern, Pete Galvan, that I was to

5  supervise and provide work for.

6          And so we talked about that.  I had asked -- I had

7  stated there's an imbalance in the work.  There's an inequity

8  in the work.  I had stated that I felt like I'm being treated

9  different.  I didn't feel like I was being heard.

10         I didn't walk in there and say, "I feel like I'm being

11 discriminated based on my race."  But I did say, "I'm being

12 treated differently.  I'm the only policy advisor down there,

13 and I'm being -- I'm having these individuals' work shuffled on

14 me."

15         And it was not the work of the women per se.  It

16 was -- Lisette Flores was new.  Certainly, it was part of her

17 work.  But I had tried to communicate to them that I feel like

18 I'm being treated differently.

19         And they -- you know, Mr. Winkler -- well, Ms. Hobbs

20 stated she really didn't understand the issue.  If I needed

21 help or if I didn't understand the work, I could just go talk

22 to John about it.

23         And it wasn't a lack of understanding about the work.

24 It was that it was inequitable, that it was unfair, that it was

25 happening to no one else except for me.

1    Q.  Did you -- after you sent this email, were you referred to

2    HR or was your concern addressed?

3    A.  No.  After the meeting, I went to go talk to Wendy.  And I

4    had talked to Wendy before about some sex-related issues,

5    specifically as relates to the hiring of Jeff Winkler over

6    Patsy Osmon for the chief of staff role.

7            And she wasn't there.  Her assistant, Monica, said she

8    had broken her foot and she -- or thought it may have been

9    broken and she was out dealing with that.  And so I returned to

10   my desk and I sent her this email.  It was never directed to

11   HR.

12   Q.  Was any corrective action ever taken?

13   A.  No.  There was no corrective action ever taken.  Wendy

14   invited me up.  We spoke.  I did talk to her about my work

15   imbalance.  I did tell her, "I feel like I'm being set up to

16   fail."  I did tell her, "I feel like I'm being treated

17   differently here at the Arizona State Senate."  I did say that

18   women are being -- doing -- you know, underwriting the work of

19   these men and that I feel strongly that I'm being treated

20   differently.

21   Q.  Was an investigation ever done?

22   A.  Not to my knowledge.

23   Q.  Overall, sitting here today, after a number of years has

24   passed, how has this termination affected you?

25   A.  In the --

1          MR. MOBERLY:  Object to the form.

2          THE COURT:  What's wrong with the form?

3          MR. MOBERLY:  "How has the discrimination affected

4    you?"

5          MR. BERNARD:  Termination.

6          MR. MOBERLY:  I'm sorry?

7          MR. BERNARD:  I said "termination."

8          MR. MOBERLY:  Oh, did you?

9          I withdraw it.  I'm sorry, Your Honor.

10   BY MR. BERNARD:

11   Q.  I'll repeat.

12          Sitting here today, after a number of years, how has

13   this termination affected you?

14   A.  I think in various ways, and I think in evolving ways.

15   When I first heard that over the telephone, I was surprised

16   that I was being fired over the phone.

17          I sat there for I don't know how long.  Quite a while.

18   I was waiting for Chris to come back to the car, and I was

19   trying to get myself together so I didn't make it known to him

20   that there was an issue, because I didn't want him to feel like

21   he was to blame for me losing my job.

22          And so I tried to get myself together, and I left a

23   note.  I went to the bathroom and came back.  I washed my face,

24   I came back.  We left.  I dropped him off at home, and I went

25   to my hotel and I called my mom.  By then, some individuals

1   were texting me, members from the Senate.

2            And I talked to my mom for -- it must have been, oh,

3   hours.  We just -- I was despondent.  I could not believe that

4   I had lost my job, and I thought like maybe I -- I could work

5   it out, like maybe I could find out what had happened, like

6   there was a mistake and -- or a misunderstanding and it could

7   be, like, made right.

8            And so I stayed with Chris and then returned.  And

9   when I got back, I just -- I talked to some senators, and they

10  had asked if maybe they could -- we could put together a

11  meeting or try to do something.  And at that point I -- I

12  understood that my job was probably gone.

13           I had sent an email to the president to meet with the

14  president.  I didn't get a response.  And I -- I was

15  devastated.  I was anxious.  I had a lot of anxiety.  I cried

16  spontaneously.  I went to go stay with my mom, and I stayed on

17  her couch for probably about two weeks.  And I didn't talk to

18  anyone because I was -- I was so embarrassed.  I was so

19  ashamed.  I was so angry.  I was so humiliated.

20           And I didn't understand why my employment had been

21  terminated and why it was just after I had had this job at the

22  Senate that I loved.  This was -- I loved working at the

23  Arizona State Senate.  There is a session, and the interim,

24  there's like this cadence that it has, and the work is the most

25  important work I've ever done.

1          And they're -- not all people, but there are people

2    there that work as staffers and policy advisors and elected

3    officials that are doing incredible work that has great impact.

4    And I enjoyed doing that work.  It was meaningful work to me.

5    It was the best job I had ever had.  And I was good at it.  And

6    so I was devastated to lose my job.

7          And Thunderbird, my cohort was leaving in March, the

8    week of -- the first week of March to the first field seminar,

9    and I was ineligible to go because I had missed the cutoff way

10   back in the fall.  And so I just sunk into depression.

11         MR. BERNARD:  No other questions, Your Honor.

12         Can we -- can I approach?

13         THE COURT:  Yeah.

14         MR. BERNARD:  I have a question.

15         (At sidebar on the record.)

16         MR. BERNARD:  This is the first time I ever --

17         THE COURT:  Go ahead.  Speak so she can hear you.

18         MR. BERNARD:  It's the first time I've ever done this,

19   so I don't know.  Do I do objections if he's going to cross

20   Ms. Adams?

21         THE COURT:  Well, she'll have to make her -- well, do

22   you have an objection to him making objections?

23         MR. MOBERLY:  No.

24         THE COURT:  Okay.  You can make objections.

25         MR. BERNARD:  Thank you.

1            THE COURT:  Okay.

2            (End of discussion at sidebar.)

3            THE COURT:  Are you finished with your direct

4   examination?

5            MR. BERNARD:  Yes, Your Honor.

6            THE COURT:  Okay.  Mr. Moberly, cross-examination.

7            MR. MOBERLY:  Thank you, Your Honor.

8            Could we begin by showing the witness I believe what

9   was Exhibit 18 that got admitted yesterday, and publish that to

10  the jury, if that would be all right.

11           THE COURTROOM DEPUTY:  You don't have it?

12           MR. MOBERLY:  Yeah, I'm sorry, we don't -- it looks

13  like Ms. Adams has the --

14           THE COURTROOM DEPUTY:  Yeah.  I don't have another

15  copy of it, though.

16           MR. MOBERLY:  Okay.  Could we have a moment, Your

17  Honor?

18           THE COURT:  Yes.

19           MR. MOBERLY:  Your Honor, I believe we actually -- I'm

20  sorry.  I believe we actually can handle it from our computer.

21           THE COURT:  Okay.

22                      CROSS-EXAMINATION

23  BY MR. MOBERLY:

24  Q.  Okay.  Do you have that document -- well, yes, you have it

25  on your screen at this point, do you not?

TALONYA ADAMS - CROSS-EXAMINATION                    18

1    A.  Yes, I have it.

2    Q.  Thank you.

3           And if we look at that first page, AZSEN 0118 -- and I

4    apologize, I didn't bring my glasses today, but if we look

5    towards the bottom of that page, Ms. Adams, it appears that

6    there is quite a gap, about a four-hour gap between 8:48 a.m.

7    and 12:52 p.m.

8           Do you see that?

9    A.  Yes, I do.

10   Q.  I'm assuming you may have been on your airplane to Seattle

11   at that time; is that right?

12   A.  On -- on February 16th?

13   Q.  Correct.

14   A.  No.

15   Q.  Okay.  Do you know the reason for that four-hour gap there

16   between calls?

17   A.  I would assume because no one called me.

18   Q.  You seemed to be getting pretty regular communications in

19   and out.  That's just chance, in your mind?

20   A.  I -- it's the record of the calls that I received.

21   Q.  All right.  When did you fly to Seattle?

22   A.  I flew to Seattle on Saturday.

23   Q.  On Saturday?

24          Did you attend classes at Thunderbird that weekend?

25   A.  The Thunderbird weekend was -- for February was

1    February 13th and February 14th.  I did not attend Saturday,

2    February 14th.

3    Q.  How did you decide what part of this phone bill to show to

4    the Court?

5    A.  I had the phone records from the date of February 16th,

6    after I was told -- let me go back.

7           I had deposed Jeff Winkler in March of 2018, and when

8    I deposed him, he had stated that we had a meeting.  I didn't

9    appear at the meeting.  I inquired whether or not he had

10   given -- he knew my son was ill and I was traveling to Seattle.

11   He stated I should return -- I should have returned.  I should

12   have waited the weekend, met with him, and then left for

13   Seattle.

14          I stated that -- I asked if that was required of

15   people that had an emergency family meeting.  And he said,

16   "Well, no, but you could have called and you didn't call."

17          And then his statements began to say, you know, "We

18   were supposed to speak, and I expected you to call and you

19   didn't."

20          So then I requested the phone records from

21   February 16th, 2015, because I had called in.  And I did leave

22   a message saying, "Jeff, please call me when you arrive."

23   Q.  You recall giving testimony yesterday, though, that there

24   are no incoming calls to you from Mr. Winkler's phone; is that

25   correct?

1   A.  I do recall saying that I didn't receive an incoming call

2   from the Arizona State Senate.

3   Q.  You do know that there are additional pages to this phone

4   bill that would include text messages, don't you?

5   A.  I do know that there are -- yeah, this -- at the top of the

6   page, I don't know if you can show it, it does say that it is

7   "talk."  So here, this is phone calls.

8   Q.  And do you recall -- I mean, you've looked at the whole

9   phone bill at some point, have you not?

10  A.  I think so, yes.

11  Q.  And do you recall that if we were to look to the pages that

12  weren't marked and admitted in evidence, there would be text

13  messages from Mr. Winkler's phone to you on the 16th?

14  A.  Honestly, I'm not sure.  I think that's possible.  I didn't

15  normally have a texting relationship with Mr. Winkler, but I do

16  recall receiving a text from him regarding the Family Medical

17  Leave response.

18  Q.  Would you have any objection to the rest of the bill being

19  introduced in evidence?

20  A.  No.  I don't.

21          MR. MOBERLY:  Your Honor, I don't know that we need to

22  interrupt, but at some point I'd like to have that exhibit

23  marked and move its admission in evidence.

24          THE COURT:  Okay.

25

1    BY MR. MOBERLY:

2    Q.  Ms. Adams, when you applied for your job at the Arizona

3    Senate, you did not have any prior experience as a policy

4    advisor for a legislative body; is that true?

5    A.  If you're asking whether I had worked at the Arizona State

6    Senate or the Arizona State House of Representatives prior to

7    my application, the answer is no.

8    Q.  Did you have some other policy advisor experience?

9    A.  I had a law degree.  I had done some legislative work at

10   Greenberg Traurig in my summer year of 2005.

11   Q.  You consider that policy advisor work?

12   A.  I consider it policy-related work.  I consider it legal

13   work, and public policy creates the laws.

14   Q.  Your law degree was not a requirement for that position,

15   was it?

16   A.  It was -- it was not.

17           THE COURT:  Which position are we talking about now?

18           MR. MOBERLY:  I'm sorry.  For the policy advisor

19   position.  Thank you, Your Honor.

20   BY MR. MOBERLY:

21   Q.  At the Senate, the policy advisor -- let me ask the

22   question again.

23           Your law degree was not a job requirement or

24   prerequisite for the policy advisor position at the Senate, was

25   it?

1    A.   No.

2    Q.   You mentioned that you had made a counteroffer when you

3    were originally offered the $60,000?

4    A.   I did.

5    Q.   Do you remember your discussion with Mr. Silverman about

6    that?

7    A.   I do.

8    Q.   He indicated he'd never heard of anybody making a

9    counteroffer.  Do you remember that?

10   A.   Yes.

11   Q.   But he said he'd ask.

12   A.   He said if I wanted to pursue it, he would fight for me,

13   but that it was an honor to work at the legislature.

14   Q.   And he came back later and told you he had been unable to

15   sell that or words to that effect, I assume?

16   A.   He -- I believe he called me and he said that the offer was

17   $60,000, and if I was interested in the role I should take it

18   because they had a second candidate that they were considering.

19   Q.   You decided to do that?

20   A.   I told him that I'd like to speak with a couple of mentors

21   and get back to him.

22   Q.   And what happened?

23   A.   He said okay.  And I spoke with some individuals and then

24   ultimately I just accepted the role at $60,000.

25            MR. MOBERLY:  Could the exhibit -- or could the

1    witness be shown Exhibit 212, please.

2    BY MR. MOBERLY:

3    Q.  Do you recognize this document?

4    A.  Yes, I do.

5    Q.  Can you tell us how you recognize it.

6    A.  This is an email that I sent on December 14th, 2012, to --

7    it doesn't say it, but I believe I sent it -- the underlying

8    email to Peter Silverman.

9    Q.  Right.  So if we look at it, it's actually a string of two

10   or three emails; is that correct?

11   A.  Yes.

12   Q.  And the first email is the one that you just referred to

13   that you sent to Peter?

14   A.  Yeah.  I believe I sent it to Peter Silverman, and I cc'd

15   Senator Leah Landrum Taylor.

16   Q.  And it effectively reflects that you -- well, it reflects

17   your acceptance of the position, ultimately, doesn't it?

18   A.  Yes, it does.  It also shows that I was required to resign

19   as a precinct committeeman prior to accepting my role at the

20   Senate.  And there was a question about -- at the time, I was

21   serving as the -- I was serving on the Board of Adjustment,

22   which is a zoning appellate board for the City of Phoenix.

23          And there was a question -- I had been asked to resign

24   that as well, and I had stated that I'd prefer really not to

25   resign.  It was an honor to serve the City of Phoenix.  It was

1    a mayoral appointment, and it was really important to me.  And

2    ultimately, they agreed to allow me to stay on that board that

3    met on the first Thursday of each month.

4            MR. MOBERLY:  I'd move the admission of Exhibit 212,

5    please.

6            MR. BERNARD:  No objection, Your Honor.

7            THE COURT:  Exhibit 212 is admitted.

8            (Exhibit No. 212 admitted into evidence.)

9    BY MR. MOBERLY:

10   Q.  I had a little trouble hearing you there at the end, but I

11   think the decision was made that you could resign as the

12   precinct committeeperson and stay on the Board of Adjustment;

13   is that correct?

14   A.  That's correct.

15   Q.  When you applied for the position at the Arizona Senate,

16   you did have a law degree but you weren't licensed at that time

17   to practice in Arizona, were you?

18   A.  I was licensed in Washington state.  I was not licensed in

19   Arizona.

20   Q.  You've since become licensed in Arizona; correct?

21   A.  Yes.

22   Q.  And you have your own law firm now?

23   A.  Yes.

24           MR. MOBERLY:  Could the exhibit -- or could we publish

25   Exhibit 216, which is in evidence, to the witness and the jury,

1    please.

2              THE COURT:  You may.

3              MR. MOBERLY:  Scroll down to the second page.  Keep

4    going.  The next page, please.

5    BY MR. MOBERLY:

6    Q.  Do you see on page -- what's marked as page 909 at the top

7    there, the list of the Democratic Leaders Office and then the

8    Democratic Staff; correct?

9    A.  Correct.

10   Q.  And these were -- where it lists the three policy advisors

11   on the Democratic staff, do you agree those were the three

12   policy advisors employed by the Senate after you accepted your

13   position?

14   A.  Yes.  This is the Arizona State Senate Journal.  It's the

15   official record of the Arizona State Senate, and that's -- I

16   believe that to be true.

17   Q.  So there was you, there was Mr. Fetherston --

18             By the way am I mispronouncing his name?  Is it

19   "Fetherston" or "Featherstone"?

20   A.  You're pronouncing it correctly.  Others aren't, yes.

21   Q.  -- and Mr. Winkler?

22   A.  Yes.

23   Q.  And you were -- the other two were on board at the time you

24   were hired.  You were the third of the three; is that correct?

25   A.  That's correct.

1    Q.  Now, there's a reference to Ms. Osmon here, who we've heard

2    about in the trial, and Aaron Latham, who we've also heard

3    about.

4             And both of those were also policy advisors; is that

5    correct?

6    A.  Yes, in the sense that they staffed committees and carried

7    the committee workload, yes.

8    Q.  But they're listed here as also having a dual role, a

9    second role, each of them.  Mr. Latham was a communications

10   director, and Ms. Osmon was a staff attorney.  Was that your

11   understanding as well?

12   A.  At the time, I thought Ms. Osmon was just a policy advisor

13   when I was hired, but it's my understanding -- I take this

14   record to be an accurate reflection.

15   Q.  Were Ms. Osmon and Mr. Latham already in place when you

16   were hired?

17   A.  Yes.  I believe when I applied to the Senate prior,

18   Mr. Latham was selected for the role.

19   Q.  The earlier -- when you made the earlier application,

20   Mr. Latham was the person who was selected; is that what you're

21   telling us?

22   A.  I believe so.

23   Q.  Okay.  And this indicates, and we've heard, Mr. Silverman

24   was your supervisor; is that correct?

25   A.  He was the chief of staff and general counsel.

1  Q.  Did you consider him your supervisor?

2  A.  I think as it relates to the work that was being done on

3  the Democratic staff, but ultimately, I considered my

4  supervisor to be Wendy Baldo.

5  Q.  Sometime later, Mr. Winkler succeeded Mr. Silverman?

6  A.  Yes.

7  Q.  That occurred in November of 2014; is that right?

8  A.  I believe so.

9  Q.  Mr. Silverman left the Senate?

10  A.  Yes.  I think -- I'm not really sure how it worked out on

11  the paper, but Mr. Silverman was gone in early November.  Patsy

12  Osmon was the acting chief of staff.  She was also interviewing

13  for the role.  And ultimately, she was selected by the

14  committee, and then Senator Hobbs gave the job to Mr. Winkler.

15  Q.  Let's go over the Thunderbird issue as it sort of -- in its

16  initial stages, just briefly again.

17      How did that opportunity come to you?

18  A.  I had first learned about Thunderbird when I was working at

19  Microsoft in the early 2000s.  I had flown out to --

20  Thunderbird at the time was located in Glendale, Arizona.  I

21  was residing in Seattle, working in Redmond.  And I had flown

22  out to Thunderbird to do the, like, 360 preview weekend.

23      There were people that work at Microsoft, when they

24  worked there and sometimes when they leave, if they're an

25  alumni of Microsoft, they're called Microsofties.  And there

1    were individuals from Microsoft, Microsofties, that had

2    attended Thunderbird.

3    Q.  And when the opportunity to perhaps attend Thunderbird

4    arose in the summer of 2014, was -- Ms. Baldo was the first

5    person at the Senate you went to; is that correct?

6    A.  Yes, she was.

7    Q.  And she was supportive, I think you told us?

8    A.  She was supportive, and I went to her because I knew she

9    could make the decision and she could make it clearly and

10   definitively.  And she did.

11   Q.  There were -- there's no question she had some concerns

12   that she shared with you, though; correct?

13   A.  She was concerned about the money, right.  It was $91,500

14   to attend Thunderbird for this 20-month program, and she wanted

15   it to be explicitly clear that the Senate was not going to be

16   responsible for any tuition reimbursement or any contribution

17   monetarily to Thunderbird.

18   Q.  She also had some concerns about your ability to do both --

19   both tasks, didn't she?  And specifically, to be in the Senate

20   during the legislative session?

21        MR. BERNARD:  Objection.  Speculation.

22   BY MR. MOBERLY:

23   Q.  Did she express any of those concerns to you?

24   A.  She -- we went over -- we went over the Thunderbird

25   requirements for the program, which is a 20-month program, one

1    to two months a weekend, five terms, three field seminars.  And

2    she said that we would have to figure something out as it

3    relates to the legislative session for the field seminar.

4    Q.  And that's -- that conversation ultimately culminated in

5    the drafting of the agreement we've seen here; is that correct?

6    A.  In part.  I went back to Thunderbird and said, "I have

7    employer approval to attend" -- and Thunderbird is the one that

8    required the employer approval before you could even interview;

9    it was a prerequisite -- "but during the interim session, I

10   need to see if there can be an accommodation made."

11   Q.  And that had to do with being in the session -- or the

12   field trips during the session; is that correct?

13   A.  That's correct.

14   Q.  And you were told that that probably could be done by you

15   attending with another class; is that right?

16   A.  I was told that it absolutely could be done.  I could

17   attend.  We were executive cohort 24, and I was told that

18   executive cohort 25, they were recruiting.  As our cohort was

19   beginning they were recruiting for E 25 is what it's called.  I

20   could travel with them.

21          So they would have their initial field seminar in the

22   spring -- well, arguably in the spring, and then they would

23   have a field seminar during the interim, and I would be able to

24   go on that second field seminar with them to make up for the --

25   at the time the February -- the week of the February 23rd,

1    2015, seminar.

2    Q.  After meeting with Ms. Bald -- Ms. Baldo, I'm sorry, you

3    also met with Anna Tovar and Peter Silverman about this; do you

4    remember that?

5    A.  I do.  I met with Anna Tovar and Peter Silverman and

6    Senator Pancrazi.  She was the assistant minority leader.

7    Q.  And again, at the time, Ms. Tovar was the Senate minority

8    leader, wasn't she?

9    A.  Yes, she was.

10   Q.  And you remember she had some concern about you being out

11   of the building or out of the Senate during legislative

12   session?

13          MR. BERNARD:  Objection.  Speculation.

14          THE COURT:  I think he asked her if she recalled her

15   expressing some concern.

16          MR. BERNARD:  Okay.  If that was the question, Your

17   Honor.

18          THE COURT:  Overruled.

19          THE WITNESS:  Do you mean out of the legislative

20   session -- what do you mean when you say out of the --

21   BY MR. MOBERLY:

22   Q.  She asked -- I'm sorry.  Were you finished?

23   A.  I'm curious, when you say being out of the legislative --

24   during the legislative session for the field seminar?

25   Q.  She had -- yeah.  She had a concern, I think, about you

TALONYA ADAMS - CROSS-EXAMINATION

1    being out of the building during legislative session, didn't

2    she?

3    A.  She didn't raise that issue.

4    Q.  She did not?

5    A.  She asked me -- there was a language requirement as it

6    relates to Thunderbird.  To graduate, you have to have mastered

7    a second language.  She asked me what was my language going to

8    be.

9    Q.  Do you remember Mr. Silverman saying that he'd never heard

10   of an arrangement of this kind being made?

11   A.  Yes, he did.  He said -- and the same way he told me he had

12   never heard of anyone countering.  He had never heard, ever, of

13   anyone at the Senate asking to attend Thunderbird.  And I asked

14   him if anyone at the Senate had ever been admitted to

15   Thunderbird.

16   Q.  In any event, that -- your request was ultimately approved?

17   A.  My understanding is that the request was approved by Wendy

18   Baldo when I went and told Thunderbird that I had employer

19   approval and then was allowed to interview and subsequently

20   admitted.

21   Q.  Do you know who came up with the itemization in the

22   agreement?

23   A.  I do not know.  I talked to Wendy and then there -- she

24   provided me with the initial draft of the agreement, which I

25   needed on file prior to school starting.

1   Q.  You did understand that one of the conditions was that the

2   legislature had to come first; correct?

3   A.  I did.  And I always put the legislature first.

4           MR. MOBERLY:  Could I have just one second?

5           THE COURT:  Yes.

6           MR. MOBERLY:  Could the witness be shown Exhibit 228,

7   please.

8   BY MR. MOBERLY:

9   Q.  Do you recognize that document?

10  A.  Yes, sir.

11  Q.  And how do you recognize that?

12  A.  On -- it's an email that I sent to Jeff Winkler on

13  Thursday, November 20th, 2014, after receiving a call from

14  Senator Hobbs.

15  Q.  And do you -- well, it's -- and it's a chain from you

16  returned back to him?  I mean, there's an exchange between the

17  two of you; is that correct?

18  A.  Between Jeff and I, yes.

19  Q.  Yeah.

20          MR. MOBERLY:  I'd move the admission of Exhibit 228,

21  Your Honor.

22          THE COURT:  I'm going to ask Ms. Adams, do you have an

23  objection?

24          MS. ADAMS:  No, sir.

25          THE COURT:  Exhibit 228 is admitted.

1              (Exhibit No. 228 admitted into evidence.)

2              MR. MOBERLY:  Could it be published to the jury?

3              THE COURT:  You may.

4    BY MR. MOBERLY:

5    Q.  And if we look at the middle, sort of the middle email in

6    there, I guess it's the 4:19 p.m. one --

7    A.  Yes.

8    Q.  Excuse me.  I'm looking at the wrong one.

9              It's the 9:02 -- or 9:02 p.m.  You indicate to him

10   that you'd like to discuss some educational-related time-off

11   request; is that right?

12   A.  That's correct.

13   Q.  And at this point, obviously, it's clear from the email

14   Mr. Winkler had just been appointed chief of staff?

15   A.  We had just been notified.  Senator Hobbs called all the

16   policy advisors to notify them that she had selected Jeff.  She

17   left a voicemail for me that said, "I want you to know I have

18   selected Jeff Winkler as the chief of staff.  It's going to

19   come out in media shortly, but I want staff to know first.  You

20   can follow up with Jeff regarding your education request."

21   Q.  And you'd also submitted a formal leave request; is that

22   right?

23   A.  I -- I did submit a leave request form when I met with

24   Senator Hobbs on November 18th, 2014.

25             MR. MOBERLY:  Could the witness be shown Exhibit 227?

1    BY MR. MOBERLY:

2    Q.  Do you recognize this document?

3    A.  Yes, I do.

4    Q.  That's the leave request?

5    A.  That is the leave request.

6           MR. MOBERLY:  I'd move the admission of 227, Your

7    Honor.

8           THE COURT:  Any objection?

9           MS. ADAMS:  No objection.

10          THE COURT:  It's admitted.

11          (Exhibit No. 227 admitted into evidence.)

12          MR. MOBERLY:  Could we publish it briefly to the jury,

13   please?

14          THE COURT:  You may.

15          MR. MOBERLY:  And then if the witness could be shown

16   Exhibit 226.

17   BY MR. MOBERLY:

18   Q.  Do you recognize that document, Ms. Adams?

19   A.  Yes, I do.

20   Q.  Can you tell us how you recognize that?

21   A.  This is an email that I sent to Senator Hobbs on Saturday,

22   November 15th, 2014, asking her to meet because I wanted to

23   discuss my enrollment at Thunderbird.

24          MR. MOBERLY:  I'd move the exhibit of -- I'm sorry,

25   the admission of 226 as well, Your Honor.

1          THE COURT:  Any objection?

2          MS. ADAMS:  No objection.

3          THE COURT:  Exhibit 226 is admitted.

4          (Exhibit No. 226 admitted into evidence.)

5          MR. MOBERLY:  And if we could also publish that to the

6    jury, please.

7          THE COURT:  You may.

8    BY MR. MOBERLY:

9    Q.  So if I'm reading these correctly, the sequence was you

10   made this request to Ms. Hobbs; two, three days later, you

11   actually submitted a formal leave request; and then two or

12   three days after that, you requested to meet with Mr. Winkler.

13   Is that the right timing?

14   A.  I made this request to Ms. Hobbs.  Janelle, her assistant,

15   was cc'd.  She reached out and scheduled a time for me to meet

16   with Ms. Hobbs on Monday, November 18th.  During that meeting,

17   I completed the form -- the request form that you just showed

18   and left it with Ms. Hobbs.

19   Q.  So the meeting actually occurred on the day that is the

20   date on the leave request; is that right?

21   A.  That's correct.

22   Q.  The 18th, if I'm remembering?

23   A.  That's correct.

24   Q.  After you met with Senator Hobbs, she said she'd get back

25   to you, didn't she?

1    A.  Yeah.  She thought it would be no problem, but she said

2    that she could get back to me in the next day or so.  And I

3    said okay.

4    Q.  And she subsequently let you know that it would be

5    Mr. Winkler that would be getting back to you?

6    A.  That's right.  She never approved or denied the request.

7    She called on, I believe it was November 20th.  It was right

8    before Thanksgiving.  And she had said -- she had left a

9    voicemail about her selection of Mr. Winkler and advised that I

10   follow up with him regarding my request.

11   Q.  And you did have that meeting with Mr. Winkler?

12   A.  I sent the email to Mr. Winkler asking if I could meet with

13   him regarding education-related time off at Ms. Hobbs'

14   direction that she had left in a voicemail.

15   Q.  And you did meet with him?

16   A.  I did meet with Mr. Winkler on December 1st.

17   Q.  During that meeting, he told you that the request for leave

18   would not be approved; is that correct?

19        MR. BERNARD:  Objection.  Hearsay.

20        THE COURT:  Overruled.

21        THE WITNESS:  In a -- yes and no.  I guess my answer

22   is yes and no.

23   BY MR. MOBERLY:

24   Q.  Why don't you just tell us what he told you.

25   A.  Okay.  He had -- he had become the chief of staff, and the

1    subsequent week, I think, interviews were happening for the

2    general counsel role.  I hadn't heard back from Mr. Winkler,

3    but he wanted to do one-on-one meetings with each policy

4    advisor.

5            And so he scheduled a meeting with me on December 1st.

6    And we met and he talked about he -- well, he had a meeting

7    with the entire team, I guess, of policy advisors, Democratic

8    policy advisors.  Stated that he was the chief of staff but

9    that things were going to be fine.  He stated nobody's job was

10   at risk.

11           And he also stated that he wanted to -- he understood

12   that other policy advisors, not myself but Patsy Osmon and

13   Aaron Latham, had applied for the chief of staff role and had

14   not been selected, and he wanted to make sure that we could

15   come together as a team and that he would be meeting with us

16   one on one, individually.

17           He set the time to meet with me on December 1st, 2014.

18   At that time he talked about how he intended to lead the team,

19   committees.  He -- what committees I might be interested in and

20   he would take under consideration, and that he was -- needed to

21   decide when he was going to put his staff meetings together.

22   And that was about it.

23   Q.  At some point, though, in the meeting he told you that the

24   request for leave would not be approved?

25   A.  I asked him, I said, "Jeff, did you receive my request for

1    leave from Senator Hobbs?"

2         And he said, "Yeah.  It's denied."

3         And I said, "Okay.  Do you have the form?  Like, can

4    you fill it out?  I need to -- you know, I need to let

5    Thunderbird know."

6         The reason why I'd asked for the request is because

7    the original field seminar date was in February of 2015.

8    That's what Ms. Baldo had denied.  Thunderbird was being

9    acquired by ASU.  I had went back to Ms. Baldo, and she said,

10   "Go to your new leadership," like she testified yesterday.

11   "When you have your new leadership, if they will approve it --

12   if you can give them a compelling reason and they will approve

13   it, I will allow it."

14        I waited until Ms. Hobbs was in place.  I sent her the

15   request.  She sent it to Jeff.  I met with Jeff.  Jeff said no.

16   Q.  Do you remember him making reference to the prior agreement

17   during that meeting?

18   A.  Well, I had -- I said, "Jeff, can I -- can I have the

19   form?"  Because I needed something to take back to Thunderbird

20   to say -- Thunderbird was losing its accreditation in the

21   merger, so my class was the last class that was going to be a

22   teach-out period, which meant all my degree requirements needed

23   to occur in lock step during that teach-out period to be

24   eligible to graduate.

25        I at least needed a document to take back to them to

1    say I had received employer approval to attend, but given the

2    change in Thunderbird's status, I need to figure out some other

3    accommodation.  Thunderbird at that time wasn't recruiting

4    E 25.  That option no longer existed, and so I was trying to

5    figure it out.

6            Mr. Winkler said he -- I had already asked Wendy, and

7    Wendy had already said no.  And -- and that he had talked to

8    other chief of staffs, including Peter Silverman and Michael

9    Mandell, who worked at the Senate prior to me, and they had

10   all -- they had never heard of such a request and therefore it

11   was denied.

12   Q.  Do you remember him offering to speak to the dean of

13   Thunderbird to see if there was anything he could do to help?

14   A.  After he gave me the form, I had just -- I had just said

15   okay.  The -- I had went to Wendy in October because the field

16   seminar in February that had been moved to March was in Beijing

17   and Shanghai and Singapore.  And we needed to get visas, and

18   those visas were going through a third-party agency that

19   Thunderbird uses.

20           And so there are tiered deadlines and $5,000 deposits

21   that have to be given in advance of these trips to qualify.

22   That period of time expired in November.  So when Jeff had told

23   me no, I had already -- I was already barred from attending.

24           And so him -- he offered -- Jeff staffed the education

25   committee.  And after we had met that day, I think later in the

1    week, he stopped by my office and he said, you know, "If you

2    need me to talk to Dr. Crow, I can talk to Dr. Crow."  Dr. Crow

3    is Michael Crow, the president of ASU.  He's not the dean of

4    Thunderbird.

5    Q.  And did you take him up on the offer or did you say, "How

6    about calling the dean of Thunderbird?"  Or what did you do in

7    response?

8    A.  I just said, "Jeff, I'm just waiting to see what

9    Thunderbird is willing to do.  Maybe there's accommodation."

10             MR. MOBERLY:  Could the witness be -- and the jury be

11   shown Exhibit 227 again briefly.

12             And if you'd scroll down for me.

13   BY MR. MOBERLY:

14   Q.  So you indicated that you had asked for some sort of

15   written confirmation, and I presume this is -- that you got it

16   and this is what you're referring to; is that correct?

17   A.  Yeah.  This is the form I completed when I sat down and met

18   with Senator Hobbs and the form that I left with her.

19   Q.  And then at the bottom, is that Mr. Winkler's signature

20   with "not approved" on there, to your knowledge?

21   A.  I believe so.

22             MR. MOBERLY:  Could the witness be shown Exhibit 234,

23   please.

24   BY MR. MOBERLY:

25   Q.  Do you recognize this email chain?

1    A.  Yes.

2    Q.  Can you tell us how you recognize it?

3    A.  I was working on Sunday, February 1st, at the Arizona State

4    Senate, and I had sent an email to Jeff Winkler that morning

5    and to Senator Hobbs.

6    Q.  And what was the subject?

7    A.  Are you asking about the subject line of the email or the

8    subject of the request to meet?

9    Q.  I'm sorry, I couldn't hear you.

10   A.  I just want to know if you're asking about the subject line

11   of the email or the subject of the request to meet.

12   Q.  The subject of the request to meet.

13   A.  Okay.  Yeah.  I wanted to talk to them about my workload at

14   the Arizona Senate after the bills had been assigned.

15          MR. MOBERLY:  I'd move the admission of Exhibit 234,

16   Your Honor.

17          THE COURT:  Any objection?

18          MS. ADAMS:  No objection.

19          THE COURT:  Exhibit 234 is admitted.

20          (Exhibit No. 234 admitted into evidence.)

21          MR. MOBERLY:  And then 235, please.  Show it to the

22   witness.

23   BY MR. MOBERLY:

24   Q.  And do you recognize that chain?

25   A.  Yes, I do.

TALONYA ADAMS - CROSS-EXAMINATION

1    Q.  And can you tell us what that is?

2    A.  I think it starts like -- I'm not sure, but I think the

3    last email in the thread is an email that Jeff -- yes, thank

4    you -- that Jeff sent to me while I was in committee asking

5    when I would be available to meet with Senator Hobbs.

6    Q.  So Exhibit 235 is a chain that follows up on 234; correct?

7    A.  It could be.

8    Q.  Trying to schedule a meeting?

9    A.  Yes.

10           MR. MOBERLY:  I'd move the admission of 235.

11           MS. ADAMS:  No objection.

12           THE COURT:  Exhibit 235 is admitted into evidence.

13           (Exhibit No. 235 admitted into evidence.)

14           MR. MOBERLY:  If it could be published briefly to the

15   jury.

16           THE COURT:  You may.

17   BY MR. MOBERLY:

18   Q.  You did, in fact, have that meeting with Mr. Winkler and

19   Senator Hobbs; is that correct?

20   A.  Yes, I did.

21   Q.  You were told at that time that policy advisors were

22   salaried and not hourly.  Do you remember that?

23   A.  Yes, I do.

24   Q.  I think they made the reference to the fact that you have

25   to work until the work is done.  Do you remember discussion

1   along those lines?

2   A.  Yes.

3   Q.  And everybody is working hard during legislative session;

4   you'll acknowledge that, won't you?

5   A.  Yes.  Yes, sir.

6   Q.  And there was an offer, I think, from Mr. Winkler to get

7   you help from Mr. Fetherston on election bills if that was

8   necessary.  Do you remember that?

9   A.  I don't think the offer was from Mr. Winkler.

10  Q.  Okay.  Was it from Senator Hobbs?

11  A.  I think -- I think that was Senator Hobbs' response.  She

12  said that if I needed help with the election bills, I could go

13  to Jeff.  The issue was it was Jeff's work -- I'm sorry, I

14  could go to John Fetherston.

15  Q.  John?

16  A.  And the issue was it was John's work that I was being

17  assigned to do.

18  Q.  So that wasn't an acceptable solution to you because you

19  didn't think you should have that work at all?  Am I --

20  A.  I think -- it wasn't that it wasn't an acceptable solution.

21  I think they really had no regard as it relates to the amount

22  of work that they were placing on me, and I also think they

23  made it appear to sound like, "Oh, you're not able to deal with

24  the capacity of your workload.  You're not able to balance your

25  work with Thunderbird.  You're, you know, not able to -- you

```
1    don't understand election bills, and so if you need help, go to
2    John and John can help you better understand."
3          It wasn't a lack of understanding.  It wasn't an issue
4    of capacity.  It was an issue of inequity.
5    Q.  In any event, I take it you weren't satisfied with the
6    outcome of that meeting?
7    A.  I think Mr. Winkler was very upset in the meeting.  He was
8    yelling in the meeting.  It was very clear that things
9    weren't -- I said, "I -- I just consider the issue resolved."
10         And he said, "No, it's not resolved until I say it's
11   resolved.  And you will come to me and you will -- every week
12   and you will tell me what your bills are, and I will -- I
13   assign the work.  I'm the chief of staff."
14         He had been chief of staff from the beginning of the
15   legislative session, from the second week -- Tuesday in January
16   till February 3rd.
17   Q.  It was immediately after this meeting that you went to see
18   Ms. Baldo and found out she had the broken foot?
19   A.  After I did, yes, I went to see Ms. Baldo, and I was not
20   told not to go to Ms. Baldo.  She had an open-door policy.
21   Q.  You were unhappy with the new leadership at that time,
22   weren't you?
23   A.  No, I don't think I was unhappy with Jeff Winkler.  I was
24   curious, as were many others, about the selection of Jeff
25   Winkler as the chief of staff.
```

1   Q.  So when you went to talk to Ms. Baldo about the HR issue

2   that was referred to in Exhibit 236 that we looked at on your

3   direct -- I'm sorry, you can -- we can put it back up if you

4   want it -- you didn't complain about Mr. Winkler?

5   A.  I think I did complain about Mr. Winkler, yes.  But whether

6   I complained about him and I was unhappy, I think, are two

7   different things.  I complained about my treatment at the

8   Senate, but I was deeply happy with my job and the work.

9   Q.  You remember talking to Ms. Baldo about the Democratic

10  staff being in the basement?

11  A.  I do.

12  Q.  No windows?

13  A.  Did I talk to her about that?

14  Q.  Yeah.

15  A.  I don't know if I did.

16  Q.  Is it possible you did?

17  A.  I -- it sounds like an odd thing to say.  I don't know

18  that -- I'm not sure -- I don't recall.  I don't recall saying

19  that.  I mean, she would -- she would know, and I don't recall

20  saying that.  It is true.  I just don't recall that being part

21  of our conversation.

22  Q.  You don't recall saying that at your deposition?

23  A.  I don't -- I don't know that I -- I don't know that I do.

24  Q.  Did you think you had a strained relationship with

25  Mr. Winkler at that time?

1    A.  How do you define "strained"?

2    Q.  I don't know.  Was there any friction between you and

3    Mr. Winkler as a result of his elevation to the chief of staff

4    role?

5    A.  I don't -- I guess I'm just not sure how to -- how to

6    answer that question.  I don't think I had a strained

7    relationship.  If you mean, like, there's a breakdown in

8    communication or that I wouldn't go to him or that I wouldn't

9    respect him as being the chief of staff, the answer is no.

10            MR. MOBERLY:  Could the witness be shown Exhibit 237,

11   please.

12   BY MR. MOBERLY:

13   Q.  I think we've heard some testimony about this document, but

14   I don't think it's actually in evidence.  You recognize it,

15   don't you?

16   A.  I do.

17   Q.  Can you tell us what the lower half email is, to begin

18   with, the one from Mr. Latham?

19   A.  Yeah.  This is the -- this is the email that Aaron Latham,

20   the policy advisor on Democratic staff, sent out to all members

21   and staffers and interns regarding the Arizona Capitol Times

22   article on Senate staff salaries for -- on Thursday,

23   February -- well, the article came out Thursday, February 12th,

24   2015.  Mr. Latham sent it out the morning of February 13th,

25   2015.

1    Q.  And this is the document that you received that prompted

2    you to send the email, which I believe is Exhibit 238 in

3    evidence, to Ms. Baldo inquiring about the protocol for

4    requesting a raise?

5    A.  I think I'd like to see Exhibit 238.

6    Q.  Okay.

7            MR. MOBERLY:  If we could publish that to the jury.  I

8    believe it's in evidence.

9    BY MR. MOBERLY:

10   Q.  So if we look at 238, it appears to have the same --

11   forwarding the same email that's on 237?

12   A.  With the same time, yes.

13           MR. MOBERLY:  Could we go back to 237 for a moment.

14   BY MR. MOBERLY:

15   Q.  And with 237, you actually appear to be forwarding that

16   same email from Mr. Latham to someone else; is that correct?

17   A.  That's correct.

18   Q.  The "someone else" is?

19   A.  It's to Arthur Hamilton.

20   Q.  And who is that?

21   A.  Art Hamilton is a mentor of mine.  He is a former

22   legislator.  He used to be the minority leader in the Arizona

23   House of Representatives.

24           MR. MOBERLY:  I'd move the admission of 237, Your

25   Honor.

1           THE COURT:  Is there any objection?

2           MS. ADAMS:  I guess I would just object to relevance

3   and duplicity.

4           THE COURT:  Overruled.  Exhibit 237 is admitted into

5   evidence.

6           (Exhibit No. 237 admitted into evidence.)

7   BY MR. MOBERLY:

8   Q.  And I think you told us yesterday, Ms. Adams --

9           THE COURT:  Hang on a second.

10          MR. MOBERLY:  I'm sorry.

11          THE COURT:  This looks like a good time for a break.

12  I have a matter I have to take up now, so we'll take a little

13  longer than normal.  We'll come back at 10:45.

14          And the matter I have to take up is not this case.

15  It's another case.  So I'm not doing something in this case

16  right now.

17          (Jury not present.)

18          THE COURT:  Please be seated.  I'm sorry, but I have

19  another -- you can stay where you are, you can take a break,

20  but I have to do a conference call.  I have to do a conference

21  call on another case, take a few minutes, so you're free to go

22  if you want.

23          (Recess taken, 10:17 a.m. to 10:47 a.m.)

24          (Further proceedings held on the record not

25  transcribed herein.)

1          (Jury present.)

2          THE COURT:  Please be seated.

3          Okay.  I interrupted -- you may continue.

4          MR. MOBERLY:  Thank you, Your Honor.

5          Just by way of housekeeping, the Court may recall that

6    there was a discussion about marking and admitting a new

7    document.  And at this point, I understand it's been marked as

8    Exhibit 269, and I would just move its admission, please.

9          THE COURT:  Is there any objection?

10         MS. ADAMS:  I don't know what the document is.

11         MR. MOBERLY:  It's the full phone record.

12         MS. ADAMS:  Oh.  No objection.

13         THE COURT:  Exhibit 269 is admitted into evidence.

14         (Exhibit No. 269 admitted into evidence.)

15         MR. MOBERLY:  If it could be published to the jury,

16   Your Honor?

17         THE COURT:  It may be.

18         MR. MOBERLY:  And maybe just scroll through it slowly.

19         If you'd stop there for just a minute.  And if there's

20   a way to blow that up slightly.

21         And then scroll down again, please.  That's far

22   enough.

23   BY MR. MOBERLY:

24   Q.  Do you see the -- if we look in the right-hand column, do

25   you see the reference to "picture"?

1    A.  Yes, I do.

2    Q.  Okay.  Right below that, there's a series of texts that all

3    kind of popped in at the same time.  I'm no technology master,

4    but I think that usually indicates your phone's been off or --

5    anyway, do you see that series of texts there?

6    A.  I do.

7    Q.  At one point in time, I'm sure you had Mr. Winkler's cell

8    phone number, didn't you?

9    A.  Yes, I did.

10   Q.  Do you happen to notice -- or know whether any of these

11   numbers are his?

12   A.  I -- I don't know offhand, but I do have at plaintiff's

13   table a little sheet that has the cell phone numbers.  I could

14   check.

15   Q.  All right.  You don't need to do that right now unless

16   you'd like to --

17          MR. MOBERLY:  Well, maybe that would be useful, Your

18   Honor.  Is that all right?

19          THE COURT:  Yeah.  If you want to step down and get

20   it, you may.

21          THE WITNESS:  Yes, Your Honor.  Thank you.

22   BY MR. MOBERLY:

23   Q.  Thank you for doing that, Ms. Adams.

24          My question to you is, it's my understanding that

25   those first two texts after the reference to "picture" come

1    from -- incoming texts come from Mr. Winkler's cell phone

2    number.  Can you confirm that?

3    A.  In the document that I'm looking at, it -- Mr. Winkler's

4    cell phone number --

5            THE WITNESS:  Can I state what it is, Your Honor?

6            THE COURT:  Yes.

7            THE WITNESS:  602-618-7032.

8            And it -- the picture is a little bit pixelated, but

9    it looks like on 2/16/2015, sorry, that this number right here

10   and this number right here is Mr. Winkler's cell phone number.

11   BY MR. MOBERLY:

12   Q.  Okay.  And I realize this is over four years ago, but do

13   you happen to recall -- I mean, I'm looking at that series of

14   about eight texts that show up -- eight texts that show up in

15   the two minutes between 12:49 and 12:51.  Do you happen to

16   remember if your phone was down or --

17   A.  I -- I don't think it was.  I think -- for two reasons.

18   One, if you scroll up to the top of the page -- thank you.

19   Maybe not -- this page is not a good page, but maybe the next

20   one down.

21   Q.  Going down?

22   A.  Yeah.

23            So here, it says at the top, the date and time

24   corresponds to Pacific time.  So I was in Seattle at the time,

25   and -- I think your question is whether or not my phone was

1    off?

2    Q.  Yeah.

3    A.  Yeah.  And if you scroll to the "talk" time that we looked

4    at earlier, I had called the Arizona State Senate at 12:53 p.m.

5    Q.  Oh, okay.  I see your point, that there was a phone call

6    within that same time frame?

7    A.  Right.  In fact, I think it was four minutes after

8    Mr. Winkler text me.

9    Q.  All right.  Thank you.

10   A.  You're welcome.

11          MR. MOBERLY:  Could the witness be shown Exhibit 239.

12   BY MR. MOBERLY:

13   Q.  And if you would -- well, take a look at the first page of

14   that document, and then we'll scroll to the second page as

15   well.

16   A.  Okay.

17   Q.  Do you recognize that document?

18   A.  Yes, I do.

19   Q.  Can you tell us what it is?

20   A.  The second page is the first -- the initial email that I

21   sent to Senate leadership after receiving Wendy Baldo's

22   response to "go through your leadership."

23   Q.  And to take it back one step, that was prompted by the

24   Latham distribution of the Arizona Capitol Times report; is

25   that correct?

1  A.  My email to Wendy?

2  Q.  Yes.

3  A.  Yes.

4        MR. MOBERLY:  I'd move the admission of Exhibit 239,

5  Your Honor.

6        THE COURT:  Any objection?

7        MS. ADAMS:  No objection.

8        THE COURT:  Exhibit 239 is admitted.

9        (Exhibit No. 239 admitted into evidence.)

10       MR. MOBERLY:  Could it be published to the jury,

11 please?

12       THE COURT:  It may be.

13       MR. MOBERLY:  If the witness could then be shown

14 Exhibit 241.

15 BY MR. MOBERLY:

16 Q.  And if you'd take a minute to review that, Ms. Adams, and

17 then tell us whether you recognize it.

18 A.  Yes, I do.

19 Q.  Can you tell us what that is?

20 A.  This is the same email that I just talked about.  I had

21 sent it in the morning of February 13th, 2015, to leadership.

22 And in the evening, at 6:04, after business hours, Senator

23 Hobbs wrote back to me, and she removed all of the other

24 senators and Wendy Baldo and kept Jeff Winkler in the cc, to

25 tell me that her and Jeff had already met with me regarding my

1   concerns.

2           MR. MOBERLY:  I'd move the admission of 241.

3           MS. ADAMS:  No objection.

4           THE COURT:  Exhibit 241 is admitted.

5           (Exhibit No. 241 admitted into evidence.)

6           MR. MOBERLY:  And with your permission, Your Honor, if

7   it could be published to the jury.

8           THE COURT:  It may be.

9           MR. MOBERLY:  Exhibit 243, if the witness could be

10  shown that document.

11  BY MR. MOBERLY:

12  Q.  If you'd take a minute to review that document first.

13  A.  I recognize it.

14  Q.  Okay.  What is it?

15  A.  This is -- this is an email that I sent to Mr. Winkler.

16  The first thread of the email at the very bottom is an email

17  that I sent to Jeff Winkler, the chief of staff, on Friday,

18  February 13th, 2015, at 7:04 p.m. regarding my son.  I think it

19  was entitled "Family-Related Matter."  It's not shown here, but

20  Wendy Baldo and Katie Hobbs were also on this email.

21  Q.  And then a response back from Mr. Winkler, I think?

22  A.  Yeah, that's correct.

23          And I -- can I just clarify something here?

24  Q.  Sure.

25  A.  At the very top, it says Todd McKay.  And that just was the

1    legal counsel from the attorney after litigation ensued, so he

2    wasn't part of any of these -- most of the emails say that.  He

3    wasn't part of it.

4    Q.  Thank you for pointing that out.  You're right.  There have

5    been a handful, obviously some just printing, some -- yeah.

6           So the point is we can ignore the "Todd McKay" at the

7    top on that?

8    A.  Correct, yes.

9           MR. MOBERLY:  I'd move the admission of 243.

10          MS. ADAMS:  No objection.

11          THE COURT:  Exhibit 243 is admitted and may be shown.

12          (Exhibit No. 243 admitted into evidence.)

13          MR. MOBERLY:  If we could publish it to the jury.

14   Maybe you just said that.

15          And then if the witness could be shown Exhibit 244.

16   BY MR. MOBERLY:

17   Q.  I think we've already seen the bottom part of it, but can

18   you tell us what that upper half is?

19   A.  Yeah.  The top part is the response -- my response to

20   Senator Hobbs' email that was just shown in Exhibit 243.

21   Q.  Okay.

22          MR. MOBERLY:  I'd move the admission of Exhibit 244.

23          MS. ADAMS:  No objection.

24          THE COURT:  Exhibit 244 is admitted, and it may be

25   published.

1              (Exhibit No. 244 admitted into evidence.)

2              MR. MOBERLY:  And then Exhibit 245.

3    BY MR. MOBERLY:

4    Q.  Do you recognize that document, Ms. Adams?

5    A.  Yes, I do.

6    Q.  Can you tell us what it is?

7    A.  This is a response to my response from Mr. Winkler

8    regarding a meeting on Monday morning.

9    Q.  And the final email in the chain is an email from

10   Mr. Winkler to you, is it not?  On this document.

11   A.  Yes, it is.

12   Q.  Okay.

13             MR. MOBERLY:  I'd move the admission of Exhibit 245.

14             MS. ADAMS:  No objection.

15             THE COURT:  Exhibit 245 is admitted.

16             (Exhibit No. 245 admitted into evidence.)

17             MR. MOBERLY:  And could it be published to the jury,

18   Your Honor?

19             THE COURT:  It may be published.

20   BY MR. MOBERLY:

21   Q.  Ms. Adams, it's my understanding that you did not ever

22   reply directly to this last email, did you?

23   A.  I didn't reply in writing, no.

24             MR. MOBERLY:  I have no further questions, Your Honor.

25   Thank you.

 1              THE COURT:  Okay.

 2              MR. BERNARD:  May I begin, Your Honor?

 3              THE COURT:  Yes.

 4              MR. BERNARD:  Thank you, Your Honor.

 5                      REDIRECT EXAMINATION

 6    BY MR. BERNARD:

 7    Q.  Good afternoon again, Ms. Adams.

 8              Was there ever --

 9    A.  Good morning.  Oh, it's afternoon.  No, it's morning.  Good

10    morning.

11    Q.  Good morning.

12              Was there ever a protocol at the Arizona Senate for

13    requesting a raise that you knew of?

14    A.  No.

15              MR. BERNARD:  Can we -- I'd like to show Exhibit 245,

16    which I believe has been admitted.

17    BY MR. BERNARD:

18    Q.  Now, the defense counsel has shown you and the jury a

19    number of email chains.

20    A.  Correct.

21    Q.  And just to refresh the jury's memory, what sparked this

22    dialogue between you and the members of the email chain?

23    A.  I had received the article -- the Capitol Times article

24    regarding Senate salaries came out on February 12th, 2015.

25    Many people at the Senate were talking about it, including

**TALONYA ADAMS - REDIRECT EXAMINATION**

1  members.  Aaron Latham sent it out to all of Senate staff on

2  Friday, February 13th, 2015.

3          And so I had conversation with many members that were

4  concerned about my salary that didn't know the salary of policy

5  advisors.  And we discussed putting together or trying to put

6  together a meeting.

7  Q.  And this happened on Friday, the 13th; correct?

8  A.  I think the dialogue started happening on Thursday.  I was

9  at work that day when the article came out.  Aaron sent it out

10  to everyone Friday.

11  Q.  Well, specifically, this email chain was happening on

12  Friday, the 13th?

13  A.  That's correct.  The infamous Friday the 13th.

14          MR. BERNARD:  Now -- and I'm sorry.  I want to

15  publish -- one second, Your Honor -- 239, which also I believe

16  has been admitted, as soon as I can find it.  One second, Your

17  Honor.

18          I can move past it.

19  BY MR. BERNARD:

20  Q.  One of the email chains you sent out requesting a meeting

21  with upper leadership; correct?

22  A.  Correct.  It's Exhibit 239.

23  Q.  239.

24  A.  Exhibit 239.

25  Q.  And it was Katie Hobbs in one of the emails stated that you

1  needed to talk to her or Jeff; correct?

2  A.  That's correct.  I think that's Exhibit 241.

3          MR. BERNARD:  And, Your Honor, may I publish

4  Exhibit 241, which has been admitted into evidence?

5          THE COURT:  Yes.

6  BY MR. BERNARD:

7  Q.  And in this email, she's stating to you that you needed to

8  address her and Jeff; correct?

9  A.  Correct.

10  Q.  But in the email that you sent out, one -- I believe it was

11  Senator Contreras's assistant responded to you confirming a

12  date that you could meet with him; correct?

13  A.  Correct.  I believe that's Exhibit 239.

14          MR. BERNARD:  May I publish Exhibit 244 -- 245, Your

15  Honor?

16          THE COURT:  You may.

17          MR. BERNARD:  Which has already been admitted into

18  evidence.

19  BY MR. BERNARD:

20  Q.  And then in response to Ms. Baldo's email, you apologized

21  for sending out that email, did you not?

22  A.  Yes, I did.

23  Q.  And you went on to address Jeff, that you had specific and

24  additional issues that you want to discuss with him, did you

25  not?

1   A.  Correct.  In the initial email that I had sent out to

2   leadership, I -- and cc'd Ms. Baldo, I had stated that I wanted

3   to talk about my status on the Democratic Caucus.  And so it

4   was not clear to me how Ms. Hobbs knew whether or not they had

5   already addressed my issues.  She didn't know what they were.

6   Q.  Now, in the email that Jeff sent back to you saying that he

7   was available on Monday --

8   A.  Yes.

9   Q.  -- you stated on cross-examination that you did not respond

10  in the email.  Did you respond at all to him?

11  A.  Yes.  So in Exhibit 245, Mr. Winkler stated that he would

12  be available to meet with me on Monday, February 16, 2015,

13  before office hours.  And I called him.

14  Q.  Now, there's also been some talk about your phone records.

15  A.  Correct.

16  Q.  All right.  Did Mr. Winkler text you during that -- at that

17  time, at 12:45 on the 16th -- or, excuse me, 12:49 on

18  February 16th, 2015?

19  A.  I do believe that is his number.  He had text me that the

20  Senate was not exempt or -- excuse me.  He had text me and

21  stated that the Senate was exempt from FMLA, from Family

22  Medical Leave Act.

23  Q.  And did you call him four minutes later or call the Senate

24  four minutes later to have a discussion with him?

25  A.  Yes, I did.

1   Q.  Now, were you ever jealous of Mr. Winkler and his position?

2   A.  No.

3   Q.  Did you respect Mr. Winkler and his position?

4   A.  Yes, I did.

5           MR. BERNARD:  One second, Your Honor.

6           THE WITNESS:  Are you looking for Exhibit 36?

7           MR. BERNARD:  No.

8           Your Honor, may I publish Exhibit 212, which has been

9   admitted into evidence?

10          THE COURT:  You may.

11  BY MR. BERNARD:

12  Q.  Now, Ms. Adams, what is this -- what is Exhibit 212?

13  A.  This, again, is an email I sent to the former Senate

14  minority leader at the time.  Well, originally I sent an email

15  to Peter Silverman, but I didn't hear back.  I sent an email on

16  December 14th, 2012, and I didn't hear back from Peter

17  Silverman.

18          And I had cc'd Senator Landrum Taylor, although it's

19  not represented here.  And she replied on Saturday,

20  December 15th.  And then I replied to her on Monday,

21  December 17th, 2012.

22  Q.  So prior to working at the Senate, you actually did have

23  some government experience?

24  A.  I had government experience as it relates to lobbying at

25  Greenberg Traurig.  I had worked at the Securities and Exchange

1    Commission, a federal agency, in the State of California, in

2    Los Angeles.  In undergrad, while I was at the University of

3    Washington, I worked in the mayor's office in Seattle, in the

4    Department of Aging and Disability.

5           I also had a law degree and a lot of policy experience

6    as it relates to earning my law degree and law license.

7    Q.  And the position that you're leaving in this email, is this

8    a mayoral appointment?

9    A.  The position -- the Board of Adjustment is a volunteer

10   citizen board for the City of Phoenix.  I wasn't paid to be on

11   that board, and I wasn't leaving that board.  At the time, I

12   had -- if you scroll down, you'll see, in Seattle, a small law

13   firm called Axis Law.  And it was a professional limited

14   liability company, and I was a sole practitioner lawyer.

15          MR. BERNARD:  Your Honor, may I publish Exhibit 216

16   that's been admitted into evidence?

17          THE COURT:  You may.

18   BY MR. BERNARD:

19   Q.  Now, Ms. Adams, how many degrees do you hold?

20   A.  Are you asking me at the moment, or are you asking me at

21   the time I was employed at the Senate?

22   Q.  At the time you were employed at the Senate.

23   A.  I had a bachelor's degree and a law degree.

24   Q.  And how many bar licenses did you have at the time you were

25   employed at the Senate?

**TALONYA ADAMS - REDIRECT EXAMINATION**

1  A.  Initially I just had one license.  I was licensed in the

2  state of Washington.  And then I subsequently was licensed in

3  the state of Arizona.

4  Q.  Now, what's John Fetherston's educational background?

5  A.  My understanding is that Mr. Fetherston graduated from

6  Arizona State University with a bachelor's degree in May of

7  2012.

8  Q.  Does he have a law license?

9  A.  No.

10  Q.  Is he barred in Arizona as an attorney?

11  A.  No.

12  Q.  What's Mr. Winkler's educational background?

13  A.  My understanding is Mr. Winkler has a high school diploma.

14  Q.  Does he have a law license?

15  A.  No.

16  Q.  An associate's?

17  A.  No.

18  Q.  Now, Mr. Winkler and Ms. Olson applied for the chief of

19  staff position; correct?

20  A.  Patsy Osmon.

21  Q.  Osmon, I'm sorry.

22  A.  Yeah.  Aaron Latham and Jeff Winkler applied internally.

23  There were also external candidates, including lawyers.

24  Q.  Now, at the time, Ms. Osmon held two positions within the

25  Democratic staff; correct?

1    A.  According to this record, yes.

2    Q.  And we heard testimony that she had a great -- or good

3    interview; correct?

4    A.  Correct.  Yes, Mr. Bradley said that.

5    Q.  But who ultimately got the job?

6    A.  As Mr. Bradley stated, Ms. Osmon was recommended and

7    selected by the committee for the chief of staff role, and

8    subsequently, Ms. Hobbs gave the role to Mr. Winkler.

9    Q.  Now, there was a lot of discussion about you going to a

10   school called Thunderbird.

11            Do you remember that --

12   A.  Correct.  Yes.

13   Q.  -- on cross?

14   A.  Yes.

15   Q.  Was there -- was the Senate paying for that?

16   A.  No.

17   Q.  Who else -- who other policy advisors were attending

18   Thunderbird with you?

19   A.  None.

20   Q.  Is -- was your idea to go to Thunderbird -- well, why did

21   you want to go to Thunderbird?

22   A.  I had always -- I consider myself a lifetime learner.  I

23   had always been really intrigued about Thunderbird.

24   Thunderbird has an incredible reputation.  It was the number

25   one international MBA school in the world.  It has the third

1     largest network in -- of business schools.  It's ranked by the

2     Wall Street Journal as the third largest network.

3             And just in furthering developing myself, I'm

4     interested in being a global citizen.  I'm interested in making

5     an impact.  I'm interested in having a life --

6     Q.  Did you believe --

7     A.  -- of service.

8     Q.  I'm sorry.

9             Did you believe that if you took additional classes in

10    Thunderbird, it would help your position at the Arizona Senate?

11    A.  I think at the Senate and also just to, yes, make a greater

12    impact.

13    Q.  What was the protocol for requesting time off so you can

14    take these classes?

15    A.  I wasn't aware of any protocol, and that's why I went to

16    Wendy Baldo to inquire.

17    Q.  And when does the Senate session -- Arizona Senate session

18    begin?

19    A.  It begins on the second Tuesday of January.

20    Q.  Of what year?

21    A.  Of any year.

22    Q.  Okay.  Thank you.

23            MR. BERNARD:  Your Honor, may I publish Exhibit 228,

24    which has been admitted?

25            THE COURT:  You may.

1    BY MR. BERNARD:

2    Q.  Now, Ms. Adams, I want to point your attention to the top

3    of the page.  What date did you send this email?

4    A.  February -- I'm sorry.  Friday, November 21st, at -- in

5    2014.

6    Q.  Are you in session at this time?

7    A.  No.

8    Q.  What date were you asking for off?

9    A.  At this time, I was asking for, I think, March 2nd to

10   March 5th of 2015.

11   Q.  So how many months ahead of time were you asking for this

12   time off?

13   A.  I have to count.  I think about four months.

14   Q.  Is this -- you're asking for time off for a vacation?

15   A.  No.  I'm asking for time off to be able to complete the

16   Thunderbird degree requirements post-ASU/Thunderbird merger.

17   Q.  And this will also have you learning another language;

18   correct?

19   A.  Correct.

20   Q.  Now, on cross-examination, there was discussion about a

21   meeting that you had with Ms. Winkler -- or, excuse me, Jeff

22   Winkler regarding your workload.

23          Do you remember that discussion?

24   A.  Yes, I do.

25   Q.  Were -- did you communicate to Mr. Winkler about the type

1   of work that you were doing?

2   A.  I'm not sure I understand the question.

3   Q.  Did you -- do you believe that you were doing other

4   people's work as well as your own?

5   A.  I think, yes, I -- ultimately, I did.  I was being assigned

6   John Fetherston's work.  The work is assigned -- it's been

7   stated that the work is assigned based on subject matter

8   expertise.  So if somebody had been assigned the government

9   bills, they would have a reasonable belief that they're being

10  assigned my work.

11          I was assigned all of the election bills.  They

12  were -- that was previously John Fetherston's subject matter

13  expert.

14  Q.  And what date was that meeting?

15  A.  I think it was on or about February 4th, 2015.

16  Q.  And then you testified that you were informed about this --

17  I think you said it was a memo or newsletter, that you weren't

18  getting paid as much as your colleagues?

19  A.  Yeah.  The -- the Capitol Times had reported the salaries,

20  the Senate salaries, and when it reported the Senate salaries,

21  it had my salaries but it also had the salaries of the other

22  policy advisors in the Arizona State Senate.

23  Q.  And what day was that that you found out about that

24  discrepancy?

25  A.  I originally found out about it on the evening of Thursday,

1    February 12th, 2015.  That's the same day the article came out.

2    The following morning, Aaron Latham sent the email or sent the

3    article out to all of the --

4    Q.  So on the 5th, you inform Mr. Winkler that you're doing

5    somebody else's work?

6    A.  I think it was on the 4th of February.

7    Q.  You ask about -- you ask to speak with HR about it;

8    correct?

9    A.  On the 5th, I asked -- I sent a letter to -- email to Wendy

10   Baldo.  Having stopped by her office on the 4th and she not be

11   there, I followed up with an email and asked if I could speak

12   with her regarding an HR issue, yes.

13   Q.  And then on the 12th, you are informed that you're getting

14   paid less than people similar situated as yourself?

15   A.  Yes.  So on the 5th, I met with Wendy Baldo and we had a

16   discussion.  On the 12th, the article comes out.  On the 13th,

17   I inquire about the protocol to ask for a raise now that I know

18   individuals are receiving salary increases.

19   Q.  And then something else happens on the 13th; correct?

20   A.  Yes.  On that same day, that was the last day I received a

21   salary from the Arizona State Senate.  It's the last day I had

22   dental coverage.  It's the last day I had healthcare insurance.

23   It's the last day I had vision insurance.

24           MR. BERNARD:  No further questions, Your Honor.

25           THE COURT:  Okay.  You may step down.

1          THE WITNESS:  Thank you, Your Honor.

2          (Witness excused.)

3          (Further proceedings held on the record not

4   transcribed herein.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, JENNIFER A. PANCRATZ, do hereby certify that I am

4  duly appointed and qualified to act as Official Court Reporter

5  for the United States District Court for the District of

6  Arizona.

7        I FURTHER CERTIFY that the foregoing pages constitute

8  a full, true, and accurate transcript of all of that portion of

9  the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12        DATED at Phoenix, Arizona, this 11th day of November,

13  2019.

14

15

16
                    s/Jennifer A. Pancratz_____ _____ ___
17                    Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25