**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Talonya Adams, | ) | |
| | ) | No.  CV-17-00822-PHX-DLR |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 15, 2019 |
| Arizona Senate, | ) | 1:29 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TELEPHONE CONFERENCE**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2

     For the Plaintiff:
3
          Talonya Adams, Esq.
4         In propria persona
          2 N. Central Avenue, Suite 1800
5         Phoenix, AZ 85004

6    For the Defendant:

7         Michael D. Moberly, Esq.
          Ryley Carlock & Applewhite PA
8         1 N. Central Avenue, Suite 1200
          Phoenix, AZ 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

(Proceedings commenced at 1:29 p.m.)

THE COURTROOM DEPUTY:  Civil Case No. 17-822, Adams versus Arizona Senate, on for telephone conference.

Parties, please announce for the record.

MS. ADAMS:  Talonya Adams representing self, plaintiff.

MR. MOBERLY:  Michael Moberly, Your Honor, on behalf of defendant.

THE COURT:  All right, good afternoon.

We're here on --

MS. ADAMS:  Good afternoon.

THE COURT:  -- the plaintiff's notice of noncompliance, and I've received the response and supplemental information.  And I have reviewed the emails that were submitted by the defense.

Let me make a couple of things clear.  First, this is telephonic, so it's very difficult to control the conversation. So what I'd appreciate is when I ask counsel or Ms. Adams to speak, that you address what I ask you to address and don't go any further.

MS. ADAMS:  Yes, Your Honor.

THE COURT:  And second, please don't start talking until I ask you to.  Just, we have to do it that way.  It's just difficult over the phone.

1          Secondly, we're here only on that one issue.  I know

2     other things have been filed, and I don't intend to get into

3     anything else other than the issue raised by Ms. Adams in her

4     motion for -- notice of noncompliance.

5          I've taken a look at the emails, and one of the things

6     that jumps out at me is it looks like this negotiation process

7     has been made harder by Ms. Adams' reluctance to deal directly

8     with Mr. Moberly.

9          I would suggest, Ms. Adams, that you deal directly

10    with Mr. Moberly, and that might make it a little easier in

11    trying to resolve this.

12         Additionally, I've -- I don't know really what all the

13    issues are.  I've made some notes on what it looks like from

14    the emails, but let me make it clear, I'm not the HR department

15    over the Senate, and I'm not going to set forth all the

16    conditions of employment.  I assume when Ms. Adams is hired, or

17    rehired, that it's under the conditions as any other employee

18    at her position.  And that's all I'd expect to happen.

19         So let's get started and try to understand what I can

20    do to help resolve this, but like I said, I'm not going to

21    make -- set the terms and conditions of employment.  That's up

22    to the employer, in consultation with the employee, to reach an

23    agreement as to the employment contract.

24         So let me go through what I saw in the emails, and the

25    two of you can tell me if this is any longer an issue.

1          First is the written employment offer.  That looked

2    like that was an issue.  Has that been resolved?  Yes or no is

3    all I want to know.

4          MR. MOBERLY:  Your Honor, no.  This is Mike Moberly.

5    No, it has not, but we're not unwilling to do a written

6    employment offer.  We just took the position that it's

7    premature to do that until we actually have something that

8    approximates a deal.  Otherwise we're going to be doing a

9    series of those.  It would look very much like the emails.

10         THE COURT:  Yeah, I read the emails and I agree.  It

11   doesn't make any sense to do a written offer till you guys have

12   agreed in principal as to what the terms will be.

13         Ms. Adams, do you see it any differently?

14         MS. ADAMS:  I do, Your Honor, and I -- yes, I see it

15   differently.

16         THE COURT:  Okay.

17         MS. ADAMS:  There is -- there is no offer to

18   respond -- there's no official or formal offer to respond to.

19   To the extent --

20         THE COURT:  Okay.  Let me stop you there.

21         We all understand that.

22         MS. ADAMS:  Okay.

23         THE COURT:  But the idea is you talk, you reach

24   agreements, and then they offer you what you've agreed on

25   rather than going back and forth.  It's just a matter of an

1    informal -- it's an informal negotiation until you have

2    something that's workable, and then you put down in writing

3    what you think you agreed on, and then you fine-tune it.  I

4    think that would be much more workable than trying to go back

5    and forth.

6          I don't understand why you haven't had a conversation

7    before to work something out, but I think you need to sit down

8    and just talk about it, and then put together what you can

9    agree on and work on what you don't agree on.  Okay?

10          So I think it's really important that you two talk.

11    And, Ms. Adams, I think you need to talk to him.  It makes it

12    much easier if you're talking to one person and not several

13    different parties and trying to negotiate this.

14          Do you have a problem talking to Mr. Moberly?

15          MS. ADAMS:  Your Honor, I have requested to sit down

16    and have a face-to-face negotiation.  All correspondence

17    regarding the negotiations has occurred via email and is before

18    the Court.  I -- two calls -- three calls have been made to

19    Mr. Moberly.  They've all been initiated by me.  I have

20    requested to sit down and talk to him.

21          THE COURT:  Okay.

22          MS. ADAMS:  I've requested to sit down and talk to him

23    with the Senate present, right?  They're the party.  That has

24    not --

25          THE COURT:  Okay, stop.

1          MS. ADAMS:  -- happened as of today.

2          THE COURT:  As I saw the emails, it looked like there

3     were -- that you felt that there was something inappropriate

4     for you to talk with Mr. Moberly and that's why you weren't

5     dealing with him.  But apparently, you and Mr. Moberly can talk

6     and there won't be an issue.  Is that true?

7          MS. ADAMS:  I think Mr. Moberly does not have

8     settlement authority to make decisions without going back to

9     the client.

10         THE COURT:  Okay.  Well, that --

11         MS. ADAMS:  Which, it creates --

12         THE COURT:  That's a different issue.

13         MS. ADAMS:  Okay.

14         THE COURT:  Mr. Moberly -- you need to deal with one

15    person.  One thing that's hanging this whole thing up is you're

16    trying to talk to, apparently, several different people and

17    work out an agreement.  You need to talk to one point person,

18    that's Mr. Moberly, work it out with him, and then if he needs

19    to get authority, he can do that.

20         But it sounds like from what I've seen in these

21    emails, and I'm just trying to interpret what those emails have

22    to say, that there's been -- it looks like you're pretty close

23    on most things.  I'm not sure where you're not agreeing.

24         But I think it's important that you two work it out.

25    And, Ms. Adams, as long as you don't have a problem with that,

1    and it doesn't sound like you do, it sounds like you can get

2    moving on that rather quickly.

3           All right.  The salary, it looks like Mr. Kamp, Garth

4    Kamp, is the one you've identified, Ms. Adams, as a senior

5    policy advisor who's a comparator, and he earns $113,300; is

6    that true?

7           MS. ADAMS:  Yes, Your Honor.

8           THE COURT:  And they've offered you $113,300?

9           MS. ADAMS:  Yes, Your Honor.

10          THE COURT:  Is that salary resolved then?

11          MS. ADAMS:  Your Honor, I think there's a broader

12   issue that has brought the motion -- the notice of

13   noncompliance.

14          THE COURT:  Okay.  But let me just ask you, though:

15   Have you agreed on the salary for the highest-paid senior

16   policy advisor as the trial -- as the comparator that you

17   identified at trial, Garth Kamp?  Have you agreed on $113,300?

18          MS. ADAMS:  There has been no agreement to the salary,

19   Your Honor.

20          THE COURT:  And why not?

21          MS. ADAMS:  Because reinstatement under Title VII

22   allows for a prevailing Title VII plaintiff to be reinstated to

23   the place that they would be but for the discriminatory acts

24   that have occurred.

25          The job at the Arizona State Senate, irregardless of

1  salary, right, is of great benefit to a person based in part,

2  or specifically for me, as it relates to the fringe benefits,

3  the health benefits, the retirement points, the retirement

4  match.  This idea to take a hollowed or gutted reinstatement

5  because of prior rulings by the Court is why we're at an

6  impasse.

7         THE COURT:  Well, I -- the case is over.  All we're

8  talking about now is reinstatement.  We're not going to

9  relitigate anything that's happened in the past now.  We're

10  going to move forward.

11         So my question is, if they've offered you the same

12  salary as the highest-paid competitor -- comparator that you

13  identified at trial, why haven't you taken it?

14         MS. ADAMS:  The salary?

15         THE COURT:  Yeah.  $113,300 is what you indicated --

16         MS. ADAMS:  Sure.  Sure.  I accept that, Your Honor.

17  I accept that.  Let's move on to the next term.

18         THE COURT:  All right.  The start date.  I ordered

19  that you be reinstated by October 31st.  Have they failed to

20  comply with that?

21         MS. ADAMS:  Yes, they have.

22         THE COURT:  Okay.  How so?

23         MS. ADAMS:  They haven't reinstated me.

24         THE COURT:  Okay.  I thought I saw somewhere where you

25  asked not to go on that date because you were winding down your

1   trial practice -- or your law practice.  Did I misunderstand

2   that?

3         MS. ADAMS:  I think there is a misunderstanding as it

4   relates to reinstatement and a required appearance, physical

5   presence, on a date certain.

6         Mr. Moberly -- we had no conversation about a start

7   date, and then the day before, I think it's October 30th, he

8   said, "Mr. Winkler is waiting for you tomorrow."

9         THE COURT:  Okay.  Hang on a second.

10         I'm trying to understand what you just said.  Are you

11   saying that you think you can work for the Senate and maintain

12   your practice at the same time?  Is that what --

13         MS. ADAMS:  No, sir.  What I'm saying is I think I

14   need transition time, transition time that has been given to

15   other employees at the Arizona State Senate without

16   circumstances like this or a court order.

17         THE COURT:  Okay.  What --

18         MS. ADAMS:  There's been no conversation about what

19   that transition looks like, what that transition time might be.

20         THE COURT:  Okay.  Well, I --

21         MS. ADAMS:  Or a start date.

22         THE COURT:  I don't understand what "transition time"

23   means.  What do you entail?  Are you saying you'd be an

24   employee, you'd be paid a salary, but you wouldn't be working?

25   Is that what you're asking for?

1          MS. ADAMS:  I'm asking for an opportunity to

2    transition my practice, Your Honor.

3          THE COURT:  Well, explain to me what that means in

4    terms with your relationship to your employment.  If you want

5    time to wind down your practice before you start, it doesn't

6    sound like that's a problem.  Are you asking for something

7    different?

8          MS. ADAMS:  I don't know if it's a problem or not.

9    It's never -- it's never been responded to.

10         THE COURT:  Okay.  I thought I -- I'm trying to

11   interpret your guys' emails, and that's why I'm asking these

12   questions.

13         Mr. Moberly, what's the position of the Senate with

14   regard to transition time?

15         MR. MOBERLY:  We are willing to work with Ms. Adams on

16   that, Your Honor.  It's not a problem.  I think -- and I don't

17   want to be polarizing about this because I think I understand

18   the situation.

19         My perception is this is a little bit tied to the

20   supervisory issue because -- and maybe I misinterpreted, but I

21   understood Ms. Adams to be inquiring as to who she should deal

22   with at the Senate with respect to that transition issue.  I

23   gave her Mr. Winkler's name, and at that point, it's my

24   impression that the issue of Mr. Winkler being the contact

25   and/or the supervisor was not -- was not acceptable.  Or at

1   least hadn't been worked out.

2        And my sense is that's where that issue broke down,

3   that I understood where we were headed was to a conversation

4   between --

5        THE COURT:  Well, let me --

6        MR. MOBERLY:  -- to resolve that.

7        THE COURT:  I'm trying to interpret what "transition

8   time" means, but what I think it means is just a start date.

9        Is that right, yes or no, Ms. Adams?

10        MS. ADAMS:  I -- I think in part it's a start date,

11   Your Honor.  There have been policy advisors hired at the

12   Senate, leaving an employer -- Lisette Flores is one.  She

13   worked at Friendly House.  She was hired by the Arizona State

14   Senate.  She was an Arizona State Senate employee.  She had

15   continuing matters at the Friendly House, and she continued to

16   simultaneously work at the Arizona State Senate and the

17   Friendly House until she transitioned those clients even during

18   the legislative session.

19        I'm asking for a similar accommodation, or at least a

20   conversation to be had around it.

21        THE COURT:  Okay.  I've never understood transition

22   time like that before, but Mr. -- it seems like, Mr. Moberly,

23   is that something you could negotiate on behalf of the Senate

24   and make it one -- one person who she can talk to instead of

25   her having to go run around and talk to different people?

1          MR. MOBERLY:  Well, I would assume so, Your Honor.

2          THE COURT:  So why don't you take that on,

3   Mr. Moberly, as part of your decision-making authority.  And I

4   assume you can confirm that with your client, but I don't know

5   that it would be useful to have her negotiating with several

6   different parties or entities over there that could make it

7   more complicated.  It seems like if you're the one contact

8   person, why don't you talk from your -- with your client and

9   find out what authority you have and then sit down with her and

10  make this part of the package you negotiate.

11         MR. MOBERLY:  I will do that, Your Honor.

12         THE COURT:  Okay.

13         All right.  So, Ms. Adams, the transition time issue

14  is with Mr. Moberly now, and he will get -- find out what

15  authority he has.  I'm not familiar with -- my experience has

16  been when an employer hires someone full-time, they normally

17  are ready to go without having other obligations with other

18  jobs, typically.  But in your case, it may be different.  So

19  you guys can work that out.

20         All right.  Then the next thing is the law firm

21  transition.  Is that different than transition time,

22  Ms. Moberly -- I mean, Ms. Adams?  I've seen -- I'm trying to

23  interpret these emails.  There's a start date and there's a law

24  firm transition.  Have we pretty much covered that by turning

25  it all over to Mr. Moberly?

1          MS. ADAMS:  I -- to the extent that your confidence is

2     high, I suppose we have.

3          THE COURT:  Okay.  So what we're talking about is you

4     working with Mr. Moberly on a start date, and he will try to

5     work -- he will work with you and try to come up with an

6     agreement with you as to how you'll wind down your practice.

7          I assume that -- I don't know how that works.  So you

8     guys can see if you can work that out, but that's -- like I

9     said, I'm not going to get in the middle of the details of your

10    employment.  I'm not the HR over at the Senate.

11         Okay.  Now, there's some emails talking about the

12    supervisor.  Ms. Adams, explain to me, are you saying you

13    refuse to work under Mr. Winkler?

14         MS. ADAMS:  I'm saying that I think there's sufficient

15    case law that says to the extent a person has been

16    discriminated by a supervisor and that employer then places

17    that person's livelihood and control, right, underneath that

18    same supervisor, there is -- there is justified cause to

19    request that there be an alternative individual, a

20    nondiscriminating individual, that I report to when I return

21    back to the Arizona State Senate.

22         THE COURT:  Okay.  Well, like I said, I'm not the HR

23    department over there.  I'm not going to determine who your

24    supervisor's going to be.

25         But, Mr. Moberly, do you want to respond?

1        MR. MOBERLY:  Well, yeah.  Two quick responses.

2        Number one, I understand Ms. Adams' position, and

3    obviously these kind of things can be challenging for

4    everybody.  The problem is, we're not Microsoft.  There's only

5    one supervisor over there in the role she's got, and it is

6    Mr. Winkler.

7        And that was specifically testified to at that

8    August 14th hearing.  She called Ms. Baldo and asked who my

9    supervisor would be, and Ms. Baldo said your supervisor would

10   be Mr. Winkler.  And, you know, Ms. Adams went ahead and wanted

11   reinstatement.

12       If we can't have Mr. Winkler as the supervisor, then I

13   think we maybe made a mistake with respect to whether

14   reinstatement is feasible because that's really our only option

15   here.

16       THE COURT:  Well, I'm not going to tell the Senate --

17       MS. ADAMS:  Your Honor --

18       THE COURT:  -- who will occupy positions.  If there

19   turns out to be a problem, then that's another issue down the

20   road, but I ordered reinstatement to her former position as if

21   any -- she'd be any other person in that situation.  And I

22   can't micromanage the Senate and tell them who the supervisors

23   are going to be for any particular individual.  And my

24   recollection is that Mr. Winkler was the only supervisor in

25   that situation.

1      So, Ms. Adams, you talk to Mr. Moberly and see what

2  you guys can work out, but I'm not going to order them to --

3  I'm not going to pick the supervisor for you.  I can't do that.

4      All right.  Retroactive seniority.  Ms. Adams, is that

5  still an issue?

6      MS. ADAMS:  That is the issue, Your Honor.

7  Reinstatement requires retroactive seniority.

8      THE COURT:  Explain to me --

9      MS. ADAMS:  That is not what --

10     THE COURT:  Explain to me what you are asking to be

11  retroactive that hasn't been given to you in the negotiations.

12     MS. ADAMS:  My original start date.  My time -- time,

13  you know, of State service credit, as if the discriminatory act

14  had never occurred.

15     THE COURT:  Okay.  Credit for what?  For retirement,

16  under the retirement system?

17     MS. ADAMS:  For retirement purposes, yes.

18     THE COURT:  What else?

19     MS. ADAMS:  Retirement, my -- that is tethered to my

20  retirement points.  But also, retirement benefits that I

21  would -- that I missed out on, and specifically, the Arizona

22  State Retirement System matching, mandatory.  There's a

23  mandatory withdrawal and there's a 6 percent State match.  I'm

24  asking for that.  Under reinstatement, it's allowed.

25     I'm asking for the accrual of sick leave.  They have

1    offered that.  The accrual of vacation.  Any kind of other

2    fringe benefit that I missed out on because of discriminatory

3    acts at the Arizona State Senate.

4              THE COURT:  Have they agreed to the accrual of sick

5    leave and vacation?

6              MS. ADAMS:  They have agreed to sick leave.  They have

7    not agreed to vacation.  They originally offered a six-month

8    delay, as if I were a new employee, to contribute to

9    retirement.  They have taken that back, but there's no

10   restoration of any --

11             THE COURT:  I'm asking you first about sick leave and

12   vacation.

13             MS. ADAMS:  Sick leave, yes, they have agreed.

14             THE COURT:  But not vacation?

15             MS. ADAMS:  Yes, sir.

16             THE COURT:  Okay.  Mr. Moberly?

17             MR. MOBERLY:  Well, Your Honor, our position on this

18   was twofold.

19             Number one -- well, I guess the problem was that we

20   have -- we have agreed, as I understand it, if we're talking

21   about the same thing, to reinstate what was lost at the time of

22   termination.  The question is whether there should be

23   additional amounts added to that accrual because of the time

24   Ms. Adams was out of work.

25             And one of the problems we have with that is that

1   people don't just accrue sick time.  They also use it during

2   that period.  And there was -- there's no evidence, no basis on

3   which we can conclude what's the average usage, what was

4   Ms. Adams' average usage.

5          Our position is, frankly, that that issue was a matter

6   for the back pay argument during the August 14th hearing, and

7   it was either embedded within your ruling or it was -- there

8   was not evidence to address that issue.

9          THE COURT:  Okay.  I --

10         MR. MOBERLY:  So that's --

11         THE COURT:  Let me just -- so we're talking about --

12  first you're talking about the sick leave and the vacation.

13  And that's for the period of time between the time she was let

14  go until the time she was reinstated.  Is that right?

15         MR. MOBERLY:  I think that's correct.

16         THE COURT:  Those were damages that were available at

17  the time of the trial.  I'm not going to award any damages now

18  that were already addressed or could have been addressed at the

19  trial.

20         Ms. Adams, do you see it differently?  Weren't these

21  issues -- weren't you claiming as damages the sick leave and

22  the vacation time you would have accrued?

23         MS. ADAMS:  I was claiming sick leave, vacation time,

24  and other fringe benefits that would have accrued.  I was also

25  asking for front pay.  And it could have been the case that the

1    Court granted those damages and then also granted front pay.

2    The Court did not do that.

3            The Court granted some of those damages for a duration

4    of time --

5            THE COURT:  Okay.  Stop.

6            MS. ADAMS:  -- based on --

7            THE COURT:  Let me interrupt you.  It's not whether I

8    granted it.  It's whether you had the opportunity to claim

9    them, which you did.  But you didn't produce the documents that

10   were required that I ordered you to produce three times, and

11   therefore, as a sanction, you weren't allowed to make some of

12   those claims.

13           So regardless of what the outcome was, those claims

14   were addressed as a result of the trial.  We don't go back and

15   redo that again after the trial.  Anything that was claimed

16   that could have been made at the trial or was made at the trial

17   is not subject to the reinstatement provisions.

18           So whatever the situation was with regard to the

19   accrual of sick leave and accrual time, if that was a damage

20   sought at trial for that gap period when you were off work,

21   we're not going to go back and do it again.

22           So let's talk about the credit for State service for

23   retirement.  Mr. Moberly, do you want to address that?

24           MR. MOBERLY:  Yes, I would, Your Honor.

25           Same issue.  Frankly, that was an issue for the

1    August 14th hearing, and then take this one a step further.

2    That actually specifically was addressed and denied in your

3    October 17th order, Your Honor.  So I think that's a historic

4    loss that fits within the same analysis.

5          Now, but I also want to make clear, we actually have

6    gone to ASRS and made sure that they are waiving the six-month

7    delay period that new employees usually have when Ms. Adams

8    goes back.  So there's a little something there that we've

9    done, but the other issue, we do think has already been

10   resolved adversely to Ms. Adams.

11         THE COURT:  Yeah.  If this was already resolved, it's

12   not something that's negotiable now.  It's over with.  That

13   part of it's over.  Everything that's already been resolved is

14   over with.  It's not part of the negotiations.

15         I think it's time to move forward, and what we have is

16   a situation where it looks like you guys are pretty close on

17   most of these issues.  She's agreed on the salary.  I think you

18   can work out some sort of arrangement for her to wind down her

19   practice, and it looks like this should be -- everything should

20   be resolvable.

21         Is there any issue that we haven't talked about?

22         MS. ADAMS:  Yeah.  I just want to clarify with the

23   retirement, Your Honor, there's both the retirement points,

24   which is the amount of time an employee has worked for the

25   Arizona State, for their service, and then there's the matching

UNITED STATES DISTRICT COURT

1    retirement benefits.  Matching retirement benefits was

2    addressed in the order of October 17th; credit for service was

3    not.

4            And I just want to preserve a record here that as it

5    relates to reinstatement, this Court did not order that the

6    Senate rehire me.  This Court did not order that the Senate

7    give me a new job.  This Court ordered that I be reinstated,

8    and reinstatement as pled for in 2016 in the original complaint

9    is reinstatement pursuant to Title VII of the Civil Rights Act

10   of 1964.  And that requires an employer to put an employee in

11   the position that they would have been, and what has been

12   offered to me is grossly inconsistent with that based on things

13   asked for and not granted.

14           THE COURT:  Well, what I need to understand from you,

15   Ms. Adams, is what is it you are asking for that wasn't already

16   addressed at trial?  I'm missing that.

17           MS. ADAMS:  As it relates to the terms of the

18   reinstatement?

19           THE COURT:  Yes.

20           MS. ADAMS:  I'm asking for the retirement benefits

21   that seem to have been extinguished or not being offered.  I'm

22   being treated as a new employee.  I think that is not only

23   improper, I think it's unlawful.  And it's incongruent with

24   reinstatement.

25           THE COURT:  Explain to me again what retirement

1  benefits you're talking about, because there's two or three

2  things you've mentioned.

3          MS. ADAMS:  State service, Your Honor.  State service.

4          THE COURT:  Okay, stop.

5          So what you're asking for is the credit for the -- was

6  it two or three years that you were off work?

7          MS. ADAMS:  Four years and nine months.

8          THE COURT:  Okay.

9          MS. ADAMS:  Yes, Your Honor.

10         THE COURT:  It's for the four years that you were off

11 work.  You want that to be credited towards your retirement --

12 your future retirement.

13         MS. ADAMS:  I think the law requires that a plaintiff

14 be --

15         THE COURT:  Stop.  All I'm asking you is -- I don't

16 want to hear about the law.  I know what the law is.

17         MS. ADAMS:  Okay.

18         THE COURT:  All I want to ask you is what you're

19 asking for.

20         You're asking for credit for the four years and nine

21 months that you weren't working as being credited towards your

22 retirement; is that true?

23         MS. ADAMS:  As if I had been -- that's exactly right,

24 yes, Your Honor.  Yes, I am.

25         THE COURT:  Okay.  Mr. Moberly, what's your response

1    to that?

2           MR. MOBERLY:  Well, I -- I'm a little -- this is a

3    little bit out of my wheelhouse, because I'm not sure how the

4    retirement system works.  If we are talking about some sort --

5    well, Ms. Adams referenced points, and I don't know what that

6    is, but I take it it's probably -- has something to do with

7    rate at which you're -- I just don't know what that is.

8           THE COURT:  What I think -- let me explain, and

9    Ms. Adams can correct me if I'm wrong.

10          You need so many years in the retirement system to be

11   able to retire.

12          MS. ADAMS:  Yes, sir.

13          THE COURT:  She has so many years in now, and she

14   wants added to that, what she already has on record with the

15   retirement system, the additional four years and nine months.

16   So, for example, if she had two years in the retirement system

17   before, she wants the retirement system to reflect she has six

18   years and nine months instead of just two years.

19          MR. MOBERLY:  I see.

20          THE COURT:  Ms. Adams, did I accurately describe what

21   you're seeking?

22          MS. ADAMS:  That's correct, and I want my original

23   seniority date as it relates to --

24          THE COURT:  Whoa, whoa, whoa, stop, stop, stop.

25   Ms. Adams, please answer what I ask you first.  We'll move on

1    to something else.  I'm just trying to get one issue at a time.

2           All right.  So, Mr. Moberly, do you understand that

3    issue?

4           MR. MOBERLY:  I think I do, Your Honor.  And I -- and

5    I have -- this is the first time I've thought about that issue,

6    and I'm happy to go back and speak to --

7           THE COURT:  Why don't you investigate that, look and

8    see what you can do with the retirement system and take a look

9    at the law and assure yourself that you feel comfortable that

10   that's what's required, and you and Ms. Adams can talk about

11   it.

12          But I think there's two things.  First, you need to

13   review the law to understand if that is what you understand it

14   to be.  Second, you need to talk to the retirement system and

15   see if under the retirement system that can be done.  I don't

16   know what can be done down there.  But you need to investigate

17   both of those, and then you and Ms. Adams can negotiate that.

18   Okay?

19          MR. MOBERLY:  Yeah.  Yes.

20          THE COURT:  All right.  Ms. Adams, the next thing.

21   What was the next?

22          MS. ADAMS:  My seniority date at the Arizona State

23   Senate.

24          THE COURT:  And tell me, how does that -- I know

25   seniority date means the date you started, but how does that

1    relate?  Is that for purposes of raises or --

2            MS. ADAMS:  I think it's for purposes of retirement.

3    I think it's for purposes of accrual rates.

4            THE COURT:  Okay.  Retirement is a separate issue.

5    We've talked about that.

6            But your seniority date, you're talking about -- you

7    want it to reflect that your original date of hire was your

8    first date of hire, with uninterrupted service; is that right?

9            MS. ADAMS:  In essence, yes.

10            THE COURT:  Did I misstate in any way?  I don't

11    understand what "in essence" means.

12            MS. ADAMS:  I think the Senate does it a little bit --

13    the State does it a little bit different.  If you worked for a

14    State agency prior to the Arizona State Senate, which I did,

15    the effective seniority date is different than your -- it's

16    different for me than my date of hire.  But as -- in concept,

17    your statement is correct.

18            THE COURT:  Okay.  And, Mr. Moberly, do you understand

19    that?

20            MR. MOBERLY:  I understand it, Your Honor.  And in

21    principal, I certainly don't have any discomfort with it.  What

22    I wrestle with as a practical matter is, beyond what we've

23    discussed today, what does it impact?  So I can understand

24    exactly what the discussion is.

25            Because if -- my understanding is, for example, for

1    leave accrual, Ms. Adams is coming in at the maxed-out level

2    for both vacation and sick leave.  Salary, we're effectively at

3    the top.  We've agreed to make her a senior policy advisor.  I

4    just want to make sure I understand, is there something else I

5    don't understand that that seniority date impacts?

6              THE COURT:  Well, why don't you investigate that and

7    get back with her.  We've already discussed the idea of the

8    vacation time and sick leave she would have acquired during the

9    off period, and that was already addressed at the trial.  But

10   these two issues, I think you need to investigate and sit down

11   with Ms. Adams and try to work it out.

12             Ms. Adams, anything else?

13             MR. MOBERLY:  That's fair.

14             MS. ADAMS:  Your Honor, my healthcare benefits.  I

15   have delayed maintenance.  I need to go to the dentist.  I

16   would like my healthcare benefits reinstated as soon as

17   possible.  As soon as possible.

18             THE COURT:  Mr. Moberly?

19             MR. MOBERLY:  Well, that's sort of tied to the

20   transition discussion.  We were attempting to accomplish that.

21   I guess I don't know what the transition discussion is going to

22   be at this point.

23             THE COURT:  Well, let me see if I can summarize what

24   you just said, Mr. Moberly.  Basically, what you're saying is

25   you're trying to reach an agreement with Ms. Adams on her terms

1   of employment, and if you don't ever reach those terms of

2   agreement, then she won't ever be on the insurance.  Is that

3   what you're basically saying?

4          MR. MOBERLY:  That's essentially correct, and it's

5   because it's driven by policy language.  It's not really a

6   discretionary issue.

7          THE COURT:  So she has to be an employee before she

8   can be insured.  The insurance company --

9          MR. MOBERLY:  Correct.

10          THE COURT:  -- won't insure her unless she's an

11   employee.

12          MR. MOBERLY:  That's right.

13          THE COURT:  So, Ms. Adams, it looks like your

14   insurance is tied to your employment.  And I think you guys can

15   sit down and resolve this rather quickly.  It doesn't look like

16   you're that far apart.  Mr. Moberly's got a little research to

17   do now on the credit for the start -- the original start time

18   and the credit for the State service for retirement benefits,

19   but hopefully you two can sit down early next week and work

20   this all out.

21          Mr. Moberly, how much time do you think you'll need to

22   get this research done?

23          MR. MOBERLY:  Well, I won't -- that won't take very

24   much, Your Honor.  I'll be able to get that done by early next

25   week.

1          And I agree that I think we're a lot closer than we

2     occasionally portray.

3          THE COURT:  So what I'd like you to do, Mr. Moberly,

4     is sit down, the two of you, Ms. Adams, in a room together and

5     talk about it and come to the best agreement you can come to.

6     I don't think you're far apart.  I think it's just a matter of

7     working out these details and understanding -- and honestly, I

8     had a hard time understanding what the issues were from reading

9     the emails, but I think we've kind of got drilled down on them

10    to where I think everyone understands what the issues are now.

11         Ms. Adams, are there any other issues that we haven't

12    discussed?

13         MS. ADAMS:  Your Honor, this Court denied front pay

14    because it ordered the Arizona Senate to reinstate me within

15    two weeks of the October 17, 2019, order.  The Arizona State

16    Senate did not comply with that order.  I am asking that I be

17    reinstated effective October 31, 2019, as we sort out these

18    details that we're so close on.

19         THE COURT:  Well --

20         MS. ADAMS:  I need help here, Your Honor.

21         THE COURT:  -- if you're not working --

22         MS. ADAMS:  I'm entitled to help here.

23         THE COURT:  If you're not working, I don't know why

24    they would -- I mean, it's got to be a two-way street.  If

25    you're not working there, then you guys -- I just don't see why

1    this is taking so long, but until you're employed, I can't
2    order them to pay you.
3           MS. ADAMS:  They can suspend the pay.  Or I can use
4    the sick leave.  Let's get creative.  The Court ordered
5    reinstatement.  They didn't do it.  I'm asking for them to
6    honor the Court's order.
7           THE COURT:  Well, from what I saw, they --
8           MS. ADAMS:  There's 90 hours --
9           THE COURT:  Whoa, stop.
10          MS. ADAMS:  There's 90 hours of sick leave --
11          THE COURT:  Stop, stop, Ms. Adams.
12          From what I saw, they were working in good faith
13   trying to resolve this.  And I had a hard time understanding,
14   from reading the emails, what the real problem was.  I think
15   we've resolved it.
16          You and Mr. Moberly can talk about that.  My order was
17   that you be reinstated October 31st, and if it turns out we
18   have to litigate why you weren't reinstated, we can do that
19   some other time.
20          MS. ADAMS:  I'd like to.
21          THE COURT:  But they're not required just to give you
22   everything you ask for if it's not a reasonable term of
23   employment.  So it takes two to work this thing out, and as I
24   understood it, some of the problem was that you were involved
25   in your practice and not able to get to work.

UNITED STATES DISTRICT COURT

1           So I don't know all the facts.  I don't know the

2    details.  I'm not going to make any ruling right now that

3    someone's entitled to one thing or not.  If there's an issue we

4    have to resolve later, we can do that.  But right now I want

5    you two to get together and get this worked out very quickly.

6           All right.  Anything else, Ms. Adams?

7           MS. ADAMS:  Your Honor, I'd like to -- I'd like the

8    Court to order a date for the parties to meet in person.  And

9    maybe that -- I understand you said early next week.  I'd like

10   there to be a date.  I'm available on the 18th.

11          THE COURT:  Okay.  Mr. Moberly?

12          MR. MOBERLY:  I'm available then too.

13          THE COURT:  Okay.  You guys meet.  I'm going to order

14   you meet at 8:30 a.m. and don't leave till you either have an

15   agreement or have reached the point where you can't reach an

16   agreement.  And if you reach that point, let me know.

17          MS. ADAMS:  Thank you, Your Honor.

18          THE COURT:  All right.  Anything else?

19          MS. ADAMS:  No, Your Honor.

20          THE COURT:  Mr. Moberly?

21          MR. MOBERLY:  No, Your Honor.

22          THE COURT:  Okay.  We'll stand in recess.  Bye-bye.

23          (Proceedings concluded at 2:06 p.m.)

24

25

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 17th day of November,

13   2019.

14

15

16
                         s/Jennifer A. Pancratz_____ _____ ____
17                       Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25