# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Talonya Adams, | ) | |
| | ) | No.  CV-17-00822-PHX-DLR |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 11, 2019 |
| Arizona Senate, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**


**<u>REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS</u>**


**<u>JURY TRIAL DAY 3 - TESTIMONY OF JEFFREY WINKLER</u>**


Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

For the Plaintiff:

3
      Talonya Adams, Esq.
4     In propria persona
      2 N. Central Avenue, Suite 1800
5     Phoenix, AZ 85004

6  For the Defendant:

7      Michael D. Moberly, Esq.
       Ryley Carlock & Applewhite PA
8      1 N. Central Avenue, Suite 1200
       Phoenix, AZ 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**SUMMARY OF COURT PROCEEDINGS**                              **PAGE:**

Sidebar Conference (off the record)                              81

| WITNESSES FOR THE DEFENDANT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jeffrey Winkler | | | | |
| By Mr. Moberly | 4 | | | |
| By Ms. Adams | | 38 | | |

**E X H I B I T S**

| NO. | DESCRIPTION | REC'D |
|---|---|---|
| 242 | 2-13-15 email from Katie Hobbs re: Adams' request for meeting has been addressed | 76 |

1                    **P R O C E E D I N G S**

2              (Prior proceedings held on the record not transcribed

3    herein.)

4              (Jury present.)

5              THE COURT:  Please be seated.

6              Mr. Winkler, would you come up here, please, and be

7    sworn.

8                         JEFFREY WINKLER,

9    called as a witness herein by the Defendant, having been first

10   duly sworn or affirmed, was examined and testified as follows:

11             THE COURT:  You may proceed.

12             MR. MOBERLY:  Thank you, Your Honor.

13                         DIRECT EXAMINATION

14   BY MR. MOBERLY:

15   Q.  Would you state your name for the record.

16   A.  Jeffrey Walton Winkler.

17   Q.  And your position?

18   A.  Chief of staff of the Senate Democratic Caucus.

19   Q.  How long have you held that position?

20   A.  Since November of 2014.

21   Q.  Mr. Winkler, I want to ask you to share your background

22   with the jury a little bit.  Take your time.  We've all been

23   talking a little fast here, and I'll prompt you at some point

24   if you have a natural stopping point.

25             Why don't we go back, and you can start with your

1    education.

2    A.   Sure.  I attended California State University, Sacramento,

3    and University of California, Berkeley.  Did not get a degree.

4    I went into restaurant management, actually twice, during that

5    period of time.

6           Subsequent to other employment, I have a California

7    School Board Association master's in governance and a

8    certificate from the Arizona School Administrators Association

9    in both personnel management and budget.  Those were intensive

10   10-month seminar courses.

11   Q.   Where did you grow up?

12   A.   Sacramento.

13   Q.   How long did you live there?

14   A.   19 years.

15   Q.   19 years?  From birth to 19 years of age or -- yeah.  So

16   what happened then?

17   A.   I went into management for Victoria Station, which was a

18   chain of high-end restaurants back in the '70s, and went

19   through their management training program for about three or

20   four months and then was transferred to Minneapolis.  Worked

21   for Victoria Station for a total of about eight years.

22   Q.   And after that?

23   A.   Returned to California.  Lived in the Bay area.  Continued

24   my career in the restaurant business, eventually going into

25   management for Spectrum Foods, which is a white tablecloth

1   restaurant company, or was.  No longer in business.  We had

2   about -- about 15 restaurants in Los Angeles and San Francisco.

3   About 10 of the 15 were Italian restaurants.

4   Q.  And what did you do in the restaurant management business?

5   What kinds of work did you do?

6   A.  Well, I was a front of -- I was both a kitchen manager, a

7   front-of-the-house manager, and a general manager at various

8   points in my career.

9   Q.  And why don't you tell the jury sort of in summary fashion

10  what the differences are.

11  A.  A kitchen manager basically, in lieu of the chef, and was

12  responsible for all of the operations of the kitchen.  Front of

13  the house was responsible for all of the service, the bar, the

14  host stand, the -- just the front-end operation of the house.

15  And then, of course, general management, responsibility for the

16  whole operation, including the P&L, the profit and loss

17  statement.

18  Q.  And when you say you were involved in general management,

19  did that involve multiple restaurants in the chain you

20  described or was that an individual?

21  A.  That was at MacArthur Park in San Francisco, for Spectrum

22  Foods.

23  Q.  And what did you do next?

24  A.  I retired from the restaurant business when my oldest son,

25  Daniel, was born.  He was born in November of '92.  My wife had

1   a four-month maternity leave.  After three of her four months,

2   in January of '93, I retired and became a full-time dad.

3   Q.  What prompted that decision?

4   A.  My wife had a very demanding career.  She was a managing

5   partner of a law firm.  And we wanted to have more than one

6   child, so we made the decision that I would be the full-time

7   dad, and we subsequently had our second son 26 months after --

8   after the first.

9   Q.  How long did you serve in that role of stay-at-home dad?

10  A.  At two points in my career, but during that time, seven

11  years.

12  Q.  Seven years?

13  A.  Yeah.

14  Q.  So your oldest was 7 and your youngest was maybe 4 and a

15  half when that ended?  Am I doing my math correct?

16  A.  Yes.  The youngest was going into kindergarten, and I

17  became reemployed at that point, yeah.

18  Q.  In what occupation?

19  A.  Went to work as a business services coordinator for

20  Larkspur School District in Marin County, California.  I was on

21  the governing board of the neighboring district where we lived,

22  in Tiburon, the Reed Union School District.  And I became aware

23  of this opening, and it was time.  My younger son was going

24  into kindergarten, so it seemed like the opportunity to get

25  back in the work force.

1          And then I was subsequently promoted in that role to

2   director of business services and stayed in that role, loved

3   that job, would still be there today, probably, had we not

4   moved to Arizona in 2004.

5   Q.  How did you come to move to Arizona?

6   A.  My wife was recruited to come and manage a small boutique

7   immigration law firm here in Arizona.  A large -- Littler

8   Mendelson, large employment law firm, had purchased this

9   immigration law firm and recruited my wife to come and run it.

10  Q.  And what did you do when you came to Arizona?

11  A.  I was -- I went back to being a full-time dad because I

12  think it's a fallacy that your -- that kids need a full-time

13  parent only when they're getting ready to go to kindergarten

14  and then everything's good.

15          We were moving to Arizona at the time.  My older son,

16  Daniel, was entering sixth grade and my younger son, Ryan, was

17  entering fourth grade.  And the move was especially tough on my

18  son Daniel, who really already developed his cohort of friends.

19  So it turned out that I was needed more than ever.

20          So I ended up being a full-time dad for, at that

21  point, another five years.

22  Q.  What happened at the end of that five years?

23  A.  I was employed by an advocacy organization called Stand for

24  Children, which still has a footprint in Arizona to this day,

25  as their first Arizona advocacy director.  So during the

1    time --

2            Well, actually, going back to California, when I was a

3    full-time dad the first time, and leading up to me ending up on

4    the Reed Union School District governing board and working as a

5    business manager in the school district, neighboring, the

6    preschool where my boys attended in San Francisco had two

7    owners.  One of the owners died, the owner that ran the

8    business.  It was a preschool through second grade.  And then

9    the other owner arrived at school one morning and said, "We're

10   closing at the end of the week.  I can't make payroll."

11           So five parents got together.  We immediately and very

12   quickly formed a nonprofit and took the school private, made it

13   a private nonprofit, and then we gradually grew the school from

14   a preschool through second grade school to a preschool through

15   eighth grade, which it remains to this day.

16           So having done that, that really got my interest --

17   that got my enthusiasm for education policy at a very high

18   level.  So when we moved to Arizona, I immediately got involved

19   in the Scottsdale Parent Council, because we lived in Arcadia,

20   which is part of the Scottsdale Unified School District, and I

21   took on the role of Arcadia complex chair, which is basically

22   kind of leading the parent effort for Arcadia High School and

23   the middle school and the feeder elementary schools in that

24   complex.

25           Subsequent to that, I became the vice president of the

1    organization for legislative advocacy and started my active

2    lobbying at the capitol.  And then I became president of the

3    parent council the following year, continued my advocacy, and

4    after about two -- well, three, four years doing that, I and

5    two other individuals were really -- we really kind of came --

6    became the lead parent advocates statewide for K-12 education

7    issues at the capitol.

8         We had an organization called Apple, Arizona Parents

9    for Public Education.  It no longer exists.  It's been subsumed

10   into other organizations.  But I was one of the leaders of that

11   for -- during that time too.

12   Q.  What was the time period?

13   A.  That would have been 2006/'7 to immediately before I went

14   to work for Stand for Children, which would be 2010.

15   Q.  Okay.  And what did you do for Stand for Children?

16        And you're saying "Stand for Children"?

17   A.  Stand for Children, yes.

18        I was their first Arizona advocacy director.

19   Q.  And in that position, what did you do?

20   A.  I developed -- we were a young organization trying to grow

21   the footprint in Arizona.  It's a -- it's a parent-driven

22   ground-up organization, so organizing parents in local

23   districts.  But my specific responsibility was advocacy before

24   the legislature.

25   Q.  So it's a lobbying position, largely?

1    A.  Yes.  And then that was also the time that Proposition 100

2    was on the ballot.  It was the special election in May, and I

3    ended up being the statewide parent volunteer coordinator for

4    the steering committee for Proposition 100.  And that was in

5    context of my employment at Stand for Children.

6    Q.  For those of us who that's not ringing a bell for, what is

7    Proposition 100?

8    A.  That was an education funding initiative that was proposed

9    and pushed by former Governor Brewer, and it was a three-year

10   one-cent sales tax.  But it only -- so it only lasted three

11   years.

12   Q.  What happened -- what did you do next, careerwise?

13   A.  The opening for the Senate Democratic Caucus policy advisor

14   came open in December of 2010.

15   Q.  How did you become aware of that?

16   A.  I was a pretty known quantity at the capitol among the

17   Democratic members and the Republican members.  I mean, I

18   certainly advocated to all members of the House and Senate on

19   education -- K-12 education-related issues.

20          The Senate minority leader at the time -- at that time

21   was David Schapira.  David Schapira was very focused on K-12

22   education.  I knew him very well.  But I'm not really -- he did

23   not make me aware, actually, of the staff opening, but he was

24   the minority leader at that time.  So I applied and received

25   the job.

JEFFREY WINKLER - DIRECT EXAMINATION

1        My first day of work on the job was the first day of

2   session.  And I staffed appropriations, finance, and education.

3   So I think they kind of decided to throw me fully clothed into

4   the deep end of the pool and see if I could float, and

5   apparently I floated because I...

6   Q.  Do you happen to remember the salary at which you began?

7   A.  47,000.

8   Q.  And did you subsequently receive a raise?

9   A.  After three sessions, yes.

10  Q.  Do you recall the amount to which your salary was raised at

11  that time?

12  A.  It was raised to 60,000.  But along about that same time, I

13  and all of the uncovered employees in the State, in the context

14  of personnel reform, received a 5 percent increase, so

15  effectively my salary went to 63,000.

16  Q.  You were ultimately promoted to chief of staff?

17  A.  Yes.

18  Q.  For the minority caucus, obviously.  I left that part out.

19  A.  We like to say the Democratic Caucus, but yes.

20  Q.  All right.  Fair enough.

21        How did that come about?

22  A.  It was an open -- openly advertised position.  We were all,

23  of course, aware that Peter Silverman, the -- my predecessor,

24  was stepping down and going back into private practice.  So I

25  applied and was interviewed and got the job.

JEFFREY WINKLER - DIRECT EXAMINATION

1   Q.  Do you recall when that occurred?

2   A.  That occurred in November of 2014.

3   Q.  Do you know Ms. Adams?

4   A.  Yes, I do.

5   Q.  Tell the jury how you know her.

6   A.  She was a colleague on the Senate Democratic Caucus policy

7   staff.

8   Q.  Did you have -- prior to your promotion to chief of staff,

9   did you have any, for lack of a better term, notable

10  interactions with her?

11  A.  We were -- our policy staff are pretty siloed in their

12  areas, and we're all very busy.  So not -- we had interaction

13  at our staff meetings and group meetings.  Only one notable

14  negative interaction, and that was over COWA, Committee of the

15  Whole Amendment, that I had suggested that was on a bill that

16  was -- that had gone through the government committee, so that

17  was Talonya's committee.

18        And I suggested an amendment.  Talonya left to go, I

19  think, to a Board of Adjustment meeting.  The amendment was

20  drafted, but it was subsequently withdrawn after I realized

21  this is a strike-everything amendment.

22        Now, oftentimes -- well, the strike-everything

23  amendment, you can do strike-everything amendments in

24  committee, but you cannot do them on the floor of the chamber.

25  So a strike-everything amendment basically guts everything

1    that's in the bill, and after the enacting clause, replaces

2    everything and makes it a new bill.

3         So you can't do that on the floor.  I realized that.

4    And I worked with Senator Gallardo, whose amendment it was, to

5    have that withdrawn.

6    Q.  And how did that relate to Ms. Adams?  What was the

7    interaction there?

8    A.  She thought that I had proposed that and thrown her under

9    the bus, was how she put it.  But the reverse was true.  I

10   talked to Senator Gallardo, and there was a sword to fall on,

11   and I fell on it.  I told Senator Gallardo, sorry.  This

12   amendment has to be withdrawn.  It's a strike-everything

13   amendment.  It's my mistake.

14   Q.  Any other impressions of her you formed during the first

15   couple years after she was hired?

16   A.  Everyone worked hard.  We had, I would say, a fairly good

17   camaraderie.  Talonya was out of the office a lot, and I think

18   that was noted by most members of the staff.

19   Q.  Do you recall a request from her for time off in the second

20   half of November 20- -- or, yeah, November 2014?

21   A.  Yeah.  I received an email on November 20th with Talonya

22   requesting to meet on an education-related time-off request,

23   yes.

24        MR. MOBERLY:  Could the -- if you could just give me a

25   moment.

1          Could the witness be shown and be published to the

2   jury Exhibit 228 in evidence.  Oh, I'm sorry.

3          THE COURTROOM DEPUTY:  I'm not sure what's going on

4   with it.

5          MR. MOBERLY:  Okay.  I can probably move on if we --

6          THE COURT:  We can do it with the document camera.

7          MR. MOBERLY:  It's all right.  It's already in

8   evidence.  If I need it, I'll come back to it.

9          I have a feeling that that's not working either, huh?

10         THE COURTROOM DEPUTY:  Oh.  There we go.

11  BY MR. MOBERLY:

12  Q.  Mr. Winkler, do you recognize that document?

13  A.  I do.

14  Q.  Is that the request that you just told us about?

15  A.  It is.

16  Q.  And what happened after you -- after you received that

17  request?

18  A.  Talonya and I met on, I believe, Monday the 24th, pursuant

19  to the request.  And she shared with me her time-off request

20  for -- to attend a field seminar week off during session in

21  conjunction with her Thunderbird master's program.

22  Q.  Now, had you been aware of that issue before?

23  A.  I had not.

24  Q.  What happened then?

25  A.  I met with her and said I would look into it.  I went to

JEFFREY WINKLER - DIRECT EXAMINATION

1   meet with Wendy Baldo.  Well, subsequent to that, Senator Hobbs

2   had -- the minority leader, had indicated that she had spoken

3   to Talonya about the request and that Talonya would be reaching

4   out to me.  So it was not unexpected that she did so.

5         That was pretty much the day I was announced as the

6   chief of staff, so that would have been Talonya's first

7   opportunity to talk to me about it.

8         Went to speak to Wendy.  And then I learned that,

9   indeed, that there was already a signed agreement prohibiting

10  any time off during session in conjunction with the Thunderbird

11  program.

12  Q.  What happened next?

13  A.  Discussed that with Wendy.  Discussed that with Senator

14  Hobbs.  Senator Hobbs affirmed the decision that no -- that the

15  denial would be upheld, that no education-related time-off

16  during session would happen.  And I communicated the same to

17  Talonya.

18  Q.  During that process, do you recall whether you were -- you

19  actually had a chance to review the agreement that you referred

20  to?

21  A.  Yes.  I was -- I received a photocopy of the agreement, and

22  Wendy went right over to Sandy Reilly's office -- and actually,

23  I think at that point it wasn't Sandy, it was our previous

24  comptroller -- and got a copy of the agreement.

25  Q.  What happened then?

1    A.   Talked to Talonya about it.  Told her that the decision was

2    that it was a final decision pursuant to the agreement and that

3    the request would be denied and that both Senator Hobbs and

4    chief of staff Wendy Baldo confirmed that that was the case.

5    Q.   Do you recall a discussion about talking with the dean?

6    A.   I offered to talk to the dean of the Thunderbird school.

7    Talonya explained that there was some reason why she now had to

8    go during session because of a change in accreditation.

9    Thunderbird was sold to ASU.  ASU took over the accreditation

10   of the Thunderbird School of Global Management, and so I

11   offered to speak to the dean to see if an alternative

12   accommodation could be arranged.

13   Q.   What happened next?

14   A.   Well, contrary to the instructions I gave Talonya that this

15   was -- this was the final -- I mean, this was a final

16   determination, Talonya went to Senator Hobbs.  Senator Hobbs

17   contacted me and said, "Talonya wants to meet again."

18        And I said -- well, we made the decision that we would

19   have the meeting and that I would be there.  And so that

20   meeting happened the next week.

21   Q.   What do you remember about that meeting?

22   A.   Well, we talked about the agreement again.  I again

23   extended the offer to talk to the dean, as did Senator Hobbs.

24   Senator Hobbs agreed to also speak to the dean to see if we

25   could find an accommodation that would work with the Senate

1    schedule and would allow Talonya to complete the course

2    requirements for her master's.

3    Q.  And what happened then?

4    A.  There was no -- there was never any outreach from Talonya

5    that she was okay with us talking to the dean, so we never

6    ultimately did talk to the dean.  But Talonya immediately went

7    to Wendy and I think pled her case anew.  And it was my

8    understanding that Wendy affirmed the decision that --

9            MS. ADAMS:  Objection, Your Honor.  Hearsay.

10           MR. MOBERLY:  That's all right.

11   BY MR. MOBERLY:

12   Q.  How do you know she went to see Ms. --

13   A.  Ms. Baldo told me.

14   Q.  Do you recall a discussion with Ms. Adams in the first week

15   of February 2015?

16   A.  I do.

17   Q.  What do you remember about that?

18   A.  It was an email request.  It's probably an exhibit.  I know

19   it's an exhibit.  I've seen it.

20           Essentially, she wanted to discuss hourly pay and

21   workload issues.

22   Q.  And what did you do when you got that email?

23   A.  I responded and said I'd be happy to talk about that.  That

24   was a Sunday.  Talonya was working and I was working.  I was

25   working at home.  I indicated to her that I would -- I was

1    contemplating coming down to the office, and if I did, we could

2    talk then.  Otherwise we'd talk on Monday, which subsequently

3    we did discuss it on Monday.

4    Q.  Just the two of you or anyone else participate?

5    A.  On that Monday morning, just the two of us.

6    Q.  What do you remember about that?

7    A.  It -- basically, I explained to her that we're not hourly

8    employees, so I don't understand the hourly pay issue, but that

9    Senator Hobbs and I already had a prior agreement with Wendy

10   Baldo and with President Biggs that we wouldn't discuss any

11   further salary issues until after the conclusion of session,

12   which is -- which is the typical practice.  That is the

13   standard practice.  We don't -- we're far too busy in session

14   to actually have those kinds of personnel conversations.  All

15   parties are too busy.

16   Q.  Anything else you remember about that meeting?

17   A.  No.  That -- pretty much that -- oh, and we -- so Talonya

18   and I talked about the workload issues, and I said, "Well, we

19   will definitely address workload issues."  And we did.

20           I said -- she was particularly concerned about

21   elections-related bills.  We had gone -- we had gone from 12 to

22   16 committees.  So the 2014 session of the legislature, we had

23   12 committees; and in the 2015 session, which we were there

24   then in, we had 16 committees.

25           So we did do -- there was a shuffling of committee

1    assignments.  In the '14 session, we had an elections

2    committee.  In the '15 session, we no longer had an elections

3    committee.  So Talonya was, I think, struggling with some of

4    the elections-related bills, so said for sure we can work on

5    the workload issues, but we'll also specifically address

6    elections-related bills if those came up.

7            And then subsequent to that, we met, Talonya and I,

8    with Senator Hobbs and had the same -- pretty much the same

9    discussion.

10   Q.  Did you do anything to try and ease that election committee

11   load?

12   A.  The following week, the government committee agenda was

13   posted.  There was an elections-related bill on it.  I spoke to

14   John Fetherston, who was a member of the policy staff who had

15   staffed the elections committee the previous session.  And I

16   asked him to be available if Talonya reached out and wanted

17   assistance with elections-related bills, and he agreed.

18           But then she never -- Talonya never did reach out to

19   Mr. Fetherston about that bill.

20   Q.  Let's move to the events of mid-February 2015.  Do you

21   recall an incident that arose pertinent to Ms. Adams?

22   A.  Are you referring to --

23   Q.  The salary announcement.

24   A.  The February 13th email regarding wanting to meet with the

25   full caucus regarding salary and workload issues?

1    Q.  Correct.

2    A.  Even though I thought -- I mean, Senator Hobbs and I were

3    under the belief that that was -- that was a settled issue

4    until after session.  I think the actual first email talked

5    about Talonya wanted to talk to the leadership about her status

6    on the staff.  And then workload and hourly/salary issues were

7    added in a subsequent exchange of emails during that time.

8    Q.  Okay.  What happened when that -- when -- after Ms. Adams

9    sent that email?  Well, strike that.

10            Were you copied on that email?

11   A.  I was.

12   Q.  What do you know happened after that?

13   A.  Senator Hobbs responded that both she and I had already met

14   with Talonya on this issue and that it was inappropriate to

15   have a full leadership meeting on the topic.  And that if she

16   had any concerns, she should direct her further concerns back

17   to me and we would address them.

18   Q.  Do you recall that email kicked off shortly after the

19   Arizona Capitol Times report?

20   A.  Or right about then, right.

21   Q.  What happened next?

22   A.  Well, that was -- they print all of the -- they're very

23   helpful.  They print all of the salaries for legislative staff

24   in the Yellow Sheet.  The Yellow Sheet is a -- kind of an

25   insider political newsletter that comes out Monday through

1    Friday in session.  Well, actually, Monday through Friday

2    pretty much year round.  And then they have an accompanying

3    legislative report that comes out in session only.

4            And, of course, there's a lot of angst around the

5    publishing of salaries.  We've had a salary debate in our

6    caucus with the majority for as long as I've been -- as long as

7    I've been chief of staff.  Wendy's well aware.

8    Q.  What are the --

9    A.  We're still talking about that.

10   Q.  Sorry.

11           What are the natures of those debates?  I mean,

12   enlighten the jury as to what that kind of discussion is.

13   A.  Well, we don't really have -- there is no civil service

14   type structure to determine what appropriate salary level is

15   for caucuses.  And kind of an additional complication is

16   that -- so, essentially the president of the Senate ultimately

17   controls the salaries of everybody in the building.  The

18   speaker of the house controls the salaries of everybody in that

19   building.

20           There is no agreement between those two folks about

21   what the appropriate salary levels are, so their salary levels

22   are set kind of in a -- in a microcosm of each chamber

23   separately.  The result has been that -- I've made the argument

24   for the last five years, during my tenure as chief of staff,

25   that the Senate Democratic staff has been kind of -- we've been

1   the lower on the totem pole in terms of compensation, which it

2   makes it hard to manage a personnel when the House Democratic

3   staff members are making 20,000 more for a similarly situated

4   employee.

5           So, yeah, Wendy and I had this debate.  Wendy

6   maintains the House is the House, the Senate is the Senate, and

7   I maintain, no.  All four caucuses should be treated using the

8   same matrix.

9           And we -- and this is a little awkward for me to be

10  talking about with Wendy sitting right there, because we are

11  currently actually in a negotiation for salaries, so...

12  Q.  So that has existed as long as you've been at the Senate;

13  is that right?

14  A.  That's correct.

15  Q.  After -- after Senator Hobbs responded to Ms. Adams'

16  February 13th email, what do you recall happening then?

17  A.  There were -- there were -- Talonya responded, apologizing

18  for reaching out to the full leadership team.  Also indicated

19  that her son was having heart-related issues, in and out of the

20  emergency room, I believe, in Seattle, and she would eventually

21  be needing to go to Seattle.  And she inquired about FMLA, the

22  Family and Medical Leave Act.

23          So I -- in the course of those emails and on that

24  Friday night, we agreed that we would meet Monday morning at

25  7:30.  Monday morning, the 16th.

1    Q.  And did that occur?

2    A.  It did not.

3    Q.  Tell the jury about that.

4    A.  When I arrived at work, there was no call from Talonya.  So

5    I texted her about -- I'm guessing it was about 8:30, probably,

6    when I texted her saying, "Please call me as soon as possible."

7         But I didn't hear back from Talonya until 1:30, which

8    is when we go on the floor.  Talonya was aware of that, that I

9    would be on the floor at 1:30, but I did -- talking to her was

10   a high priority so I was watching my phone, and I obviously

11   took the call.  I took the call in the Senate lounge.

12        Kind of before that, though, before 1:30, I talked to

13   Talonya's intern, Pete Galvan, and asked Pete, okay, what is

14   this -- oh, and also, our administrative assistant, Dora

15   Ramirez, informed me that Talonya had left a voicemail on the

16   main -- on the main line, on essentially Dora's line.  It's the

17   main line for the caucus, saying that she was in Seattle --

18        MS. ADAMS:  Objection, Your Honor.  Hearsay.

19        THE COURT:  Overruled.

20        THE WITNESS:  Saying that she was going to be in

21   Seattle all week for a family medical emergency and would not

22   be available to take any work calls.

23        So, actually, I didn't have knowledge of that before I

24   texted her saying, "Please call me as soon as possible."

25        In the intervening time, I talked to Pete Galvan and

1    said, "Okay, where are we with the briefs for committee?"

2         Talonya staffed -- well, three of our policy staff

3    staffed three committees.  Three other of our policy staff

4    staffed two committees each and had other responsibilities,

5    including me.  And in addition to being chief of staff, I

6    staffed the appropriations and education committees still.  I

7    no longer do.  That was a fruitful part of the negotiation

8    process over these last several years.

9         Thank you, Wendy.

10        And then our director of communications had just two

11   committees, but he was also our director of communications.  So

12   he had transportation and state debt and budget, budget reform.

13   State debt and budget reform.  And then Lisette Flores, our

14   general counsel, also staffed judiciary and rules.

15        So the three of us that had two committees shared two

16   interns, and the other members of the policy staff had a

17   dedicated intern.  So Pete Galvan was Talonya's dedicated

18   intern, and Talonya staffed rural affairs and environment,

19   government, and public safety, military, and transportation.

20        Rural affairs and environment meets on Tuesday.  So

21   that was the initial issue, was we were scheduled to -- Pete

22   was going to have to brief the RAE committee members on Monday

23   afternoon for that Tuesday committee meeting.

24        So I asked him, I said, "Well, what is the status of

25   the briefs?"  Because we had to start prepping immediately, and

1   then we had the government and the PSMT briefings were both on

2   Tuesday.

3             And he said, "Well, there are no" --

4             MS. ADAMS:  Objection.  Hearsay.

5             THE WITNESS:  "There are no briefs" --

6             THE COURT:  Whoa, whoa.

7             THE WITNESS:  Oh, sorry.

8             MR. MOBERLY:  I think it's relevant to notice.  This

9   is --

10            THE COURT:  The objection's not relevance.  It's

11  hearsay.  What's your response?

12            MR. MOBERLY:  Well, that is my response.  This is a

13  notice issue.  This is one of the decision-makers.

14            MS. ADAMS:  But the statement as it relates to the

15  intern, who is not in the room, is an out-of-court statement

16  offered to prove the truth of the matter asserted, Your Honor.

17            THE COURT:  What are you trying to prove with this?

18            MR. MOBERLY:  What's that?

19            THE COURT:  What are you trying to prove with this

20  statement?

21            MR. MOBERLY:  Well, that the -- the information that

22  was in Mr. Winkler's mind when he made some decisions.

23            THE COURT:  Okay.  Yeah.  I don't think it's being

24  offered to prove the truth of what the intern was saying.  It's

25  just offered to prove -- for what Mr. Winkler understood the

1   facts when he's making some decisions, so I'm going to overrule

2   the objection.

3           MS. ADAMS:  Your Honor, before you do --

4           THE COURT:  I'm overruling the objection.

5           MS. ADAMS:  Thank you, Your Honor.

6   BY MR. MOBERLY:

7   Q.  Go ahead, Mr. Winkler.

8   A.  So -- I'm sorry.  I probably don't need a microphone.

9           So Pete immediately got to work on the briefs, as did

10  I.  However, he also stated at that time that it wasn't

11  practice to do a brief until you saw the Senate research fact

12  sheet.

13          So I explained to him, that is not the case.  That is

14  not procedure.  Talonya had had the agenda, and therefore, the

15  bills that were going to be heard on that Tuesday agenda, since

16  the previous Wednesday.  There had been no work product

17  prepared for the member briefing, nor any work product prepared

18  for the member briefings that were to occur on Tuesday for

19  Wednesday committees for both government and public safety,

20  military, and technology.

21          So immediately I told Pete, well, triage the rural

22  affairs and environment bills first.  It's an easy -- it's the

23  easier of the three committees.  He did that, started working

24  up a brief, and we managed to brief the members on Monday

25  afternoon.

1   Q.  What happened next with respect to Ms. Adams?

2   A.  I talked to Ms. Adams at 1:30 when I was on the floor.  I

3   stepped out into the member lounge, and we had a conversation.

4   And I said, you know, that leaving to take care of a family

5   member who's sick is not the issue.  The issue is how you left

6   with no work done, no work product, essentially leaving her

7   intern and myself in the lurch and our members potentially

8   unbriefed.

9         And she assured me that she would have time in between

10  appointments, that her son was going back and forth to

11  different appointments.  She was, I think, trying to get him

12  into -- or that was actually later in the week, where she

13  talked about wanting to get him into another specialist.  But

14  in any event, she agreed that she could get on the phone with

15  Pete and at least give him some direction.

16  Q.  What happened next?

17  A.  That did not occur.

18  Q.  Did you have discussions with anybody about that then?

19  A.  Yes.  With -- with Senator Hobbs and Wendy.

20  Q.  How did that --

21  A.  Were both made aware.

22  Q.  Did you report that to them?

23  A.  Yes.

24  Q.  Why don't you tell the jury about that.

25  A.  Just that, you know, here is the situation.  Talonya's

1    gone.  Again, it wasn't an issue of her being gone.  It was

2    there was no handoff.  Started talking about, you know,

3    basically abandonment of position.  And we had several

4    conversations throughout the week leading up to the Friday

5    meeting with ADOA counsel.

6    Q.  Did you have any further conversations with Ms. Adams

7    during that time period?

8    A.  There were a few communications, ministerial.  Talonya

9    couldn't find the strike-everything amendments -- back to the

10   strike-everything amendments.  She could not find them posted

11   on the system.  And I said, "You have to look under amendments,

12   because it's an amendment."

13             And I actually checked the system, the external

14   system, not the -- we have an internal and an external system

15   for legislative business.  So I went to the external system,

16   knowing that that would be the system she would have to access,

17   and they were posted.  So she was made aware that they were

18   posted.

19   Q.  Tell us about that Friday meeting.

20             First of all, what was the date of that meeting?

21   A.  That would be the -- that would be, I believe, the 20th,

22   February 20th.

23   Q.  Okay.  Tell us what you remember about that meeting, who

24   was present, and what was said.

25   A.  So Wendy and Senator Hobbs and I, you know, had some brief

1    conversations throughout the week, and we agreed at some

2    point -- and again, at this point I'm supervising an intern

3    who's basically holding up three committees and also doing my

4    own two committees and being chief of staff.  And Senator

5    Hobbs -- our members in session, their schedules are really --

6    I mean, they're packed between floor and meetings and committee

7    meetings.  They're packed solid.

8         So Friday becomes the day where we get a lot of

9    business done.  Friday is the day we catch up.  So it was

10   agreed that we would meet with -- that Wendy and Senator Hobbs

11   and I would meet on Friday and that we would include Sandy

12   Reilly, who is the comptroller of the Senate, and we would also

13   ask an ADOA employment attorney to join us at the meeting.

14   Ultimately, the ADOA employment attorney joined us by phone.

15   Q.  And what do you recall about the discussion between you,

16   Ms. Hobbs -- Senator Hobbs, excuse me -- Ms. Baldo, and

17   Ms. Reilly?

18   A.  Well, we basically -- because we had -- well, Sandy Reilly

19   was -- Sandy may have been tangentially aware of the issue, but

20   she wasn't, you know, fully briefed in her role as HR.  So --

21   and neither was the ADOA employment attorney.

22        So we basically just started from the beginning, from

23   really November 20th, and discussed all of the issues with the

24   leave request, discussed all the issues of the insubordinate

25   behavior relating to not being able to accept a directive that

JEFFREY WINKLER - DIRECT EXAMINATION

1   this was the last and final.  There was always another

2   end-around.  The end-around was either to Senator Hobbs or it

3   was, after Senator Hobbs and I met, then Talonya went to Wendy.

4           And there was -- so "no" was never no.  And then we

5   discussed the issue of the last week and what happened on

6   Monday, Monday morning, and all week, really.

7   Q.  And what happened?  What --

8   A.  Well, eventually, so the conversation got around to, you

9   know, what do we -- what is a requirement of being a member of

10  the policy staff?  It's a very unique job.  It requires a lot

11  of discretion, a lot of emotional intelligence, because you

12  have to -- I mean, we have 13 senators in our caucus.  Our

13  members of the policy staff, while not any one member of my

14  staff works with all 13 members -- I do -- they work with most

15  of them, and sometimes all of them.  And we have to staff our

16  members the way they want to be staffed.

17          So we don't adapt our way of doing business or way of

18  communicating or way of delivering information -- we don't do

19  it our way; we adapt to each one of those individual members.

20  And so there is a trust relationship that all members of the

21  staff have individually with each member of the caucus.

22          So we could and often -- not often, but we could and

23  sometimes do, for example, have members that will be working on

24  the same issue, but they'll be working on like diametrically

25  opposed solutions to that issue and working on legislation.

1    And so that staffer has to keep that discreet relationship with

2    that Member A and then that same discreet relationship with

3    Member B.

4          And so that's an extremely strong trust relationship.

5    Trust is kind of the coin of the realm, is what a lot of people

6    will say if they've been on legislative staff for a long time.

7          So we started talking about trust.  And at one point,

8    it was asked of Senator Hobbs, "Do you trust Talonya?  Do you

9    still trust Talonya?"

10         And Senator Hobbs --

11         MS. ADAMS:  Objection, Your Honor.  Hearsay.

12         THE COURT:  Overruled.

13         THE WITNESS:  And she said no.  So the discussion

14   of -- about termination ensued from there.

15         And it was -- so I'm Talonya's immediate supervisor.

16   Senator Hobbs is really the leader of our caucus.  Wendy Baldo

17   is the chief of staff of not just the Republican caucus but of

18   the whole Senate.  And so ultimately, personnel decisions are

19   made by Wendy.  I mean, they're not necessarily made by but

20   agreed to.  I mean, it's ultimately her decision what to do

21   about personnel.

22         Now, I don't think that a -- that Wendy would ever

23   terminate or discipline a Democratic Caucus employee against

24   the wishes of the leader, against the wishes of our leader, but

25   it's her -- she has the authority to do so.  So that's pretty

1    clear.

2              So it is -- it is --

3              THE COURT:  Hang on a second.  Why don't we ask

4    questions and have answers, okay?

5              MR. MOBERLY:  Yeah.  Just slow down, and I'll prompt

6    you a little bit.

7              THE WITNESS:  Okay.

8              THE COURT:  You're answering more than he asked.

9              THE WITNESS:  Oh, I'm sorry.  Okay.

10             THE COURT:  Wait for a question.

11             THE WITNESS:  I'm sorry.

12   BY MR. MOBERLY:

13   Q.  So you had a discussion about termination?

14   A.  Right.

15   Q.  You indicated that Senator Hobbs was asked whether she

16   trusted -- still trusted Talonya, and she said no?

17   A.  Yes.

18   Q.  Do you recall the next part of the discussion?

19   A.  We had further input from the ADOA employment counsel, and

20   we went around the room and everyone -- everyone agreed that

21   the decision to terminate was the correct decision.

22   Q.  Okay.  Do you recall any other discussion in that meeting?

23   A.  There was a discussion with the ADOA counsel about the

24   headline test.  And --

25   Q.  You don't need to tell us about the discussion with your

1   lawyer, but --

2   A.  Okay.  Then that -- then no.

3   Q.  Okay.  Was there any discussion about how this would be

4   communicated to Ms. -- to Ms. Adams?

5   A.  There was.  Wendy actually said, "Well, I'm happy to" -- I

6   don't think she said "I'm happy to" -- "I will call Talonya and

7   request a meeting with her for Monday morning."

8   Q.  Did you participate in that call?

9   A.  I did not.

10  Q.  During any of your discussion in that meeting on Friday,

11  was there any discussion of Ms. Adams' race?

12  A.  No.

13  Q.  Was there any discussion of her gender?

14  A.  No.

15  Q.  Was there any discussion of whether she had ever made an

16  allegation of discrimination on the basis of her race or

17  gender?

18  A.  There may have been with our -- with the legal counsel.  It

19  was mostly the merits of -- we really stuck to the merits of

20  the situation.

21  Q.  Did Ms. Adams ever make an allegation of discrimination to

22  you?

23  A.  No.

24  Q.  Are you aware of her ever having made an allegation of

25  discrimination to anyone else?

1   A.   No.

2   Q.   So to the extent this was discussed with counsel, it was

3   because he raised the issue?

4   A.   Yes.   Again, it's four and a half years ago, but that would

5   be my recollection, yes.

6         MR. MOBERLY:   I don't think I have anything further,

7   Your Honor.   Thank you.

8         THE COURT:   All right.   Cross-examination.

9         MS. ADAMS:   Thank you, Your Honor.

10        Your Honor, I'm just trying to check the time.   Do you

11  know what time we'll break for the afternoon?

12        THE COURT:   In about five minutes.

13        MS. ADAMS:   Okay.

14        THE COURT:   Would it be better to break now?

15        MS. ADAMS:   Would that be okay?   I can get the

16  exhibits prepared.

17        THE COURT:   Yeah.   Let's take our break.   We'll come

18  back at five minutes to 3:00.

19        MS. ADAMS:   Thank you, Your Honor.

20        (Jury not present.)

21        THE COURT:   Please be seated.

22        Is there anything to take up at this time?

23        MS. ADAMS:   No, Your Honor.

24        MR. MOBERLY:   No, Your Honor.

25        THE COURT:   I'm ready to rule on that Rule 50 motion.

1    I'm going to deny the motion.  Reasonable minds could disagree

2    on whether the differences in experience and duties between

3    her -- between the plaintiff and Kamp and Ross are material in

4    the context of this case.  So the motion is denied.

5              Have you two met on -- regarding final jury

6    instructions?  Do we have an agreement on those?

7              MR. MOBERLY:  Well, we're pretty close, I think, Your

8    Honor.  Actually, the instructions that you circulated

9    yesterday are -- I think we had submitted those jointly --

10             THE COURT:  Some of them are contradictory with regard

11   to causation, I think, so --

12             MR. MOBERLY:  The motivating factor and --

13             THE COURT:  Yeah.

14             MR. MOBERLY:  Yeah, I think Ms. Adams has a position

15   on that.  I'll let her --

16             THE COURT:  I don't want to talk about it yet.  I just

17   want to know, have you reached full agreement or not?

18             MS. ADAMS:  No, Your Honor.

19             MR. MOBERLY:  Not quite, but --

20             THE COURT:  Okay.  You're still working on it?

21             MR. MOBERLY:  Yeah.

22             MS. ADAMS:  Your Honor, but I do believe we're at an

23   impasse, unless Mr. Moberly can enlighten me.

24             MR. MOBERLY:  So there were two issues raised in the

25   email.

1            THE COURT:  Wait.  We need to take a break.  I don't

2    want to get into it.  I just wanted to see where you were.

3            And finally, with the proposed forms of verdict, I've

4    reviewed them from the defense.  Any objection to these?

5            MS. ADAMS:  I do object to the verdict form, Your

6    Honor.

7            THE COURT:  Okay.  We'll talk about those, too, then.

8            All right.  We'll stand in recess.

9            (Recess taken, 2:40 p.m. to 2:57 p.m.)

10           THE COURT:  Please be seated.

11           Okay.  Are we ready to get started?

12           MS. ADAMS:  Yes, Your Honor.

13           THE COURT:  We'll meet after trial today and finish up

14   instructions and forms of verdict.  Okay?

15           MS. ADAMS:  Thank you, Your Honor.

16           THE COURT:  Mr. Moberly, who else are you calling

17   today?

18           MR. MOBERLY:  I'm sorry, Your Honor?

19           THE COURT:  Who else are you calling today?

20           MR. MOBERLY:  Secretary Hobbs.

21           THE COURT:  Anybody else after that?

22           MR. MOBERLY:  No.

23           THE COURT:  So we should -- I'm showing you have 3

24   hours and 25 minutes.  Ms. Adams, you have 59 minutes.  We may

25   make some adjustments when we see where we are with time, but

 1    tomorrow we still have a busy day.

 2            Are we going to finish today, you think, with your

 3    witnesses?

 4            MR. MOBERLY:  We'll be close.  I'm not sure about

 5    rebuttal, but I think we'll be close.

 6            THE COURT:  Well, I vacated my 4:30 matter so we can

 7    go late if we have to, just to get as far along as we can

 8    towards finishing.  Because there's always things that come up

 9    the last day, and we try to wrap things up.

10            (Jury present.)

11            THE COURT:  Please be seated.

12            Ms. Adams, you may proceed.

13            MS. ADAMS:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15    BY MS. ADAMS:

16    Q.  Hi, Mr. Winkler.  How are you?

17    A.  I'm well, thank you.  How are you?

18    Q.  I'm good.  Thank you.

19            MS. ADAMS:  I need one more exhibit.  Thank you.

20    BY MS. ADAMS:

21    Q.  Mr. Winkler, I wanted to talk to you -- can you take the

22    folder that's marked Exhibit 269?

23    A.  Uh-huh.

24            MS. ADAMS:  And, Your Honor, this has been admitted

25    into evidence.  I'd like to publish to the jury.

1             THE COURT:  You may.

2             THE WITNESS:  Yes.

3    BY MS. ADAMS:

4    Q.  Do you recognize this document?

5    A.  I do not.

6    Q.  You do not?  Okay.

7             If you look in the upper left-hand corner, do you see

8    a cell phone number?

9    A.  602-903-8809.

10   Q.  Yes.  Do you know whose telephone number that is?

11   A.  I don't.

12   Q.  Okay.  Would you agree that that might be Ms. Adams' cell

13   phone number?

14   A.  It could be, I suppose.

15   Q.  Okay.  If you look down -- actually, let's turn the

16   document one, two, three -- if you turn the document four

17   pages, in the lower right-hand corner it's Bates stamped

18   AZSEN 0121.

19   A.  Yes.

20   Q.  When you look down to the lower bottom of the document, do

21   you see the date 2/16/2015 at 12:49 p.m.?

22             THE COURT:  Can you blow that up any more?

23             MS. ADAMS:  Yes, Your Honor.

24             THE WITNESS:  Yes.

25             THE COURT:  Now we can't see --

 1             MS. ADAMS:  Right.  Let's see.

 2             THE COURT:  That's better.

 3             MS. ADAMS:  If it will stay.

 4   BY MS. ADAMS:

 5   Q.  Do you recognize this number?  I know it's quite pixelated

 6   but --

 7   A.  It's mine.

 8   Q.  That is.  And is that your cell phone number?

 9   A.  Yes.

10   Q.  Okay.  And do you see to the far right where it says

11   "Incoming"?

12   A.  Yes.

13   Q.  Okay.  Would you agree that you had sent a text message to

14   this 602-903-8809 cell phone on February 16th, 2015?

15   A.  Apparently.

16   Q.  Okay.  And how many text messages did you send?

17   A.  At that time?  It looks like two.

18   Q.  Okay.  Do you recall texting Ms. Adams on Monday,

19   February 16th, 2015?

20   A.  At this 12:49 p.m.?

21   Q.  That's what the record says.

22             THE COURT:  Hang on a second.

23             That's Pacific time, though, correct?

24             MS. ADAMS:  It is Pacific time, correct.

25             THE COURT:  What time would that be for Arizona?

1          MS. ADAMS:  For Arizona it would be one hour later, so

2     it would be 1:49 p.m. Arizona, Phoenix time.

3          THE WITNESS:  Probably as a follow-up to our call, I

4     would imagine.

5     BY MS. ADAMS:

6     Q.  Okay.  So if you look at this document and we scroll up

7     here, it says "Text"; is that correct?

8     A.  Yes.

9     Q.  Okay.  And your testimony on direct was that you had

10    arrived the office and Ms. Adams was not there for the 7:30

11    meeting; correct?

12    A.  That's correct.

13    Q.  Okay.  And you were asked about that meeting in deposition;

14    is that correct?

15    A.  Yes.

16    Q.  Okay.  And so you were chief of staff at the Arizona State

17    Senate on this day, February 16th, 2015; correct?

18    A.  Yes.

19    Q.  And individuals -- had you, in your role as chief of staff,

20    received any orientation as it relates to how to be a chief of

21    staff at the Arizona State Senate?

22    A.  I had some conversations with Peter Silverman.

23    Q.  The question is about orientation.

24    A.  Not specific to being chief of staff, no.

25    Q.  Okay.  Did you receive any policy handbook or any

JEFFREY WINKLER - CROSS-EXAMINATION

1   guidelines as it relates to managing staffers at the Arizona

2   State Senate?

3   A.  No.

4   Q.  Were you aware of any policy handbook or did you sign the

5   acknowledgment of receipt of a policy handbook?

6   A.  When I was hired on staff, as I think is typical for all

7   staff, we're -- we are required to view an ADOA video, which

8   talks about, among other things, personnel policies.  And then

9   we're required to sign an acknowledgment that we have viewed

10  the video.

11  Q.  And you completed that process?

12  A.  In 2011, yes.

13  Q.  When you were hired as a policy advisor?

14  A.  Yes.

15  Q.  Okay.  So -- and you said when you started working at the

16  Arizona State Senate, it was January of 2011?

17  A.  Yes.

18  Q.  Okay.  And so when Ms. Adams was hired at the Arizona State

19  Senate in December of 2012, you had been there just 11 months;

20  is that correct?

21  A.  That sounds about right, yeah.

22  Q.  Okay.  And in December, when Ms. Adams was hired in 2012,

23  you received a salary increase of $13,000; is that correct?

24  A.  So I would have to look at -- do you have an exhibit with

25  the payroll?

JEFFREY WINKLER - CROSS-EXAMINATION

1   Q.  I think I might, but we'll save that for Mr. Moberly.

2            To the best of your knowledge, at some point in time

3   you received a $13,000 salary increase; right?

4   A.  I was -- well, I -- yes.  Uh-huh.

5   Q.  Okay.  And it could have been in December of 2012, after

6   you had been at the Arizona State Senate one legislative

7   session for 11 months total; is that correct?

8   A.  No.  That would be two legislative sessions.

9   Q.  Okay.  How would it be two legislative sessions?

10  A.  Because I -- my first day in January of 2011 was the first

11  day of the session.

12  Q.  Okay.

13  A.  December of 2012, we also had the 2012 session.

14  Q.  Okay.  So you had completed the 2012 session as your second

15  session?

16  A.  Second session, yes.

17  Q.  Okay.  And then you received a $13,000 salary increase?

18  A.  If that's when I received it, yes.  I received that size

19  of --

20  Q.  Okay.  Very good.

21  A.  Yes.

22  Q.  So you say on this day, Ms. Adams -- you and Ms. Adams are

23  supposed to connect.  You had no training as it relates to how

24  to be a chief of staff, but you did watch an ADOA video and

25  sign acknowledgment of receipt in 2011 when you were hired as a

1   policy advisor for $47,000 a year; correct?

2   A.  Correct.

3   Q.  Okay.  And so did you have any idea what -- did you know

4   whether or not the Senate was exempt from the Family Medical

5   Leave Act?

6   A.  I was not specifically aware of that.

7   Q.  Okay.  So you didn't know?

8   A.  I wasn't sure what the -- you know, what our status was.

9   Q.  Okay.  So you wanted to find out for Ms. Adams; correct?

10  A.  Yes.

11  Q.  And so how did you do that?

12  A.  By contacting Sandy Reilly.

13  Q.  Okay.  And Sandy Reilly is the comptroller in HR?

14  A.  That's correct.

15  Q.  Okay.  And so you didn't know about -- did you know about

16  any emergency leave outside of FMLA that the Senate might be

17  aware of?

18  A.  No.

19  Q.  Okay.  So the legislative session started the second

20  Tuesday in January of 2015, and this was your first legislative

21  session as chief of staff; correct?

22  A.  Second Monday.

23  Q.  Second Monday?

24  A.  Yes.

25  Q.  Okay.  This was your first legislative session as chief of

1  staff?

2  A.  That's correct.

3  Q.  Okay.  And then Ms. Adams was hired -- strike that --

4  Ms. Adams was fired in February of 2015, within the first month

5  of you entering into your chief of staff role at the Arizona

6  State Legislature; is that correct?

7  A.  Would be my third month.

8  Q.  It would be your third month?

9  A.  You're chief of staff in the interim as well.  In fact,

10 there's a lot of -- a lot of legwork that goes into the interim

11 before the first day of session.

12 Q.  Yes, it does.  Yeah.  There's a lot of prework before

13 session.

14         So in the first 90 days of you being chief of staff,

15 Ms. Adams was terminated; correct?

16 A.  Correct.

17 Q.  Okay.  And you decided that Ms. Adams should be terminated

18 based on the testimony you gave when you were examined on

19 direct; correct?

20 A.  We decided.

21 Q.  And when you say "we," who do you mean?

22 A.  Senator Hobbs, Wendy Baldo, and myself.

23 Q.  Were you aware of a progressive disciplinary policy at the

24 Arizona State Senate?

25 A.  No.

JEFFREY WINKLER - CROSS-EXAMINATION

1  Q.  Had you ever terminated anybody at the Arizona State Senate

2  prior?

3  A.  No.

4  Q.  Had you ever had an individual with a policy -- with a

5  personnel issue outside of Ms. Adams in your role as chief of

6  staff?

7  A.  Personnel issue?  Yes.

8  Q.  Okay.

9  A.  At that point?

10  Q.  Yes, at that point.

11  A.  No.

12  Q.  Okay.  So you become chief of staff and the session starts,

13  and within the first 90 days there's an employment action that

14  needs to occur to correct behavior that you perceived to be

15  both, one, abandonment, and two, insubordination; is that

16  correct?

17  A.  I and others, yes.

18  Q.  Okay.  And the first tool in your toolbox that you reach in

19  as chief of staff is termination; is that correct?

20  A.  There was many discussions about proper communication and

21  protocol before that decision was made.

22  Q.  And when you say "proper communication and protocol," what

23  do you speak of, specifically?  Is there a written policy?

24  A.  There's not.

25  Q.  Is there a handbook?

JEFFREY WINKLER - CROSS-EXAMINATION

1   A.  There's not.

2   Q.  Is there any class that a policy advisor would take as it

3   relates to protocol?

4   A.  There's not.

5   Q.  Okay.  And when you say there were many discussions, who

6   were involved in these discussions?

7   A.  Well, yourself and me; yourself and Senator Hobbs and I;

8   yourself and Wendy.  I believe there were probably plenty of

9   occasions when that was discussed.

10  Q.  Okay.  So in the record, Mr. Winkler, there are probably

11  about five times, and I might be generous when I say that

12  number, that there were meetings held.  Do you believe there

13  were more than five meetings that were held with Ms. Adams in

14  these discussions that you speak of?

15  A.  I hesitate to, you know, put a hard count on it, but that's

16  about right probably.

17  Q.  Okay.  So back to this document here, this here, it says

18  "Talk" on the upper right corner of Exhibit 269, Bates stamped

19  AZSEN 0118.  Do you see that?

20  A.  Yes.

21  Q.  And Ms. Adams is in Seattle at the time, and so it's

22  Pacific Standard Time.  And you say that although she had an

23  emergency medical leave, you wanted her -- you had approved her

24  to go to Seattle; is that correct?

25  A.  At a -- at a point in the future, yes.

1   Q.  Okay.  Did you tell her, "I approve.  You can go to Seattle

2   under these emergent circumstances for your child at a point in

3   the future"?

4   A.  What I think I said was, "Family comes first."  And that

5   was the -- that was the Friday evening, one of the Friday

6   evening emails.

7   Q.  What does that mean, "Family comes first"?

8   A.  Well, that obviously there's an understanding that when you

9   have a family medical emergency, you need to attend to it.

10  Q.  And does that mean that I needed to -- on Friday evening,

11  when you said to Ms. Adams, "Family comes first" --

12          MS. ADAMS:  Your Honor, may I publish Exhibit 243

13  already entered into evidence?

14          THE COURT:  You may.

15          MS. ADAMS:  Thank you.  Actually, I'm not sure if it's

16  entered into evidence.  I would move to --

17          THE COURTROOM DEPUTY:  It is, yes.

18          MS. ADAMS:  Okay.  Thank you.

19  BY MS. ADAMS:

20  Q.  Do you recognize this document, Mr. Winkler?

21  A.  I do.

22  Q.  Okay.  And what is this document?

23  A.  This is the -- my "Family comes first" response when you

24  talked about Chris being in and out of the ER.

25  Q.  Okay.  And who is Chris?

1    A.  Your son.

2    Q.  Okay.  And so I'm saying, "Chris has been in and out of the

3    ER this week with heart-related issues.  I'm awaiting results

4    of an EKG and may need to travel to Seattle.  It's touch and

5    go" --

6            THE COURT:  Please slow down.

7    BY MS. ADAMS:

8    Q.  -- "right now.  I will communicate additional details as I

9    know them."

10           Did you receive that email?

11   A.  Yes.

12   Q.  And Ms. Hobbs and Ms. Baldo were carbon-copied on that

13   email?

14   A.  Correct.

15   Q.  And then you responded from your cell phone; yeah?

16   A.  Yes.

17   Q.  What did you say?

18   A.  "I'm so sorry to hear that, and please know that family

19   comes first at the Senate.  Keep me in the loop" --

20           THE COURT:  Whoa, whoa, whoa.  Slow down, please.

21           THE WITNESS:  Sorry.

22           "Keep me in the loop, but please do what you need to

23   do for your son.  I will keep Chris in my prayers.  Jeff."

24   BY MS. ADAMS:

25   Q.  And when you said, "Please do what you need to do for your

```
1    son," what did you mean by that?
2    A.   That if you needed to go to Seattle, you should go to
3    Seattle.
4    Q.   Okay.  And Ms. Adams did go to Seattle; is that right?
5    A.   Correct.
6    Q.   And you approved her to go to Seattle; is that right?
7    A.   At some -- there -- there's all of the other email
8    exchange --
9    Q.   It's a yes-or-no question, Mr. Winkler.
10   A.   -- later in the --
11   Q.   It's a yes-or-no question.  You approved for her to go to
12   Seattle; is that correct?
13   A.   Yes.
14   Q.   At any point in time did you say to her, "You must first
15   come into the office physically.  You must wait the weekend
16   while your son is in the hospital and come into the office 36
17   hours later to meet with me, and after that, you can fly to
18   Seattle"?
19   A.   The --
20   Q.   It's a yes-or-no question.
21   A.   The email exchange later in the evening reflects that we
22   were going to meet at 7:30 on Monday morning.
23   Q.   Okay.  So here you get -- you send this email to Ms. Adams
24   saying "Family comes first at the Senate."
25            Her son's family; you would agree?
```

1   A.  Yes.

2   Q.  He's in emergent situations; you would agree?

3   A.  That's how you represented it, that's correct.

4   Q.  Okay.  If your son had been hospitalized, would that be

5   emergent for you?

6   A.  Absolutely.

7   Q.  Okay.  Would it be emergent for any other policy advisor at

8   the Arizona Senate if they had a child that had been

9   hospitalized?

10  A.  I would assume so, absolutely.

11  Q.  And in your chief of staff role when you were chief of

12  staff and this incident came up, was this the first time you

13  had an employee have an emergency leave need?

14  A.  Yes.

15  Q.  Okay.  And you thought it would be prudent to have

16  Ms. Adams come in on the next business day, before business

17  hours, prior to leaving to Seattle?

18  A.  That was upon your request to meet on Monday morning.  And

19  I said I would clear my calendar and meet with you at 7:30.

20  Q.  Okay.  Let's talk about that.  Do you see Exhibit 245?

21          MS. ADAMS:  Your Honor, permission to publish 245,

22  already admitted into evidence.

23          THE COURT:  You may.

24          MS. ADAMS:  Thank you.

25          THE WITNESS:  Yes.

1    BY MS. ADAMS:

2    Q.  Okay.  Is this the document you're talking about?

3    A.  Yes.

4    Q.  Okay.  And so what do you say here?  Slowly, so we all can

5    hear clearly.

6    A.  "I will be in by 7:30, if not earlier, on Monday morning

7    and will clear my schedule to meet with you.  I will check with

8    Sandy regarding FMLA protocols as soon as she is in on Monday."

9    Q.  Okay.  And what you mean by FMLA is the Family Medical

10   Leave Act; is that correct?

11   A.  Correct.

12          MS. ADAMS:  Okay.  Can we go back to Exhibit 269?

13   BY MS. ADAMS:

14   Q.  Mr. Winkler, in the upper left-hand corner underneath the

15   cell phone number, do you see what it says there?

16   A.  Can you -- well, I've got it now.  Here it is.

17   Q.  I've just circled it for you.  Do you see where it says

18   "Talk"?

19   A.  Yes.

20   Q.  Okay.  So these are the calls that were coming in to this

21   telephone number, 602-903-8809, that you sent a text message to

22   on February 16th, 2015?

23   A.  Uh-huh.

24          THE COURT:  Is that a yes?

25          THE WITNESS:  Yes.  Sorry.

```
1          THE COURT:  She doesn't do very well with "uh-huh" and

2   "huh-uh."

3          THE WITNESS:  Sorry.

4   BY MS. ADAMS:

5   Q.  Okay.  And so do you see on February 16th, 2015 -- I think

6   it begins right around here -- oh, it begins at 1:23 a.m. with

7   a call from a number I know to be my mother.  Do you see that

8   there?

9   A.  I see the one with the red dot.

10  Q.  Oh, okay, sure, the one with the red dot.

11         Do you recognize that number?

12  A.  That's the main line.

13  Q.  Okay.  For where?

14  A.  For the Senate.

15  Q.  Okay.  And what time does it say the --

16  A.  12:53 p.m.

17  Q.  And then if you go up a little bit, maybe one, two, three,

18  four, five, six -- six telephone numbers --

19  A.  The same number.

20  Q.  Here.

21  A.  Yes.

22  Q.  Do you see it says at 6:27 a.m. that number was called?

23  A.  I can't make out the -- is that 8:27?

24  Q.  I believe it's 6:27.

25  A.  Okay.  Can't read it.  But, yes, I see that one.
```

JEFFREY WINKLER - CROSS-EXAMINATION

1   Q.   Okay.  But you do see that that number was called; is that

2   correct?

3   A.   Yes.

4   Q.   And were you at the Arizona State Senate at 7:27 a.m.?

5   A.   Well, I was there at 7:30, so I mean, I was close.

6   Q.   Okay.  So a call came in from this telephone number to the

7   Arizona State Senate, and it looks like the line was on for 3

8   minutes.  Is that correct?

9   A.   It does.

10  Q.   Okay.  And then you say -- you testified just moments ago

11  that you got there at 7:30.  Ms. Adams was not there; correct?

12  A.   Correct.

13  Q.   And you thought she had abandoned her job; correct?

14  A.   That's -- at that point, I wasn't aware of the entirety of

15  the situation, so I wouldn't characterize it at that point --

16  Q.   Okay.

17  A.   -- that way, no.

18  Q.   So Friday evening you say to Ms. Adams, the last business

19  day before this Monday, you say to Ms. Adams, "Family comes

20  first.  Go do what you need to do for your son.  I'm praying

21  for him."

22          And Monday morning you're confused about where she is?

23  A.   Pursuant to the pre -- the continuing -- continuation of

24  the chain, yes.

25  Q.   Okay.

JEFFREY WINKLER - CROSS-EXAMINATION

1   A.  I'm confused.

2   Q.  Fair enough.

3          So you get there.  Ms. Adams is not there; right?

4   A.  Correct.

5   Q.  Oh, and what do you do?

6   A.  I check with your intern, Pete Galvan.

7   Q.  Okay.

8   A.  And see if he has heard from you.  He had not.

9   Q.  Okay.

10  A.  And then at some point reached out to you to please call

11  me.

12  Q.  Right.  And you testified that was at 8:30 a.m.; is that

13  right?

14  A.  Or -- there, I'm not exactly sure what time that -- it

15  happened sometime that morning, during the context of --

16  Q.  So now you're not sure.  Was it 8:30 or you're not sure?

17  A.  I recall it being probably that's a good guess.

18  Q.  Okay.  So 8:30, and you said, "Please call me" -- or you

19  said, "Please call me as soon as possible" is what you

20  testified; is that correct?

21  A.  Right.  Yes.

22  Q.  Okay.  Where is the call?

23  A.  I don't see it.

24  Q.  Outside of Ms. Adams' cell phone, are you aware of a cell

25  phone that the Arizona State Senate may have provided her that

1   you called?

2   A.  No.

3   Q.  Are you aware of a landline that Ms. Adams had?

4   A.  No.

5   Q.  Okay.  When you called Ms. Adams, what number did you call?

6   A.  I would have called your cell phone.

7   Q.  Her cell phone.  Okay.

8        And if I say to you today that this 602-903-8809 is

9   Ms. Adams' cell phone number, are you surprised that your call

10  is not there?

11  A.  If that is your cell phone number.

12  Q.  Okay.  Okay.  Fair enough.

13       You then say Ms. Adams called you back at 1:30 p.m.

14  when she knew you were on the floor; is that correct?

15  A.  Right.

16  Q.  And do you believe that to be the call with the red dot

17  next to it?

18  A.  Yeah.  Probably.

19  Q.  Okay.  So it says 12:53 p.m., but that's Pacific Standard

20  Time, so it would be 1:53 p.m.; is that correct?

21  A.  Yes.

22  Q.  And you would be on the floor at that time; right?

23  A.  Yes.

24  Q.  And Ms. Adams would know that you were on the floor and

25  probably not available to talk; is that right?

1    A.  Yes.

2    Q.  Okay.  Do you see any further calls?  Do you see on the

3    last call here, 12/16/2015 [sic], at 2:27 p.m.?

4    A.  Yes.

5    Q.  Okay.  And do you see -- do you recognize that number?

6    A.  That's the main line.

7    Q.  So Ms. Adams was calling into the main line at 2:27 p.m.,

8    third call of the day.  First call happens 7:27 a.m. Phoenix

9    time; second call happens 1:53 p.m. Phoenix time; the third

10   call happens at 2:27 p.m., while she's out on approved medical

11   emergency leave with her son that has been in and out of the

12   hospital, and you're aware of that.

13            Let's turn the page.

14            THE COURT:  Whoa, whoa.  Was that a question?

15   BY MS. ADAMS:

16   Q.  And you're aware of that, question mark?

17   A.  I'm aware of what?

18   Q.  That Ms. Adams is out of the office on approved emergency

19   medical leave that was approved by you?

20   A.  I'm aware that you're not in the building, and -- and we

21   have yet to have our conversation about how the handoff

22   occurred, but yes.

23   Q.  Okay.  And -- but that morning you were concerned, and so

24   you went to Ms. Baldo and you said, "Ms. Adams didn't show up

25   for work."  Right?  That's what you said to her?

JEFFREY WINKLER - CROSS-EXAMINATION

1    A.  Ms. Baldo received the same email that I received saying

2    that we were going to meet at 7:30 on Monday morning.

3    Q.  Okay.  And then you said, "I called her and said call me

4    back as soon as possible, and I've heard nothing from her"; is

5    that right?

6    A.  That's correct.

7    Q.  Do you have any evidence today of documentation of where or

8    how you called Ms. Adams on the morning of February 16th, 2015?

9    A.  I don't.

10   Q.  Okay.  Here we are on the second page of Exhibit 269.  And

11   it's Bates stamped AZSEN 0119.

12         Still talking, calls coming in to Ms. Adams.  And

13   again here at 3:44 p.m. Pacific time, 4:44 p.m. Phoenix time,

14   Ms. Adams is calling again; is that right?

15   A.  It looks like it didn't go through.

16   Q.  To the main line.  Looks like it probably didn't go

17   through.  That's right.

18         So on that day that Ms. Adams is gone and with her ill

19   son, she's called in no less than four times.  But we also know

20   that you sent her a text that morning and said the Senate is

21   exempt from FMLA; correct?

22   A.  I'm not -- I'm not -- I don't recall exactly when Sandy got

23   back to me, but that most likely would have been on that

24   Monday.

25   Q.  Okay.  Can you turn on Exhibit 269 to AZSEN 0121.  If we go

1   back here, you stated this was your cell phone number; correct,

2   Mr. Winkler?

3   A.  Where -- yes.

4   Q.  Okay.  Sorry.  Let me clear the screen.

5          And so you text Ms. Adams at what would be 1:49 p.m.

6   two text messages, it looks like; is that correct?

7   A.  Could well be, relating to the FMLA issue.

8   Q.  Okay.  And we see here that it's 12:49 p.m. Pacific time,

9   1:49 p.m. Phoenix time.

10  A.  Right.

11  Q.  And where would you be?

12  A.  I'd be most likely off the -- well, either on or off the

13  floor, depending on how long the floor is.

14  Q.  Okay.  Either on or off the floor.

15  A.  Yep.

16  Q.  If we go back to the "Talk," Bates stamped AZSEN 0118,

17  12:53 p.m., 1:53 p.m. Phoenix time, Ms. Adams calls the main

18  line.  So you sent her a text -- two text messages, and four

19  minutes later she calls the main line.  Would you agree?

20  A.  I'm not aware of what the -- that's what it looks like.

21  Q.  Thank you.

22          You stated that you were going to meet with Ms. Adams

23  as it relates to the education request; is that right?

24  A.  When?

25  Q.  In November of 2014.

1    A.  Yes.

2    Q.  Okay.  And you also stated that Senator Hobbs had said,

3    "Hey, Jeff, you know Talonya's going to be reaching out to you

4    regarding this issue with Thunderbird, so be ready for that."

5    Is that correct?

6    A.  I was made aware that Senator Hobbs was aware of it.

7    Q.  Okay.  What do you mean by that?

8    A.  Well, your email could have come in first, but when I

9    contacted Senator Hobbs she was already aware of it, so...

10   Q.  Okay.  Very well.

11   A.  You had contacted Senator Hobbs prior.

12   Q.  And we had discussed it.  Senator Hobbs and I had discussed

13   the agreement?

14   A.  Uh-huh.

15        MS. ADAMS:  Your Honor, permission to publish

16   Exhibit 227.

17        THE COURT:  Is it in evidence?

18        MS. ADAMS:  Into evidence already.

19        THE COURT:  You may.

20        MS. ADAMS:  Thank you.

21   BY MS. ADAMS:

22   Q.  Do you recognize this document, Mr. Winkler?

23   A.  Yes.

24   Q.  Okay.  And this is the leave of absence request form; is

25   that correct?

JEFFREY WINKLER - CROSS-EXAMINATION

1    A.  Yes.

2    Q.  And do you know how it came to be that Ms. Adams and

3    Ms. Hobbs met to discuss this form?

4    A.  How they came to discuss this form?

5    Q.  Correct.  Yes.

6    A.  It would be after the request was denied, most likely.

7    Q.  Denied --

8    A.  Because this is generated from the staff level.

9    Q.  Okay.  When you say "generated from the staff level," what

10   do you mean?

11   A.  Well, leave requests don't go to the members.  They

12   would -- they would -- your leave request would come to me.

13   Q.  But you weren't chief of staff -- you hadn't been announced

14   chief of staff by November 18th, 2014, had you?

15   A.  Two days later.

16   Q.  Two days later, yeah.  So --

17   A.  So you may have given the leave request to Peter Silverman

18   or to Senator Hobbs.

19   Q.  Well, Patsy Osmon was the acting chief of staff; is that

20   correct?

21   A.  No.

22   Q.  Okay.  So on November 18, 2014, you were not the chief of

23   staff; is that correct?

24   A.  I don't believe.  I'm thinking that your root email was

25   probably the first day I was chief of staff, but I would defer

1    to Sandy Reilly --

2    Q.  Okay.

3    A.  -- who's got the start date.

4    Q.  Very good.  Okay.

5            And then you reviewed the request and then you said

6    the two of us met; is that right?

7    A.  You and I?  Yes.

8    Q.  Yes.  Okay.

9            And on what day did you say that we met?

10   A.  Well, you had requested on the 20th.  I would say we met on

11   that following Monday.

12   Q.  Do you have any documentation of that?

13   A.  No.

14   Q.  Okay.

15   A.  It would just be when you had come into the office.

16   Q.  Did you take any notes as it related to that?

17   A.  I took the information you gave me about the Thunderbird

18   program.

19   Q.  Okay.  And then what did you tell Ms. Adams as it relates

20   to the request?

21   A.  I said I would look into it.

22           MS. ADAMS:  Your Honor, permission to publish

23   Exhibit 224.

24           THE COURT:  Is it in evidence?

25           MS. ADAMS:  Already into evidence, Your Honor.

1          THE COURT:  You may.

2          MS. ADAMS:  Thank you.

3   BY MS. ADAMS:

4   Q.  Is this -- is this the information you're talking about,

5   Mr. Winkler?

6   A.  I should put these in numerical order.  Hold on.

7          No.

8   Q.  Regarding -- regarding Thunderbird?

9   A.  No.

10  Q.  No, okay.  What information are you talking about?

11  A.  What you -- what you shared with -- about the program.  So

12  the -- not the first page but the other pages.

13  Q.  Oh, I understand.

14         So as it relates to Exhibit 224, you mean the second

15  page, Bates stamped AZSEN 0059; is that right?

16  A.  Yes.

17  Q.  It's your testimony today that Ms. Adams sat down with you

18  and she brought this pamphlet to you and said, "Mr. Winkler, I

19  am requesting to leave the Senate during legislative session

20  for purposes of attending a Thunderbird field seminar"?

21  A.  Or something to that effect.

22  Q.  Okay.  Fair enough.

23         And then she showed you this document; right?

24  A.  Which document?

25  Q.  This document that's right before you on the screen.

1   Exhibit 224.

2   A.  Absent the -- yes.  Absent the -- not the agreement part,

3   but yes.

4   Q.  Okay.  The one Bates stamped AZSEN 0059?

5   A.  Yep.

6   Q.  Okay.  And do you see right here where it says, Second

7   term, Mr. Winkler?

8   A.  Yes.

9   Q.  And it says, Field seminar off campus.  Do you see that?

10  A.  Yes.

11  Q.  And it says, Choose between Southeast Asia --

12  A.  Sub-Saharan Africa, or South America.

13  Q.  Or South America, yeah.

14          And can you just read out loud what those dates are?

15  A.  February 23 to 28.

16  Q.  Is it February 20 -- is it and 28 or is it February 23rd

17  through the 28th?

18  A.  Through.

19  Q.  All right.  And if we turn the page to the first page,

20  there's a Thunderbird agreement signed by Ms. Adams and

21  Ms. Baldo; is that correct?

22  A.  Yes.

23  Q.  Okay.  And this agreement was part of this remaining

24  Thunderbird packet; is that correct?

25  A.  Not -- I received these two documents separately.

1    Q.   Okay.  Fair enough.

2         But the genesis of the agreement was the

3    Thunderbird --

4    A.   Yes.

5    Q.   -- program; correct?

6         Okay.  So when the Thunderbird program was signed, the

7    field seminar was the week of February 23rd; is that right?

8    A.   Correct.

9    Q.   And then Ms. Adams, did she speak with you about the merger

10   between ASU and Thunderbird?

11   A.   You did.

12   Q.   Okay.  And she told you Thunderbird was losing its

13   accreditation?

14   A.   It was being transferred to ASU.

15   Q.   The accreditation?

16   A.   Correct.

17   Q.   Okay.  And that there was a teach-out period, and the

18   opportunity for her to travel with a future cohort wouldn't

19   work because there was no future cohort?

20   A.   No.  That was never clearly -- it was never clearly -- the

21   nexus between the change in accreditation and why, when before

22   you could have attended the field seminar and then you couldn't

23   under the new regime, that was never made clear.  That was one

24   of the nexuses for offering to speak to the dean.

25   Q.   Okay.  Yeah.  How did you know to talk to the dean if it

1    wasn't clear?

2    A.  Well, to make it clear.  To find out what is the situation.

3    How can -- both Senator Hobbs and I, our goal was to try to

4    help you.  You know, assist to find an accommodation so you

5    could continue in your master's program.

6    Q.  Okay.  Thank you.

7    A.  And --

8    Q.  If we can go back here to Exhibit 227, Mr. Winkler.

9            This request here, is Ms. Adams asking to leave the

10   week of February 23rd?

11   A.  No.

12   Q.  Is she asking to leave as it relates to a Thunderbird field

13   seminar?

14   A.  Yes.

15   Q.  And it's a different date than the date that was on the

16   initial document; is that correct?

17   A.  Yes.

18   Q.  Okay.  So Ms. Adams didn't come to you and say, "I asked

19   Wendy Baldo if I could be gone February 23rd, and she said no.

20   How about March 2nd?"  Did she say that?

21   A.  No.

22   Q.  No.  And you denied the request; is that correct?

23   A.  Correct.

24   Q.  And then you denied the request on December 1st, 2014?

25   A.  Correct.

1   Q.  And the request was initiated or at least signed on

2   November 18, 2014; is that correct?

3   A.  Correct.

4   Q.  Okay.  And then it's your testimony today that Ms. Adams

5   then went back to Wendy Baldo -- strike that.

6          It is your testimony today that Ms. Adams then went to

7   Senator Hobbs and asked again if the Thunderbird request that

8   you had -- you denied on December 1st, 2014 --

9   A.  No.

10  Q.  -- could be approved?

11  A.  No.

12  Q.  She did not?

13  A.  So --

14  Q.  Yes or no?

15  A.  It's -- it's a convoluted question.  It's not a yes-or-no

16  answer.

17  Q.  No.  The question is, Mr. Winkler, your testimony,

18  Ms. Adams went to you, you said no.  And never being able to

19  accept no, Ms. Adams went to Senator Hobbs or sent her an email

20  and wanted to meet again.  Yes or no?

21          THE COURT:  What's your question?

22          THE WITNESS:  That's not a yes or no.

23          THE COURT:  I'm not sure --

24  BY MS. ADAMS:

25  Q.  The question is, after December 1st, 2015, did Ms. Adams go

1   to Wendy Baldo or Senator Hobbs to have any further

2   conversation, to your knowledge, about this Thunderbird

3   request?

4   A.  I met with you.  I met with Senator -- you had met with

5   Senator Hobbs.  I met with you.  I subsequently spoke to Wendy

6   Baldo and Senator Hobbs, and then subsequent to that, you and I

7   met with Senator Hobbs again.

8   Q.  On what day?

9   A.  After --

10  Q.  On what day?

11  A.  After I indicated to you that it was -- the resolution was

12  final and that the request was denied.

13  Q.  On what day did you do that?

14  A.  That would have happened the -- I'm not sure if that

15  happened before or after the 12/1.  I mean, that happened --

16  Q.  You denied it on 12/1; is that correct?

17  A.  Correct.

18  Q.  Okay.  So was it before or after 12/1?

19  A.  I could have signed the denial and then you requested

20  another meeting with Senator Hobbs.

21  Q.  Is that what happened?  Not "could have."  The question is,

22  did it?

23  A.  I don't -- I don't -- I don't see that it's relevant.  We

24  had another meeting with Senator Hobbs.

25  Q.  I think it's relevant when you're basing a termination --

1              THE COURT:  Whoa.  You two don't argue about what's

2    relevant.  If there's an objection, I'll rule on it.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Just ask the question, please.

5    BY MS. ADAMS:

6    Q.  The question is, is after December 1st, 2014, to the best

7    of your knowledge, did Ms. Adams have any further conversations

8    regarding the Thunderbird School of Global Management and this

9    request or any request as it relates to Thunderbird?

10   A.  What I'm saying is --

11             MS. ADAMS:  Your Honor, please ask this witness to

12   answer the question asked.

13             MR. MOBERLY:  I think he's trying to, Your Honor.

14             THE COURT:  I think he's trying.

15             Answer it the best you can.  Go ahead.

16             THE WITNESS:  The -- the signing -- signing this leave

17   request, 12/1/14, is that -- you're asking me, is that -- if

18   there was no further meeting after that?

19   BY MS. ADAMS:

20   Q.  Yes.

21   A.  The meeting with Senator Hobbs and you and I could well

22   have been.  So it could have been a matter of days after that.

23   So what I'm saying --

24   Q.  Don't know?

25   A.  What I'm saying is, the request was denied after I spoke to

JEFFREY WINKLER - CROSS-EXAMINATION

1  Senator Hobbs and Wendy Baldo.  And then you subsequently

2  requested a meeting with Senator Hobbs.

3  Q.  Regarding the denied request?

4  A.  Yes.

5  Q.  Okay.  Very good.

6       And then did Ms. Adams also subsequently request to

7  meet with Wendy Baldo?

8  A.  I believe so, yes.

9  Q.  Okay.  Do you know what day that was?

10  A.  I do not.

11  Q.  Do you know where the meeting occurred?

12  A.  I do not.

13  Q.  Why do you believe the meeting happened?

14  A.  Wendy -- we were keeping in contact.

15  Q.  Okay.  How were you keeping in contact with Ms. Baldo?

16  A.  Usually on the floor.

17  Q.  Okay.  So you talked to Ms. Baldo on the floor, and she

18  said, "You denied Ms. Adams' request, and she came back to me

19  again"?

20  A.  I believe so, yes.

21  Q.  Okay.  Fair enough.

22       And then you said Talonya was struggling with

23  election-related bills; is that right?

24  A.  Yes.

25  Q.  And so you wanted to send her to Mr. Fetherston, who had

1  staffed elections committee before; is that right?

2  A.  I offered Mr. Fetherston to help you, yes.

3  Q.  And was he the subject matter expert on election bills?

4  A.  He had staffed the committee the previous year.

5  Q.  Was he the subject matter on election bills, is the

6  question.

7  A.  To the extent that we have a subject matter expert in

8  the -- on the Senate Democratic Caucus staff, yes.

9  Q.  Why wasn't he staffing the election bills?

10  A.  Because as we -- as I previously explained and as we

11  discussed as a staff, we went from 12 to 16 committees, but we

12  also lost the elections committee.  And so there -- what we

13  discussed as a full staff was there is going to be some policy

14  crossover, bills going to different committees.

15          And this was -- elections was a perfect example of an

16  issue that had that issue happening.  Elections could have

17  gone --

18  Q.  Thank you.  Asked and answered.

19  A.  -- either to judiciary --

20  Q.  Asked and answered, sir.

21  A.  -- or government.

22  Q.  Thank you very much.  I think as it relates to Ms. Adams

23  abandoning her job -- right?  She didn't show up to work on

24  Monday, February 16th.  You said she abandoned her job.  What

25  did you mean by that?

1   A.  Well, primarily -- so the timing of the Friday emails and

2   then the Monday meeting that never happened, setting that

3   aside, what I was faced with Monday morning was talking to your

4   intern and finding out that no work had been performed the

5   previous week on these issues, that there was no written brief

6   even started on any of the three committees, including rural

7   affairs and environment, which had a member briefing scheduled

8   for Monday afternoon.

9        So that is really -- I mean, that's the -- we could

10  have -- we could have worked with any outcome absent the fact

11  that Monday morning there was nothing -- I mean, there was

12  nothing in the can.  There was nothing ready to go.

13  Q.  Thank you.

14       Mr. Winkler, you have a document in front of you.  It

15  has a -- it has a yellow tab.  I'm actually not sure what

16  exhibit it is, so it has your deposition testimony in it.

17  A.  29?

18  Q.  That sounds about right.  Can you open that up?

19  A.  Sure.

20  Q.  Are you familiar with this document?

21  A.  Yes.

22  Q.  You were deposed in this matter?

23  A.  Yes.

24       MS. ADAMS:  Okay.  Your Honor, permission to publish

25  to the jury.

1              THE COURT:  What, the entire deposition?

2              MS. ADAMS:  Page one oh- -- initially, page 102,

3    sections 1 through 12.

4              THE COURT:  Any objection?

5              MR. MOBERLY:  Is this being offered as impeachment?

6              THE COURT:  I'm not sure.

7              MS. ADAMS:  No, it's not.

8              MR. MOBERLY:  No objection.

9              THE COURT:  Okay.  You may.

10             MS. ADAMS:  Thank you.

11   BY MS. ADAMS:

12   Q.  Are you familiar with this, Mr. Winkler, this testimony?

13   A.  Yes.

14   Q.  Okay.  So you know Ms. Adams had -- her son had been

15   hospitalized?

16   A.  Or -- ER, yes.

17   Q.  Okay.  And you stated that she had called in on Monday and

18   that she would not be available for work-related matters?

19   A.  Correct.

20   Q.  Would it surprise you that then Ms. Adams would call in

21   four times to the Arizona State Senate?

22   A.  I don't know the nature of those calls, so one of them was

23   requested so -- well, two.  The morning one and then the 1:30

24   or 1:47 call would be a call that I had requested.

25   Q.  How do you know you had requested it?

```
 1   A.  I -- it could have been email, but I'm -- my recollection,
 2   if it -- if it was text, if it didn't show up on the text log,
 3   it could have been email.
 4   Q.  Okay.  Thank you very much.
 5            Can you take Exhibit 241, please?
 6            MS. ADAMS:  Your Honor, permission to publish
 7   Exhibit 241.  I believe it's been admitted.
 8            THE COURT:  All right.  You may publish it.
 9   BY MS. ADAMS:
10   Q.  Are you familiar with this document?
11   A.  Yes, I am.
12   Q.  What is the document?
13   A.  This is the -- your email to leadership on February 13th at
14   11:12.
15   Q.  Okay.  And then what's the response that you're cc'd on?
16   A.  From Senator Hobbs saying there will be no leadership team
17   meeting.  And please contact me if you have any further --
18   Q.  And by "me," who do you mean?
19   A.  That you -- Senator Hobbs was directing you to contact me
20   if you had any further issues.
21   Q.  Okay.  And what time is that meeting?  What time does that
22   happen at?
23   A.  That's at 6:04 p.m.
24   Q.  Okay.  And then can you take Exhibit 242 out of the folder.
25            MS. ADAMS:  Your Honor, permission to publish
```

1    Exhibit 242.

2              THE COURT:  You may.

3              THE COURTROOM DEPUTY:  242 is not in.

4              THE COURT:  Hang on a second.  It's not in evidence.

5              MS. ADAMS:  Your Honor, I would move to offer

6    Exhibit 242.

7              MR. MOBERLY:  Well, could we have some foundation for

8    it, Your Honor?

9              THE COURT:  What is it?

10             MS. ADAMS:  This is a --

11             THE COURT:  Okay.  If he's not stipulating its

12   admission, you need to lay the foundation through a witness.

13             MS. ADAMS:  Okay.  Yes.  Thank you.

14   BY MS. ADAMS:

15   Q.  Do you have the document, Mr. Winkler?

16   A.  I do.

17   Q.  Okay.  Do you recognize this document?

18   A.  This is Senator Hobbs to members of the leadership team.

19   Q.  Are you also included on that?

20   A.  I'm -- yes, I am.

21   Q.  Okay.  And you received this document on February 13th,

22   2015, at 6:12 p.m.?

23   A.  That looks right.

24             MS. ADAMS:  Okay.  Your Honor, permission to -- I move

25   to offer Exhibit 242 into evidence.

1              MR. MOBERLY:  No objection, Your Honor.

2              THE COURT:  Exhibit 242 is admitted.

3              (Exhibit No. 242 admitted into evidence.)

4              MS. ADAMS:  Your Honor, may I publish to the jury?

5              THE COURT:  You may.

6              MS. ADAMS:  Thank you.

7    BY MS. ADAMS:

8    Q.  Okay, Mr. Winkler.  You see this document; yes?

9    A.  Yes.

10   Q.  So at the bottom, Ms. Adams -- this is the infamous "Dear

11   Leadership" email that Ms. Adams had sent at 11:12 a.m. on

12   Friday, February 13th; correct?

13   A.  Right.

14   Q.  And then she had resent it because Senator McGuire hadn't

15   been on there.  And then Senator Hobbs sends it to the

16   leadership and yourself but not Ms. Adams; is that correct?

17   A.  That's correct.

18   Q.  And did she talk to you prior to sending this email?

19   A.  She did.

20   Q.  Okay.  And what was that conversation about?

21   A.  About whether it was appropriate to have a leadership team

22   meeting.

23   Q.  And what did you communicate?

24   A.  We talked about it, and neither one of us thought it was

25   the right thing to do.

1    Q.  Okay.

2    A.  This was a personnel -- it's a personnel matter.

3    Q.  Okay.  And so did you know Senator Hobbs was going to send

4    this email?

5    A.  I recall the email that was going to go to all of the

6    members, including you, but yes, I mean, I think that she would

7    also have -- we also would have agreed that she should reach

8    out to the leadership team.

9    Q.  Okay.  And she's telling the leadership team, "Do not

10   respond."  Right?

11   A.  That's correct, yes.

12   Q.  Okay.  Thank you.

13          MS. ADAMS:  Your Honor, permission to publish -- this

14   is I believe Exhibit 36.  It's also deposition testimony,

15   page 155, 16 through 23.

16          THE COURT:  Any objection?

17          MR. MOBERLY:  This is the witness's deposition

18   testimony?

19          MS. ADAMS:  Yes.  This is Mr. Winkler's deposition

20   testimony.

21          MR. MOBERLY:  No objection.

22          THE COURT:  Okay.  You may.

23   BY MS. ADAMS:

24   Q.  Mr. Winkler, you had testified that there was some

25   perspective you had as it related to the trust relationship

**JEFFREY WINKLER - CROSS-EXAMINATION**

1    between Ms. Hobbs and Ms. Adams breaking down; is that right?

2    A.  Yes.  Are you -- but I'm not finding -- is this Exhibit 29?

3    Q.  Maybe it's Exhibit 22.  It's the deposition testimony that

4    you just had.

5    A.  Is there only one folder of deposition testimony?

6    Q.  Correct.

7    A.  Then it's 29, okay.

8    Q.  Okay.  Thank you.  Exhibit 29.

9    A.  And what page are we on?

10   Q.  We're on page 155.

11   A.  Okay.

12   Q.  And do you see lines 16 through 23?

13   A.  Yes.

14   Q.  So question around whether or not --

15          MS. ADAMS:  Your Honor, permission to publish to the

16   jury.

17          THE COURT:  You may.

18          MS. ADAMS:  Thank you.

19   BY MS. ADAMS:

20   Q.  There was a question around whether or not you trusted

21   Ms. Adams; is that correct?

22   A.  Yes.

23   Q.  Okay.  And prior to that, there was a question around

24   whether you -- whether Senator Hobbs trusted Ms. Adams; is that

25   correct?

1    A.   Correct.

2    Q.   And when you were asked if you trust Ms. Adams, at the

3    time, what did you say?

4    A.   "No."

5    Q.   Okay.  And why?

6    A.   Well, first of all, I'd have to reference, what is "at the

7    time"?

8    Q.   I think "at the time" is --

9    A.   During the conversation in -- on February 20th?  That's --

10   Q.   Around, sure.  I think that's around the time --

11   A.   Friday, February the 20th?

12   Q.   -- when the decisions were being made.

13            Yes.

14   A.   Yes.

15   Q.   And you didn't trust Ms. Adams?

16   A.   No.

17   Q.   Why?

18   A.   The repeated lack of ability to follow very direct -- to

19   follow a directive that this matter is over and we're not

20   proceeding with it.  And then obviously, the Monday morning of

21   the 16th, where it turned out that there was absolutely no work

22   that had been performed or there was nothing in writing, and

23   nothing to the -- nothing to the knowledge of your intern --

24   Q.   Okay.

25   A.   -- had been --

1    Q.  Did you call Ms. Adams and ask her about her work the prior

2    week?

3    A.  It was our -- it was discussed in our -- I guess it's our

4    1:47 p.m. call on Monday, you and I.

5    Q.  Okay.

6    A.  Because by that time I was aware.

7    Q.  Sure.

8    A.  And at that time, you didn't say to me, yeah, I've got work

9    product that I can send you the brief right now.  It was, no,

10   there's no...

11   Q.  Okay.  And then you stated that there were

12   strike-everything amendments that Ms. Adams couldn't find; is

13   that correct?

14   A.  Correct.

15   Q.  You testified earlier that a strike-everything amendment is

16   where one bill is entirely gutted and brand-new language, maybe

17   even a different subject, is added into the bill; is that

18   correct?

19   A.  Correct.

20   Q.  When bills come out on a legislative agenda, they're just

21   bills; is that correct?

22   A.  Yes.

23   Q.  They're not a "strike everything"; is that correct?

24   A.  Well, you can't strike a bill that's on a committee agenda

25   unless the agenda is posted as a potential to be a "strike

1   everything."

2   Q.  Okay.  And so say there's --

3   A.  Strike-everything amendment may be offered is what it says

4   on the --

5   Q.  May be offered.  And when it --

6   A.  Right.

7          THE COURT:  Parties approach, please.

8          (At sidebar off the record.)

9   BY MS. ADAMS:

10  Q.  An agenda must be revised for there to be a "strike

11  everything"; is that correct?

12  A.  That is a good question.  Can you post the original agenda

13  with a strike-everything amendment?  I believe usually it's

14  revised.

15  Q.  Okay.  And so the agenda that was issued the week prior had

16  to have been revised for there to be a "strike everything" the

17  week of February 16th; is that correct?

18  A.  Yes.

19          MS. ADAMS:  No further questions.

20          THE COURT:  Redirect?

21          MR. MOBERLY:  No, Your Honor.  Thank you.

22          THE COURT:  All right.  You may step down.  Thank you

23  for coming.

24          (Further proceedings held on the record not

25  transcribed herein.)

1                    C E R T I F I C A T E

2

3        I, JENNIFER A. PANCRATZ, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7        I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12       DATED at Phoenix, Arizona, this 9th day of March,

13  2020.

14

15

16

                        s/Jennifer A. Pancratz_____ _____ ____
17                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25